No. 21-2835

# In the
# United States Court of Appeals
# for the Third Circuit

◆

**BRYAN DAVID RANGE,**

*Plaintiff-Appellant,*

v.

**ATTORNEY GENERAL UNITED STATES**, et al.,

*Defendants-Appellees.*

◆

Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court Civil Action No. 5:20-CV-03488-GEKP

◆

## BRIEF OF *AMICI CURIAE* FIREARMS POLICY COALITION AND FPC ACTION FOUNDATION IN SUPPORT OF APPELLANT AND REVERSAL

◆

JOSEPH G.S. GREENLEE
*Counsel of Record*
MATTHEW LAROSIERE
FIREARMS POLICY COALITION
1215 K Street, 17th Floor
Sacramento, CA 95814
(916) 378-5785
jgreenlee@fpclaw.org

Counsel for *Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *Amici Curiae* make the following statements:

**Firearms Policy Coalition** has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

**FPC Action Foundation** has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

/s/ *Joseph G.S. Greenlee*
Counsel for *Amici Curiae*

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF CONTENTS ...........................................................ii

TABLE OF AUTHORITIES................................................iv

STATEMENT OF *AMICI CURIAE* ......................................1

CONSENT TO FILE .................................................2

SUMMARY OF ARGUMENT ................................................2

ARGUMENT .................................................................3

   I.   For "presumptively lawful" regulations, this Court determines whether the historical justifications underlying the statute support a permanent prohibition on the challenger. ....................3

  II.  Historically, firearm prohibitions applied to dangerous persons. .4

     A.  In English tradition, arms prohibitions applied to disaffected and other dangerous persons. ....................................4

     B.  In colonial America, arms prohibitions applied to disaffected and other dangerous persons. ....................................9

     C.  At Constitution ratifying conventions, influential proposals called for disarming dangerous persons and protecting the rights of peaceable persons.......................................13

     D.  Prohibited persons could regain their rights in the founding era. ....................................................................17

     E.  Nineteenth-century bans applied to slaves and freedmen, while lesser restrictions focused on disaffected and dangerous persons. ...........................................................19

     F.  Most early twentieth-century bans applied to noncitizens, who were blamed for rising crime and social unrest.........................21

     G.  Early twentieth-century prohibitions on American citizens applied only to violent criminals—the few laws that applied to nonviolent criminals did not restrict long gun ownership........24

     H.  The historical tradition of disarming dangerous persons provides no justification for disarming Range. ..........................26

III. There is no historical justification for disarming "unvirtuous" citizens.................................................................27

IV. Laws sometimes expressly protected the arms of "unvirtuous" citizens.................................................................32

CONCLUSION .......................................................................33

CERTIFICATE OF COMPLIANCE.......................................35

CERTIFICATE OF SERVICE.................................................36

# TABLE OF AUTHORITIES

## Cases

*Binderup v. Attorney Gen. United States of Am.,*
  836 F.3d 336 (3d Cir. 2016) (en banc) ........................................ *passim*

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) .................................................. 3, 13, 19

*Folajtar v. Attorney Gen. United States of Am.,*
  980 F.3d 897 (3d Cir. 2020) ........................................... 12, 31

*Kanter v. Barr,*
  919 F.3d 437 (7th Cir. 2019) ............................................... 31

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) .......................................................... 3

*Medina v. Whitaker,*
  913 F.3d 152 (D.C. Cir. 2019) ............................................. 31

*Parman v. Lemmon,*
  244 P. 227 (Kan. 1925) ..................................................... 21

*Parman v. Lemmon,*
  244 P. 232 (Kan. 1926) ..................................................... 21

*Patsone v. Pennsylvania,*
  232 U.S. 138 (1914) ......................................................... 23

*People v. Nakamura,*
  99 Colo. 262 (1936) ......................................................... 24

*Poe v. Ullman,*
  367 U.S. 497 (1961) ........................................................... 5

*State v. Hogan,*
  63 Ohio St. 202 (1900) ...................................................... 20

*United States v. Barton,*
  633 F.3d 168 (3d Cir. 2011) ............................................. 4, 17

iv

*United States v. Bena*,
    664 F.3d 1180 (8th Cir. 2011) ............................................................ 30

*United States v. Booker*,
    644 F.3d 12 (1st Cir. 2011) ............................................................... 26

*United States v. Carpio-Leon*,
    701 F.3d 974 (4th Cir. 2012) .............................................................. 30

*United States v. Rene E.*,
    583 F.3d 8 (1st Cir. 2009) ................................................................. 29

*United States v. Vongxay*,
    594 F.3d 1111 (9th Cir. 2010) ..................................................... 29, 30

*United States v. Yancey*,
    621 F.3d 681 (7th Cir. 2010) .............................................................. 30

## Statutes and Regulations

1 Stat. 271 (1792) ...................................................................................... 33

1776 Mass. Gen. Laws 479 ....................................................................... 11

1776 Mass. Gen. Laws 484 ....................................................................... 18

1777 N.J. Laws 90, ch. 40 §20 ................................................................. 11

1786 Mass. Gen. Laws 265 ....................................................................... 32

18 U.S.C. §922(g)(1) .......................................................................... 22, 25

1804 Ind. Acts 108 .................................................................................... 19

1804 Miss. Laws 90 ................................................................................... 19

1806 Md. Laws 44 ..................................................................................... 19

1851 Ky. Acts 296 ..................................................................................... 19

1860–61 N.C. Sess. Laws 68 ..................................................................... 19

