PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 21-2835

_____

BRYAN DAVID RANGE,

Appellant

v.

ATTORNEY GENERAL UNITED
STATES OF AMERICA; REGINA LOMBARDO,
Acting Director, Bureau of Alcohol, Tobacco, Firearms
and Explosives

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D. C. No. 5-20-cv-03488)
District Judge:  Honorable Gene E.K. Pratter

_____

Argued on September 19, 2022

Before: SHWARTZ, KRAUSE and ROTH, <u>Circuit Judges</u>

(Opinion filed November 16, 2022)

Michael P. Gottlieb        **(ARGUED)**
Vangrossi & Recchuiti
319 Swede Street
Norristown, PA 19401

Counsel for Appellant

Kevin B. Soter        **(ARGUED)**
Mark B. Stern
United States Department of Justice
Civil Division, Room 7222
950 Pennsylvania Avenue, NW
Washington, DC 20530

Counsel for Appellee

Joseph G.S. Greenlee        **(ARGUED)**
Firearms Policy Coalition Action
5550 Painted Mirage Road
Suite 320
Las Vegas, NV 89149

Counsel for Amicus Appellant

---

OPINION

---

*Per Curiam*[*]

In *District of Columbia v. Heller*, the Supreme Court held that "the right of the people to keep and bear Arms," enshrined in the Second Amendment, is an individual right. 554 U.S. 570, 595 (2008). While the precise contours of that individual right are still being defined, the Court has repeatedly stated that it did not question the "longstanding prohibition[] on the possession of firearms by felons." *Id.* at 626.

Appellant Bryan Range falls in that category, having pleaded guilty to the felony-equivalent charge of welfare fraud under 62 Pa. Cons. Stat. § 481(a). He now brings an as-applied challenge to 18 U.S.C. § 922(g)(1), contending that his disarmament is inconsistent with the text and history of the Second Amendment and is therefore unconstitutional under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). We disagree. Based on history and tradition, we conclude that "the people" constitutionally entitled to bear arms are the "law-abiding, responsible citizens" of the polity, *id.* at 2131, a category that properly excludes those who have demonstrated disregard for the rule of law through the commission of felony and felony-equivalent offenses, whether or not those crimes are violent. Additionally, we conclude that even if Range falls within "the people," the Government has met its burden to demonstrate that its prohibition is consistent with historical tradition. Accordingly, because Range's felony-equivalent conviction places him outside the class of people traditionally entitled to Second Amendment rights, and

---

[*] We issue this precedential opinion *per curiam* to reflect both its unanimity and the highly collaborative nature of its preparation.

because the Government has shown the at-issue prohibition is consistent with historical tradition, we will affirm the District Court's summary judgment in favor of the Government.

## I.  Factual and Procedural Background

In 1995, Range pleaded guilty to making false statements about his income to obtain $2,458 of food stamp assistance in violation of 62 Pa. Cons. Stat. § 481(a), a conviction that was then classified as a misdemeanor punishable by up to five years' imprisonment.[1]  Range was sentenced to three years' probation, $2,458 in restitution, $288.29 in costs, and a $100 fine.  He has paid the fine, costs, and restitution.

Congress has deemed it "unlawful for any person . . . who has been convicted in any court, of a crime punishable by imprisonment for a term exceeding one year"—the definition of a felony under both federal law, 18 U.S.C. § 3156(a)(3), and traditional legal principles, *see Felony*, Black's Law Dictionary (11th ed. 2019)—to "possess in or affecting commerce, any firearm or ammunition."[2]   18   U.S.C.

---

[1] In 2018, Pennsylvania amended § 481(b) so that welfare fraud involving "$1,000 or more" in fraudulently obtained assistance became a "[f]elony of the third degree."  62 Pa. Cons. Stat. § 481(b) (2018).  However, the parties agree that the offense's categorization at the time of Range's guilty plea controls for purposes of our analysis.

[2] Congress exercised its discretion to exclude certain categories of offenses from this ban, such as "antitrust violations, unfair trade practices, restraints of trade, or other similar offenses[.]" 18 U.S.C. § 921(a)(20)(A).

§ 922(g)(1). In deference to state legislatures, Congress also raised the bar for "any State offense classified by the laws of the State as a misdemeanor" by excluding from the prohibition those misdemeanors "punishable by a term of imprisonment of two years or less." *Id.* § 921(a)(20)(B).[3] Put differently, it treated state misdemeanors punishable by more than two years' imprisonment as felony-equivalent offenses. As the maximum punishment for Range's offense was five years' imprisonment, his conviction subjected him to § 922(g)(1).

Three years after his conviction, Range attempted to purchase a firearm but was "rejected by the instant background check system." App. 46, 68, 203. Range's wife subsequently bought him a deer-hunting rifle, and when that rifle was destroyed in a house fire, she bought him another.[4] Sometime in 2010 or 2011, believing his first rejection was an error, Range again attempted to purchase a firearm. Again, he was rejected by the instant background check system. Several years after this rejection, Range "researched the matter" and learned that he was barred from purchasing and possessing firearms because of his welfare fraud conviction. App. 46, 205–06. Having "realize[d] that [he] was not allowed to

---

[3] For ease of reference, we use the term "felony-equivalent" to refer to these misdemeanors. We do not address whether individuals convicted of misdemeanors carrying lesser punishments can be disarmed consistent with the Second Amendment.

[4] A shotgun that Range's father had given him as a teenager was also destroyed in the fire. After his father died in 2008, Range came into possession of his father's pistol, but gave it away within a month.

possess a firearm," he sold his deer hunting rifle to a firearms dealer.  App. 201.

Range has hunted regularly for at least twenty years, most frequently using a bow or a muzzleloader.  During the years that he possessed a deer hunting rifle, he routinely hunted with it on the first morning and the two Saturdays of each two-week season.  He maintained a Pennsylvania hunting license at the time he filed his lawsuit and averred in deposition testimony that if not barred by § 922(g)(1), he would "for sure" purchase another hunting rifle and "maybe a shotgun" for self-defense in his own home.  App. 46, 184, 197, 198, 200–02, 210.

In 2020, Range filed suit in the Eastern District of Pennsylvania, seeking a declaratory judgment that § 922(g) violates the Second Amendment as applied to him, as well as an injunction to bar its enforcement against him.  Both Range and the Government moved for summary judgment.  The District Court applied the two-step test that this Court adopted in *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) and amplified in *Binderup v. Attorney General*, 836 F.3d 336 (3d Cir. 2016) (en banc), which asks whether (1) a regulation burdens conduct protected by the right to keep and bear arms, and (2) if so, whether that regulation survives means-end scrutiny, *id.* at 346 (quoting *Marzzarella*, 614 F.3d at 89).  Applying *Binderup*, the District Court concluded that Range's challenge failed at step one because the Second Amendment does not protect "unvirtuous citizens," including any person convicted of "a serious offense," *id.* at 349, and Range's offense qualified as serious under the factors we had identified.

The District Court therefore granted the Government's motion for summary judgment, and this appeal followed.

While Range's appeal was pending, the Supreme Court issued *Bruen*, rejecting the means-end component of the second step of *Marzzarella* and *Binderup* and holding the first step was "broadly consistent with *Heller*" to the extent it focused on "the Second Amendment's text, as informed by history." 142 S. Ct. at 2127. The Government filed a letter pursuant to Federal Rule of Appellate Procedure 28(j), contending that Range's Second Amendment challenge still must fail under *Bruen*'s framework. Range responded with his own Rule 28(j) letter, underscoring *Bruen*'s emphasis on history and asserting "there is no history in 1791 that given the facts of Mr. Range's case that he would be disarmed and prevented from owning and possessing firearms." Dkt. No. 41 at 2. The panel ordered supplemental briefing on (1) *Bruen*'s impact, if any, on the multifactor analysis developed in *Binderup* and *Holloway v. Attorney General*, 948 F.3d 164 (3d Cir. 2020); (2) whether *Bruen* shifts the burden to the Government to prove that the challenger is outside the scope of those entitled to Second Amendment rights, and whether the Government has met that burden here; and (3) whether we should remand this matter to the District Court.[5]

---

[5] The relevant factual record has been fully developed, and the appeal raises "purely legal questions upon which an appellate court exercises plenary review," *Comite' De Apoyo A Los Trabajadores Agricolas v. Perez*, 774 F.3d 173, 187 (3d Cir. 2014) (quoting *Hudson United Bank v. LiTenda Mortg. Corp.*, 142 F.3d 151, 159 (3d Cir. 1998)), so we can apply *Bruen* and resolve this matter without remand, *see Hudson*, 142 F.3d at 159.

