No. 21-2835

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

BRYAN RANGE,
Appellant

v.

ATTORNEY GENERAL UNITED STATES,
Appellee

Appeal from an order entered in the United States District Court for the Eastern
District of Pennsylvania at No. 5:20-cv-3488

**BRIEF FOR *AMICI CURIAE* FEDERAL PUBLIC AND COMMUNITY
DEFENDER OFFICES OF THE THIRD CIRCUIT IN SUPPORT OF
APPELLANT BRYAN RANGE**

ELENI KOUSOULIS,
Federal Public Defender
District of Delaware

K. ANTHONY THOMAS,
Federal Public Defender
District of New Jersey

HELEN A. MARINO,
Interim Chief Federal Defender
Eastern District of Pennsylvania

HEIDI R. FREESE,
Federal Public Defender
Middle District of Pennsylvania

MATTHEW CAMPBELL,
Federal Public Defender
District of the U.S. Virgin Islands

LISA B. FREELAND
Federal Public Defender
Western District of Pennsylvania

RENEE PIETROPAOLO
Assistant Federal Public Defender
*Counsel of Record*

Federal Public Defender for the
Western District of Pennsylvania
Suite 1500
1001 Liberty Avenue
Pittsburgh, PA 15222
(412) 644-6565

# TABLE OF CONTENTS

Table of Authorities ............................................................................... ii

Identity and Interest of *Amici Curiae* ....................................................v

Introduction ............................................................................................1

Argument................................................................................................3

I.    The Second Amendment's plain text protects the right of "the people," not only "law-abiding, responsible" people, to keep and bear arms.................................................................................................3

II.    *Bruen's* historical test requires that the government show a robust tradition of "distinctly similar" historical precursors and teaches that exceptions to "the Second Amendment's 'unqualified command'" must be narrowly drawn ..............................................................................7

    A.    When a statute addresses a longstanding societal problem, the government must show a robust tradition of "distinctly similar"—not just "relevantly similar"—historical precursors............................8

    B.    The Court should be wary of efforts to satisfy *Bruen's* historical test that seek to draw historical analogies at excessively high levels of generality .........................................................................................11

    C.    The panel's "disrespect for the law" standard will relegate courts to interest-balancing or require judicial abdication to legislative infringements of the Second Amendment right. ..................................14

Conclusion .............................................................................................18

Certificate of Bar Membership  ..............................................................19

Certificate of Compliance .......................................................................20

Certificate of Service ..............................................................................21

# TABLE OF AUTHORITIES

**Cases**

*Binderup v. Att'y Gen'l*,
    836 F.3d 336 (3d Cir. 2016) (en banc) ...........................................6, 11

*District of Columbia v. Heller*,
    554 U.S. 570 (2008).........................................................1, 3, 4, 5, 7, 8

*Drummond v. Robinson Twp.*,
    9 F.4th 217 (3d Cir. 2021) ..............................................................15, 16

*Folajtar v. Att'y Gen.*,
    980 F.3d 897 (3d Cir. 2020) .............................................5, 11, 15, 17

*IBP, Inc. v. Alvarez*,
    546 U.S. 21 (2005).....................................................................................4

*Kanter v. Barr*,
    919 F.3d 437 (7th Cir. 2019) ....................................................5, 6, 17

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010)..............................................................................1, 5

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022)....................................................................*passim*

*United States v. Coombes*,
    ___ F.Supp.3d ___, 2022 WL 4367056 (N.D.Okla., 2022) ...............5

*United States v. Jimenez-Shilon*,
    34 F.4th 1042 (11th Cir. 2022) .............................................................5

*United States v. Meza-Rodriguez*,
    798 F.3d 664 (7th Cir. 2015) ...............................................................5

*United States v. Perez-Gallan*,
No. 22-cr-427, 2022 WL 16858516 (W.D.Tex., 2022).........................6

*United States v. Prince,*
___F.Supp.3d___, 2022 WL 6968457 (S.D.W.Va., Oct. 12, 2022) ...................9

*United States v. Reaves*,
No. 4:22-cr-224 (E.D.Mo., Jan. 9, 2023).............................6

*United States v. Stevens*,
559 U.S. 460 (2010)..............................15

*United States v. Verdugo-Urquidez*,
494 U.S. 259 (1990).........................3, 4

