**No. 21-2835**

# In the United States Court of Appeals for the Third Circuit

**BRYAN DAVID RANGE**,

*Plaintiff-Appellant*,

v.

**ATTORNEY GENERAL UNITED STATES**, et al.,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court Civil Action No. 5:20-cv-03488-GEKP

## BRIEF OF *AMICI CURIAE* FIREARMS POLICY COALITION AND FPC ACTION FOUNDATION ON REHEARING EN BANC IN SUPPORT OF APPELLANT AND REVERSAL

JOSEPH G.S. GREENLEE
FPC ACTION FOUNDATION
5550 Painted Mirage Road
Suite 320
Las Vegas, NV 89149
(916) 517-1665
jgreenlee@fpclaw.org
*Counsel of Record*

Counsel for *Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *Amici Curiae* make the following statements:

**Firearms Policy Coalition** has no parent corporation, and as a non-stock nonprofit corporation, no publicly held corporation could own any share of its stock.

**FPC Action Foundation** has no parent corporation, and as a non-stock nonprofit corporation, no publicly held corporation could own any share of its stock.

/s/ *Joseph G.S. Greenlee*
Counsel for *Amici Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................ i
TABLE OF CONTENTS ........................................................................ ii
TABLE OF AUTHORITIES .................................................................. iii
STATEMENT OF *AMICI CURIAE* .......................................................... 1
CONSENT TO FILE ............................................................................. 1
ARGUMENT......................................................................................... 1
I. Ratification proposals prove the Founders' intent to protect the arms rights of peaceable persons. ............................................. 1
II. Revolutionary War loyalists were disarmed for being dangerous. ....................................................................................... 5
III. Colonial laws disarming people based on race and religion should not be considered but were also based on danger. ............. 7
CONCLUSION ................................................................................... 11
CERTIFICATE OF COMPLIANCE ........................................................ 13
CERTIFICATE OF SERVICE ............................................................... 14

# TABLE OF AUTHORITIES

## Cases

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
142 S. Ct. 2111 (2022) .......................................................... 7

## Statutes and Regulations

1799 Laws of the Miss. Terr. 113 ................................................ 7

1806 Md. Laws 45 .................................................................... 7, 8

## Other Authorities

*A History of the King's American Regiment, Part 1*, THE ON-LINE INSTITUTE FOR ADVANCED LOYALIST STUDIES .......................................... 5

AMERICAN ARCHIVES, vol. 2 (4th Ser., Peter Force ed., 1839) .................. 5

AMERICAN ARCHIVES, vol. 4 (4th Ser., Peter Force ed., 1843) .................. 5

AMERICAN ARCHIVES, vol. 5 (4th Ser., Peter Force ed., 1844) .................. 6

AMERICAN ARCHIVES, vol. 6 (4th Ser., Peter Force ed., 1846) .................. 6

AMERICAN ARCHIVES, vol. 2 (5th Ser., Peter Force ed., 1851) .................. 6

ARCHIVES OF MARYLAND: PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY OF MARYLAND, 1752-1754, vol. 50 (J. Hall Pleasants ed., 1933) ...................................................................... 9, 10

ARCHIVES OF MARYLAND: PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY OF MARYLAND, 1755-1756, vol. 52 (William Hand Browne ed., 1935) ............................................................... 10

CATHOLICITY IN PHILADELPHIA (Joseph L. J. Kirlin ed., 1909) ......... 10, 11

Greenlee, Joseph G.S., *Avoiding Danger: Why Mere Disrespect for the Law Cannot Justify Disarmament*, Working Draft (Forthcoming 2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4317000 ........ 4

Johnson, Nicholas et al., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY (3d ed. 2021).......... 5, 8

MARYLAND GAZETTE, Oct. 10, 1754 ........ 9

MARYLAND GAZETTE, Oct. 17, 1754 ........ 9

*No. XI*, FEDERAL GAZETTE, Nov. 28, 1788........ 3

PENNSYLVANIA GAZETTE, June 13, 1754 ........ 10

THE AMERICAN CATHOLIC HISTORICAL RESEARCHES (Martin I. J. Griffin ed., 1908) ........ 9

THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, vol. 2 (Merrill Jensen et al. eds., 1976)........ 2

THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, vol. 5 (John P. Kaminski et al. eds., 1998) ........ 3

THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, vol. 6 (John P. Kaminski et al. eds., 2000) ........ 2, 3

THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, vol. 28 (John P. Kaminski et al. eds., 2017) ........ 1

THE PAPERS OF THOMAS JEFFERSON, vol. 1 (Julian P. Boyd ed., 1950) .... 4

THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, vol. 5 (WM Stanley Ray ed., 1898) ........ 11

Winthrop, John, THE HISTORY OF NEW ENGLAND FROM 1630 TO 1649, vol. 2 (James Savage ed., 1826) ........ 3

## STATEMENT OF *AMICI CURIAE*

**Firearms Policy Coalition** is a nonprofit organization devoted to advancing individual liberty and defending individual rights.

