**No. 21-2835**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

———————————

BRYAN DAVID RANGE,

Plaintiff-Appellant,

v.

ATTORNEY GENERAL OF THE UNITED STATES, et al.,

Defendants-Appellees.

———————————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

———————————

## EN BANC BRIEF FOR APPELLEES

———————————

BRIAN M. BOYNTON
 *Principal Deputy Assistant Attorney*
 *General*

JACQUELINE C. ROMERO
 *United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT
KEVIN B. SOTER
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7222*
 *U.S. Department of Justice*
 *950 Pennsylvania Avenue NW*
 *Washington, DC 20530*
 *(202) 305-1754*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT.............................................1

ARGUMENT ..........................................................................................................2

TEXT AND HISTORY DEMONSTRATE THAT APPLICATION OF 18 U.S.C.
§ 922(G)(1) TO RANGE IS CONSISTENT WITH THE SECOND
AMENDMENT. ......................................................................................................2

    A.      The right to bear arms has historically extended to the political
community of law-abiding, responsible citizens. .........................................2

    B.      The Second Amendment's text reflects its historical roots.......................11

    C.      Range's "dangerousness" inquiry would enmesh courts in
standardless assessments without basis in the Second
Amendment. .................................................................................................13

CONCLUSION ...................................................................................................... 15

COMBINED CERTIFICATIONS

# TABLE OF AUTHORITIES

**Cases:**                                                                                          **Page(s)**

*Binderup v. Attorney Gen.*,
836 F.3d 336 (3d Cir. 2016) .................................................................................6

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ................................................................. 1, 2, 3, 8, 9, 11

*Flick v. Attorney Gen.*,
812 F. App'x 974 (11th Cir. 2020),
*cert. denied*, 141 S. Ct. 2551 (2021) ..............................................................13

*Folajtar v. Attorney Gen.*,
980 F.3d 897 (3d Cir. 2020) .................................................6, 7, 9, 10, 14, 15

*Hamilton v. Pallozzi*,
848 F.3d 614 (4th Cir. 2017) ........................................................................4-5

*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011) .......................................................................5

*Holloway v. Attorney Gen.*,
948 F.3d 164 (3d Cir. 2020) ........................................................................ 5, 6

*Johnson v. United States*,
576 U.S. 591 (2015) .......................................................................................14

*Kanter v. Barr*,
919 F.3d 437 (7th Cir. 2019) ................................................................... 14, 15

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) .........................................................................................3

*Medina v. Whitaker*,
913 F.3d 152 (D.C. Cir. 2019) ...............................................4, 6, 9, 10, 12, 14

*New York State Rifle & Pistol Ass'n v. Bruen*,
142 S. Ct. 2111 (2022) ............................................................1, 2, 3, 9, 10, 11

ii

*New York State Rifle & Pistol Ass'n v. City of New York*,
  140 S. Ct. 1525 (2020) ................................................................3

*Roper v. Simmons*,
  543 U.S. 551 (2005) ..............................................................10

*Tyler v. Hillsdale Cty. Sheriff's Dep't*,
  837 F.3d 678 (6th Cir. 2016) ..............................................12

*United States v. Bean*,
  537 U.S. 71 (2002) ..............................................................14

*United States v. Flores*,
  663 F.3d 1022 (8th Cir. 2011) ............................................12

*United States v. Jimenez-Shilon*,
  34 F.4th 1042 (11th Cir. 2022) ...........................................13

*United States v. McCane*,
  573 F.3d 1037 (10th Cir. 2009) ........................................ 4, 6

*United States v. Portillo-Munoz*,
  643 F.3d 437 (5th Cir. 2011) ..............................................12

*United States v. Rozier*,
  598 F.3d 768 (11th Cir. 2010) .....................................4, 6, 13

*United States v. Scroggins*,
  599 F.3d 433 (5th Cir. 2010) ................................................4

## U.S. Constitution:

Amend. II ......................................................................................13

## Statutes:

An Act for the Punishment of Certain Crimes Against the United States,
  1 Stat. 112 (1790) ................................................................9

