No. 21-2835

# UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

BRYAN DAVID RANGE,

*Plaintiff-Appellant*,

*v.*

ATTORNEY GENERAL OF THE UNITED STATES, et al.,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

**BRIEF OF EVERYTOWN FOR GUN SAFETY
AS AMICUS CURIAE IN SUPPORT OF APPELLEES**

Janet Carter
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017
jcarter@everytown.org
(646) 324-8174

February 1, 2023

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock and hence no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ............................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................ 2

ARGUMENT ........................................................................................... 4

    I.    Range Has Not Met His Burden to Establish Coverage Under the Second Amendment's Plain Text ........................................ 4

    II.   If the Court Reaches the Issue of Historical Regulation, the Proper Focus for Its Analysis Is 1868, Not 1791 ...................... 6

    III.  This Court Should Reject Any Effort to Dismiss the United States's Historical Analogues as "Outliers" ........................... 17

CONCLUSION ....................................................................................... 19

# TABLE OF AUTHORITIES

*Cases*

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
  910 F.3d 106 (3d Cir. 2018) ........................................................................ 2

*Davenport v. Wash. Educ. Ass'n*,
  551 U.S. 177 (2007) .................................................................................. 19

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ................................................................3, 13, 14, 17

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011) .................................................................. 8, 9

*Friedman v. City of Highland Park*,
  784 F.3d 406 (7th Cir. 2015) ...............................................................18, 19

*Gould v. Morgan*,
  907 F.3d 659 (1st Cir. 2018) ...................................................................... 7

*Kennedy v. Bremerton School District*,
  142 S. Ct. 2407 (2022) ................................................................................ 5

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ................................................................................8, 18

*New York State Rifle & Pistol Ass'n v. Bruen*,
  142 S. Ct. 2111 (2022) ........................................................................*passim*

*New York State Rifle & Pistol Ass'n v. City of New York*,
  140 S. Ct 1525 (2020) ................................................................................ 5

*Rehaif v. United States*,
  139 S. Ct. 2191 (2019) ............................................................................... 2

*Rupp v. Becerra*,
  401 F. Supp. 3d 978 (C.D. Cal. 2019), *vacated and remanded*, No. 19-56004,
  2022 WL 2382319 (9th Cir. June 28, 2022) .............................................. 2

*Teter v. Connors*,
  460 F. Supp. 3d 989 (D. Haw. 2020), *appeal docketed*, No. 20-15948 (9th Cir.
  May 19, 2020) ......................................................................................... 2

*United States v. Greeno*,
  679 F.3d 510 (6th Cir. 2012) ..................................................................... 8

*United States v. Reyna*,
  No. 3:21-cr-00041, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022) .............. 4

### Statutes and Ordinances

1913 N.Y. Laws 1629 ................................................................................ 15

1919 N.C. Laws 397-98 ............................................................................ 15

1923 Cal. Stat. 696 .................................................................................. 14

1923 N.D. Laws 380 ................................................................................. 15

1923 N.H. Laws 138 ................................................................................. 15

1925 Ind. Laws 495 .................................................................................. 15

1925 Or. Laws 468 ................................................................................... 15

Brooklyn, N.Y., An Ordinance to Regulate the Carrying of Pistols in the City
  of Brooklyn (Oct. 4, 1880) ...................................................................... 16

Elmira, N.Y., Act of July 18th, 1892 ......................................................... 16

Montclair, N.J., An Ordinance to Regulate the Carrying of Concealed
  Weapons and to Prohibit the Carrying of the Same Except as Herein
  Provided (May 3, 1897) ........................................................................... 16

New York, N.Y., An Ordinance to Regulate the Carrying of Pistols in the City
  of New York (Jan. 7, 1878) ...................................................................... 15

Passaic, N.J., Proposed Ordinance, An Ordinance Concerning the Carrying
  and Firing of Guns and Pistols (Apr. 23, 1887) ........................................ 16

Troy, N.Y., An Ordinance Regulating the Carrying of Loaded Firearms and Other Dangerous Weapons in the City of Troy (May 4, 1905) .................. 16

*Other Authorities*

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ..... 11, 12

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S.) ........................................................ 12, 17