1863 Del. Laws 332 ......................................................................... 19

1878 N.H. Laws 612 ........................................................................ 19

1878 Vt. Laws 30, ch. 14 §3............................................................ 20

1879 R.I. Laws 110, ch. 806 §3...................................................... 20

1880 Mass. Gen. Laws 232.............................................................. 20

1880 Ohio Rev. St. 1654, ch. 8 §6995 ........................................... 20

1883 Kan. Sess. Laws 159 §1 ......................................................... 21

1897 Iowa Laws 1981, ch. 5 §5135................................................. 20

1909 Pa. Laws 466 §1 ...................................................................... 23

1915 N.D. Laws 225–26, ch. 161 §67 ............................................ 23

1915 N.J. Laws 662–63, ch. 355 §1 ............................................... 23

1917 Minn. Laws 839–40, ch. 500 §1 ............................................ 23

1917 Utah Laws 278......................................................................... 23

1919 Colo. Sess. Laws 416–17 §1 .................................................. 23

1921 Mich. Pub. Acts 21 §1 ............................................................ 23

1921 N.M. Laws 201–02, ch. 113 §1.............................................. 23

1923 Cal. Laws 696 ......................................................................... 25

1923 Conn. Acts 3732, ch. 259 §17................................................ 23

1923 N.D. Laws 380 ........................................................................ 24

1923 N.H. Laws 138 ........................................................................ 24

1925 Nev. Laws 54 .......................................................................... 25

1925 W.Va. Acts 31, ch. 3 §7 ......................................................... 23

1925 Wyo. Sess. Laws 110, ch. 106 §1 ...................................................23

1927 R.I. Pub. Laws 256 ...........................................................................25

1927 R.I. Pub. Laws 257 ...........................................................................25

1931 Cal. Laws 2316 ..................................................................................25

1931 Pa. Laws 497......................................................................................25

1933 Or. Laws 488......................................................................................25

2 Henry IV ch. 12 (1400–01) ....................................................................6

52 Stat. 1250 (1938) ..................................................................................26

7 William III ch. 5 (1695) .........................................................................7

75 Stat. 757 (1961) ....................................................................................26

## Other Authorities

A DIGEST OF THE STATUTE LAW OF THE STATE OF PENNSYLVANIA
FROM THE YEAR 1700 TO 1894 (12th ed. 1894) ......................................20

ACTS AND LAWS OF HIS MAJESTY'S PROVINCE OF NEW-HAMPSHIRE
IN NEW ENGLAND (1759)........................................................................17

ANCIENT LAWS AND INSTITUTES OF ENGLAND (Benjamin Thorpe
ed., 1840) .............................................................................................5

ANNOTATED STATUTES OF WISCONSIN, CONTAINING THE GENERAL
LAWS IN FORCE OCTOBER 1, 1889 (1889)...............................................20

ARCHIVES OF MARYLAND (William Hand Browne ed., 1894)...................33

Atkinson, Rick, THE BRITISH ARE COMING (2019) ..................................12

BLACK'S LAW DICTIONARY (6th ed. 1996) ...............................................15

Blackstone, William, 2 COMMENTARIES (Edward Christian ed.,
12th ed. 1794)......................................................................................22

CALENDAR OF STATE PAPERS, DOMESTIC SERIES, 1670 (1895) .................. 6

CALENDAR OF STATE PAPERS, DOMESTIC SERIES, OF THE REIGN OF
CHARLES II, 1660–1661 (1860) ............................................................ 6

CALENDAR OF STATE PAPERS, DOMESTIC SERIES, OF THE REIGN OF
CHARLES II, 1684–1685 (1938) ............................................................ 7

CALENDAR OF STATE PAPERS, DOMESTIC SERIES, OF THE REIGN OF
WILLIAM III, 1699–1700 (1937) ......................................................... 8

CALENDAR OF STATE PAPERS: DOMESTIC SERIES, OF THE REIGN OF
WILLIAM III, 1700–1702 (1937) ......................................................... 8

Cooley, Thomas M., A TREATISE ON CONSTITUTIONAL
LIMITATIONS (Boston, Little Brown & Co. 1868) ............................... 30

Cornell, Saul & DeDino, Nathan, *A Well Regulated Right: The
Early American Origins of Gun Control*, 73 FORDHAM L. REV.
487 (2004) ............................................................................... 28, 29, 30

Cornell, Saul, *"Don't Know Much about History": The Current
Crisis in Second Amendment Scholarship*, 29 N. KY. L. REV.
657 (2002) ............................................................................... 28, 29, 30

Dalton, Michael, THE COUNTREY JUSTICE (1690) ..................................... 5

*Editorial*, BOSTON INDEPENDENT CHRONICLE, Aug. 20, 1789 ................. 14

Elliot, Jonathan, THE DEBATES IN THE SEVERAL STATE CONVENTIONS
ON THE ADOPTION OF THE FEDERAL CONSTITUTION (2d ed. 1836) ......... 16

Gardiner, Robert, THE COMPLEAT CONSTABLE (3d ed. 1708) ................... 7

GENERAL STATUTES OF THE STATE OF KANSAS (1897) ............................ 21

Greenlee, Joseph G.S., *The Historical Justification for Prohibiting
Dangerous Persons from Possessing Arms*, 20 WYO L. REV. 249
(2020) ......................................................................................................... 31

Halbrook, Stephen P., THAT EVERY MAN BE ARMED (revised ed.
2013) ......................................................................................................... 14

Hancock, Harold B., THE LOYALISTS OF REVOLUTIONARY DELAWARE (1977) ........................................................................................ 12

Hening, William Waller, 3 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA (1820) ............................... 33

Hening, William Waller, 4 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA (1820) ............................... 33

Hening, William Waller, 7 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA (1820) ............................... 10

Hening, William Waller, 9 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA (1821) ............................... 11

Johnson, Nicholas, et al., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS AND POLICY (2d ed. 2017)............. 10

Johnson, Samuel, A DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 1773) ..................................................................................... 15

JOURNALS OF THE CONTINENTAL CONGRESS, 1774–1789 (1906) .............. 10

Kates, Jr., Don B., *The Second Amendment: A Dialogue*, 49 LAW & CONTEMP. PROBS. 143 (1986) ............................. 27, 28, 29, 30

LAWS AND ORDINANCES OF NEW NETHERLAND, 1638–1674 (1868) ........... 9

Malcolm, Joyce Lee, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO–AMERICAN RIGHT (1994) .................................................... 30, 31

Marshall, Kevin, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J.L. & PUB. POL'Y 695 (2009) ..................................................... 30

Noble, John, A FEW NOTES ON THE SHAYS REBELLION (1903) ................. 18

Pickering, Danby, THE STATUTES AT LARGE, FROM THE TWELFTH YEAR OF KING CHARLES II, TO THE LAST YEAR OF KING JAMES II (1763) ......... 7

PRIVATE AND SPECIAL STATUTES OF THE COMMONWEALTH OF MASSACHUSETTS FROM 1780–1805 (1805) ............................................ 18

Rawle, William, A VIEW OF THE CONSTITUTION OF THE UNITED STATES
OF AMERICA (2d ed. 1829) .................................................................. 22

Reynolds, Glenn Harlan, *A Critical Guide to the Second
Amendment*, 62 TENN. L. REV. 461 (1995) .............................. 28, 29, 30

Sawyer, Charles Winthrop, 1 FIREARMS IN AMERICAN HISTORY (1910) .... 5

Schwartz, Bernard, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY
(1971) ...................................................................................... 14, 16

Shalhope, Robert E., *The Armed Citizen in the Early Republic,*
49 LAW & CONTEMP. PROBS. 125 (1986) ............................................ 29

Sheridan, Thomas, A COMPLETE DICTIONARY OF THE ENGLISH
LANGUAGE (2d ed. 1789) .................................................................. 15