In supplemental briefing on the effect of *Bruen*, Range argues that the history and tradition of the Second Amendment demonstrates that only individuals with a dangerous propensity for violence, as opposed to peaceful citizens like him, can be disarmed. *Amici* filed a brief on Range's behalf, echoing his contention that "[t]he historical tradition of disarming dangerous persons provides no justification for disarming Range." Amicus Br. 26. The Government urges us to reject a narrow focus on dangerousness, reaffirm our holdings in *Binderup* and subsequent cases that the Second Amendment extends only to people considered "virtuous citizens," and therefore hold that there is a longstanding tradition of disarming citizens who are not law-abiding.

With the benefit of *Bruen*, cases applying *Bruen*,[6] and the parties' briefing and arguments, we turn to the merits of Range's appeal.

## II.    Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. § 1331.  We have appellate jurisdiction under 28 U.S.C. § 1291.  We review the District Court's order granting summary judgment *de novo, see Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 418 (3d Cir. 2013), viewing the facts and making all reasonable inferences in the non-movant's favor, *see Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 266–67 (3d Cir. 2005).  Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party is entitled to judgment as a matter of law when the non-moving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof."[7]  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## III.    *Bruen*'s Doctrinal Impact

Applying *Bruen*'s historical focus, we conclude § 922(g)(1) comports with legislatures' longstanding authority and discretion to disarm citizens unwilling to obey the government and its laws, whether or not they had demonstrated a propensity for violence.  We proceed in two parts.  We begin by explaining how the Supreme Court replaced our two-step framework with a distinct test focused on the text and history of the Second Amendment.  Next, we examine disarmament laws from the seventeenth to the nineteenth centuries to

---

[6] Although we appear to be the first Court of Appeals to address the constitutionality of 18 U.S.C. § 922(g)(1) since the Supreme Court decided *Bruen*, a number of district courts have done so. *See United States v. Young*, No. 22-CR-54, 2022 WL 16829260, at *11 (W.D. Pa. Nov. 7, 2022); *United States v. Minter*, No. 22-CR-135, 2022 WL 10662252, at *6–7 (M.D. Pa. Oct. 18, 2022); *United States v. Trinidad*, No. 21-CR-398, 2022 WL 10067519, at *3 (D.P.R. Oct. 17, 2022); *United States v. Raheem*, No. 20-CR-61, 2022 WL 10177684, at *3 (W.D. Ky. Oct. 17, 2022); *United States v. Carrero*, No. 22-CR-30, 2022 WL 9348792, at *3 (D. Utah Oct. 14, 2022); *United States v. Riley*, No. 22-CR-163, 2022 WL 7610264, at *10, *13 (E.D. Va. Oct. 13, 2022); *United States v. Price*, No. 22-CR-97, 2022 WL 6968457, at *9 (S.D.W. Va. Oct. 12, 2022); *United States v. Daniels*, No. 3-CR-83, 2022 WL 5027574, at *4 (W.D.N.C. Oct. 4, 2022); *United States v. Charles*, No. 22-CR-154, 2022 WL 4913900, at *11 (W.D. Tex. Oct. 3, 2022); *United States v. Siddoway*, No. 21-CR-205, 2022 WL 4482739, at *2 (D. Idaho Sept. 27, 2022); *United States v. Collette*, No. 22-CR-141, 2022 WL 4476790, at *8 (W.D. Tex. Sept. 25, 2022); *United States v. Coombes*, No. 22-CR-189, 2022 WL 4367056, at *8, *11 (N.D. Okla. Sept. 21, 2022); *United States v. Hill*, No. 21-CR-107, 2022 WL 4361917, at *3 (S.D. Cal. Sept. 20, 2022); *see also United States v. Ridgeway*, No. 22-CR-175, 2022 WL 10198823, *2 (S.D. Cal. Oct. 17, 2022); *United States v. Cockerham*, No. 21-CR-6, 2022 WL 4229314, at *2 (S.D. Miss. Sept. 13, 2022); *United States v. Jackson*, No. CR 21-51, 2022 WL 4226229, at *3 (D. Minn. Sept. 13, 2022); *United States v. Burrell*, No. 21-20395, 2022 WL 4096865, at *3 (E.D. Mich. Sept. 7, 2022);

determine whether Range's disarmament fits within the nation's history and tradition of the right to keep and bear arms.

---

*United States v. Ingram*, No. 18-CR-557, 2022 WL 3691350, at *3 (D.S.C. Aug. 25, 2022).

[7] While Range's standing to bring this claim was not challenged by Government nor discussed by the District Court, "we have 'an independent duty to satisfy ourselves of our jurisdiction . . . .'" *Bedrosian v. IRS*, 912 F.3d 144, 149 (3d Cir. 2018) (quoting *Papotto v. Hartford Life & Acc. Ins. Co.*, 731 F.3d 265, 269 (3d Cir. 2013)). The party invoking federal jurisdiction must establish the three elements forming "the irreducible constitutional minimum of standing": injury in fact, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "When an individual is subject to [threatened enforcement of a law], an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Here, Range met his burden by showing that the Government's prohibition twice thwarted him from purchasing a firearm and by averring that he would purchase a hunting rifle but for § 922(g)(1). *See Parker v. District of Columbia,* 478 F.3d 370, 376 (D.C. Cir. 2007) ("The formal process of application and denial, however routine, makes the injury to [the petitioner's] alleged constitutional interest concrete and particular."), *aff'd sub nom. District of Columbia v. Heller*, 554 U.S. 570 (2008); *Dearth v. Holder*, 641 F.3d 499, 503 (D.C. Cir. 2011) (affirming that the petitioner suffered a cognizable injury where "the federal regulatory scheme thwarts his continuing desire to purchase a firearm").

### A.    Post-*Bruen* Standard for Second Amendment Challenges

The Supreme Court's decision in *Bruen* modifies our prior test for analyzing Second Amendment challenges to 18 U.S.C. § 922(g)(1).

Before *Bruen*, we analyzed Second Amendment challenges under a two-part test that was eventually adopted by most of our sister Circuits. *Marzzarella*, 614 F.3d at 89; *see also Binderup*, 836 F.3d at 346 ("Nearly every court of appeals has cited *Marzzarella* favorably."). At the first step, we considered whether the challenged law burdened conduct within the scope of the Second Amendment. *Marzzarella*, 614 F.3d at 89. In examining this subject, we observed that "the right to bear arms was tied to the concept of a virtuous citizenry and that accordingly, the government could disarm 'unvirtuous citizens[,]" including "any person who has committed a serious

criminal offense, violent or nonviolent."[8]  *Binderup*, 836 F.3d at 348 (quoting *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010)); *see also Heller*, 554 U.S. at 626–27 & n.26. If the first step was met, we proceeded to the second step and assessed whether the regulation withstood means-end scrutiny. *Marzzarella*, 614 F.3d at 89.