*Voisine v. United States*,
579 U.S. 686 (2016)...........................15

## Statutes

18 U.S.C. § 921(a)(20)(B) ........................................1

18 U.S.C. § 922(g)(1)..........................................v, 1, 6, 9, 10, 11

18 U.S.C. § 922(g)(9)..........................................15

Fed. R. App. P. 29(a)(2) ...................................v

Fed. R. App. P. 29(a)(4)(E) .................................v

## Constitutional Provisions

U.S. Const. amend. II ........................................ *passim*

U.S. Const. pmbl..............................................5

## Other Authorities

Barondes, Royce de R., *The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous,"* 25 Tex. Rev. L. & Pol. 245 (2021) ....................................................................10

Dyche, Thomas & Pardon, William, *A New General English Dictionary* (14th ed. 1771). ........................................................................................3

Johnson, Samuel, *A Dictionary of the English Language* (1766) ............................3

Larson, Carlton F. W., *Four Exceptions in Search of a Theory*, 60 Hastings L. J. 1371 (2009)................................................................................11

Marshall, C. Kevin, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695 (2009)............................................................11

## Identity and Interest of *Amici Curiae*

The Federal Public and Community Defender Offices for the judicial districts in the Third Circuit represent indigent defendants in federal court in each office's respective district and in the United States Court of Appeals for the Third Circuit pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A. As institutional defenders, these offices have a unique interest and expertise in all areas of federal criminal law. These organizations also defend the majority of indigent defendants charged under 18 U.S.C. § 922(g)(1), which prohibits any person convicted of a crime punishable by imprisonment for a term exceeding one year, from possessing, shipping, transporting, or receiving a firearm or ammunition. More broadly, *amici* represent individuals charged with firearms-related offenses on a daily basis and in these cases they often litigate Second Amendment issues. Accordingly, *Amici* have a strong interest in the manner in which this Court construes and applies *New York State Rifle & Pistol, Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), which lies at the heart of Mr. Range's challenge.

Both parties have consented to the filing of this brief. No party's counsel authored this brief in whole or in part, nor did any person or entity, other than *Amici* or its counsel, make a monetary contribution to the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(2), (a)(4)(E).

## INTRODUCTION

In *District of Columbia v. Heller*, the Supreme Court canvassed text and history to hold that the Second Amendment codified a pre-existing "individual right to keep and bear arms" that "belongs to all Americans." 554 U.S. 570, 581, 592 (2008). Two years later, the Court warned against treating that "fundamental" right "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald v. City of Chicago*, 561 U.S. 742, 767, 780 (2010). But for the last decade, courts scrutinizing firearms regulations generally "defer[red] to legislative interest balancing," imposing few meaningful constraints on government power. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2123 (2022). Last term, the Supreme Court responded by repudiating interest-balancing and confirming that a firearms regulation passes muster only if it conforms to the Second Amendment's text and this nation's historical tradition. *Id.*, 2127, 2129-30.

The *en banc* Court here is tasked with applying *Bruen's* text-and-history test to 18 U.S.C. § 922(g)(1): Neither the text nor historical tradition countenances a complete lifetime prohibition on the possession of any firearm by anyone convicted at any time of a crime punishable by imprisonment for more than one year, including (as here) certain crimes designated a misdemeanor under state law. *See* 18 U.S.C. § 921(a)(20)(B) ("crime punishable by imprisonment for a term

1

exceeding one year" includes state offenses classified as a misdemeanor and punishable by more than two years). In reaching the contrary conclusion, the panel misapplied *Bruen*'s methodological framework. The *en banc* Court should not repeat its errors.

Preliminarily, *amici* explain that the Second Amendment's plain text covers possession of a handgun by "the people," that is, all members of the national community, and does not categorically exclude anyone with a prior conviction for a crime punishable by more than one year. Next, as this Court begins to apply *Bruen*'s framework, *amici* caution against a troublesome trend in Second Amendment litigation. The panel opinion analogized the challenged firearm regulation to purported historical practices that it describes at extremely high levels of generality—*e.g.,* historical measures disarming people who evinced a "disrespect for the rule of law." The Court should take heed of *Bruen*'s emphatic rejection of such broad analogizing—which amounts to interest-balancing under the guise of historical comparison—and insist that the government demonstrate that challenged regulations are consistent with a narrow, well-defined historical tradition.