**FPC Action Foundation** is a nonprofit organization dedicated to restoring human liberty and protecting constitutional rights.

## CONSENT TO FILE

All parties consented to the filing of this brief.[1]

## ARGUMENT

### I. Ratification proposals prove the Founders' intent to protect the arms rights of peaceable persons.

Three proposals from Constitution ratifying conventions addressed who may be barred from possessing arms. Only New Hampshire's was approved by a majority. It provided, "Congress shall never disarm any Citizen, unless such as are or have been in actual Rebellion." 28 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 378 (John Kaminski et al. eds., 2017).

[1] No counsel for a party authored this brief in any part. No party or counsel contributed money intended to fund its preparation or submission. Only *amici* and their members contributed money intended to fund its preparation or submission.

In Massachusetts, Samuel Adams's proposal ensured "that the said constitution be never construed…to prevent the people of the United States, who are peaceable citizens, from keeping their own arms." 6 *id.* at 1453. Although not approved by a majority, many convention members ratified with the understanding that such amendments would follow. *See id.* at 1476 (John Hancock: "I give my assent to the Constitution in full confidence that the amendments proposed will soon become a part of the system."). Adams's supporters later celebrated the Second Amendment as the adoption of Adams's proposal. *Id.* at 1453-54.

The *only* proposal that the panel considered was from Pennsylvania's "Dissent of the Minority." Panel Op. 36-37. Twenty-one of the twenty-three members who voted against ratification at Pennsylvania's convention signed the Dissent. 2 DOCUMENTARY HISTORY, at 617. It proposed amendments, including that "no law shall be passed for disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals." *Id.* at 624.

No evidence suggests that "crimes committed" included nonviolent crimes; the only discussion of what the proposal included said it covered

insurrectionists.[2] Since disarmament laws traditionally focused on danger, "crimes committed" likely covered violent crimes, while "real danger of public injury" provided a catchall for violence not covered by the law.[3]

None of the 10 states that ratified the Constitution after the Dissent was published—including New Hampshire and Massachusetts—proposed an amendment allowing nonviolent persons to be disarmed. And Samuel Adams apparently interpreted the Dissent as protecting nonviolent persons from disarmament. According to Bostonian Jeremy Belknap, "it is supposed A[dams] had a copy" of the Dissent and based his amendments on it, because they "proposed to guard against" the "*very things*" the Dissent "objected to." 5 *id.* at 820. Adams's proposal forbade disarmament for nonviolent crimes. 6 *id.* at 1453.

---

[2] "Insurrections against the federal government are undoubtedly real dangers of public injury, not only from individuals, but great bodies; consequently the laws of the union should be competent for the disarming of both." *No. XI*, FEDERAL GAZETTE, Nov. 28, 1788.

[3] *E.g.*, three men who raped a child confessed but avoided the death penalty because Massachusetts law in 1641 did not expressly proscribe such conduct. 2 John Winthrop, THE HISTORY OF NEW ENGLAND FROM 1630 TO 1649, at 45-48 (James Savage ed., 1826).

Prominent Virginia Federalist Alexander White responded to the Dissent by arguing that "the rights of bearing arms for defence, or for killing game" are "clearly out of the power of Congress." 8 *id.* at 404. "These things seem to have been inserted" in the Dissent "to induce the ignorant to believe that Congress would have a power over such objects." *Id.* Surely White would have noted if his Antifederalist adversaries, instead of protecting rights as they claimed, were proposing the unprecedented measure of disarming nonviolent criminals.[4]

*All* the evidence suggests that the Dissent was not advocating for the first-ever prohibition for non-dangerous crimes. But if so, that view was limited to *some* dissenters in the *minority* of *one state*'s convention.[5]

---

[4] White's understanding echoed Thomas Jefferson's proposal for Virginia's 1776 constitution (which arrived too late for consideration): "No freeman shall be debarred the use of arms [within his own lands or tenements]." 1 THE PAPERS OF THOMAS JEFFERSON 363 (Julian Boyd ed., 1950).