18 U.S.C. § 921(a)(20) ...............................................................1, 5

18 U.S.C. § 922(g)(1) ................................................................................1

18 U.S.C. § 3559(a)(5) ..............................................................................5

Del. Code Ann. tit 11, § 4205(b)(5) ..........................................................5

18 Pa. Cons. Stat. § 106(b)(6) ...................................................................5

18 Pa. Cons. Stat. § 1104(1) ......................................................................5

62 Pa. Cons. Stat. § 481 (1995) .................................................................5

**Other Authorities:**

Akhil Reed Amar, *The Bill of Rights* (1998) .........................................12

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon
    the Legislative Power of the States of the American Union* (1868)............................... 11-12, 12

2 Bernard Schwartz, *The Bill of Rights: A Documentary History* (1971)........................... 8, 9

2 *The Documentary History of the Ratification of the Constitution* (1976) ................................ 8-9

iv

**INTRODUCTION AND SUMMARY OF ARGUMENT**

For more than 50 years, federal law has generally prohibited individuals convicted of crimes punishable by more than one year of imprisonment from possessing firearms. *See* 18 U.S.C. § 922(g)(1). Plaintiff Bryan Range is subject to that prohibition because he was convicted of a state-law fraud offense punishable by five years' imprisonment, a felony-equivalent crime for purposes of this federal law. *See id.* § 921(a)(20). As the district court concluded, and the panel confirmed, application of Section 922(g)(1) to Range comports with the Second Amendment.

Range's argument that individuals convicted of non-violent crimes are entitled to an exception from this statute is incompatible with the Second Amendment's text and history. Range's argument conflicts with the Supreme Court's understanding of the Second Amendment right as belonging to "law-abiding" citizens, *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2131 (2022), and with the Court's specific endorsement of "prohibitions on the possession of firearms by felons," *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). And as the panel's detailed textual and historical analysis shows, legislatures have "broad discretion to prohibit those who did not respect the law from having firearms." Op. 16. This analysis confirms that Congress may prohibit firearm possession by individuals who commit felony and felony-equivalent crimes, regardless of whether those crimes involve violence.

Range identifies no persuasive basis for disregarding the many historical laws demonstrating legislatures' authority to prohibit analogous categories of individuals

from possessing firearms, including individuals with no history of violent conduct. *See* Op. 16-42. No court of appeals has accepted Range's theory that people convicted of felony and felony-equivalent crimes are constitutionally entitled to carry deadly weapons as long as their disqualifying offenses are not too "dangerous" or "violent." Adopting a "dangerousness" standard would not only be ahistorical but would also make the constitutionality of federal and state enactments dependent on unclear standards with a high likelihood of unpredictable and inconsistent judgments.

## ARGUMENT

### TEXT AND HISTORY DEMONSTRATE THAT APPLICATION OF 18 U.S.C. § 922(G)(1) TO RANGE IS CONSISTENT WITH THE SECOND AMENDMENT.

**A.    The right to bear arms has historically extended to the political community of law-abiding, responsible citizens.**

**1.** To determine whether a statute comports with the Second Amendment, courts look to "the Second Amendment's plain text," as informed by "this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. As the Supreme Court has repeatedly recognized, the protections embodied in the Second Amendment's text belong to "law-abiding, responsible citizens." *Heller*, 554 U.S. at 635. Indeed, as the panel in this case noted, *Bruen* "characterized the holders of Second Amendment rights as 'law-abiding' citizens no fewer than fourteen times." Op. 17-18. In one passage, *Bruen* explained that unlike New York's "may-issue" licensing regime, "shall-issue" licensing regimes—which require authorities to issue licenses whenever applicants satisfy threshold requirements—generally pass constitutional muster because they "are

designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635); *see also id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("[S]hall-issue licensing regimes are constitutionally permissible[] . . . ."). In another passage, *Bruen* explained that the historical analysis focuses on "how and why" regulations "burden a law-abiding citizen's right to armed self-defense," *id.* at 2133, again reflecting the Court's recognition that a regulation that imposes no burden on law-abiding citizens presents no Second Amendment problem.