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018) ........................................................... 12, 17

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 ............................................................................................... 11, 12

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022) ............................................................................ 6, 10

*The City Council*, Passaic Daily News, May 17, 1887 .................................... 16

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021) ........................................................................ 9

## INTEREST OF AMICUS CURIAE

Amicus curiae Everytown for Gun Safety ("Everytown") is the nation's largest gun violence prevention organization, with nearly ten million supporters across the country, including over 770,000 in the three states in the Third Circuit. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. The mayors of 64 cities, towns, and other localities in the states in the Third Circuit are members of Mayors Against Illegal Guns. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

Over the past several years, Everytown has devoted substantial resources to researching and developing expertise in historical firearms legislation.

---

[1] No party's counsel authored this brief in whole or part; no party or party's counsel contributed money intended to fund its preparation or submission; and, apart from Everytown, no person contributed money intended to fund its preparation or submission. All parties consent to this brief's filing.

Everytown has drawn on that expertise to file more than 60 amicus briefs in Second Amendment and other firearms cases, offering historical and doctrinal analysis, as well as social science and public policy research, that might otherwise be overlooked. *See, e.g.*, *Lara v. Commissioner*, No. 21-1832, Dkts. 31-1, 61 (3d Cir.); *Miller v. Smith*, No. 22-1482, Dkt. 42 (7th Cir.); *Teter v. Shikada*, No. 20-15948, Dkt. 73 (9th Cir.). Several courts have expressly relied on Everytown's amicus briefs in deciding Second Amendment and other firearms cases. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 112 n.8 (3d Cir. 2018); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 991-92, 992 n.11 (C.D. Cal. 2019), *vacated and remanded*, No. 19-56004, 2022 WL 2382319 (9th Cir. June 28, 2022); *Teter v. Connors*, 460 F. Supp. 3d 989, 1002-03 (D. Haw. 2020), *appeal docketed*, No. 20-15948 (9th Cir. May 19, 2020); *see also Rehaif v. United States*, 139 S. Ct. 2191, 2210 n.4, 2211 n.7 (2019) (Alito, J., dissenting).

## INTRODUCTION AND SUMMARY OF ARGUMENT

Appellant Bryan Range has a felony-equivalent conviction for welfare fraud under 62 Pa. Cons. Stat. § 481(a). He brought an as-applied Second Amendment challenge to 18 U.S.C. § 922(g)(1), the federal law prohibiting those with felony and felony-equivalent convictions from possessing firearms and ammunition.

As the panel correctly held, and for the reasons in the United States's supplemental brief, applying Section 922(g)(1) to Range is constitutional under the approach to Second Amendment cases set out in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). *See* En Banc Br. for Appellees, Dkt. 93 ("U.S. Br."). Everytown submits this brief to expand on three methodological issues. *First*, on the initial, textual inquiry of the *Bruen* framework, Range has the burden, and he has not met that burden. *Second*, in applying the historical inquiry of the *Bruen* framework—asking whether the regulation is "consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130—the historical analysis should center on the public understanding of the right in 1868, when the Fourteenth Amendment was ratified, not 1791. This is true not only in cases challenging state laws, but also in cases, like this one, challenging a federal law. Moreover, 1868 is neither a starting-line nor a cutoff; under *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570 (2008), both earlier and later history are also relevant. *Third*, *Bruen*'s analysis reveals that a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary.

## ARGUMENT

### I.    Range Has Not Met His Burden to Establish Coverage Under the Second Amendment's Plain Text

*Bruen*'s framework involves both a textual inquiry and a historical inquiry. Courts first must ask whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2129-30. If so, courts then move on to ask whether the government has shown that its regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. *See generally id.* at 2134-38 (separating application of test into Part III.A (text) and Part III.B (history)). If not, the law is constitutional and the inquiry ends: self-evidently, if people, conduct, or weapons are outside the Second Amendment's protection, then the government may regulate them without infringing the Second Amendment. *See, e.g.*, *United States v. Reyna*, No. 3:21-cr-00041, 2022 WL 17714376, at *5 (N.D. Ind. Dec. 15, 2022) (dismissing defendant's challenge to indictment and plea because "§ 922(k)'s regulated conduct is outside [the] scope of the Second Amendment" and that fact "is enough to decide" the case; declining to reach historical inquiry).