THE ACTS OF THE GENERAL ASSEMBLY OF THE COMMONWEALTH OF
PENNSYLVANIA (1782) ...................................................................... 12

*The Address and Reasons of Dissent of the Minority of the
Convention of Pennsylvania to their Constituents* ............................. 16

THE AMERICAN HISTORICAL REVIEW (1899) ...................................... 11, 17

THE HISTORY AND PROCEEDINGS OF THE HOUSE OF LORDS, FROM THE
RESTORATION IN 1660, TO THE PRESENT TIME (1742) ............................. 8

THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, PRIOR TO
THE UNION WITH NEW HAVEN COLONY, MAY 1665 (J. Hammond
Trumbull ed., 1850) ......................................................................... 33

THE STATE RECORDS OF NORTH CAROLINA (1905) .................................. 11

THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801 (1902) .. 11

Trenchard, J. & Moyle, W., *An Argument Shewing, That a Standing
Army Is Inconsistent with a Free Government, And Absolutely
Destructive to the Constitution of the English Monarchy* (1697) ........ 29

Tucker, St. George, 1 BLACKSTONE'S COMMENTARIES (1803) .................. 22

Webb, George, THE OFFICE OF AUTHORITY OF A JUSTICE OF PEACE
    (1736).................................................................................................9

Webster, Noah, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE
    (1828)...............................................................................................15

Yassky, David, *The Second Amendment: Structure, History, and
    Constitutional Change*, 99 MICH. L. REV. 588 (2000)....................28, 30

## STATEMENT OF *AMICI CURIAE*

**Firearms Policy Coalition (FPC)** is a nonprofit organization devoted to advancing individual liberty and defending constitutional rights. FPC accomplishes its mission through legislative and grassroots advocacy, legal and historical research, litigation, education, and outreach programs. FPC's legislative and grassroots advocacy programs promote constitutionally based public policy. Its historical research aims to discover the founders' intent and the Constitution's original meaning. And its legal research and advocacy aim to ensure that constitutional rights maintain their original scope.

**FPC Action Foundation (FPCAF)** is a nonprofit organization dedicated to preserving the rights and liberties protected by the Constitution. FPCAF focuses on research, education, and legal efforts to inform the public about the importance of constitutional rights—why they were enshrined in the Constitution and their continuing significance. FPCAF is determined to ensure that the freedoms guaranteed by the Constitution are secured for future generations.

## CONSENT TO FILE

All parties have consented to the filing of this brief.[1]

## SUMMARY OF ARGUMENT

To succeed in his as-applied challenge, Range must identify the traditional justifications for excluding individuals from Second Amendment protections, and then present facts that distinguish his circumstances from those who were historically barred.

Both English and American tradition support firearm prohibitions on dangerous persons—disaffected persons posing a threat to the government and persons with a proven proclivity for violence. This tradition of disarming dangerous persons has been practiced for centuries. It was reflected in the debates and proposed amendments from the Constitution ratifying conventions, and throughout American history.

There is no tradition of disarming peaceable citizens. Nor is there any tradition of limiting the Second Amendment to "virtuous" citizens.

---

[1] No counsel for a party authored this brief in any part. No party or counsel contributed money intended to fund its preparation or submission. No person other than *amici* and their members contributed money intended to fund its preparation or submission.

Historically, nonviolent criminals who demonstrated no violent propensity—such as someone who made a false statement to obtain food stamps assistance—retained their right to keep and bear arms. Indeed, several laws expressly allowed them to keep arms. Thus, Range is distinct from those who have historically been barred from keeping arms and he should retain his Second Amendment rights.

## ARGUMENT

## I.  For "presumptively lawful" regulations, this Court determines whether the historical justifications underlying the statute support a permanent prohibition on the challenger.

In *District of Columbia v. Heller*, the Supreme Court called "longstanding prohibitions on the possession of firearms by felons" "presumptively lawful" and promised "to expound upon the historical justifications for the exception[]" when the opportunity arises.[2] 554 U.S. 570, 626–27 & n.26 (2008); *see Binderup v. Attorney Gen. United States of Am.*, 836 F.3d 336, 343 (3d Cir. 2016) (en banc) (Hardiman, J., concurring) ("*Heller* catalogued a non-exhaustive list of 'presumptively

---

[2] The Court repeated these "longstanding regulatory measures" in *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010).

3

lawful regulatory measures' that have historically constrained the scope of the right.") (quoting *Heller*, 554 U.S. at 627 n.26).

Accordingly, to rebut the presumption and succeed in an as-applied challenge, "a challenger [must] clear two hurdles: he must (1) identify the traditional justifications for excluding from Second Amendment protections the class of which he appears to be a member, and then (2) present facts about himself and his background that distinguish his circumstances from those of persons in the historically barred class." *Id.* at 346–47 (Ambro, J., opinion) (quoting *United States v. Barton*, 633 F.3d 168, 173, 174 (3d Cir. 2011)).

## II. Historically, firearm prohibitions applied to dangerous persons.

There is no tradition in American history of banning peaceable citizens from owning firearms. The historical justification *Heller* relied on to declare felon bans "presumptively lawful" must have been the tradition of disarming dangerous persons.

### A. In English tradition, arms prohibitions applied to disaffected and other dangerous persons.

England's historical tradition cannot be directly applied to an interpretation of the Second Amendment, because the American colonists

developed their own distinct arms culture that reflected their heavy dependence on firearms for survival and sport. *See* 1 Charles Winthrop Sawyer, FIREARMS IN AMERICAN HISTORY 1 (1910) ("The Colonists in America were the greatest weapon-using people of that epoch in the world. Everywhere the gun was more abundant than the tool.").

Nevertheless, as an ancestor of American arms culture, English arms culture is useful for understanding the background of the American right. The "liberty of the individual" in America was secured with "regard to what history teaches are the traditions from which it developed as well as the traditions from which it broke." *Poe v. Ullman*, 367 U.S. 497, 542 (1961) (Harlan, J., dissenting).

One English tradition from which American tradition developed was that of disarming violent and dangerous persons. This tradition dates back to at least AD 602, when The Laws of King Aethelbirht made it unlawful to "furnish weapons to another where there is strife." ANCIENT LAWS AND INSTITUTES OF ENGLAND 3 (Benjamin Thorpe ed., 1840). By the seventeenth century, one's arms were confiscated for going armed "offensively" or committing an affray in the presence of a Justice of the Peace. Michael Dalton, THE COUNTRY JUSTICE 36, 37 (1690).

Most often, "dangerous persons" were disaffected persons disloyal to the current government, who might want to overthrow it—or political opponents defined as such. The precedent for disarming rebellious segments of the population was established during the Welsh Revolt from 1400 to 1415. 2 Henry IV ch. 12 (1400–01). Leading up to the Glorious Revolution of 1688, Whigs and nonAnglican Protestants were often disarmed.