*Bruen*, however, abrogated *Binderup*'s two-step inquiry and directed the federal courts, in a single step, to look to the Second Amendment's text and "the Nation's historical tradition of firearm regulation."  142 S. Ct. at 2126, 2130; *see also Frein v. Pa. State Police*, 47 F.4th 247, 254, 256 (3d Cir. 2022) (recognizing *Bruen* abrogated our two-step

---

[8] On that point, Judge Ambro's three-judge plurality in *Binderup* was joined by the seven judges who signed onto Judge Fuentes's partial concurrence and partial dissent.  *See Binderup*, 836 F.3d at 348–49; *id*. at 387, 389–90 (Fuentes, J., concurring in part).  Judge Hardiman, joined by four other judges, concurred in part and concurred in the judgment.  *Id.* at 357 (Hardiman, J., concurring in part).  Judge Hardiman reasoned that under "traditional limitations on the right to keep and bear arms" legislatures could disarm only individuals with a "demonstrated proclivity for violence."  *Id.*; *see also Folajtar v. Att'y Gen.*, 980 F.3d 897, 912 (3d Cir. 2020) (Bibas, J., dissenting) (stating that "the historical limits on the Second Amendment" permitted legislatures to disarm felons "only if they are dangerous"), *cert. denied sub nom. Folajtar v. Garland*, 141 S. Ct. 2511 (2021).

framework).[9]  "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, 142 S. Ct. at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)). Additionally, because "the Constitution presumptively protects [individual] conduct" covered by "the Second Amendment's plain text," the Court explained, the government has the burden of justifying its regulation of that conduct by demonstrating "not simply [] that the regulation promotes an important

---

[9] Given *Bruen*'s focus on history and tradition, *Binderup*'s multifactored seriousness inquiry no longer applies.  In the context of a challenge based upon the challenger's status post-*Binderup*, *Bruen* requires consideration of whether there is a historical foundation for governmental restrictions on firearms possession based on the challenger's specific status.  If that status changes, then the law would no longer apply to that person.  Thus, there is still room for "as-applied" challenges even after *Bruen*.

interest," but that "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*[10]

Under *Bruen*, the question is whether the regulation at issue is "relevantly similar" to regulations at the Founding. *Id.* at 2132 (quoting Cass R. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)). To make that determination, we must employ "analogical reasoning" and compare "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33. Specifically, the government must "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133. "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

*Bruen* does not preclude our review of Range's appeal on the record before us. *Bruen* did not address the substantive issues that we must now determine. Unlike the open-carry licensing regime in *Bruen* that created a conduct-based constraint on public carry, § 922(g)(1) imposes a status-based restriction—namely, a possession ban on those convicted of crimes punishable by more than one year in prison or by more

---

[10] In *Binderup*, we had imposed the burden at step one on the challenger, rather than on the government, 836 F.3d at 347, but after *Bruen,* we note that the government must now meet this burden in the district court, *see* 142 S. Ct. at 2126 (citing *United States v. Boyd*, 999 F.3d 171, 185 (3d Cir. 2021)). Because *Bruen* came down after the Government made its case in the District Court, we look to its filings in the District Court as well as its supplemental briefs on *Bruen*'s impact to find that it has met its burden.

than two years in prison in the case of state law misdemeanors. *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1443 (2009) (distinguishing between "what," "who," "where," "how," and "when" firearm restrictions). Despite that difference, *Bruen* still requires us to assess whether the Government has demonstrated through relevant historical analogues that § 922(g)(1) "is consistent with this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2134. As set forth below, the historical record shows that legislatures had broad discretion to prohibit those who did not respect the law from having firearms. Our assessment confirms that individuals like Range, who commit felonies and felony-equivalent offenses, are not part of "the people" whom the Second Amendment protects. Therefore, § 922(g)(1) as applied to Range is constitutional under the Second Amendment.

**B.    Scope of Second Amendment Rights in Historical Perspective**

As instructed by *Bruen*, we begin our analysis with the text of the Second Amendment, which protects "the right of the people to keep and bear Arms," U.S. Const. amend. II, and consider if Range, as a felon equivalent under 18 U.S.C. § 921(a)(20)(B), is among those protected by the Amendment. *Cf. Binderup*, 836 F.3d at 357 (Hardiman, J., concurring in part) ("[T]he Founders understood that not everyone possessed Second Amendment rights. These appeals require us to decide who count among 'the people' entitled to keep and bear arms."); *United States v. Quiroz*, No. 22-CR-00104, 2022 WL 4352482, at *10 (W.D. Tex. Sept. 19, 2022) (explaining "this

16

Nation does have a historical tradition of excluding specific groups from the rights and powers reserved to 'the people'").

The language of *Bruen* provides three insights into pertinent limits on "the people" whom the Second Amendment protects. First, the majority characterized the holders of Second Amendment rights as "law-abiding" citizens no fewer than fourteen times. *Bruen*, 142 S. Ct. at 2122, 2125, 2131, 2133–34, 2135 n.8, 2138 & n.9, 2150, 2156; *accord Heller*, 554 U.S. at 625, 635. These included its holding that the New York statute "violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms," *Bruen*, 142 S. Ct. at 2156, its explanation that the Second Amendment "'elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense," *id.* at 2131 (quoting *Heller*, 554 U.S. at 635), and its instruction to identify historical analogues to modern firearm regulations by assessing "how and why the regulations burden a law-abiding citizen's right to armed self-defense," *id.* at 2133.[11]  The Court

---

[11]  *See also Bruen* 142 S. Ct. at 2122 ("[T]he Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense."); *id.* ("[O]rdinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense."); *id.* at 2125 (explaining petitioners were "law-abiding, adult citizens"); *id.* at 2133 (describing New York's argument that "sensitive places where the government may lawfully disarm law-abiding citizens include all places where people typically congregate" (quotations omitted)); *id.* at 2134 (reiterating that petitioners are "two ordinary, law-abiding,

also quoted nineteenth-century sources extending the right to keep and bear arms to "all loyal and well-disposed inhabitants," and disarming any person who made "an improper *or* dangerous use of weapons." *Id.* at 2152 (emphasis added) (quoting Cong. Globe, 39th Cong., 1st Sess., at 908–909; and Circular No. 5, Freedmen's Bureau, Dec. 22, 1865).

Second, the Court clarified that, despite the infirmity of New York's discretionary may-issue permitting regime, "nothing in our analysis should be interpreted to suggest the

---

adult citizens"); *id.* at 2135 n.8 ("[I]n light of the text of the Second Amendment, along with the Nation's history of firearm regulation, we conclude below that a State may not prevent law-abiding citizens from publicly carrying handguns because they have not demonstrated a special need for self-defense."); *id.* at 2138 ("Nor is there any such historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense."); *id.* at 2138 n.9 (noting shall-issue public carry licensing laws "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry" but rather "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens" (quotation omitted)); *id.* at 2150 (observing "none [of the historical regulations surveyed] operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose"); *id.* at 2156 ("Nor, subject to a few late-in-time outliers, have American governments required law-abiding, responsible citizens to demonstrate a special need for self-protection distinguishable from that of the general community in order to carry arms in public." (quotations omitted)).

unconstitutionality of the 43 States' 'shall-issue' licensing regimes . . . [,] which often require applicants to undergo a [criminal] background check" and "are designed to ensure only that those bearing arms in the jurisdiction are, in fact 'law-abiding, responsible citizens.'" *Id.* at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). These criminal background checks that the Court indicated are constitutional are not limited to violent offenses; shall-issue statutes typically disqualify any person "prohibited from possessing a firearm under federal law." Wash. Rev. Code Ann. § 9.41.070(1)(a) (2021); *accord* Colo. Rev. Stat. Ann. § 18-12-203(1)(c) (2021); Kan. Stat. Ann. § 75-7c04(a)(2) (2021); Miss. Code. Ann. § 45-9-101(2)(d) (2022); N.H. Rev. Stat. Ann. § 159:6(I)(a) (2021); N.C. Gen. Stat. Ann. § 14-415.12(b)(1) (2022).

Third, neither *Bruen* nor either of the Court's earlier explanations of the individual right to keep and bear arms casts doubt on § 922(g)(1). To the contrary, Justice Scalia's majority opinion in *Heller* twice described "prohibitions on the possession of firearms by felons" as both "longstanding" and

"presumptively lawful[.]" 554 U.S. 626–27 & n.26.[12] Writing for the *McDonald* plurality, Justice Alito "repeat[ed] those assurances." 561 U.S. at 786. In *Bruen*, Justice Thomas's majority opinion acknowledged that the right to keep and bear arms is "subject to certain reasonable, well-defined restrictions," *Bruen*, 142 S. Ct. at 2156 (citing *Heller*, 554 U.S. at 581), and the concurrences by Justices Alito and Kavanaugh, the latter joined by the Chief Justice, echoed the Court's assertions in *Heller* and *McDonald. Id.* at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626–27 & n.26); *id.* at 2157 (Alito, J., concurring); *see also United States v. Coombes*, No. 22-CR-00189, 2022 WL 4367056, at *9 (N.D. Okla. Sept. 21, 2022) ("[T]he *Bruen* majority did not abrogate its prior statements in *Heller* and *McDonald*.").