**ARGUMENT**

I.      **The Second Amendment's plain text protects the right of "the people," not only "law-abiding, responsible" people, to keep and bear arms.**

The Second Amendment provides, "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Founding era dictionaries define "people" as "those who compose a community," and extending to "every person." *See, e.g.*, 2 Samuel Johnson, *A Dictionary of the English Language* (1766) ("A nation; those who compose a community"), *available at* https://tinyurl.com/y95erjwf; Thomas Dyche & William Pardon, *A New General English Dictionary* (14th ed. 1771) ("People" "signifies every person, or the whole collection of inhabitants in a nation or kingdom"), *available at* https://tinyurl.com/uk4b4fxd.

*Heller* consistently interpreted "the people" as "unambiguously refer[ing] to all members of the national community, not an unspecified subset." *Heller*, 554 U.S. at 580. *Heller* began with a "textual analysis" of the Second Amendment's "operative" clause, initially observing the phrase "the right of the people" also appears in the First and Fourth Amendments. *Id.,* 578, 579. Relying on its earlier construction of "the people" in the Fourth Amendment, the Court observed that "the people" is "a term of art." *Id.* (quoting *United States v. Verdugo-Urquidez,* 494 U.S. 259, 265 (1990)). "'[Its uses] sugges[t] that "the people,"'" as used across

3

the Bill of Rights as well as in the preamble, "'refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.'" *Id.,* 579-81 (quoting *Verdugo-Urquidez*, 494 U.S. at 265). The phrase "the people" thus created "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.,* 581. Indeed, *Bruen* cites *Heller* as directly stating, "[t]he Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions.'" *Bruen*, 142 S.Ct. at 2156 (citing *Heller* without introductory signal).

Although the Second Amendment's text does not circumscribe "the people" whose rights it guarantees, the government argues that "the people" are only "law-abiding, responsible" citizens such that (at least) those with prior convictions for offenses punishable by more than one year (including state law misdemeanors punishable by more than two years' imprisonment) are categorically outside the scope of those entitled to Second Amendment protections. Supplemental Brief, Doc. 48 at 1-2, 6. As set forth, to read "the people" protected by the Second Amendment as excluding "felons" would be contrary to text and at odds with the cardinal rule of statutory interpretation that "identical words used in different parts of the same statute are generally presumed to have the same meaning." *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005). The untenable result would be to single out

the Second Amendment for "specially unfavorable treatment." *See McDonald*, 561 U.S. at 780.

Then-Judge Barrett, reading *Heller* to interpret "'the people' as referring to 'all Americans,'" rejected the notion that felons are "categorially excluded from our national community." *Kanter v. Barr*, 919 F.3d 437, 451-53 (7th Cir. 2019) (Barrett, J., dissenting). As Judge Bibas has observed, felons "are part of 'We the People of the United States.' U.S. Const. pmbl. So they too share in the Second Amendment 'right of the people to keep and bear Arms,' subject only to the historical limits on that right." *Folajtar v. Att'y Gen.*, 980 F.3d 897, 912-13, 923 (3d Cir. 2020) (Bibas, J., dissenting). *See also United States v. Meza-Rodriguez*, 798 F.3d 664, 672 (7th Cir. 2015) ("'the people' in the Second Amendment has the same meaning as it carries in other parts of the Bill of Rights"); *United States v. Jimenez-Shilon,* 34 F.4th 1042, 1044-45 (11th Cir. 2022) (relying on founding-era dictionaries to construe "the people"); *United States v. Coombes*, ___ F.Supp.3d ___, 2022 WL 4367056, *3-4 (N.D.Okla., 2022).

In addition to being at odds with authority, text, and established canons of construction, defining "the people" by reference to a vague and malleable "law abiding" standard suffers from a lack of administrability that will bedevil courts for years to come and necessarily devolve into "interest-balancing." To the extent the "law-abiding" standard excludes those with felony convictions, this amounts to the

very judicial deference to legislative interest-balancing *Bruen* rejected. 142 S.Ct. at 2129-31. Using the "law-abiding" test at *Bruen*'s first step ("plain text") "collapses the *Bruen* analysis and risks subjecting the Second Amendment to legislative fiat." *United States v. Reaves*, No. 4:22-cr-224 Doc. 55 at 16 (E.D.Mo., Jan. 9, 2023). Moreover, excluding "felons" from "the people" categorically precludes as-applied challenges, as it prevents any felon from ever surviving *Bruen*'s "plain text" test at step one. *Cf. Binderup v. Att'y Gen'l*, 836 F.3d 336 (3d Cir. 2016) (en banc) (18 U.S.C. § 922(g)(1)'s permanent bar on firearm possession was unconstitutional as applied to petitioners with remote convictions for state misdemeanors punishable by more than two years that *inter alia* did not involve physical violence or threats of violence).