[5] For more on ratification debates, *see* Joseph Greenlee, *Avoiding Danger: Why Mere Disrespect for the Law Cannot Justify Disarmament*, Part VI, Working Draft (Forthcoming 2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4317000.

## II. Revolutionary War loyalists were disarmed for being dangerous.

"During the course of the American Revolution, over one hundred different Loyalist regiments, battalions, independent companies or troops were formed to fight alongside the British Army against their rebellious countrymen." *A History of the King's American Regiment, Part 1*, THE ON-LINE INSTITUTE FOR ADVANCED LOYALIST STUDIES.[6] Additionally, insurrections were frequent. *See* Greenlee, at Part V. Thus, authorities repeatedly stated that the reason for disarming loyalists was danger:

- Massachusetts's Congress disarmed loyalists so they could not "join with the open and avowed enemies of America" to inflict "ruin and destruction…against these Colonies." 2 AMERICAN ARCHIVES 793 (4th Ser., Peter Force ed., 1839) (May 1775).

- General Washington to General Lee: "The Tories should be disarmed immediately though it is probable that they may have secured their arms…until called upon to use them against us." 4 *id.* at 395 (January 1776).

- "[T]o frustrate the mischievous machinations, and restrain the wicked practices of these men" who "have taken part with our oppressors," the Continental Congress "recommended" that "they ought to be disarmed." *Id.* at 1629 (January 1776).

[6] http://www.royalprovincial.com/military/rhist/kar/kar1hist.htm.

- Governor Trumbull to General Schuyler: "I…congratulate you on…disarming the Tories.…Suppressing such enemies…is of very great importance." *Id.* at 899 (January 1776).

- New York's Congress deemed it "absolutely necessary, not only for the safety of the…Province, but of the United Colonies in general, to take away the arms and accoutrements of the most dangerous among [the loyalists]." 5 *id.* at 1504 (May 1776).

- New Jersey's Congress, because "a number of disaffected persons have assembled…preparing, by force of arms…to join the British Troops for the destruction of this country," disarmed "these dangerous Insurgents." 6 *id.* at 1636 (July 1776).

- Pennsylvania noted "the folly and danger of leaving arms in the hands of Non-Associators" when it disarmed them. 2 *id.* (5th. Ser.) at 582-83 (September 1776).[7]

That *everyone* disarmed may not actually have committed violence if given the chance does not change the fact that danger was the justification. *See* Panel Op. 34. Disarmament laws were wartime measures from desperate governments on the brink of destruction—they were not models for constitutional rights. Thus, while the reason for Revolutionary War disarmament—i.e., dangerousness—is informative because it continues the justification for disarmament laws from 17th-century England[8] through 20th-century America, the breadth of the

[7] For more examples, *see* Greenlee, at Part V.

[8] *See id.*, at Part III.

wartime laws is less relevant. A better measure of the scope the Founders intended is New Hampshire's proposed constitutional amendment, presented when individual rights were top-of-mind.

## III. Colonial laws disarming people based on race and religion should not be considered but were also based on danger.

Discussing colonial America, the panel relied exclusively on discriminatory laws—laws prohibiting "Native Americans, Black people, and indentured servants from owning firearms," as well as "Catholics" and people who "advocated personal relationships with the divine." Panel Op. 27-30.

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, makes clear that discriminatory laws cannot establish a historical tradition. 142 S. Ct. 2111 (2022). Several historical laws required Blacks to acquire discretionary licenses to carry arms;[9] *Bruen* considered none.

Regardless, even the discriminatory laws were based on danger. Laws preventing Blacks from keeping arms "rested upon White fears that armed Blacks, especially freemen, might conspire to carry out a slave revolt." Nicholas Johnson et al., FIREARMS LAW AND THE SECOND

---

[9] *See, e.g.*, 1799 Laws of the Miss. Terr. 113; 1806 Md. Laws 45.

AMENDMENT 440 (3d ed. 2021). Blacks could sometimes keep arms, however, if deemed peaceable (and thus unlikely to engage in revolt). *See, e.g.*, 1806 Md. Laws 45.

Laws preventing firearm transfers to American Indians—which were not prohibitions on possession—were among the numerous laws preventing attacks. *See* Johnson, at 189-91, 210-12; Greenlee, at Part IV.B.

It does not appear that any law forbade indentured servants to possess arms—rather, they were sometimes exempted from militia duty. *Id.* at Part IV.C. Nevertheless, to the extent that some servants received unfavorable treatment, it was because some—particularly convict servants—were dangerous. *Id.* But other servants were issued "freedom dues" upon completing their service, which were sometimes required by law and often included a firearm. *Id.*; Johnson, at 191-92.