Consistent with that understanding, the Supreme Court has emphasized that its decisions should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Heller*, 554 U.S. at 626; *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion) ("repeat[ing]" *Heller*'s "assurances" regarding such prohibitions). And in *Bruen*, six Justices took pains to reiterate that certain firearms regulations, including prohibitions on the possession of firearms by felons, are constitutional. *See Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring); *id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring); *id.* at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting); *see also New York State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525, 1540-41 (2020) (Alito, J., joined by Thomas and Gorsuch, JJ., dissenting).

The panel's analysis of the text of the Second Amendment and its extensive review of the historical record confirm that felon-possession prohibitions are

3

constitutional, regardless of whether the felony was violent. Op. 16-42. Two categories of evidence demonstrate that legislatures have long "had broad discretion to prohibit those who did not respect the law from having firearms," confirming that felons and felon-equivalents "fall[] outside 'the people'" protected by the Second Amendment. Op. 16, 21. First, "legislatures traditionally used status-based restrictions" to disarm groups that were seen as posing a threat to "an orderly society and compliance with its legal norms." Op. 41. Second, founding-era felons were exposed to far more severe consequences than disarmament—including estate forfeiture and death. Op. 38.

The panel's conclusion comports with the analysis of the many courts that have likewise upheld felon-possession prohibitions under the governing text-and-history test. While *Bruen* "abrogated" the second, "means-end scrutiny" step of the Second Amendment framework previously applied by many courts of appeals, Op. 6-7, 13-14, many courts have rejected challenges to felon-possession prohibitions without relying on means-end scrutiny. The D.C. Circuit "look[ed] to tradition and history" to conclude that "those convicted of felonies are not among those entitled to possess arms," "reject[ing] the argument that non-dangerous felons have a right to bear arms." *Medina v. Whitaker*, 913 F.3d 152, 157-61 (D.C. Cir. 2019). Several other courts of appeals have categorically upheld felon-possession prohibitions without relying on means-end scrutiny. *See, e.g.*, *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010) (per curiam); *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009); *accord Hamilton v. Pallozzi*, 848 F.3d 614, 625-27 (4th

Cir. 2017); *see also Heller v. District of Columbia*, 670 F.3d 1244, 1278 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (noting that "the Court in *Heller* affirmatively *approved* a slew of gun laws," including "felon-in-possession laws," "based on a history- and tradition-based test"). And although the panel's decision in this case is the first precedential court of appeals decision addressing felon-dispossession laws since *Bruen*, district courts in more than 80 cases have already addressed the constitutionality of Section 922(g)(1)— and all the decisions we are aware of have upheld the statute. *See* Brief for Fed. Gov't at 17 n.5, *Vincent v. Garland*, No. 21-4121 (10th Cir. Jan. 17, 2023) (collecting 86 district court decisions).

**2.**  Range does not contend that legislatures lack authority to enact felon-possession prohibitions. And his petition correctly acknowledges (Pet. 4) that he has been convicted of an offense that is "equivalent" to a felony.[1] Range nonetheless claims

---

[1] Range was convicted of a state-law fraud offense that was punishable by up to five years' imprisonment at the time of his conviction. *See* 62 Pa. Cons. Stat. § 481 (1995). Under Pennsylvania's unique sentencing scheme, the label for crimes punishable by five years' imprisonment is "misdemeanor of the first degree." 18 Pa. Cons. Stat. §§ 106(b)(6), 1104(1). For purposes of Section 922(g)(1), Congress accounted for variations in state-law labels by adopting a uniform federal definition of "crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 921(a)(20). Thus, similarly situated individuals are generally treated similarly— whether they were convicted in Pennsylvania (where a variety of incontestably serious offenses are called first-degree misdemeanors, *see Holloway v. Attorney Gen.*, 948 F.3d 164, 175 (3d Cir. 2020)), in New Jersey (where crimes are divided by class without the labels "misdemeanor" and "felony," *id.* at 174-75), or under the laws of the many other jurisdictions that follow the more common practice of labeling crimes felonies when they are punishable by more than one year of imprisonment, *see, e.g.*, 18 U.S.C. § 3559(a)(5); Del. Code Ann. tit 11, § 4205(b)(5) (crimes punishable by five years' incarceration labeled as felonies).

that the Second Amendment requires an exception to felon-possession prohibitions for "nonviolent felons," urging that the historical record conclusively limits legislative disarmament authority to those whose past conduct bears a close connection to "dangerousness." Pet. 10-15. But as the panel explained, history reflects that "[n]on-violent individuals were repeatedly disarmed between the seventeenth and nineteenth centuries because legislatures determined that those individuals lacked respect for the rule of law and thus fell outside the community of law-abiding citizens. That longstanding tradition refutes Range's constrictive account of Anglo-American history as prohibiting the government from disarming non-violent individuals." Op. 45.