At the first step, the burden of proof is on the plaintiff challenging a law. *Bruen* itself makes this clear, by indicating that a presumption that the Constitution protects a plaintiff's conduct arises *after* ("when" or "because") the textual inquiry is satisfied. *See* 142 S. Ct. at 2126, 2141 n.11. If the burden

were on the government throughout—in what would be an extraordinary departure from ordinary principles of litigation—the Court would have said that the presumption exists from the outset. Furthermore, placing the initial burden on the plaintiff accords with the Court's approach to other constitutional issues. For example, just a week after *Bruen*, the Court announced in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), that "[u]nder this Court's precedents, a plaintiff bears certain burdens to demonstrate an infringement of [their] rights under the Free Exercise and Free Speech Clauses. If the plaintiff carries these burdens, the focus then shifts to the defendant to [justify] … its actions[.]" *Id.* at 2421.

As the United States explains, and as the panel held, individuals like Range with felony or felony-equivalent convictions are not within the Second Amendment's textual scope. *Heller*, *Bruen*, and concurring opinions in both *Bruen* and *New York State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct 1525 (2020), all make clear that individuals with felony and felony-equivalent convictions "fall outside 'the people' protected by the Second Amendment." U.S. Br. 4 (cleaned up) (quoting Op. 16, 21); *see id.* at 11-12. And, as the United States further explains, even if they did not, "'the right … to keep and bear Arms' is not 'infringed' by longstanding laws prohibiting felons from

possessing firearms." *Id.* at 13. Accordingly, this Court should reject Range's

claim at the first, textual inquiry of *Bruen*'s analysis.

## II.    If the Court Reaches the Issue of Historical Regulation, the Proper Focus for Its Analysis Is 1868, Not 1791

If the Court proceeds to the second, historical inquiry, it should conclude

that the most relevant time period for that inquiry centers on 1868, when the

Fourteenth Amendment was ratified. This is true not only in cases challenging

state regulations, but also in cases, like this one, where the challenged law is

federal. As scholars have explained, the Fourteenth Amendment's ratification

not only made the Second Amendment (and other rights in the Bill of Rights)

applicable to the states; "it also requires an updated 1868 understanding of the

Bill of Rights itself." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of*

*Incorporation*, 97 Ind. L.J. 1439, 1441 (2022); *see Bruen*, 142 S. Ct. at 2138

(citing pre-publication version of Professor Lash's article). Accordingly, under

this originalist approach, it is the 1868 understanding of the right to keep and

bear arms that should inform all Second Amendment cases after *Bruen*.

To understand why this is the correct rule for cases challenging federal

laws, it is necessary first to understand why it is correct for cases challenging

state laws. In a case involving a state law, focusing on 1868 is the only way to

answer the originalist question: How did the people understand the right at the

time of its adoption? There was no right to keep and bear arms constraining the

states under the U.S. Constitution until 1868; as *Bruen* correctly observed, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." 142 S. Ct. at 2137. Thus, when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right at that time should control the originalist analysis today. In a case against a state, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect.

Several circuits reached this conclusion in analyzing the tradition of firearm regulation at the first, historical step of the Second Amendment framework that courts applied prior to *Bruen*.[2] *See Gould*, 907 F.3d at 669 ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."); *Ezell v.*

---

[2] Between *Heller* and *Bruen*, every federal court of appeals to address the issue concluded that analyzing Second Amendment claims should proceed in two steps: a historical step, in which courts examined whether the challenged law restricted conduct falling within the scope of the Second Amendment, as historically understood; and, if so, a means-end scrutiny step, where courts examined the fit between the government's interest and the challenged law, usually under intermediate scrutiny. *See Bruen*, 142 S. Ct. at 2126-27; *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) (citing cases), *criticized by Bruen*, 142 S. Ct. at 2124, 2126-27.

*City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*McDonald* [*v. City of Chicago*, 561 U.S. 742 (2010),] confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified."); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*).