In 1660, Lords Lieutenant were issued instructions for "disaffected persons [to be] watched and not allowed to assemble, and their arms seized." 1 CALENDAR OF STATE PAPERS, DOMESTIC SERIES, OF THE REIGN OF CHARLES II, 1660–1661, at 150 (1860). Additionally, King Charles II ordered the Lord Mayor and Commissioners for the Lieutenancy of London "to make strict search in the city and precincts for dangerous and disaffected persons, seize and secure them and their arms, and detain them in custody." 10 CALENDAR OF STATE PAPERS, DOMESTIC SERIES, 1670, at 237 (1895).

England's 1662 Militia Act empowered officials "to search for and seize all arms in the custody or possession of any person or persons" deemed "dangerous to the peace of the kingdom." 8 Danby Pickering, THE

STATUTES AT LARGE, FROM THE TWELFTH YEAR OF KING CHARLES II, TO THE LAST YEAR OF KING JAMES II 40 (1763).

That same year, Charles II ordered deputy lieutenants of Kent "to seize all arms found in the custody of disaffected persons in the lathe of Shepway, and disarm all factious and seditious spirits." 1 CALENDAR OF STATE PAPERS, DOMESTIC SERIES, OF THE REIGN OF CHARLES II, at 538.

Charles II then issued orders to eighteen lieutenants in 1684 to seize arms "from dangerous and disaffected persons." 27 CALENDAR OF STATE PAPERS, DOMESTIC SERIES, OF THE REIGN OF CHARLES II, 1684–1685, at 26–27, 83–85, 102 (1938).

James II succeeded Charles II in 1685, but was soon overthrown in the Glorious Revolution of 1688. At that point, "dangerous persons" often included Tories loyal to James II.

After Ireland rose in a Jacobite rebellion, a 1695 statute forbade the carrying and possession of arms and ammunition by Irish Catholics in Ireland. 7 William III ch. 5 (1695). In addition to distrusted "papists," a legal manual instructed constables to search for arms possessed by persons who are "dangerous." Robert Gardiner, THE COMPLEAT CONSTABLE 18 (3d ed. 1708).

King William III called in 1699 for the disarming of "great numbers of papists and other disaffected persons, who disown his Majesty's government." 5 CALENDAR OF STATE PAPERS, DOMESTIC SERIES, OF THE REIGN OF WILLIAM III, 1699–1700, at 79–80 (1937).

The following year, The House of Lords prayed that William III "would be pleased to order the seizing of all Horses and Arms of Papists, and other disaffected Persons, and have those ill Men removed from London according to Law." 2 THE HISTORY AND PROCEEDINGS OF THE HOUSE OF LORDS, FROM THE RESTORATION IN 1660, TO THE PRESENT TIME 20 (1742). In response, William III "assured them he would take Care to perform all that they had desired of him." *Id.*

Then in 1701, William III "charge[d] all lieutenants and deputy-lieutenants, within the several counties of [England] and Wales, that they cause search to be made for arms in the possession of any persons whom they judge dangerous." 6 CALENDAR OF STATE PAPERS: DOMESTIC SERIES, OF THE REIGN OF WILLIAM III, 1700–1702, at 234 (1937) (second brackets in original).

Disarmament actions in English tradition focused on dangerous persons—violent persons and disaffected persons perceived as

threatening to the crown.

**B. In colonial America, arms prohibitions applied to disaffected and other dangerous persons.**

Similar to England, disarmament laws in colonial America were designed to keep weapons away from those perceived as posing a dangerous threat. Such laws were often discriminatory and overbroad—and thus unconstitutional by the later-enacted Second Amendment—but they were always intended to prevent danger. *See, e.g.*, LAWS AND ORDINANCES OF NEW NETHERLAND, 1638–1674, at 234–35 (1868) (1656 New York law "forbid[ing] the admission of any Indians with a gun ... into any Houses" "to prevent such dangers of isolated murders and assassinations").

Inspired by England's Statute of Northampton, some American laws forbade carrying arms in an aggressive and terrifying manner. A 1736 Virginia law authorized constables to "take away Arms from such who ride, or go, offensively armed, in Terror of the People" and bring the person and their arms before a Justice of the Peace. George Webb, THE OFFICE OF AUTHORITY OF A JUSTICE OF PEACE 92–93 (1736).

During wars with Catholic France, special laws against Catholics were enacted in Maryland (with a large Catholic population), and next-door

Virginia. For example, during the French & Indian War (1754–63), Virginia required Catholics to take an oath of allegiance; if they refused, they were disarmed. 7 William Waller Hening, THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA 35–37 (1820). An exception was made for "such necessary weapons as shall be allowed to him, by order of the justices of the peace at their court, for the defence of his house or person." *Id.* at 36.

The American Revolution began on April 19, 1775, when Redcoats marched to Lexington and Concord to confiscate guns and gunpowder. Armed Americans resisted this attempt at confiscation. *See* Nicholas Johnson et al., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS AND POLICY 262–64 (2d ed. 2017). As in any war, each side attempted to reduce the arms in the hands of the other side.

In 1776, in response to General Arthur Lee's plea for emergency military measures, the Continental Congress recommended that colonies disarm persons "who are notoriously disaffected to the cause of America, or who have not associated, and shall refuse to associate, to defend, by arms, these United Colonies." 1 JOURNALS OF THE CONTINENTAL CONGRESS, 1774–1789, at 283–85 (1906).

10

Massachusetts acted to disarm persons "notoriously disaffected to the cause of America … and to apply the arms taken from such persons … to the arming of the continental troops." 1776 Mass. Laws 479, ch. 21. Pennsylvania enacted similar laws in 1776 and 1777. 8 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 559–60 (1902); 9 *id.* at 110–14.

More narrowly, Connecticut disarmed persons criminally convicted of libeling or defaming acts of the Continental Congress; convicts also lost the rights to vote, hold office, and serve in the military. 4 THE AMERICAN HISTORICAL REVIEW 282 (1899).

In 1777, New Jersey empowered its Council of Safety "to deprive and take from such Persons as they shall judge disaffected and dangerous to the present Government, all the Arms, Accoutrements, and Ammunition which they own or possess." 1777 N.J. Laws 90, ch. 40 §20.

That same year, North Carolina stripped "all Persons failing or refusing to take the Oath of Allegiance" of citizenship rights. Those "permitted ... to remain in the State" could "not keep Guns or other Arms within his or their house." 24 THE STATE RECORDS OF NORTH CAROLINA 89 (1905). Virginia did the same. 9 Hening, at 282.