Thus, although the Supreme Court has not provided an "exhaustive historical analysis . . . of the full scope of the Second Amendment," *Bruen,* 142 S. Ct. at 2128; *Heller*, 554 U.S. at 626, *Heller*, *McDonald*, and *Bruen* provide a window

---

[12] We note that Congress enacted the federal felon-in-possession statute in 1938 and extended it to non-violent offenses in 1961. *See United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011); *cf. Freedom from Religion Found., Inc. v. County of Lehigh*, 933 F.3d 275, 283 (3d Cir. 2019) (describing a 75-year-old religious symbol as part of "our Nation's public tradition" and therefore "entitled . . . to a 'strong presumption of constitutionality'" under the First Amendment (quoting *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2085 (2019))). As explained below, however, the history and tradition of disarming those who have committed offenses demonstrating disrespect for the rule of law dates back to at least the seventeenth century.

into the Court's view of the status-based disarmament of criminals: that this group falls outside "the people"—whether or not their crimes involved violence—and that § 922(g)(1) is well-rooted in the nation's history and tradition of firearm regulation.[13]

Our Court's own review of the historical record supports the Supreme Court's understanding:  Those whose criminal records evince disrespect for the law are outside the community of law-abiding citizens entitled to keep and bear arms.[14]  Our previous decisions, endorsed by several sister courts of appeals, have expressed a related view in terms of the

---

[13] It remains the case, of course, that the executive branch also has authority to impose firearms-related directives and regulations consistent with the history and tradition, *e.g.*, in the form of executive orders or through ATF or local executive agencies.

[14] By no means do we suggest that legislatures have carte blanche to disarm anyone who commits any crime.  Rather, we decide only that the disarmament of individuals convicted of felony and felony-equivalent offenses comports with the Second Amendment.

theory of "civic virtue."[15] *See, e.g.*, *Folajtar v. Att'y Gen.*, 980 F.3d 897, 902 (3d Cir. 2020); *Binderup*, 836 F.3d at 348; *United States v. Carpio-Leon*, 701 F.3d 974, 979–80 (4th Cir. 2012); *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010); *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010).  Moreover, as detailed below, the pertinent historical periods were replete with laws "relevantly similar" to the modern prohibition on felon firearm possession because they categorically disqualified people from possessing firearms

---

[15] Numerous works of legal scholarship have espoused the civic virtue theory of the Second Amendment.  *See, e.g.*, Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1360 (2008); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 492 (2004); Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 672 (2002) [hereinafter Cornell, *Don't Know Much About History*]; David Yassky, *The Second Amendment: Structure, History, and Constitutional Change*, 99 Mich. L. Rev. 588, 626 (2000); Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995); Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 L. & Contemp. Probs. 143, 146 (1986); Anthony J. Zarillo III, Comment, *Going off Half-Cocked: Opposing as-Applied Challenges to the "Felon-in-Possession" Prohibition of 18 U.S.C. § 922(g)(1)*, 126 Penn St. L. Rev. 211, 238 (2021).  We concur with the civic virtue theory inasmuch as a person's lack of virtue in the eyes of the community served as a proxy for willingness to disobey the law.

based on a judgment that certain individuals were untrustworthy parties to the nation's social compact.[16]

The *Bruen* Court warned that "not all history is created equal" and catalogued the sources that are most probative of the right's original meaning. 142 S. Ct. at 2136. Emphasizing that the right codified in the Second Amendment was a "*pre-existing right*," the Court saw particular relevance in "English history dating from the late 1600s, along with American colonial views leading up to the founding." *Id.* at 2127 (citing *Heller*, 554 U.S. at 595).[17]  The Court made this same point in *Heller*.  554 U.S. at 592.  The *Bruen* Court also found highly relevant post-ratification practices from the late eighteenth and early nineteenth centuries.  *See Bruen*, 142 S. Ct. at 2136.  In contrast, although the Court considered history from Reconstruction to the late nineteenth century, it underscored that it did so merely to confirm its conclusions and that evidence from this period is less informative.  *See id.* at 2137.

---

[16] *See Folajtar*, 980 F.3d at 911 ("Legislatures have always regulated the right to bear arms.").

[17] When assessing Founding-era precedents, we must assume they derive from a coherent understanding of the right to keep and bear arms shared among the American populace.  *See Heller*, 554 U.S. at 604–05 ("[T]hat different people of the founding period had vastly different conceptions of the right to keep and bear arms . . . simply does not comport with our longstanding view that the Bill of Rights codified venerable, widely understood liberties.").

### 1.   England's Restoration and Glorious Revolution

We begin with the late seventeenth century, when the English government repeatedly disarmed individuals whose conduct indicated a disrespect for the sovereign and its dictates. Also, the advent of the English Bill of Rights during this period confirmed Parliament's authority to delineate which members of the community could "have arms . . . by Law." 1 W. & M., Sess. 2, ch. 2, § 7 (Eng. 1689).

In the contentious period following the English Civil War, the restored Stuart monarchs disarmed nonconformist (*i.e.*, non-Anglican) Protestants. *See* Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 45 (1994) (describing how Charles II "totally disarmed . . . religious dissenters"); Amicus Br. 6 ("Leading up to the Glorious Revolution of 1688, . . . nonAnglican [sic] Protestants were often disarmed."). The reason the Crown seized nonconformists' weapons, according to *Amici*, is that non-Anglican Protestants were dangerous. But the notion that *every* disarmed nonconformist was dangerous defies common sense. Moreover, *Amici*'s resort to dangerousness as the sole explanation for this measure ignores Anglicans' well-documented concern that nonconformists would not obey the King and abide by the law.

By definition, nonconformists refused to participate in the Church of England, an institution headed by the King as a matter of English law. *See Church of England*, BBC (June 30, 2011),
https://www.bbc.co.uk/religion/religions/christianity/cofe/cof

24

e_1.shtml (describing "the Act of Supremacy" enacted during the reign of Henry VIII). Indeed, many refused to take mandatory oaths recognizing the King's sovereign authority over matters of religion. *See* Frederick B. Jonassen, *"So Help Me?": Religious Expression and Artifacts in the Oath of Office and the Courtroom Oath*, 12 Cardozo Pub. L., Pol'y & Ethics J. 303, 322 (2014) (describing Charles II's reinstation of the Oath of Supremacy); Caroline Robbins, *Selden's Pills: State Oaths in England, 1558–1714*, 35 Huntington Lib. Q. 303, 314–15 (1972) (discussing nonconformists' refusal to take such oaths). Anglicans, in turn, accused nonconformists of believing that their faith exempted them from obedience to the law. *See* Christopher Haigh, *'Theological Wars': 'Socinians' v. 'Antinomians' in Restoration England*, 67 J. Ecclesiastical Hist. 325, 326, 334 (2016). In short, the historical record suggests nonconformists as a group were disarmed because their religious status was viewed as a proxy for disobedience to the Crown's sovereign authority and disrespect for the law, placing them outside the civic community of law-abiding citizens.

Even when Protestants' right to keep arms was restored, it was expressly made subject to the discretion of Parliament. One year after the Glorious Revolution of 1688 replaced the Catholic King James II with William of Orange and Mary, James's Protestant daughter, *see* Alice Ristroph, *The Second Amendment in a Carceral State*, 116 Nw. U. L. Rev. 203, 228 (2021), Parliament enacted the English Bill of Rights, which declared: "Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and *as allowed by Law*," 1 W. & M., Sess. 2, ch. 2, § 7 (Eng. 1689) (emphasis added). Thus, this declaration, which the Supreme Court has described as the "predecessor to our Second Amendment,"

*Bruen*, 142 S. Ct. at 2141 (quoting *Heller*, 554 U.S. at 593), reveals the "historical understanding," *id.* at 2131, that the legislature—Parliament—had the power and discretion to determine who was sufficiently loyal and law-abiding to exercise the right to bear arms. *Cf.* Lois G. Schwoerer, *To Hold and Bear Arms: The English Perspective*, 76 Chi.-Kent L. Rev. 27, 47–48 (2000) (explaining how the English Bill of Rights preserved Parliament's authority to limit who could bear arms).