Further delimiting "law-abiding and responsible" beyond those with felony convictions—*e.g.*, ascertaining the type and transience of wrongdoing that excludes someone from "the people",—will require the very "judge-empowering 'interest-balancing'" *Bruen* rejected. *Bruen*, 142 S.Ct. at 2129. *See Kanter*, 919 F.3d at 452 (Barrett, J., dissenting) ("[t]o say that certain people fall outside the Amendment's scope" means that "a person could be in one day and out the next"); *United States v. Perez-Gallan*, No. 22-cr-427, 2022 WL 16858516 (W.D.Tex., 2022) (restricting "the people" to "law-abiding" could absurdly strip Second Amendment rights from the speeding driver and the shop-owner who forgets to

post a "wet floor" sign). *See* Part II.C., *infra*. Judges lack "'the power to decide on a case-by-case basis whether the right is *really worth* insisting upon.'" *Id.* (quoting *Heller*, 554 U.S. at 634) (emphasis in original).

The Second Amendment text must be accorded its plain meaning—the same meaning it carries in other parts of the Bill of Rights—as "unambiguously" referring to all members of the national community.

II.     ***Bruen's* historical test requires that the government show a robust tradition of "distinctly similar" historical precursors and teaches that exceptions to "the Second Amendment's 'unqualified command'" must be narrowly drawn.**

According to the panel, when the Second Amendment's plain text covers an individual's conduct, courts ask whether a modern regulation and a historical precursor are "relevantly similar" in terms of how and why they burden the right to bear arms. Op.15. Applying that rubric, the panel operated at an excessively high level of generality, analogizing the challenged regulation to a collection of disparate historical regulations of discrete groups to deduce a historical tradition of disarming those evincing "disrespect for the rule of law." Op.27-28. The panel's application of the "relevantly similar" rubric was erroneous—or at least, incomplete—and the error improperly relieved the government of its burden at *Bruen* step two. And its broad analogizing—which amounts to interest-balancing under the guise of historical

comparison—both is inconsistent with *Bruen's* teaching that exceptions to "the Second Amendment's 'unqualified command,'" *Bruen*, 142 S.Ct. at 2126, be narrowly drawn, and will result in judicial deference to legislative judgments about arms-bearing.

**A.      When a statute addresses a longstanding societal problem, the government must show a robust tradition of "distinctly similar"—not just "relevantly similar"—historical precursors.**

To rebut the presumption of unconstitutionality, the government must demonstrate that a challenged regulation "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2130. Crucially, the nature of that burden varies depending on what kind of problem a statute is designed to address—specifically, whether the problem is old or new.

In "some cases," where "a challenged regulation addresses a general societal problem that has persisted since the 18th century," the historical inquiry is "fairly straightforward." *Id.*, 2131. The government must identify a robust tradition of "distinctly similar" founding-era regulations. *Id.* If "the Founders themselves could have adopted" a particular regulation "to confront [a longstanding] problem," but did not do so, that is evidence the statute is unconstitutional today. *Id.* So, too, if some jurisdictions in the founding era attempted to enact analogous regulations but those proposals were rejected on constitutional grounds. *Id.* Both *Heller* and *Bruen* fell in this category: the laws challenged in those cases were aimed at a problem—

"handgun violence, primarily in urban areas"—that existed at the founding, and the Court therefore required a tight fit between those laws and historical precursors. *Id. See also United States v. Prince*, ___F.Supp.3d___, 2022 WL 6968457 (S.D.W.Va., Oct. 12, 2022) (explaining 18 U.S.C. § 922(k)'s restriction on firearms with obliterated serial numbers addresses longstanding societal problem of "crime").

A "more nuanced approach" applies to regulations "implicating unprecedented societal concerns or dramatic technological changes" or addressing a problem that was "unimaginable at the founding." *Bruen,* 142 S.Ct. at 2132. For the latter regulations, courts ask whether the modern regulation is "relevantly similar" to a historical analogue. The "central considerations" in the "relevantly similar" analysis are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense [*i.e.,* the 'how'] and whether that burden is comparably justified [*i.e.,* the 'why']." *Id.*, 2132- 33.