The panel determined that disarmament of Catholics "was not in response to violence." Panel Op. 30. But Protestants at the time said otherwise.

During the French and Indian War, Protestants worried that American Catholics would join Catholic France. *See, e.g.*, MARYLAND

GAZETTE, Oct. 10, 1754 ("Popery" is "a *persecuting*, *blood shedding* Religion." The French King's followers are "blindly obedient….in America," and "we have to dread and guard against *these* our Enemies."); MARYLAND GAZETTE, Oct. 17, 1754 ("Popery is the Foundation of all our present…Dangers." "Self-Preservation" requires "Laws as will put it out of the Power of the Jesuits; and their deluded Votaries, to endanger the Peace").

In 1751, Maryland's Committee of Grievances warned that "the Growth of Popery within this Province may…become dangerous." THE AMERICAN CATHOLIC HISTORICAL RESEARCHES 37 (Martin Griffin ed., 1908). The "Papists Jesuits or Priests," by influencing "Germans French & other Foreigners," may "become a Dangerous intestine Enemy to Join French or Indians." *Id.*

In 1753, Maryland's lower house considered testimony "that the Papists very frequently said, they would wash their Hands in the Blood of Protestants." 50 ARCHIVES OF MARYLAND 201 (J. Hall Pleasants ed., 1933).

In 1754, Maryland's Committee of Grievances warned that "several Papists…have made great Opposition to the enlisting Men…to repel the

Invasion of the French and Indians in Alliance with them." *Id.* at 487. The "Conduct and Behaviour of the Papists" required action "to secure…against our domestic…Enemies." *Id.*; *see* Greenlee, at Part IV.D (providing examples of alleged conduct).

A 1755 bill to prohibit "the Importation of German and French Papists, and Popish Priests and Jesuits," expressed a concern that "they will…in Case of an Attack…turn their Force, in Conjunction with the French and their savage Allies, against his loyal Protestant Subjects." 52 ARCHIVES OF MARYLAND, at 89.

Maryland's act disarming Catholics emphasized the need "to quell and Suppress any intestine Commotions Rebellions or Insurrections." *Id.* at 450.

Pennsylvania Catholics also troubled authorities. New Jersey's governor worried that "should the French appear…they would in [Pennsylvania] soon get ten or twelve thousands [Catholics] together." CATHOLICITY IN PHILADELPHIA 55 (Joseph Kirlin ed., 1909). A Pennsylvania Lieutenant Colonel urged the militia to prevent the "Protestant Government" from being "trodden under foot by the bloody and tyrannical power of Popery." PENNSYLVANIA GAZETTE, June 13, 1754.

He warned, "numberless enemies amongst us…may…rise…in rebellion." *Id.*

Pennsylvania's governor worried that "the French might march in and be strengthened by the German and Irish Catholics who are numerous here." CATHOLICITY, at 79. Justices of the peace petitioned Pennsylvania's governor for authority to disarm Catholics: "that the papists should Keep Arms in their Houses," they argued, leaves "the Protestants…subject to a Massacre whenever the papists are ready." *Id.* at 78.

Pennsylvania's act disarming Catholics thus provided: "in this time of actual war…it is absolutely necessary…to quell and suppress any intestine commotions, rebellions or insurrections." 5 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 609 (Stanley Ray ed., 1898).

## CONCLUSION

Historically, disrespect for the law, or even violation of the law, was not a cause for disarmament. Dangerousness was. The district court's decision should be reversed.

Respectfully submitted,

/s/ *Joseph G.S. Greenlee*
JOSEPH G.S. GREENLEE

FPC ACTION FOUNDATION
5550 Painted Mirage Road
Suite 320
Las Vegas, NV 89149
(916) 517-1665
jgreenlee@fpclaw.org
*Counsel of Record*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 1,950 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point, proportionally spaced Century Schoolbook font.

I certify that the text of the electronic brief and the hard copies of the brief are identical.

I certify that the PDF was scanned with Windows Defender Antivirus version 1.295.1532.0, and according to the program, the document is virus free.

I certify that I am admitted to practice in the Third Circuit Court of Appeals, and that I am a member in good standing.

Dated this 13th day of January 2023.

/s/ *Joseph G.S. Greenlee*
*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I certify that on January 13, 2023, I served the foregoing brief via the CM/ECF system for the United States Court of Appeals for the Third Circuit, which will distribute the brief to all attorneys of record in this case. No privacy redactions were necessary.

Dated this 13th day of January 2023.

/s/ *Joseph G.S. Greenlee*
*Counsel for Amici Curiae*