Range now invites the Court, based on the same historical materials examined by the panel, to impose a new limitation on the permissible scope of felon-dispossession laws—a limitation that has been repeatedly rejected by this Court and other courts. *See Folajtar v. Attorney Gen.*, 980 F.3d 897, 907 (3d Cir. 2020) (explaining that this Court has repeatedly "repudiated" a "narrow focus on dangerousness"); *Holloway*, 948 F.3d at 171 n.7; *Binderup v. Attorney Gen.*, 836 F.3d 336, 348-49 (3d Cir. 2016) (en banc) (Ambro, J.); *id.* at 387, 389-90 (Fuentes, J.); *Medina*, 913 F.3d at 159; *accord Rozier*, 598 F.3d at 771 (upholding Section 922(g)(1) in all its applications); *Scroggins*, 599 F.3d at 451 (same); *McCane*, 573 F.3d at 1047 (same). As this Court has explained, although it is possible to "cherry-pick[]" the history to "show[] that dangerousness was one reason to restrict firearm possession," "it hardly was the only one." *Folajtar*, 980 F.3d at 909. "Ten of the fifteen judges to participate in *Binderup* rejected" a "narrow focus on dangerousness," a

conclusion the Court should reiterate here. *Id.* at 907.[2]

Range mistakenly dismisses relevant history on ahistorical grounds. He insists, for example, that English and colonial laws disarming Catholics and other religious groups must have been supported by a dangerousness-focused "rationale." Pet. 12-13. That post hoc explanation cannot be squared with the numerous occasions when groups were disarmed not because the members of the group had already "demonstrated a propensity for violence" but rather because of concerns that the group had "evinc[ed] inadequate faithfulness to the sovereign and its laws." Op. 28-29. Range fares no better in seeking to dismiss (Pet. 13-14) the import of Revolutionary War-era laws disarming individuals who declined to swear loyalty oaths or otherwise failed to demonstrate compliance with the emergent Nation's legal norms. Legislatures in this era "disarm[ed] non-violent individuals because their actions evinced an unwillingness to comply with the legal norms of the nascent social compact"—including Pennsylvania, where a loyalty oath law "deprived sizable numbers of pacifists" of the right to bear arms; Virginia, where a similar law disarmed individuals who "could not have been considered dangerous spies or threats of violence" because they were "still

---

[2] Three of those ten judges concluded in the controlling opinion that crimes must be evaluated under a "multifactored seriousness inquiry," but as the panel here concluded—and Range's petition does not dispute—this inquiry "no longer applies" given "*Bruen*'s focus on history and tradition." Op. 14 n.9. Although the government previously took the view that the panel here was bound by the controlling opinion in *Binderup*, *see* Gov't Suppl. Br. 1-6, that issue is now academic. The en banc Court should again reject the proposed dangerousness limitation and instead adhere to the panel opinion's correct application of *Bruen*. *See id.* at 7.

required . . . to attend militia trainings"; and Connecticut, which disarmed people who had engaged in the non-violent conduct of "defam[ing] resolutions of the Continental Congress." Op. 30-36.[3]

As the panel also explained (Op. 36-37), a "highly influential" "precursor[]" to the Second Amendment proposed by the Antifederalist contingent of the Pennsylvania ratifying convention, *Heller*, 554 U.S. at 604, included among a proposed Bill of Rights an individual right to bear arms provision that would expressly permit legislatures to disarm people "for crimes committed, *or* real danger of public injury." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971) (emphasis added). Range discounts this evidence of the founders' understanding of the scope of the right to bear arms by characterizing it as "merely a proposal" that was not adopted by the Pennsylvania ratifying convention. Pet. 14. This overlooks the proposal's "great importance in the history of the federal Bill of Rights," 2 Schwartz, *supra*, at 628. The absence of a Bill of Rights did not persuade the Pennsylvania convention to reject ratification. *Id.* at 627-28. But the Antifederalists' proposed amendments then "circulated throughout the country in newspaper, broadside, and pamphlet form." 2