*Bruen* does not alter that conclusion; the step-one analyses in these cases remain, as a general matter, good law. *See* 142 S. Ct. at 2138 (leaving open the question whether 1868 or 1791 is the correct focus); *id.* at 2127 (concluding that "[s]tep one of the predominant framework [applied in the lower courts before *Bruen*] is broadly consistent with *Heller*"). Moreover, there is good reason for these conclusions: insisting that the 1791 understanding should apply against the states does not make sense in light of the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right to keep and bear arms around 1868. *See McDonald*, 561 U.S. at 770-78 (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). It would be extraordinary if the public understanding of the right in 1868 were so central to *whether* the right was incorporated against the states, but irrelevant to *what* right was incorporated. That is presumably why the Seventh Circuit, in an opinion by Judge Sykes, reads *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-

meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell*, 651 F.3d at 702.

Further confirmation that 1868 is the correct focus, at least as to Second Amendment challenges to state gun laws, appears in the *Bruen* oral argument, where the following exchange took place between Justice Thomas and former Solicitor General Paul Clement as counsel for the NRA's New York affiliate:

> JUSTICE THOMAS: [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?

> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.

> Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843).

In sum, originalist analysis compels applying the 1868 understanding in a case challenging a state law. The next question is whether the 1868 understanding likewise controls in challenges, like this one, to federal gun laws, to which the Second Amendment applies directly rather than through the Fourteenth Amendment.

To be sure, the choice between 1791 and 1868 is a less straightforward one with respect to such challenges. If the public understanding of the Bill of Rights changed between ratification in 1791 and incorporation in 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Lash, 97 Ind. L.J. at 1441. But *Bruen* rejected the possibility of different standards for the state and federal governments. 142 S. Ct. at 2137 ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government."). Accordingly, originalists must justify applying either the 1868 understanding or the 1791 understanding (where they conflict) to all levels of government.

Existing doctrine does not resolve this choice between 1791 and 1868: *Bruen* noted prior decisions that had "assumed" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." *Id.* But if the majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the relevant focus, and pointed to "ongoing scholarly debate on

whether courts should primarily rely on the prevailing understanding of an

individual right when the Fourteenth Amendment was ratified in 1868 when

defining its scope (as well as the scope of the right against the Federal

Government)." *Id.* at 2138. And the Court then cited two scholars who support

the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports

the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and

Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of

Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2),

https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now

published at 97 Ind. L.J. 1439)).

On Professor Amar's account, when the Fourteenth Amendment was

ratified, then-contemporary understandings of incorporated rights could

transform their meaning not only against the states, but also as to the federal

government.[3] More recently, Professor Lash wrote—as quoted in *Bruen*—

---

[3] *See* Amar, *The Bill of Rights*, at xiv (account is "attentive to the possibility" that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[W]hen we 'apply' the Bill of Rights against the states today, we must first and foremost reflect on the meaning and spirit of the amendment of 1866, not the Bill of 1789. … [I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that "the Fourteenth Amendment has a doctrinal 'feedback effect' against the federal

"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2; *see Bruen*, 142 S. Ct. at 2138. On this view, too, 1868 meanings bind both the states and the federal government.

The 1868 view is also consistent with the passage in *Bruen* instructing the lower courts on historical methodology through the example of sensitive places restrictions. There, the Court indicated that "18th- *and 19th-century*" laws contained adequate restrictions on the possession of guns in legislative assemblies, polling places, and courthouses to satisfy its historical analysis, 142 S. Ct. at 2133 (emphasis added)—an incomprehensible statement if the Court believed that the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court cited for that proposition, *see id.*, all of the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[4]

---

government"); *see also id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866.").

[4] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae at 11-17, *Bruen* (No. 20-843) (July 20, 2021) (disputing relevance of 19th-century laws but (at 16

For the reasons set out in the panel opinion and the United States's brief, this Court should conclude that Section 922(g)(1) is constitutional, including as applied to individuals convicted of "non-violent" offenses, even if it focuses its analysis on the period around 1791. *See* Op. 24-42; U.S. Br. 4, 6-13. The statute is an incarnation of a longstanding historical tradition of analogous regulations, beginning before the founding and continuing—as explained further below, *see infra* at 14-16—through the Reconstruction era and later. The choice between 1868 and 1791 is thus not dispositive in this case. But if this Court prefers to settle the issue the Supreme Court left open now, to guide district courts in cases where the choice of 1868 or 1791 might be determinative, it should conclude that 1868 is the correct focus.