Pennsylvania in 1779 determined that "it is very improper and dangerous that persons disaffected to the liberty and independence of this state shall possess or have in their own keeping, or elsewhere, any firearms," so it "empowered [militia officers] to disarm any person or persons who shall not have taken any oath or affirmation of allegiance to this or any other state." THE ACTS OF THE GENERAL ASSEMBLY OF THE COMMONWEALTH OF PENNSYLVANIA 193 (1782).

In *Folajtar v. Attorney Gen. United States of Am.*, the majority concluded that the disarming of disaffected persons proved that some colonies "did not require violence or dangerousness for disarmament." 980 F.3d 897, 908 (3d Cir. 2020). On the contrary, disaffected persons posed a grave danger and were often violent. *See, e.g.*, Harold B. Hancock, THE LOYALISTS OF REVOLUTIONARY DELAWARE 4 (1977) ("At various times Whigs and Tories confronted one another in insurrections" in Delaware, resulting in "occasional deaths"); *id.* at 5 ("Insurrections were common" for Tories on Maryland's eastern shore); Rick Atkinson, THE BRITISH ARE COMING 119 (2019) (Virginia's royal governor "boasted that three thousand [loyalists] joined his ranks" after a November 1775 victory); 180 ("southern governors had been given authority to raise loyalist troops");

253 (a brigadier general reporting that continental troops "ha[d] most happily terminated a very dangerous insurrection" in North Carolina in February 1776); 309 ("Civil liberties for loyalists had become [a] rare commodity" because "Congress had resolved that anyone in America who professed allegiance to King George was 'guilty of treason'"); 320 (Newark resident worrying that "our wives & children [are] unprotected … from … the Tories … in the midst of us"); 366 (August 1776 battle in which "loyalist volunteers" fought the patriots).

Like the English, and out of similar concerns of violent insurrections, the colonists disarmed those who might rebel against them. The Revolutionary War precedents support the constitutionality of disarming persons intending to use arms to impose foreign rule on the United States.

## C. At Constitution ratifying conventions, influential proposals called for disarming dangerous persons and protecting the rights of peaceable persons.

"Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634–35. *Heller* thus concluded with "our adoption of the original understanding of the Second Amendment." *Id.* at 625. The ratifying

conventions are therefore instructive in interpreting the ultimately codified right.

Samuel Adams opposed ratification without a declaration of rights. Adams proposed at Massachusetts's convention an amendment guaranteeing that "the said constitution be never construed ... to prevent the people of the United States who are peaceable citizens, from keeping their own arms." 2 Bernard Schwartz, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 675 (1971). Adams's proposal was celebrated by his supporters as ultimately becoming the Second Amendment. *See* BOSTON INDEPENDENT CHRONICLE, Aug. 20, 1789, at 2, col. 2 (calling for the paper to republish Adams's proposed amendments alongside Madison's proposed Bill of Rights, "in order that they may be compared together," to show that "every one of [Adams's] intended alterations but one [i.e., proscription of standing armies]" were adopted); Stephen Halbrook, THAT EVERY MAN BE ARMED 86 (revised ed. 2013) ("[T]he Second Amendment ... originated in part from Samuel Adams's proposal ... that Congress could not disarm any peaceable citizens.").

In the founding era, "peaceable" meant the same as today: nonviolent. Being "peaceable" is not the same as being "law-abiding," because the law

may be broken nonviolently. Samuel Johnson's dictionary defined "peaceable" as "1. Free from war; free from tumult. 2. Quiet; undisturbed. 3. Not violent; not bloody. 4. Not quarrelsome; not turbulent." 2 Samuel Johnson, A DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 1773). Thomas Sheridan defined "peaceable" as "Free from war, free from tumult; quiet, undisturbed; not quarrelsome, not turbulent." Thomas Sheridan, A COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE 438 (2d ed. 1789). According to Noah Webster, "peaceable" meant "Not violent, bloody or unnatural." 2 Noah Webster, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (unpaginated). *Cf.* BLACK'S LAW DICTIONARY (6th ed. 1996) (defining "peaceable" as "Free from the character of force, violence, or trespass."). *Heller* relied on Johnson, Sheridan, and Webster in defining the Second Amendment's text.[3]

New Hampshire proposed a declaration of rights that allowed the disarmament of only violent insurgents: "Congress shall never disarm any citizen, unless such as are or have been in actual rebellion." 1

---

[3] For Johnson, *see Heller*, 554 U.S. at 581 ("arms"), 582 ("keep"), 584 ("bear"), 597 ("regulate"). For Sheridan, *see id.* at 584 ("bear"). For Webster, *see id.* at 581 ("arms"), 582 ("keep"), 584 ("bear"), 595 ("militia").

Jonathan Elliot, THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 326 (2d ed. 1836).

After Pennsylvania's ratifying convention, the Anti-Federalist minority—which opposed ratification without a declaration of rights—proposed the following right to bear arms:

> That the people have a right to bear arms for the defence of themselves and their own state, or the United States, or for the purpose of killing game, and no law shall be passed for disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals.

*The Address and Reasons of Dissent of the Minority of the Convention of Pennsylvania to their Constituents*, *in* 2 Schwartz, at 665. While the "crimes committed" language is not expressly limited to violent crimes, it is unlikely that the Pennsylvania Dissent wanted permanent disarmament for every imaginable offense; the context of "real danger of public injury" continues the tradition of disarming the dangerous, including by inferences drawn from criminal convictions.

"[T]he 'debates from the Pennsylvania, Massachusetts and New Hampshire ratifying conventions, which were considered "highly influential" by the Supreme Court in *Heller* ... confirm that the common law right to keep and bear arms did not extend to those who were likely

to commit violent offenses.'" *Binderup*, 836 F.3d at 368 (Hardiman, J., concurring) (quoting *United States v. Barton*, 633 F.3d 168, 174 (3d Cir. 2011)) (brackets omitted). "Hence, the best evidence we have indicates that the right to keep and bear arms was understood to exclude those who presented a danger to the public." *Id.*

### D. Prohibited persons could regain their rights in the founding era.

Offenders in the founding era could often regain their rights upon providing securities (a financial promise, like a bond) of peaceable behavior. For example, individuals "who shall go armed offensively" in 1759 New Hampshire were imprisoned "until he or she find such surities of the peace and good behavior." ACTS AND LAWS OF HIS MAJESTY'S PROVINCE OF NEW-HAMPSHIRE IN NEW ENGLAND 2 (1759).

Some states had procedures for restoring a person's right to arms. Connecticut's 1775 wartime law disarmed an "inimical" person only "until such time as he could prove his friendliness to the liberal cause." 4 THE AMERICAN HISTORICAL REVIEW, at 282. Massachusetts's 1776 law provided that "persons who may have been heretofore disarmed by any of the committees of correspondence, inspection or safety" may "receive their arms again … by the order of such committee or the general court."