In 1689, Parliament enacted a status-based restriction forbidding Catholics who refused to take an oath renouncing their faith from owning firearms, except as necessary for self-defense. An Act for the Better Securing the Government by Disarming Papists and Reputed Papists, 1 W. & M., Sess. 1, ch. 15 (Eng. 1688); *see* Malcolm, *supra*, at 123. Proponents of the view that disarmament depended exclusively on dangerousness have argued that Catholics categorically posed a threat of violence at this time. *See Kanter v. Barr*, 919 F.3d 437, 457 (7th Cir. 2019) (Barrett, J., dissenting); C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 723 (2009). Again, however, this interpretation not only rests on the implausible premise that all Catholics were violent, but also ignores the more likely historical reason for disarming this entire group: their perceived disrespect for and disobedience to the Crown and English law. That is manifest in the statute's oath requirement. When individuals swore that they rejected the tenets of Catholicism, their right to own weapons was restored. An Act for the Better Securing the Government by Disarming Papists and Reputed Papists, 1 W. & M., Sess. 1, ch. 15 (Eng. 1688).

Disavowal of religious tenets hardly demonstrated that the swearing individual no longer had the capacity to commit

violence; rather, the oath was a gesture of allegiance to the English government and an assurance of conformity to its laws. Likewise, contemporaneous arguments against tolerating Catholicism contended that Catholics' faith subverted the rule of law by placing the dictates of a "foreign power," *i.e.*, the Pope, before English legal commands. *See* Diego Lucci, *John Locke on Atheism, Catholicism, Antinomianism, and Deism*, 20 Etica & Politica/Ethics & Pol. 201, 228–29 (2018). The disarmament of Catholics in 1689 thus provides another example of the seizure of weapons from individuals whose status demonstrated, not a proclivity for violence, but rather a disregard for the legally binding decrees of the sovereign.

## 2.    Colonial America

The earliest firearm legislation in colonial America prohibited Native Americans, Black people, and indentured servants from owning firearms.[18]  *See* Michael A. Bellesiles, *Gun Laws in Early America: The Regulation of Firearms Ownership, 1607–1794*, 16 Law & Hist. Rev. 567, 578–79 (1998).  *Amici* contend that these restrictions affected individuals outside the political community and so cannot serve as analogues to contemporary restraints on citizens like

---

[18] The status-based regulations of this period are repugnant (not to mention unconstitutional), and we categorically reject the notion that distinctions based on race, class, and religion correlate with disrespect for the law or dangerousness.  We cite these statutes only to demonstrate legislatures had the power and discretion to use status as a basis for disarmament, and to show that status-based bans did not historically distinguish between violent and non-violent members of disarmed groups.

Range.  Amicus Br. 30–31; *see also Carpio-Leon*, 701 F.3d at 978 n.1 (concluding such individuals may not have been part of "the people" at the Founding).  But even accepting *Amici*'s argument, colonial history furnishes numerous examples in which full-fledged members of the political community as it then existed—*i.e.*, free, Christian, white men—were disarmed due to conduct evincing inadequate faithfulness to the sovereign and its laws.

During the late 1630s, for example, an outspoken preacher in Boston named Anne Hutchinson challenged the Massachusetts Bay government's authority over spiritual matters and instead advocated personal relationships with the divine. *See* Edmund S. Morgan, *The Case Against Anne Hutchinson*, 10 New Eng. Q. 635, 637–38, 644 (1937). Governor John Winthrop accused Hutchinson and her followers of being Antinomians, those who viewed their salvation as exempting them from the law, and banished her. *Id.* at 648; Ann Fairfax Withington & Jack Schwartz, *The Political Trial of Anne Hutchinson*, 51 New Eng. Q. 226, 226 (1978). The colonial government also disarmed at least fifty-eight of Hutchinson's supporters, not because those supporters had demonstrated a propensity for violence, but "to embarrass the offenders," as they were forced to personally deliver their arms to the authorities in an act of public submission. James F. Cooper, Jr., *Anne Hutchinson and the "Lay Rebellion" Against the Clergy*, 61 New Eng. Q. 381, 391 (1988). Disarming Hutchinson's supporters, in other words, served to shame colonists whose disavowal of the rule of law placed them outside the Puritan's civic community and obedience to the commands of the government. *Cf.* John Felipe Acevedo, *Dignity Takings in the Criminal Law of Seventeenth-Century England and the Massachusetts Bay Colony*, 92 Chi.-Kent L. Rev. 743, 761 (2017) (describing other shaming punishments used at the time, including scarlet letters).

Likewise, Catholics in the American colonies (as in Britain) were subject to disarmament without demonstrating a proclivity for violence. It is telling that, notwithstanding Maryland's genesis as a haven for persecuted English Catholics, *see* Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103

Harv. L. Rev. 1409, 1424 (1990), Maryland—as well as Virginia and Pennsylvania—confiscated firearms from their Catholic residents during the Seven Years' War, *see* Bellesiles, *supra*, at 574; Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020). That decision was not in response to violence; to the contrary, Catholics had remained peaceable even when the colony's Anglican Protestants took control of its government and required Catholics to take oaths recognizing the legal authority of the Crown, rather than the Pope, over matters of religion. *See* Michael Graham, S.J., *Popish Plots: Protestant Fears in Early Colonial Maryland, 1676–1689*, 79 Cath. Hist. Rev. 197, 197 (1993) ("[L]ittle sustained opposition to [the Anglican leadership] crystallized within the colony. What the Protestant Associators had done . . . was widely accepted."); Denis M. Moran, *Anti-Catholicism in Early Maryland Politics: The Protestant Revolution*, 61 Am. Cath. Hist. Soc'y 213, 235 (1950) (explaining how the oaths "asserted the king's supremacy in spiritual as well as in temporal matters"). In sum, Protestants in the colonies—as in England—disarmed Catholics not because they uniformly posed a threat of armed resistance, but rather because the Protestant majorities in those colonies viewed Catholics as defying sovereign authority and communal values.

### 3.    Revolutionary War

Revolutionary-era history furnishes other examples of legislatures disarming non-violent individuals because their

actions evinced an unwillingness to comply with the legal norms of the nascent social compact.[19]

John Locke—whose views profoundly influenced the American revolutionaries[20]—argued that the replacement of individual judgments of what behavior is transgressive with communal norms is an essential characteristic of the social contract. *See* John Locke, *Two Treatises of Government* § 163 (Thomas I. Cook, ed., Hafner Press 1947) (reasoning "there only is political society where every one of the members hath quitted his natural power [to judge transgressions and] resigned it up into the hands of the community"). Members of a social compact, he explained, have a civic obligation to comply with communal judgments regarding proper behavior.[21]

---

[19] Again, we cite the repugnant, status-based regulations of an earlier period—disarming individuals on the basis of political affiliation or non-affiliation—merely to demonstrate the Nation's tradition of imposing categorical, status-based bans on firearm possession.

[20] *See* Thad W. Tate, *The Social Contract in America, 1774–1787: Revolutionary Theory as a Conservative Instrument*, 22 Wm. & Mary Q. 375, 376 (1965); *see also Gundy v. United States*, 139 S. Ct. 2116, 2133 (2019) (Gorsuch, J., dissenting) (observing "John Locke [was] one of the thinkers who most influenced the framers[]").

[21] Locke based this duty on the consent of those within the political society; however, he contended that mere presence in a territory constituted tacit consent to the laws of the reigning sovereign. *See* Locke, *supra*, § 119 ("[I]t is to be considered what shall be understood to be a sufficient declaration of a man's consent to make him subject to the laws of any

In the newly proclaimed states, compliance with that civic obligation translated to entitlement to keep and bear arms, with many of the newly independent states enacting statutes that required individuals, as a condition of keeping their arms, to commit to the incipient social compact by swearing fidelity to the revolutionary regime.[22] *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 158 (2007).

In Connecticut, for example, as hostilities with Britain worsened, colonists denounced loyalists' dereliction of their duties to the civic community. The people of Coventry passed

---

government. There is a common distinction of an express and a tacit consent which will concern our present case. . . . [E]very man that hath any possessions or enjoyment of any part of the dominions of any government doth thereby give his tacit consent and is as far forth obliged to obedience to the laws of that government, during such enjoyment, as any one under it; whether this his possession be of land to him and his heirs for ever, or a lodging only for a week, or whether it be barely travelling freely on the highway; and, in effect, it reaches as far as the very being of anyone within the territories of that government.").