At the threshold, then, courts faced with a *Bruen* challenge must identify the problem at which a statute is aimed, and then determine whether it existed in 1791 or instead grows out of "unprecedented," "unimaginable" societal changes. *Id.,* 2132. The panel failed to do so. Felons' access to firearms, at which § 922(g)(1) is directed, has posed a (potential) problem since well

before 1791. Nevertheless, the panel skipped past the "distinctly similar" test without so much as mentioning it, and instead assessed the statute under the less rigorous "relevantly similar" rubric. Op.15. This fundamental error warped the panel's analysis from the outset, permitting the government to defend § 922(g)(1) based on insufficiently similar historical regulations.

Although *Bruen* did not define "distinctly similar," it indicated the standard is a stringent one. The only historical regulation *Bruen* identified as sufficiently similar to New York's proper-cause requirement was an 1871 Texas law forbidding "anyone from 'carrying on or about his person…any pistol…unless he has reasonable grounds for fearing an unlawful attack on his person.'" *Id.*, 2153 (citing 1871 Tex. Gen. Laws § 1). This "reasonable grounds" requirement was essentially identical to New York courts' interpretation of that state's proper-cause standard. *See id.,* 2123-24 & n.2. In a challenge to § 922(g)(1), therefore, a "distinctly similar" regulation would be one that either substantially abridged *felons'* right to keep and bear arms, or permanently denied firearms to some group very similar to felons (*e.g.*, those convicted of some subset of especially serious crimes).

The panel cited no such laws from the founding era, because none exist. *See, e.g.*, Royce de R. Barondes, *The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous,"* 25 Tex.

Rev. L. & Pol. 245, 291 (2021) (noting the lack of "any direct authority whatsoever" for the view that felons were "deprived of firearm rights" at the founding); Carlton F.W. Larson, *Four Exceptions in Search of a Theory*, 60 Hastings L.J. 1371, 1376 (2009) (noting felon-disarmament laws did not emerge until "the early part of the twentieth century"); C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009) (same). *See also Binderup*, 836 F.3d at 360 (Hardiman, J., concurring) (dating felon dispossession statutes to 1931 and 1961); *Folajtar*, 980 F.3d at 914-15 (Bibas, J., dissenting) (concluding no founding era case or statute imposed a "near-blanket ban for all felons"). Instead, the panel analogizes § 922(g)(1) to purported historical regulations it describes at extremely high levels of generality, that is, historical measures disarming people who "evince[d] a disrespect for the rule of law." Op.44. Defining a historical tradition at that level of generality is inconsistent with *Bruen*'s demand for "distinctly similar" precursors.

**B.    The Court should be wary of efforts to satisfy *Bruen*'s historical test that seek to draw historical analogies at excessively high levels of generality.**

In defining the relevant historical tradition, the panel identified a number of groups that were (purportedly) disarmed on account of their "disrespect for the rule of law"—*e.g.,* Catholics, nonconformist Protestants, those who refused

to swear loyalty to the colonies—and extrapolated from them a broader principle: that the Second Amendment, as understood in 1791, did not protect *any* group (or almost any group) that disrespected the law, even if that specific group was never disarmed at the founding. Op.35.

This broad-brush analogizing cannot be reconciled with *Bruen*. To the contrary, *Bruen* instructs that in carving out exceptions to "the Second Amendment's unqualified command," 142 S.Ct. at 2126, courts should proceed cautiously, defining those exceptions narrowly and concretely to ensure they are in fact consistent with America's historical tradition of firearm regulation.

*Bruen* itself modeled this cautious approach. There, to support its proper-cause requirement, New York relied on several English and early American firearms regulations that, in its view, demonstrated a "sweeping" power to enact "broad prohibitions on all forms of public carry." *Id.*, 2139, 2145.

- First, New York cited the 1328 Statute of Northampton, which prohibited bringing "force in affray of the peace" and "go[ing] []or rid[ing] armed by night []or by day," as well as colonial and early-republic statutes prohibiting similar conduct. *Id.*, 2139, 2142-46.

- Second, New York pointed to several statutes from "the early to mid-19th century" that "proscribed the concealed carry of pistols and other small weapons" in public. *Id.*, 2146.