---

[3] Range also attempts to dismiss this historical evidence as too far removed from the Second Amendment's "ratification in 1791," Pet. 12. *Heller* makes clear, however, that the Second Amendment "codified a *pre-existing* right" that was "venerable" by the time of the Amendment's ratification. 554 U.S. at 592, 605. Range also asks (Pet. 13) the Court to ignore any laws that are "repugnant (not to mention unconstitutional)" by today's standards, but as the panel explained, that feature of certain historical laws does not undermine their role in establishing legislatures' broad authority to disarm those viewed as non-law-abiding and untrustworthy. Op. 27 n.18.

*The Documentary History of the Ratification of the Constitution* 617 (1976). And when the Bill of Rights was adopted, eight of its Amendments tracked provisions "first suggested as amendments in the proposals of the Pennsylvania minority," including the Second Amendment's right to bear arms. 2 Schwartz, *supra*, at 628. Some of the Second Amendment's most "influential" proponents, *Heller*, 554 U.S. at 604, thus understood the "'*pre-existing* right'" that the Amendment "'codified,'" *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 592), as permitting legislatures to disarm convicted criminals regardless of the dangerousness of their past offenses. *See* Op. 37 (explaining that the proposal's "use of the disjunctive 'or' refutes" the argument that the proposal speaks to "disarmament of dangerous criminals only"); *Medina*, 913 F.3d at 158-59 (similar). This and other important Second Amendment precursors cannot be "shoehorn[ed] . . . into the silo of dangerousness." *Folajtar*, 980 F.3d at 908-09 (discussing, in addition to examples addressed above, proposals at the Massachusetts and New Hampshire ratifying conventions).

Range also identifies no basis for disregarding the founding-era practice of punishing felony offenses with death and estate forfeiture. The First Congress (which drafted and proposed the Second Amendment) notably made a variety of crimes punishable by death, including the non-violent offense of forging or counterfeiting a public security. *See* An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112, 115 (1790). States in the early Republic likewise treated nonviolent crimes "such as forgery and horse theft" as capital offenses. *Folajtar*, 980 F.3d at 904

(citing *Medina*, 913 F.3d at 158). Range observes that it "would violate the Eighth Amendment" to "execute an individual for a non-violent felony today." Pet. 14. While Eighth Amendment analysis may turn on "contemporary" attitudes, *see Roper v. Simmons*, 543 U.S. 551, 562 (2005), the inquiry here turns on history and tradition, *see Bruen*, 142 S. Ct. at 2130. And founding-era views on felony punishment make it "'difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms.'" *Folajtar*, 980 F.3d at 905 (quoting *Medina*, 913 F.3d at 158).

Ultimately, Range's historical arguments seek to transform "analogical reasoning under the Second Amendment" into "a regulatory straitjacket," hinging the constitutionality of a firearm regulation on the existence of a "dead ringer" or a "historical *twin*." *Bruen*, 142 S. Ct. at 2133.[4] The Court should instead adhere to the overwhelming consensus, *see supra* pp. 6-7, that felons and felon-equivalents, including those whose offenses were non-violent, can be disarmed consistent with the Second Amendment.

---

[4] The *amici* Federal Defender Offices take the argument even further, suggesting (at 10) that felon-possession prohibitions could only be constitutional if there were a historical regulation that "either substantially abridged *felons*' right to keep and bear arms, or permanently denied firearms to some group very similar to felons." In addition to contravening the Supreme Court's admonitions that firearm regulations need not have a historical twin, this contention would seem to cast doubt on the incontestable proposition that legislatures can disarm violent felons—without needing to identify a centuries-long tradition of laws specifically linking disarmament to felony status.