Moreover, 1868 is neither a starting-line nor a cutoff. *Heller* and *Bruen* both examined history preceding even 1791. *See Heller*, 554 U.S. at 592-93; *Bruen*, 142 S. Ct. at 2135-36, 2142-45. Accordingly, the government's and panel decision's founding-era and earlier history in this case remain highly relevant to how the right was understood in 1868. And *Heller* instructs that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is

---

n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

also "a critical tool of constitutional interpretation," 554 U.S. at 605 (second emphasis added); *see also Bruen*, 142 S. Ct. at 2127-28 (quoting same). *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 142 S. Ct. at 2137, 2154 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 2136 (cleaned up) (quoting decision quoting James Madison). Thus, even if evidence in the period up to and around 1868 left the meaning of the Second Amendment right "indeterminate," courts should look to "practice" in the decades that followed to "settle" the meaning of the right.

Under these principles, historical laws from the late 19th and early 20th centuries provide further confirmation that Section 922(g)(1), and its application to individuals convicted of "non-violent" felony-equivalent offenses, sits comfortably within this nation's historical tradition of firearm regulation. In the 1920s, multiple states prohibited those with felony convictions from possessing handguns, including those convicted of property crimes. *See, e.g.*, 1923 Cal. Stat. 696 (prohibiting handgun possession by any person "who has been convicted of a felony against the person or property of

another or against the government of the United States or of the State of California or of any political subdivision thereof"); 1923 N.D. Laws 380 ("a felony against the person or property of another or against the Government of the United States or of any State or subdivision thereof"); 1923 N.H. Laws 138 ("a felony against the person or property of another"); 1925 Ind. Laws 495 ("a felony committed against the person or property of another"); 1925 Or. Laws 468 ("a felony against the person or property of another or against the government of the United States or of the state of Oregon or of any political subdivision thereof"). A decade earlier, states had begun regulating access to firearms through permits to purchase or possess, and several included "good moral character" requirements in their regimes—an assessment that would have allowed evaluation of an individual's criminal record. *See, e.g.*, 1913 N.Y. Laws 1629; 1919 N.C. Laws 397-98. And, beginning as early as the 1870s, several municipalities conditioned issuance of permits to carry concealed weapons on a finding that the applicant was a "law-abiding" person. *See, e.g.*, New York, N.Y., An Ordinance to Regulate the Carrying of Pistols in the City of New York (Jan. 7, 1878) (officer must be satisfied that applicant is "a proper and law-abiding person"), *in* Proceedings of the Board of Aldermen of the City of New York from January 7 to March 26, 1878, Vol. CXLIX, at 60 (1878); Brooklyn, N.Y., An Ordinance to Regulate the Carrying of Pistols in the City

15

of Brooklyn (Oct. 4, 1880) (same), *in* Proceedings of the Board of Aldermen of the City of Brooklyn from July 1 to December 31, 1880, Vol. II, at 385 (1880), and *reprinted in* The Brooklyn Daily Eagle, Oct. 26, 1880, at 1; Elmira, N.Y., Act of July 18th, 1892 (same), *reprinted in* The Elmira Daily Gazette and Free Press, July 28, 1892, at 7; Montclair, N.J., An Ordinance to Regulate the Carrying of Concealed Weapons and to Prohibit the Carrying of the Same Except as Herein Provided (May 3, 1897) (same), *reprinted in* Montclair Times, May 15, 1897, at 8; Troy, N.Y., An Ordinance Regulating the Carrying of Loaded Firearms and Other Dangerous Weapons in the City of Troy (May 4, 1905) (same), *in* Municipal Ordinances of the City of Troy 425-26 (1905); *see also* Passaic, N.J., Proposed Ordinance, An Ordinance Concerning the Carrying and Firing of Guns and Pistols (Apr. 23, 1887) (same), *reprinted in* Passaic Daily News, Apr. 25, 1887, at 4.[5] None of these laws contained the "dangerousness" limitation that Range wishes to read into constitutional doctrine.