1776 Mass. Laws 484. When the danger abated, the arms disability was lifted.

In Shays's Rebellion, armed bands in 1786 Massachusetts attacked courthouses, the federal arsenal in Springfield, and other government properties, leading to a military confrontation with the Massachusetts militia on February 2, 1787. *See generally* John Noble, A FEW NOTES ON THE SHAYS REBELLION (1903). After the rebellion was defeated, Massachusetts gave a partial pardon to persons "who have been, or may be guilty of treason, or giving aid or support to the present rebellion." 1 PRIVATE AND SPECIAL STATUTES OF THE COMMONWEALTH OF MASSACHUSETTS FROM 1780–1805, at 145 (1805). Rather than being executed for treason, many of the Shaysites temporarily were deprived of many civil rights, including a three-year prohibition on bearing arms. *Id.* at 146–47.

While the Shaysites who had perpetrated the capital offense of treason had their arms rights restored after three years, nonviolent misdemeanants today, including Range, are prohibited from possessing arms for life.

18

### E. Nineteenth-century bans applied to slaves and freedmen, while lesser restrictions focused on disaffected and dangerous persons.

*Heller* looked to nineteenth-century experiences only for help "understanding [] the origins and continuing significance of the Amendment." 554 U.S. at 614.

Nineteenth-century prohibitions on arms possession were mostly discriminatory bans on slaves and freedmen.[4] Another targeted group starting in the latter half of the century were "tramps"—typically defined as males begging for charity outside their home county. Tramping was not a homebound activity, so any beggar could still keep arms at home.

New Hampshire in 1878 imprisoned any tramp who "shall be found carrying any fire-arm or other dangerous weapon, or shall threaten to do any injury to any person, or to the real or personal estate of another." 1878 N.H. Laws 612, ch. 270 §2. The following year, Pennsylvania prohibited tramps from carrying a weapon "with intent unlawfully to do injury or intimidate any other person." 1 A DIGEST OF THE STATUTE LAW

---

[4] *See, e.g.*, 1804 Miss. Laws 90; 1804 Ind. Acts 108; 1806 Md. Laws 44; 1851 Ky. Acts 296; 1860–61 N.C. Sess. Laws 68; 1863 Del. Laws 332.

OF THE STATE OF PENNSYLVANIA FROM THE YEAR 1700 TO 1894, at 541 (12th ed. 1894).

Vermont, Rhode Island, Ohio, Massachusetts, Wisconsin, and Iowa enacted similar laws. 1878 VT. LAWS 30, ch. 14 §3; 1879 R.I. Laws 110, ch. 806 §3; 1880 Ohio Rev. St. 1654, ch. 8 §6995; 1880 Mass. Laws 232, ch. 257 §4; 1 ANNOTATED STATUTES OF WISCONSIN, CONTAINING THE GENERAL LAWS IN FORCE OCTOBER 1, 1889, at 940 (1889); 1897 Iowa Laws 1981, ch. 5 §5135.

Ohio's Supreme Court determined that the tramping disarmament law was constitutional because it applied to "vicious persons":

> The constitutional right to bear arms is intended to guaranty to the people, in support of just government, such right, and to afford the citizen means for defense of self and property. While this secures to him a right of which he cannot be deprived, it enjoins a duty in execution of which that right is to be exercised. If he employs those arms which he ought to wield for the safety and protection of his country, his person, and his property, to the annoyance and terror and danger of its citizens, his acts find no vindication in the bill of rights. That guaranty was never intended as a warrant for vicious persons to carry weapons with which to terrorize others.

*State v. Hogan*, 63 Ohio St. 202, 218–19 (1900).

Two Kansas restrictions are also relevant. In 1868, Kansas prohibited "[a]ny person who is not engaged in any legitimate business, any person

under the influence of intoxicating drink, and any person who has ever

borne arms against the government of the United States" from publicly

carrying "any pistol, bowie-knife, dirk, or other deadly weapon." 2

GENERAL STATUTES OF THE STATE OF KANSAS 353 (1897).

Fifteen years later, Kansas prohibited the transfer of "any pistol,

revolver or toy pistol ... or any dirk, bowie-knife, brass knuckles, slung

shot, or other dangerous weapons ... to any person of notoriously unsound

mind." 1883 Kan. Sess. Laws 159 §1.

The Kansas Supreme Court held that "other deadly weapons" did not

include long guns. *Parman v. Lemmon*, 244 P. 232 (Kan. 1926).[5] Thus,

Kansas's laws did not prohibit anyone from *possessing* any arms, nor did

they apply to long guns.

## F. Most early twentieth-century bans applied to noncitizens, who were blamed for rising crime and social unrest.

The twentieth century is well beyond the historical sources cited in

*Heller*. *See Heller*, 554 U.S. at 614 ("Since those [post-Civil War]

discussions took place 75 years after the ratification of the Second

---

[5] After initially holding that shotguns (and therefore all firearms) were included based on the rule of *ejusdem generis*, *Parman v. Lemmon*, 244 P. 227 (Kan. 1925), the court reversed itself on rehearing, *id.* at 232.

Amendment, they do not provide as much insight into its original meaning as earlier sources."). Nonetheless, it is noteworthy that disarmament practices in that era continued to focus on dangerous, potentially violent persons. And no previous law was as burdensome as the modern-day ban in 18 U.S.C. §922(g)(1).

Early in the century, increasing immigration from Southern and Eastern Europe was blamed for increasing crime and social unrest. Several states enacted firearm restrictions on noncitizens. Johnson, at 501.

Because the wild game of a state belongs to the people of that state, some states used game laws as a backhanded basis to partially disarm noncitizens.[6] Pennsylvania prohibited noncitizens from possessing rifles or shotguns—the arms most useful for hunting. Noncitizens were still allowed to possess handguns—which were less suited for hunting but

---

[6] England had similarly used game laws to disarm segments of the population. *See* 1 St. George Tucker, BLACKSTONE'S COMMENTARIES, App. 300 (1803) ("In England, the people have been disarmed, generally, under the specious pretext of preserving the game"); William Rawle, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 121–23 (2d ed. 1829) ("An arbitrary code for the preservation of game in that country has long disgraced them."). *But see* 2 William Blackstone, COMMENTARIES 412 n.2 (Edward Christian ed., 12th ed. 1794) ("[E]veryone is at liberty to keep or carry a gun, if he does not use it for the destruction of game.").

well-suited for self-defense. 1909 Pa. Laws 466 §1. Four states followed Pennsylvania's model. 1915 N.D. Laws 225–26, ch. 161 §67; 1915 N.J. Laws 662–63, ch. 355 §1; 1921 N.M. Laws 201–02, ch. 113 §1; 1923 Conn. Acts 3732, ch. 259 §17.