[22] We cite these laws as evidence of the original understanding of the Second Amendment and the traditions concerning firearms regulation in historical context. Of course, our social and political awareness has obviously evolved significantly since that time, and by today's standards, the concept of restricting fundamental rights based on political affiliation would be repugnant to the Constitution, including the First Amendment.

a resolution in 1774 stating loyalists were "unworthy of that friendship and esteem which constitutes the bond of social happiness, and ought to be treated with contempt and total neglect." G.A. Gilbert, *The Connecticut Loyalists*, 4 Am. Hist. Rev. 273, 280 (1899) (describing this resolution as "a fair sample of most of the others passed at this time"). "Committees of Inspection" publicized the names and addresses of suspected loyalists in local newspapers, describing them as "persons held up to public view as enemies to their country," *id.* at 280–81, and in 1775, this stigmatization of individuals suspected of infidelity to the inchoate United States culminated in a statute prohibiting anyone who defamed resolutions of the Continental Congress from keeping arms, voting, or serving as a civil official, *see id.* at 282.

Pennsylvania likewise disarmed non-violent individuals who were unwilling to abide by the newly sovereign state's legal norms. The legislature enacted a statute in 1777 requiring all white male inhabitants above the age of eighteen to swear to "be faithful and bear true allegiance to the commonwealth of Pennsylvania as a free and independent state," Act of June 13, 1777, § 1 (1777), 9 The Statutes at Large of Pennsylvania from 1652–1801 110, 111 (William Stanley Ray ed., 1903), and providing that those who failed to take the oath—without regard to dangerousness or propensity for physical violence— "shall be disarmed" by the local authorities, *id.* at 112–13, § 3.

This statute is particularly instructive because Pennsylvania's 1776 state constitution protected the people's right to bear arms. *See* Cornell, *Don't Know Much About History*, *supra*, at 670–71; Marshall, *supra*, at 724. Yet Pennsylvania's loyalty oath law deprived sizable numbers of pacifists of that right because oath-taking violated the religious

convictions of Quakers, Mennonites, Moravians, and other groups. Jim Wedeking, *Quaker State: Pennsylvania's Guide to Reducing the Friction for Religious Outsiders Under the Establishment Clause*, 2 N.Y.U. J.L. & Liberty 28, 51 (2006); *see also* Thomas C. McHugh, Moravian Opposition to the Pennsylvania Test Acts, 1777 to 1789, at 49–50 (Sept. 7, 1965) (M.A. thesis, Lehigh University) (on file with the Leigh Preserve Institutional Repository). So while *Amici* contend that individuals disarmed under loyalty oath statutes "posed a grave danger and were often violent," Amicus Br. 12, Pennsylvania's disarmament of this sizable portion of the state's populace cannot be explained on that ground. *See Heller*, 554 U.S. at 590 ("Quakers opposed the use of arms not just for militia service, but for any violent purpose whatsoever. . . ."); *cf. Folajtar*, 980 F.3d at 908 n.11 (explaining "[r]efusing to swear an oath" does not "qualify as dangerous").

Instead, the Pennsylvania legislature forbade Quakers and other religious minorities from keeping arms because their refusal to swear allegiance demonstrated that they would not submit to communal judgments embodied in law when it conflicted with personal conviction. *See* Wedeking, *supra*, at 51–52 (describing how Quakers were "penal[ized] for allegiance to their religious scruples over the new government"). The act, in other words, was "an effort by Pennsylvania's Constitutionalist party to restrictively define citizenship"—*i.e.*, what eventually became "the people"—"to those capable of displaying the requisite virtue." Cornell, *Don't Know Much About History*, *supra*, at 671.

Exercising its broad authority to disarm individuals who disrespected the rule of law, Virginia's General Assembly also passed a loyalty oath statute in 1777. An Act to Oblige the

Free Male Inhabitants of this State Above a Certain Age to Give Assurance of Allegiances to the Same, and for Other Purposes ch. III (1777), 9 Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature in the Year 1619 281, 281 (William W. Hening ed., 1821). That law disarmed "all free born male inhabitants of this state, above the age of sixteen years, except imported servants during the time of their service" who refused to swear their "allegiance and fidelity" to the state. *Id.* But these individuals could not have been considered dangerous spies or threats of violence: the statute still required disarmed individuals to attend militia trainings and run drills without weapons, *id.* at 282—an indignity previously inflicted upon free Black men, Churchill, *supra*, at 160. Instead, this use of disarmament as a method of public humiliation reveals the statute's true social function: distinguishing those unwilling to follow the dictates of the new government from law-abiding members of the civic community.

In sum, the "how and why," *Bruen*, 142 S. Ct. at 2133, of these oath statutes' burden on the right to bear arms teaches us two things about the historical understanding of status-based prohibitions. First, in keeping with Locke's view that compliance with communal judgment is an inextricable feature of political society, these laws "defined membership of the body politic" by disarming individuals whose refusal to take these oaths evinced not necessarily a propensity for violence, but rather a disrespect for the rule of law and the norms of the civic community. Churchill, *supra*, at 158. Second, legislatures were understood to have the authority and broad discretion to decide when disobedience with the law was sufficiently grave to exclude even a non-violent offender from the people entitled to keep and bear arms. *Cf.* Dru Stevenson,

*In Defense of Felon-in-Possession Laws*, 43 Cardozo L. Rev. 1573, 1586 (2022) ("[T]he founders thought the legislature should decide which groups pose a threat to the social order or the community.").

### 4.    Ratification Debates

The ensuing deliberations over whether to ratify the Constitution similarly illustrate the Founding generation's understanding of legislatures' power and discretion over disarmament of those not considered law-abiding.

In Pennsylvania, debates between the Federalists and Anti-Federalists "were among the most influential and widely distributed of any essays published during ratification." Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory*, 16 Const. Comment. 221, 227 (1999). Those essays included "The Dissent of the Minority," which was published by the state's Anti-Federalist delegates, *id.* at 232–33, and which the Supreme Court has viewed as "highly influential" to the adoption of the Second Amendment, *Heller*, 554 U.S. at 604. The amendment proposed by the Dissent of the Minority stated:

> [T]he people have a right to bear arms for the defence of themselves and their own State or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them *unless for crimes committed*,

> or real danger of public injury from
> individuals.

2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971) (emphasis added).

As the Dissent of the Minority's proposal makes clear, members of the Founding generation viewed "[c]rimes committed—violent or not—[as] . . . an independent ground for exclusion from the right to keep and bear arms." *Binderup*, 836 F.3d at 349 (quotation omitted); *see also Folajtar*, 980 F.3d at 908–09. *Amici* insist that the proposal's crime and danger clauses must be read together as authorizing the disarmament of dangerous criminals only. *See* Amicus Br. 16; *see also* Greenlee, *supra* at 267; *Binderup*, 836 F.3d at 367 (Hardiman, J., concurring in part). But the Dissent of the Minority's use of the disjunctive "or" refutes this counterargument: The dissenters distinguished between criminal convictions and dangerousness, and provided that *either* could support disarmament. *See, e.g.*, *United States v. Woods*, 571 U.S. 31, 45–46 (2013) (explaining the "ordinary use" of "or" "is almost always disjunctive"—*i.e.*, "the words that it connects are to 'be given separate meanings'") (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979)).

The Dissent of the Minority therefore comports with the longstanding tradition in English and American law of disarming even non-violent individuals whose actions demonstrated a disrespect for the rule of law as embodied in the sovereign's binding norms.

### 5.    Other Non-Violent Offenses

Punishments meted out for a variety of non-violent offenses between the seventeenth and nineteenth centuries provide additional support for legislatures' authority to disarm even non-violent offenders.

Historically, several non-violent felonies were punishable by death and forfeiture of the perpetrator's entire estate. *See Folajtar*, 980 F.3d at 904–05. As the Government observes, those offenses included larceny, repeated forgery, and false pretenses—all of which involve deceit or the wrongful deprivation of another's property and closely resemble Range's welfare fraud offense. Appellees' Supp. Br. 7–8.[23]    *A fortiori*, given the draconian punishments that traditionally could be imposed for these types of non-violent felonies, the comparatively lenient consequence of disarmament under 18 U.S.C. § 922(g)(1) is permissible.[24]

---

[23] *See* Answering Br. 15 (citing 1 Wayne R. LaFave, *Substantive Criminal Law* § 2.1(b) (3d ed. 2017); Francis Bacon, *Preparation for the Union of Laws of England and Scotland*, *in* 2 *The Works of Francis Bacon* 160, 163–64 (Basil Montagu ed., Cary & Hart 1844); and 2 Jens David Olin, *Wharton's Criminal Law* § 28:2 (16th ed. 2021)).