- Third, New York likened the proper-cause requirement to mid-19th-century surety statutes, which "required any person who was reasonably likely to 'breach the peace,' and who, standing accused, could not prove a special need for self-defense, to post a bond before publicly carrying a firearm." *Id.*, 2148.

While acknowledging that the right to keep and bear arms in public has traditionally been subject to certain "well-defined restrictions," *Bruen* rejected New York's argument that its collection of discrete historical regulations amounted to a tradition of broadly prohibiting public carry, or of conditioning it on a special need for self-defense. *Id.*, 2156. More specifically, the Court read each of these laws narrowly and refused to treat them as more than the sum of their parts: the Statute of Northampton regulated public carry only to the extent that someone was "bearing arms in a way that spread[] 'fear' or 'terror' among the people"; antebellum courts upheld public concealed-carry bans only insofar as "they did not similarly prohibit *open* carry"; and surety statutes "presumed" individuals had a general right to public carry that could be burdened only in limited circumstances. *Id.* at 2145-48 (emphasis in original). New York's cited laws suggested the constitutionality of certain narrow, "well-defined" public-carry restrictions: those that limited "the intent for which one could carry arms" (to terrorize the people), "the manner of carry" (concealed vs. open), and "the exceptional circumstances under which one could not carry arms" (if a surety statute applied). *Id.*, 2138. But that's

13

all—these disparate regulations of discrete forms of public carry did not add

up to a legislative power to "broadly" regulate public carry in whatever way a

legislature saw fit. *Id.* From the fact that founding-era laws prohibited

"particular mode[s]" of public carry, the Court declined to conclude that

legislatures may enact a "*general* prohibition" on *all* modes of public carry or

may "ban public carry altogether." *Id.*, 2146-47 & n.19 (emphasis altered).

The same logic applies to statutes disarming those who "disrespect[] the

rule of law." Op.34. The panel cites founding-era regulations purportedly

disarming discrete groups based on status—Catholics, those who would not

swear loyalty, Native Americans, Blacks, and indentured servants—often for

discrete periods, and deduced a historical tradition of permanently disarming

all those who "disrespect [] the rule of law." Op.29-36. *Bruen* rejects such

overgeneralization.

### C. The panel's "disrespect for the law" standard will relegate courts to interest-balancing or require judicial abdication to legislative infringements of the Second Amendment right.

The "disrespect for the law" standard will prove unworkable in ways that

reveal its inconsistency with *Bruen*.

*Bruen* instructs that exceptions to the Second Amendment's "unqualified

command" must be "well-defined," *id.*, 2130, 2156, and this Court too, in a case

*Bruen* itself relies upon, required such exceptions to be "'well-defined and

narrowly limited.'" *Drummond v. Robinson Twp.*, 9 F.4th 217, 228 n.11 (3d Cir. 2021) (quoting *United States v. Stevens*, 559 U.S. 460, 468-49 (2010)). *See Bruen*, 142 S.Ct. at 2133 (quoting *Drummond*, 9 F.4th at 226).

A category of persons said to exhibit "disrespect for the law" is neither. It is instead "a mushy standard that sets no limit" at all. *Cf. Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting) (discussing "felony" label). The panel seems to imply that disarming misdemeanants is unconstitutional, *see* Op.15 n.14, but what exactly is the relevant difference between the two types of offenses? Does that logic apply even when the misdemeanor is a serious one, such as a "crime of domestic violence," *see* 18 U.S.C. § 922(g)(9)? *See Voisine v. United States*, 579 U.S. 686, 715-16 (2016) (Thomas, J., dissenting) (opining that § 922(g)(9) is unconstitutional as a person "could lose forever" the right based on a single conviction for recklessly causing injury to a family member, "such as by texting while driving," nonfelony summary offenses, and offenses punishable by only a fine; "We treat no other constitutional right so cavalierly."). Conversely, if a misdemeanant-disarmament law comports with the Second Amendment, what about a law disarming those convicted of an "infraction," *id.* § 3559(a)(9)? Or people found liable for civil offenses?