**B.    The Second Amendment's text reflects its historical roots.**

Range is equally mistaken in urging that the text of the Second Amendment is at odds with this history. Pet. 5-9. The "people" who possess a right to keep and bear firearms under the Second Amendment "are the 'law-abiding, responsible citizens' of the polity, a category that properly excludes those who have demonstrated disregard for the rule of law through the commission of felony and felony-equivalent offenses, whether or not those crimes are violent." Op. 3 (quoting *Bruen*, 142 S. Ct. at 2131); *see also* Op. 16-21, 46-48. As previously discussed, *supra* pp. 2-3, the Supreme Court has repeatedly made clear that the Second Amendment codifies a right afforded to law-abiding citizens, and that principle is reflected in the Court's repeated statements that its decisions do not call into question restrictions on firearm possession by felons.

The Court in *Heller* explained that "the people" covered by the Second Amendment are "all members of the political community." 554 U.S. at 580-81. Range mistakenly assumes that all citizens are part of the political community protected by the Second Amendment. Pet. 6. But from the founding to the present, legislatures have retained wide latitude to exclude felons from the political community. As Thomas Cooley explained in his "massively popular 1868 Treatise on Constitutional Limitations," *Heller*, 554 U.S. at 616, "the *people* in whom is vested the sovereignty of the State . . . cannot include the whole population," and "[c]ertain classes have been almost universally excluded"—including "the idiot, the lunatic, and the felon, on obvious grounds," Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which*

11

*Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868). Felons could

therefore historically be excluded from "exercis[ing] the elective franchise," *id.* at 29—

as well as from other, closely related "political rights," including the rights to "hold

public office," to "serve on juries," and, most relevant here, "to bear arms," Akhil Reed

Amar, *The Bill of Rights* 48 (1998) (explaining that these were all historically understood

as "political rights"). Today it remains the case that a felony conviction often results in

the "forfeiture of a number of rights" including not just arms bearing but also "the right

to serve on a jury and the fundamental right to vote." *Medina*, 913 F.3d at 160. Just as

Congress and the States have required those convicted of felonies to forfeit certain

political rights, Section 922(g)(1) imposes a firearms-related disability "as a legitimate

consequence of a felony conviction." *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678,

708 (6th Cir. 2016) (en banc) (Sutton, J., concurring in most of the judgment).

The panel correctly rejected the suggestion (Pet. 6) that this reasoning casts doubt

on the rights of felons under the First and Fourth Amendments. Op. 47 n.32. As the

Fifth and Eighth Circuits have recognized, there need not be an exact overlap in "the

people" covered by these three Amendments. *See United States v. Portillo-Munoz*, 643 F.3d

437, 441 (5th Cir. 2011); *United States v. Flores*, 663 F.3d 1022, 1023 (8th Cir. 2011) (per

curiam).

In any event, even if felons and felon-equivalents were among "the people"

under the Second Amendment, the panel's analysis "would yield the same result." Op.

48 (quotation marks omitted). The same history and Supreme Court precedent confirm

both that felons and felon-equivalents are not among "the people" and that "the right

. . . to keep and bear Arms" is not "infringed" by longstanding laws prohibiting felons

from possessing firearms. U.S. Const. amend. II. Indeed, the Eleventh Circuit

precedent on which Range seeks to rely (Pet. 6) illustrates the point. That court stated

in dicta that "felons" are "indisputably part of 'the people'" covered by the Second

Amendment. *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1046 (11th Cir. 2022). That

statement was immaterial to the disposition of that case, which involved a challenge to

a different firearm regulation. And as to the issue presented here, Eleventh Circuit

precedent specifies that felons categorically "may be 'disqualified from' possessing arms

without violating the Second Amendment" because regardless of the scope of "the

people," the "particular history" of the right to keep and bear arms "demonstrates that

it extended (and thus extends) to some categories of individuals, but not others"—and

in particular, not to felons. *Id.* at 1044; *see Rozier*, 598 F.3d at 770-71 ("[S]tatutes

disqualifying felons from possessing a firearm under any and all circumstances do not

offend the Second Amendment."); *see also, e.g.*, *Flick v. Attorney Gen.*, 812 F. App'x 974,

975 (11th Cir. 2020) (per curiam) ("as-applied challenge" by someone with non-violent

convictions was "foreclose[d]" under Eleventh Circuit precedent), *cert. denied*, 141 S. Ct.