---

[5] For confirmation of passage, *see The City Council*, Passaic Daily News, May 17, 1887, at 2 (reporting that "[t]he ordinance making the carrying of firearms in Passaic a misdemeanor was passed").

**III.    This Court Should Reject Any Effort to Dismiss the United States's Historical Analogues as "Outliers"**

Challengers in recent Second Amendment cases have sought to dismiss historical regulations as "outliers" insufficient to establish a historical tradition under *Bruen*. *See, e.g.*, Pls.' Suppl. Br. at 14-15, *Teter v. Shikada*, No. 20-15948 (9th Cir. Sept. 16, 2022), Dkt. 67 (arguing that as many as fifteen historical laws should be dismissed as "outliers"). No such argument is remotely tenable in this case, given the robust and extensive record of historical laws. *See* U.S. Br. at 21-31. But to the extent this Court might wish to address the issue to guide district courts' Second Amendment analysis in future cases, it should observe that a small number of laws can establish a tradition in light of *Bruen*'s discussion of the historical laws justifying sensitive places.

Specifically, *Bruen* repeated *Heller*'s identification of "schools and government buildings" as sensitive places, 142 S. Ct. at 2133 (quoting *Heller*, 554 U.S. at 626), and then recognized that three additional, more specific locations—legislative assemblies, polling places, and courthouses—were also "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment," *id.* But the sources the Court cited for the historical record justifying restrictions in those three locations identified only two laws naming legislative assemblies and two naming courthouses. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235, 246; Br. for Indep. Inst. at 11-12.

17

Under *Bruen*'s sensitive places analysis, therefore, a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary.[6]

Concluding that a small number of state laws can demonstrate a "public understanding" of a limitation on the Second Amendment right is also consistent with bedrock federalism principles that entitle a state to effectuate the policy choice of its citizens within constitutional bounds. Local conditions matter. Just as states today may (or may choose not to) "experiment[] with reasonable firearms regulations," *McDonald*, 561 U.S. at 785 (plurality opinion) (cleaned up), states historically may have chosen not to regulate certain weapons, people, or conduct, not because the public understood the right to keep and bear arms to prevent such regulations, but because of democratically supported policy choices. As the Court explained in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity," and "[t]he central role of

---

[6] To be sure, *Bruen* expressed "doubt" that three colonial regulations "could suffice to show a tradition." 142 S. Ct. at 2142. But that tentative statement should not be given undue weight, given the Court's discussion of sensitive places.

representative democracy is no less part of the Constitution than is the Second Amendment." *Id.* at 412. And the fact that states have latitude to experiment with regulations that meet their unique needs means that states historically may well have chosen not to regulate to the limits of constitutional permissibility. *Cf., e.g.*, *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 185 (2007) ("The constitutional floor [by which the First Amendment restricts public-sector] unions' collection and spending of agency fees is not also a constitutional ceiling for state-imposed restrictions."). Accordingly, while state laws restricting firearms demonstrate that the people of those states understood the right to keep and bear arms to permit such restrictions, the absence of such laws in other states does not warrant any inference that their citizens considered such restrictions unconstitutional.

## CONCLUSION

This Court should affirm the judgment of the district court.

February 1, 2023                    Respectfully submitted,

                                    /s/ Janet Carter
                                    Janet Carter
                                    Everytown Law
                                    450 Lexington Avenue, P.O. Box 4184
                                    New York, NY 10017

                                    *Counsel for amicus curiae*
                                    *Everytown for Gun Safety*

19

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because this brief contains 4,447 words, excluding the portions exempted by Fed. R. App. P. 32(f), and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Calisto MT font.

/s/ Janet Carter
Janet Carter
*Counsel for amicus curiae*
*Everytown for Gun Safety*

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2023, I electronically filed this amicus brief with the Clerk of the Court for the United States Court of Appeals for the Third Circuit using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ Janet Carter
Janet Carter
*Counsel for amicus curiae*
*Everytown for Gun Safety*