Pennsylvania's law was upheld in *Patsone v. Pennsylvania*, 232 U.S. 138 (1914). Justice Holmes wrote that the Supreme Court should defer to the judgment of the Pennsylvania legislature; even though many people poached, the legislature could decide "that resident unnaturalized aliens were the peculiar source of the evil." *Id.* at 144. Moreover, "[t]he prohibition does not extend to weapons such as pistols that may be supposed to be needed occasionally for self-defense." *Id.* at 143.

Some states barred ownership of all firearms by noncitizens. Utah forbade "any unnaturalized foreign born person ... to own or have in his possession, or under his control, a shot gun, rifle, pistol, or any fire arm of any make." 1917 Utah Laws 278. Five states followed this model. 1917 Minn. Laws 839–40, ch. 500 §1; 1919 Colo. Sess. Laws 416–17 §1; 1921 Mich. Pub. Acts 21 §1; 1925 Wyo. Sess. Laws 110, ch. 106 §1; 1925 W.Va. Acts 31, ch. 3 §7.

*People v. Nakamura* held Colorado's alien disarmament statute unconstitutional under Colorado's constitution. 99 Colo. 262 (1936). The Colorado Supreme Court conceded that aliens could be prevented from hunting. But they could not be barred from bearing arms "in defense of home, person, and property." *Id.* at 264. The 1876 Colorado Convention had mostly copied Missouri's 1875 constitutional arms right, which was then the strongest in the nation. But Colorado went further, changing Missouri's right of the "citizen" to Colorado's right of the "person."

### G. Early twentieth-century prohibitions on American citizens applied only to violent criminals—the few laws that applied to nonviolent criminals did not restrict long gun ownership.

The alcohol Prohibition era was violent. States began prohibiting some convicted felons from possessing handguns, which are the guns most often used in crime. *See Heller*, 554 U.S. at 682 (Breyer, J., dissenting) (Handguns "are the overwhelmingly favorite weapon of armed criminals."). A 1923 New Hampshire law provided, "[n]o unnaturalized foreign-born person and no person who has been convicted of a felony against the person or property of another shall own or have in his possession or under his control a pistol or revolver...." 1923 N.H. Laws 138, ch. 118 §3. Four states followed. 1923 N.D. Laws 380, ch. 266 §5;

1923 Cal. Laws 696, ch. 339 §2; 1925 Nev. Laws 54, ch. 47 §2; 1931 Cal. Laws 2316, ch. 1098 §2 (Extending prohibition to persons "addicted to the use of any narcotic drug."); 1933 Or. Laws 488.

Pennsylvania, in 1931, banned persons convicted of "a crime of violence" from possessing most handguns and short versions of long guns. 1931 Pa. Laws 497–98, ch. 158, §§1–4 (Pistol or revolver "with a barrel less than twelve inches, any shotgun with a barrel less than twenty-four inches, or any rifle with a barrel less than fifteen inches.").

The only law that applied to citizens and prohibited the keeping of all firearms was Rhode Island's from 1927. It applied to persons convicted of "a crime of violence." 1927 R.I. Pub. Laws 257 §3. "Crime of violence" meant "any of the following crimes or any attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering." 1927 R.I. Pub. Laws 256 §1.

18 U.S.C. §922(g)(1) itself was originally intended to keep firearms out of the hands of violent persons. "Indeed, the current federal felony firearm ban differs considerably from the version of the proscription in force just half a century ago. Enacted in its earliest incarnation as the

Federal Firearms Act of 1938, the law initially covered those convicted of a limited set of violent crimes such as murder, rape, kidnapping, and burglary, but extended to both felons and misdemeanants convicted of qualifying offenses." *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011) (citing Federal Firearms Act, ch. 850, §§1(6), 2(f), 52 Stat. 1250, 1250–51 (1938)). "The law was expanded to encompass all individuals convicted of a felony (and to omit misdemeanants from its scope) several decades later, in 1961." *Id.* (citing An Act to Strengthen the Federal Firearms Act, Pub.L. No. 87–342, §2, 75 Stat. 757, 757 (1961)).

## H. The historical tradition of disarming dangerous persons provides no justification for disarming Range.

*Heller* promised a "historical justification" for bans on felons. 554 U.S. at 635. There is a historical justification for bans on violent felons. Violent and dangerous persons have historically been banned from keeping arms in several contexts—specifically, persons guilty of committing violent crimes, persons expected to take up arms against the government, persons with violent tendencies, and those of presently unsound mind. "The most cogent principle that can be drawn from traditional limitations on the right to keep and bear arms is that dangerous persons likely to use firearms for illicit purposes were not understood to be protected by

26

the Second Amendment." *Binderup*, 836 F.3d at 357 (Hardiman, J., concurring).

There is no historical justification for completely and forever disarming peaceable citizens like Range.

## III. There is no historical justification for disarming "unvirtuous" citizens.

Some scholars and courts have embraced a theory that the right protected only "virtuous" citizens in the founding era. The following sources demonstrate how the theory developed despite lacking historical foundation.

- Don Kates, *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 266 (1983). For support that "[f]elons simply did not fall within the benefits of the common law right to possess arms," Kates cited the ratifying convention proposals discussed above.

- Don Kates, *The Second Amendment: A Dialogue*, LAW & CONTEMP. PROBS. 143, 146 (1986). For support that "the right to arms does not preclude laws disarming the unvirtuous citizens (i.e., criminals)," *id.* at 146, Kates cited his previous article.

- Glenn Reynolds, *A Critical Guide to the Second Amendment*, 62 TENN. L. REV. 461, 480 (1995). For support that "felons, children, and the insane were excluded from the right to arms," Reynolds quoted Kates's *Dialogue* article.

- Saul Cornell, *"Don't Know Much about History": The Current Crisis in Second Amendment Scholarship*, 29 N. KY. L. REV. 657, 679 (2002). For support that the "right was not something that all persons could claim, but was limited to those members of the polity who were deemed capable of exercising it in a virtuous manner," Cornell cited a Pennsylvania prohibition on disaffected persons.

- David Yassky, *The Second Amendment: Structure, History, and Constitutional Change*, 99 MICH. L. REV. 588, 626–27 (2000). Yassky contended that "[t]he average citizen whom the Founders wished to see armed was a man of republican virtue," *id.* at 626, but provided no example of the right being limited to such men.

- Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 491–92 (2004). The authors said, "the Second Amendment

was strongly connected to … the notion of civic virtue," *id.* at 492, but did not show that unvirtuous citizens were excluded from the right.