[24] The *Kanter* dissent takes issue with this analysis in part because the death penalty was not always imposed. 919 F.3d at 458–62 (Barrett, J., dissenting). How punishments were meted out is beside the point. What matters is the exposure. *See id.* at 459 ("[M]any crimes remained eligible for the death penalty . . . .").

Additionally, legislatures in the American colonies and United States authorized the seizure of firearms from individuals who committed non-violent, misdemeanor hunting offenses.[25] In 1652, New Netherlands passed an ordinance that forbid "firing within the jurisdiction of this city [of New Amsterdam] or about the Fort, with any guns at Partridges or other Game that may by chance fly within the city, on pain of forfeiting the Gun . . . ." 1652 N.Y. Laws 138. A 1745 North Carolina law prohibited nonresidents from hunting deer in "the King's Wast" and stated that any violator "shall forfeit his gun" to the authorities. Act of Apr. 20, ch. III (1745), 23 Acts of the North Carolina General Assembly 218, 219 (1805). New Jersey enacted a statute "for the preservation of deer, and other game" in 1771 that punished non-residents caught trespassing with a firearm by seizing the individuals' guns. 1771 N.J. Laws 19–20.

State legislatures continued to enact such laws after the Revolution. To protect the sheep of Naushon Island, Massachusetts passed a statute requiring armed trespassers on

---

[25] We appreciate that these laws involved the isolated disarmament of the firearm involved in the offense, not a ban on possession as in the other laws we discuss above. Nevertheless, they support the notion that legislatures' power to strip citizens of their arms was not limited to cases involving violent persons or offenses.

the island to forfeit their guns.[26]  An Act for the Protection and Security of the Sheep and Other Stock on Tarpaulin Cove Island, Otherwise Called Naushon Island, and on Nennemessett Island, and Several Small Islands Contiguous, Situated in the County of Dukes County § 2 (1790), 1 Private and Special Statutes of the Commonwealth of Massachusetts 258, 259 (Manning & Loring ed., 1805).  Virginia and Maryland punished individuals who hunted wild fowl on rivers at night by seizing their guns.  1832 Va. Acts 70; 1838 Md. Laws 291–92.  And Delaware law required non-residents who hunted wild geese on the state's waterways to forfeit their guns, even though the statute specified that this hunting offense was a misdemeanor.  12 Del. Laws 365 (1863).

As these centuries of hunting statutes show, legislatures repeatedly exercised their authority to decide when non-violent

---

[26] A plaintiff suing the trespasser could alternatively seek the value of the trespasser's firearms.  An Act for the Protection and Security of the Sheep and Other Stock on Tarpaulin Cove Island, Otherwise Called Naushon Island, and on Nennemessett Island, and Several Small Islands Contiguous, Situated in the County of Dukes County § 2 (1790), 1 Private and Special Statutes of the Commonwealth of Massachusetts 258, 259 (Manning & Loring ed., 1805).

offenses were sufficiently grave transgressions to justify limiting violators' ability to keep and bear arms.[27]

*   *   *   *   *

We draw three critical lessons from the historical record examined above. First, legislatures traditionally used status-based restrictions to disqualify categories of persons from possessing firearms. Second, they did so not merely based on an individual's demonstrated propensity for violence, but rather to address the threat purportedly posed by entire categories of people to an orderly society and compliance with its legal norms. Third, legislatures had, as a matter of separated powers, both authority and broad discretion to determine when

---

[27] We note that history and tradition may indicate that pretextual disarmament is inconsistent with the Second Amendment. *Cf.* 1 William Blackstone, *Commentaries* app. *300 (St. George Tucker ed., Birch & Small 1803) (decrying how "[i]n England, the people have been disarmed, generally, under the specious pretext of preserving the game"); *Drummond v. Robinson Twp.*, 9 F.4th 217, 227–29 (3d Cir. 2021). Range does not claim his conviction was pretextual, however, so we leave the issue for another day.

individuals' status or conduct evinced such a threat sufficient to warrant disarmament.[28]

---

[28] Deference to state legislatures not only accords with longstanding national tradition, but also respects state legislatures' unique ability to channel local concerns and values into criminal law. *See* Joshua M. Divine, *Statutory Federalism and Criminal Law*, 106 Va. L. Rev. 127, 188 (2020) ("[F]ederal reliance on state law disturbs uniformity by baking into federal law variations in state law. But far from being a downside, regional disparity is an asset."); *see also* Paul H. Robinson & Tyler Scot Williams, *Mapping American Criminal Law: Variations Across the 50 States* 4 (2018) (surveying state variation in the incorporation of desert, deterrence, and incapacitation norms into their criminal laws). There is good reason that the criminal codes of arid states like Nevada and Colorado include offenses like diverting irrigation water, Nev. Rev. Stat. § 207.225 (2021), and causing prairie fires, Colo. Rev. Stat. § 18-13-109 (2022), which the code of a state like Maryland does not.

In addition to preserving federalism and the separation of powers, upholding legislative determinations of when crimes are sufficiently serious to warrant disarmament avoids forcing "judges to 'make difficult empirical judgments' about 'the costs and benefits of firearms restrictions,' especially given their 'lack [of] experience' in the field." *Bruen*, 142 S. Ct. at 2130 (quoting *McDonald*, 561 U.S. at 790–91). And as explained above, judicial determinations of when a crime is sufficiently violent have proven infeasible to apply in other contexts. *See Binderup*, 836 F.3d at 410 (Fuentes, J., concurring in part).

## IV.    Range's Claims

Having identified the appropriate test and reviewed the historical evidence in this area, we now turn to Range's claims.

Range committed an offense that Pennsylvania has classified as a misdemeanor punishable by more than two years' imprisonment, 62 Pa. Cons. Stat. § 481(a), and Congress has concluded is sufficiently serious to exclude Range from the body of law-abiding, responsible citizens entitled to keep and bear arms, *see* 18 U.S.C. §§ 921(a)(20)(B), 922(g)(1).[29] That determination fits comfortably within the longstanding tradition of legislation disarming individuals whose actions

---

[29] Some of our esteemed colleagues have expressed concerns about the breadth of state offenses that trigger disarmament under 18 U.S.C. § 922(g)(1). *Binderup*, 836 F.3d at 372 n.20 (Hardiman, J., concurring in part); *Folajtar*, 980 F.3d at 921 (Bibas, J., dissenting).  But we do not perceive any inherent absurdity in a state's interest in punishing drug offenders, *see* Ariz. Rev. Stat. Ann. § 13–3405, or individuals who abuse public services like recycling programs, *see* Mich. Comp. Laws Ann. § 445.574a(1)(d), or libraries, *see* 18 Pa. Cons. Stat. Ann. § 3929.1.  Indeed, enforcement of the laws cited by our colleagues illustrates why legislatures have chosen to designate them as felonies.  *Cf. United States v. Bocook*, 59 F.3d 167, 167 (4th Cir. 1995) (describing a prosecution for uttering obscene language by means of radio communication when a defendant "broadcast[s] unauthorized radio messages to aircraft and air traffic controllers" in which he "used obscene language, harassed a female air traffic controller, made threats to shoot down aircraft, and transmitted recorded music, weather reports, and warnings about his own activities").

evince a disrespect for the rule of law. Interpreting the text of the Second Amendment in light of the right's "historical background," *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 592), we conclude that Range's criminal conviction placed him beyond the ambit of "the people" protected by the Second Amendment.