Courts will have to devise some metric for deciding which law-disrespecting people can and cannot be disarmed—when it is reasonable, in

other words, for a legislature to conclude that disrespect for the law is
"sufficiently grave to exclude [someone from the right] to keep and bear
arms." Op.35. But there is no principled way to do that without engaging in the
"judge-empowering interest-balancing inquiry" that *Bruen* rejected. 142 S.Ct.
at 2129; *see* Op.27 n.18 ("categorically reject[ing]," without explanation, the
notion that distinctions based on "class" "correlate with disrespect for the law
or dangerousness"). Applying a "disrespect for the law" standard will
inevitably devolve into "means-end scrutiny under the guise" of a historical
inquiry. *Id.*, 2133 n.7. This Court "ha[s] never endorsed an exception that
introduces so much uncertainty about the Second Amendment's scope, and [it
should] decline to do so [now]." *Drummond*, 9 F.4th at 228 n.11.

The only alternative is to adopt a posture of maximum deference: if the
legislature deems any group disrespectful of the law and thereby disqualifies
its members from bearing arms, its word is final. *See* Op.41-42
("[L]egislatures had, as a matter of separated powers, both authority and broad
discretion to determine when individuals' status or conduct evinced such a
threat sufficient to warrant disarmament."). But that approach cannot be
reconciled with *Bruen*, which teaches that judicial "defer[ence] to the
determinations of legislatures" "is not" "appropriate" in Second Amendment
litigation. 142 S.Ct. at 2131. In no other context do courts allow legislatures to

deny enumerated constitutional rights at will, and taking that approach here would render the Second Amendment "a second-class right." *Id.*, 2156. This Court "must not reflexively defer to [a] label when a fundamental right is at stake," especially when that label is "elastic, unbounded, and manipulable by legislatures and prosecutors." *Cf. Folajtar*, 980 F.3d at 912, 921 (Bibas, J., dissenting) ("felon"); *Kanter*, 919 F.3d at 465 (Barrett, J., dissenting) ("The government could quickly swallow the right if it had broad power to designate any group as dangerous and thereby disqualify its members from having a gun.").

The only way out of this thicket is to parse the historical record at a lower, more "administrable" level of generality that is tightly tethered to the historical record. *Bruen*, 142 S.Ct. at 2130. *Bruen*'s "distinctly similar" test permits nothing less.

## CONCLUSION

For the reasons set forth above, in addition to those Mr. Range has identified, this Court should reverse.

Respectfully submitted,

ELENI KOUSOULIS,
Federal Public Defender
District of Delaware

LISA B. FREELAND
Federal Public Defender
Western District of Pennsylvania

K. ANTHONY THOMAS,
Federal Public Defender
District of New Jersey

*/s/ Renee Pietropaolo*
RENEE PIETROPAOLO
Assistant Federal Public Defender
*Counsel of Record*

HELEN A. MARINO,
Interim Chief Federal Defender
Eastern District of Pennsylvania

Federal Public Defender for the
Western District of Pennsylvania
Suite 1500

HEIDI R. FREESE
Federal Public Defender
Middle District of Pennsylvania

1001 Liberty Avenue
Pittsburgh, PA 15222
(412) 644-6565

MATTHEW CAMPBELL,
Federal Public Defender
District of the U.S. Virgin Islands

# CERTIFICATE OF BAR MEMBERSHIP

It is hereby certified that Renee Pietropaolo is a member of the bar of the Court of Appeals for the Third Circuit.

*/s/ Renee Pietropaolo*
RENEE PIETROPAOLO

DATED: January 13, 2023

# CERTIFICATE OF COMPLIANCE

I, Renee Pietropaolo, Assistant Federal Defender, hereby certify the following:

1.     This brief complies the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 3,733 words excluding the parts of the brief exempted by Fed. Rule App. P. 32(f) and 3d Cir. L.A.R. 29.1 (2011).

2.     This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Word 365 in font size 14, type style Times New Roman.

3.     This brief complies with 3d Circuit L.A.R. 31.1 (2011) because the text of the electronic brief is identical to the text in the paper copies. Further, the electronic version of the attached brief was automatically scanned by Trend Micro anti-virus software version 14.0 and found to contain no known viruses.

*/s/ Renee Pietropaolo*
Renee Pietropaolo
Assistant Federal Public Defender

## CERTIFICATE OF SERVICE

I, Renee Pietropaolo, Assistant Federal Defender, hereby certify that I have electronically filed the Brief for *Amici Curiae* Federal Public and Community Defender Offices of the Third Circuit in Support of Appellant Bryan Range and Reversal and that a copy has been served upon counsel of record, through the Third Circuit Court of Appeals' Electronic Case Filing (CM/ECF) system.

*/s/ Renee Pietropaolo*
RENEE PIETROPAOLO

DATED: January 13, 2023