2551 (2021).

## C.    Range's "dangerousness" inquiry would enmesh courts in standardless assessments without basis in the Second Amendment.

The approach dictated by the Second Amendment's text and historical tradition

also "makes good sense" "as a practical matter," *Medina*, 913 F.3d at 159. Range's proposal hinges on an undefined standard of "dangerousness." Pet. 11. Indeed, Range himself offers starkly different articulations of that standard. *Compare* Pet. 10 (advocating a "violent crime" test), *with* Pet. 3 (advocating a "danger to society" test). His approach would task courts with "weighing the relative dangerousness" (or violence) "of hundreds of offenses"—from drug dealing to environmental contamination—without meaningful guidance. *Folajtar*, 980 F.3d at 906; *see also Johnson v. United States*, 576 U.S. 591, 598 (2015) (striking down Armed Career Criminal Act's residual clause, while citing the Court's "repeated attempts and repeated failures to craft a principled and objective standard" for defining violent crimes). The uncertainties inherent in Range's proposal are underscored by his prior suggestion (Opening Br. 27) that the Second Amendment compels case-by-case assessments of the danger posed by individual felons. That would be a "very difficult and time-intensive task," *Kanter v. Barr*, 919 F.3d 437, 450 (7th Cir. 2019) (quotation marks omitted), for which the judiciary is not "'institutionally equipped,'" *id.* (quoting *United States v. Bean*, 537 U.S. 71, 77 (2002)). *See also Folajtar*, 980 F.3d at 906 n.10 (similarly explaining that Congress's "decision to defund" a program under which the executive branch engaged in individualized dangerousness assessments "exemplifies" the problems inherent in such inquiries).

Moreover, even if the only relevant question were dangerousness, Range's challenge would still fail. The Court's analysis could begin and end with the recognition that felon-dispossession statutes such as Section 922(g)(1) plainly do aim to keep

14

firearms out of the hands of "persons who demonstrated that they would present a danger to the public if armed." Pet. 10 (quotation marks omitted). It does not follow that the Court would need to further compare such a historical justification with every individual application of the statute. And even if the Court were to accept Range's invitation to focus only on non-violent offenses, that would not advance his argument: even non-violent felons are more likely than ordinary, law-abiding citizens "to engage in illegal and violent gun use." *Kanter*, 919 F.3d at 448 (quotation marks omitted); *see Folajtar*, 980 F.3d at 909 (citing evidence that fraud and forgery offenders commit violent crimes at a significant rate, approaching the rate associated with similarly situated individuals convicted of burglary and drug offenses).[5]

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

---

[5] The panel's decision provides ample basis for affirming the district court's judgment. If the Court were to disagree, the proper remedy is not to hold that Range is entitled to judgment in his favor but to remand to the district court for further proceedings. If the historical materials discussed by the panel were found insufficient to establish conclusively that Range can properly be disarmed, it would not follow that history settles the issue in Range's favor. If the Court were not prepared to affirm the judgment, further proceedings would be particularly warranted because the government has not yet had the opportunity to submit a full-length brief in this case post-*Bruen*.

Respectfully submitted,

BRIAN M. BOYNTON
   *Principal Deputy Assistant Attorney*
     *General*

JACQUELINE C. ROMERO
   *United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT

 */s/ Kevin B. Soter*
KEVIN B. SOTER
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7222*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *California Bar No. 324524*
   *(202) 305-1754*
   *kevin.b.soter@usdoj.gov*

January 2023

## COMBINED CERTIFICATIONS

1.    Government counsel are not required to be members of the bar of this Court.

2.    This brief complies with the Court's January 6 order because it contains 15 pages, excluding the parts of the brief exempted under Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

3.    The text of the electronic version of this document is identical to the text of the hard copies that will be provided.

4.    This document was scanned for viruses using CrowdStrike Falcon Sensor version 6.49.16303.0, and no virus was detected.


*/s/ Kevin B. Soter*
Kevin B. Soter