- *United States v. Rene E.*, 583 F.3d 8, 15 (1st Cir. 2009). In addition to Reynolds, Cornell, and the Dissent of the Minority of Pennsylvania, the court cited Robert Shalhope, *The Armed Citizen in the Early Republic,* 49 LAW & CONTEMP. PROBS. 125, 130 (1986), providing a quote to show that in "the view of late-seventeenth century republicanism … [t]he right to arms was to be limited to virtuous citizens only. Arms were 'never lodg'd in the hand of any who had not an Interest in preserving the publick Peace.'" This quote—referring to dangerous persons—was about the ancient "Israelites, Athenians, Corinthians, Achaians, Lacedemonians, Thebans, Samnites, and Romans." J. Trenchard & W. Moyle, *An Argument Shewing, That a Standing Army Is Inconsistent with a Free Government, And Absolutely Destructive to the Constitution of the English Monarchy* 7 (1697).

- *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010). *Vongxay* cited Kates's *Dialogue* and Reynolds.

- *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010).
  *Yancey* cited *Vongxay*, Reynolds, and Kates, then Thomas Cooley
  "explaining that constitutions protect rights for 'the People'
  excluding, among others, 'the idiot, the lunatic, and the felon.'"
  *Id.* at 685 (citing Thomas Cooley, A TREATISE ON CONSTITUTIONAL
  LIMITATIONS 29 (1868)). "The . . . discussion in Cooley, however,
  concerns classes excluded from voting. These included women
  and the property-less—both being citizens and protected by arms
  rights." Kevin Marshall, *Why Can't Martha Stewart Have a
  Gun?*, 32 HARV. J.L. & PUB. POL'Y 695, 709–10 (2009).

- *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011). *Bena*
  cited Kates's *Dialogue* article.

- *United States v. Carpio-Leon*, 701 F.3d 974, 979–80 (4th Cir.
  2012). *Carpio-Leon* cited *Yancey*, *Vongxay*, Reynolds, Kates,
  Yassky, Cornell, Cornell and DeDino, the ratifying conventions,
  and noted the English tradition of "disarm[ing] those …
  considered disloyal or dangerous." *Id.* The court also cited Joyce
  Lee Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN
  ANGLO–AMERICAN RIGHT 140–41 (1994), discussing how "Indians

and black slaves ... were barred from owning firearms." *Id.* at 140. Discriminatory bans on noncitizens, however, say little about unvirtuous citizens.

- *Binderup*, 836 F.3d at 348–49 (Ambro, J., opinion). Judge Ambro's opinion cited each of the above sources.

- *Medina v. Whitaker*, 913 F.3d 152, 158–59 (D.C. Cir. 2019). The court cited the Dissent of the Minority of Pennsylvania, Reynolds, Cornell and DeDino, *Carpio-Leon*, *Yancey*, *Vongxay*, *Binderup*, *Rene E.*, and referenced Massachusetts and Pennsylvania prohibitions on disaffected persons.

None of these sources provided any founding-era law disarming "unvirtuous" citizens—or anyone, for that matter, who was not perceived as dangerous.[7]

---

[7] For a more thorough refutation of the virtuous citizen test, *see Kanter v. Barr*, 919 F.3d 437, 462–64 (7th Cir. 2019) (Barrett, J., dissenting); *Folajtar*, 980 F.3d at 915–20 (Bibas, J., dissenting); Joseph Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO L. REV. 249, 275–83 (2020).

## IV. Laws sometimes expressly protected the arms of "unvirtuous" citizens.

In American history and tradition, "unvirtuous" citizens were not disarmed. Rather, they were sometimes expressly allowed to maintain their arms.

For example, in 1786 Massachusetts, if the tax collector stole the money he collected, the sheriff could sell the collector's estate to recover the stolen funds. If the sheriff stole the money from the collector's estate sale, the sheriff's estate could be sold to recover the amount he stole. If an estate sale did not cover the stolen amount, the deficient collector or sheriff would be imprisoned. In the estate sales, the necessities of life— including firearms—could not be sold:

> [I]n no case whatever, any distress shall be made or taken from any person, of his *arms* or household utensils, necessary for upholding life; nor of tools or implements necessary for his trade or occupation, beasts of the plough necessary for the cultivation of his improved land; nor of bedding or apparel necessary for him and his family; any law, usage, or custom to the contrary notwithstanding.

1786 Mass. Laws 265 (emphasis added).

This law existed when Samuel Adams proposed his amendment at the Massachusetts ratifying convention. Even citizens who had been

convicted of stealing tax money, imprisoned, and had nearly all their belongings confiscated retained their arms rights.

Laws exempting arms from civil action recoveries existed since at least 1650. Connecticut's 1650 law allowed officers, upon "execution of Civill Actions.… to breake open the dore of any howse, chest or place" where goods liable to execution were, except that "it shall not bee lawfull for [an] officer to [levy] any mans … armes" or any other implements "which are for the necessary upholding of his life." THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, PRIOR TO THE UNION WITH NEW HAVEN COLONY, MAY 1665, at 537 (J. Hammond Trumbull ed., 1850).

The federal Uniform Militia Act in 1792 exempted militia arms "from all suits, distresses, executions or sales, for debt or for the payment of taxes." 1 Stat. 271, §1 (1792). Maryland and Virginia had similar exemptions. 13 ARCHIVES OF MARYLAND 557 (William Hand Browne ed., 1894) (1692 Maryland); 3 Hening, at 339 (1705 Virginia); 4 *id.* at 121 (1723 Virginia).

## CONCLUSION

The decision below should be reversed, and the ban should be held unconstitutional as applied to Range.

Respectfully submitted,

/s/ *Joseph G.S. Greenlee*
JOSEPH G.S. GREENLEE
  *Counsel of Record*
MATTHEW LAROSIERE
FIREARMS POLICY COALITION
1215 K Street, 17th Floor
Sacramento, CA 95814
(916) 378-5785
jgreenlee@fpclaw.org

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 6,369 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point, proportionately spaced Century Schoolbook font.

I certify that the text of the electronic brief and the hard copies of the brief are identical.

I certify that the PDF was scanned with Windows Defender Antivirus version 1.295.1532.0, and according to the program, the document is virus free.

I certify that I am admitted to practice in the Third Circuit Court of Appeals, and that I am a member in good standing.

Dated this 27th day of December 2021.

/s/ *Joseph G.S. Greenlee*
*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on December 27, 2021, I served the foregoing brief via the CM/ECF system for the United States Court of Appeals for the Third Circuit, which will distribute the brief to all attorneys of record in this case. No privacy redactions were necessary.

Dated this 27th day of December 2021.

/s/ *Joseph G.S. Greenlee*
*Counsel for Amici Curiae*