Range asserts that "[t]he Government has failed to meet its burden of proving that the plaintiff's conviction places him outside the scope of those entitled to Second Amendment rights based on the historical analysis of those who can be disarmed."[30]  Appellant's Supp. Br. 1.  Notwithstanding the

---

[30] Moreover, in his supplemental brief, Range appears to raise the issue that a permanent ban on firearm possession lacks a historical basis. *See* Appellant's Supp. Br. 3–4.  As to arguments concerning the duration of a ban, Congress has addressed it in two ways.  First, Congress has exempted any person whose conviction "has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored" from disarmament. § 921(a)(20).  Second, Congress also permitted the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) to restore individuals' ability to possess firearms upon consideration of their personal circumstances, criminal record, and the public interest.  18 U.S.C. § 925(c).  But these assessments proved so resource intensive for ATF that Congress has refused to fund the program since 1992. *See Logan v. United States*, 552 U.S. 23, 28 n.1 (2007); S. Rep. No. 102-353 (1992).  As we previously noted, "[i]f [the petitioner] and others in his position wish to seek recourse, it is to the legislature, and not to the judiciary, that efforts should be directed." *Folajtar*, 980 F.3d at 911; *Binderup*, 836 F.3d at 402-03 (Fuentes, J., concurring in part and dissenting in part).

historical evidence surveyed above, Range contends that his disarmament is inconsistent with the nation's tradition of firearm regulation "because he is not dangerous." Opening Br. 28. Echoing positions expressed by some judges, *Amici* agree, arguing "English and American tradition support firearm prohibitions on dangerous persons" but "[t]here is no tradition of disarming peaceable citizens." Amicus Br. 2; *see Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting); *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting); *Binderup*, 836 F.3d at 369 (Hardiman, J., concurring in part). Our review of the historical record convinces us otherwise. Non-violent individuals were repeatedly disarmed between the seventeenth and nineteenth centuries because legislatures determined that those individuals lacked respect for the rule of law and thus fell outside the community of law-abiding citizens. That longstanding tradition refutes Range's constrictive account of Anglo-American history as prohibiting the government from disarming non-violent individuals.

*Amici* offer a few statutes that purportedly prove legislatures' inability to disarm non-violent offenders, but these laws confirm our view. Specifically, *Amici* cite a 1785 Massachusetts law that forbid tax collectors and sheriffs from embezzling tax revenue. Amicus Br. 32 (citing 1785 Mass. Laws 516).[31] Although the statute permitted estate sales to recover embezzled funds, "the necessities of life—including firearms—could not be sold." *Id.* Likewise, *Amici* discuss a 1650 Connecticut law exempting weapons from execution in civil actions and four statutes providing similar protections for

---

[31] We note that *Amici* cited to a 1786 Massachusetts law, but the language *Amici* references comes from Chapter 46 of the 1785 Act of Massachusetts.

militia arms. *Id.* at 33 (citing *The Public Records of the Colony of Connecticut, Prior to the Union with New Haven Colony, May 1665*, at 537 (J. Hammond Trumbull ed., 1850); 1 Stat. 271, § 1 (1792); *Archives of Maryland Proceedings and Acts of the General Assembly of Maryland*, at 557 (William Hand Browne ed., 1894); An Act for Settling the Militia ch. XXIV (1705), 3 Statutes at Large: Being a Collection of all the Laws of Virginia from the First Session of the Legislature, in the Year 1619 335, 339 (William W. Hening ed., 1823); An Act for the Settling and Better Regulation of the Militia ch. II (1723), 4 Statutes at Large: Being a Collection of all the Laws of Virginia from the First Session of the Legislature, in the Year 1619 118, 121 (William W. Hening ed., 1820). But *Amici* place more weight on those laws than they can rightly bear. The fact that legislatures did not *always* exercise their authority to seize the arms of individuals who violated the law does not show that legislatures *never* could do so. Rather, these laws underscore legislatures' power and discretion to determine when disarmament is warranted. And, as detailed above, Range and *Amici*'s contention that legislatures lacked the *authority* to disarm non-violent individuals "flatly misreads the historical record." *Heller*, 554 U.S. at 603.

We believe the Supreme Court's repeated characterization of Second Amendment rights as belonging to "law-abiding" citizens supports our conclusion that individuals convicted of felony-equivalent crimes, like Range, fall outside

"the people" entitled to keep and bear arms.[32] *See, e.g.*, *Bruen*, 142 S. Ct. at 2122; *Heller*, 554 U.S. at 635. As Judge Hardiman explained in his *Binderup* concurrence, Second Amendment challenges to § 922(g)(1) "require us to decide who count among 'the people' entitled to keep and bear arms" because "the Founders understood that not everyone possessed Second Amendment rights." 836 F.3d at 357 (Hardiman, J., concurring in part); *see also* Oral Arg. at 49:54 (*Amici* discussing which individuals fall outside "the people").

---

[32] A concern with which district courts have wrestled when assessing the constitutionality of 18 U.S.C. § 922(g)(1) after *Bruen* is that interpreting "the people" in the Second Amendment to exclude individuals convicted of offenses would deviate from that phrase's meaning in the First and Fourth Amendments. *Cf. Collette*, 22-CR-141, 2022 WL 4476790, at *8 ("[T]his Nation has a longstanding tradition of exercising its right—as a free society—to exclude from 'the people' those who squander their rights for crimes and violence."), *with Coombes*, No. 22-CR-189, 2022 WL 4367056, at *4 ("[T]he court declines to carve out felons from the scope of the Second Amendment's protection of 'the people.'"). But Justice Stevens's dissent leveled that very criticism against the *Heller* majority: "[T]he Court limits the protected class to 'law-abiding, responsible citizens.' But the class of persons protected by the First and Fourth Amendments is *not* so limited; for even felons (and presumably irresponsible citizens as well) may invoke the protections of those constitutional provisions." 554 U.S. at 644 (Stevens, J., dissenting). However, our reasoning applies solely to the Second Amendment and does not imply any limitation on the rights of individuals convicted of felony and felony-equivalent offenses under other provisions of the Constitution.

Focusing our inquiry on the meaning of "the people" also comports with the Lockean principles that animated Founding-era disarmaments of individuals whose unwillingness to abide by communal norms placed them outside political society. *Cf. Heller*, 554 U.S. at 580 (suggesting "the people" refers to "all members of the *political community*" (emphasis added)); Cornell, *Don't Know Much About History*, *supra*, at 671 (contending the right to keep and bear arms was historically "limited to those members of the polity who were deemed capable of exercising it in a virtuous manner").

But even if we were to adopt the contrary view, treating Range as covered by "the Second Amendment's plain text[,]" *Bruen*, 142 S. Ct. at 2126, would "yield the same result," *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting). *Bruen* requires the Government to (1) provide relevant historical analogues demonstrating a traditional basis for disarming those who commit felonies and felony-equivalent crimes, and (2) show that the challenger was convicted of a felony or felony-equivalent offense. *Cf. Charles*, No. 22-CR-154, 2022 WL 4913900, at *9 ("[R]eading *Bruen* robotically would require the Government in an as-applied challenge[] to find an analogy specific to the crime charged. . . . That's absurd.").

The Government has satisfied its burden on both prongs. First, as discussed above, our Nation's tradition of firearm regulation permits the disarmament of those who committed felony or felony-equivalent offenses. *See Holloway*, 948 F.3d at 172 ("We 'presume the judgment of the legislature is correct and treat any crime subject to § 922(g)(1) as disqualifying unless there is a strong reason to do otherwise.'" (quoting *Binderup*, 836 F.3d at 351)). The Government has established as much through its detailed discussion of our pre-*Bruen* jurisprudence concerning the "the historical justification for stripping felons [of Second Amendment rights], including those convicted of offenses meeting the traditional definition of a felony." Appellees' Supp. Br. 2–3, 7 (quoting *Binderup*, 836 F. 3d at 348); *see also* Answering Br. 11–12.

The Government has also shown that Range was convicted of a felony or felony-equivalent offense. Range pleaded guilty to welfare fraud in violation of 62 Pa. Cons. Stat. § 481(a), a misdemeanor punishable by up to five years' imprisonment. Range's conviction therefore qualifies as a felony-equivalent offense under both federal law, 18 U.S.C. § 921(a)(20)(B), and traditional legal principles, *see Felony*, Black's Law Dictionary (11th ed. 2019). Accordingly, Range may be disarmed consistent with the Second Amendment. *See* Answering Br. at 16 (citing *Hamilton v. Pallozzi*, 848 F.3d 614, 627 (4th Cir. 2017))

## V.    Conclusion

We have conducted a historical review as required by *Bruen* and we conclude that Range, by illicitly taking welfare money through fraudulent misrepresentation of his income, has

demonstrated a rejection of the interests of the state and of the community.  He has committed an offense evincing disrespect for the rule of law.  As such, his disarmament under 18 U.S.C. § 922(g)(1) is consistent with the Nation's history and tradition of firearm regulation.

For the above reasons, we will affirm the judgment of the District Court.