ORIGINALISM-BY-ANALOGY
AND SECOND AMENDMENT ADJUDICATION

133 YALE L.J. (FORTHCOMING)

*Joseph Blocher*[*] *& Eric Ruben*[**]

### ABSTRACT

In *New York State Rifle & Pistol Association v. Bruen*, the Supreme Court held that the constitutionality of modern gun laws must be evaluated by direct analogy to history, unmediated by familiar doctrinal tests. *Bruen*'s novel approach to historical decisionmaking purported to constrain judicial discretion, but instead enabled judicial subjectivity, obfuscation, and unpredictability. Those problems are painfully evident in courts' faltering efforts to apply *Bruen* to laws regulating 3D-printed guns, assault weapons, large-capacity magazines, obliterated serial numbers, and the possession of guns on subways or by people subject to domestic violence restraining orders. Without a more disciplined approach the future of Second Amendment doctrine is dire, as is that of other areas of constitutional law where such tests take root.

This Article begins by explaining *Bruen*'s approach, which we call originalism-by-analogy. It shares some features with standard forms of originalism and traditionalism, but also differs in the degree to which it requires judges to reason analogically straight from the historical record rather than, for example, using historical sources to identify the original public meaning of a constitutional provision. The Article then explains and addresses several challenges of originalism-by-analogy by bringing together two bodies of scholarship that have thus far had little overlap: the voluminous literature on originalism and the generations-old literature on analogical reasoning in law.

We distill three broad challenges for post-*Bruen* Second Amendment law and scholarship, and suggest some partial solutions. First, courts applying *Bruen* must discern workable principles of relevant similarity—the *sine qua non* of analogical reasoning—to compare historical and modern laws. Second, doctrine must account for the fundamental differences between past and present, in part through careful attention to the level of generality at which the historical inquiry is conducted. Third, the approach must account for courts' institutional

---

[*] Lanty L. Smith '67 Professor of Law, Duke University School of Law.
[**] Assistant Professor of Law, SMU Dedman School of Law. We are grateful to Albert W. Alschuler, Jennifer Behrens, Jacob D. Charles, Brannon Denning, Mark Frassetto, Pratheepan Gulasekaram, Darrell A.H. Miller, Michael Ramsey, Kelly Roskam, Reva Siegel, and Andrew Willinger for superb comments and critiques on early drafts of this article. Khoa Nguyen and Maggie Gianvecchio provided invaluable research assistance.

Electronic copy available at: https://ssrn.com/abstract=4408228

limitations in conducting a difficult historical inquiry. This includes not over-reading silences in the record, and also recognizing that—precisely because it requires comparison of past and present—*Bruen* not only licenses regulatory change, but preserves an important role for contemporary empirics and legislative deference.

TABLE OF CONTENTS

**Abstract** _____ **1**

*Table of Contents* _____ *2*

*Introduction* _____ *3*

*I.  Bruen's Novel Approach to Historical Analogy* _____ *12*

   **A. Bruen's Novel Approach** _____ **14**
     1.  The "Plain Text" Threshold _____ 15
     2.  A Stringent Test for Historically Persistent "General Societal Problems" _____ 20
     3.  *Bruen*'s Primary Historical-Analogical "Metrics": "Why" and "How" _____ 23
     4.  The Continuing Relevance of *Heller*'s "Presumptively Lawful" Regulations _____ 25

   **B. A Pivot in Constitutional Historicism** _____ **28**

*II.  Implementing Originalism-by-Analogy* _____ *37*

   **A. Principles of Relevant Similarity** _____ **38**
     1.  Historical Citations Without Reasoning _____ 39
     2.  The Centrality of Relevant Similarity in Analogical Reasoning___ 43
     3.  Toward Workable Principles of Relevant Similarity After *Bruen* __ 46

   **B. Anachronism and Levels of Generality** _____ **49**
     1.  Anachronism After *Bruen* _____ 49
     2.  Selecting a Level of Generality _____ 59

   **C. Institutional Limitations** _____ **66**
     1.  Judicial Resources _____ 67
     2.  Empirics and Deference _____ 68

*Conclusion* _____ *72*

Captured by the Third Circuit Libraries on 06/07/2023

Electronic copy available at: https://ssrn.com/abstract=4408228

## INTRODUCTION

The Supreme Court's increasingly historical approach to constitutional rights adjudication faces waves of criticism. Legal scholars and historians alike have highlighted the Court's selective use of historical sources,[1] the disconnect between those sources and modern challenges,[2] the silence of most voices within the historical record,[3] and even basic errors of historical fact.[4] Many of these critiques track longstanding criticisms of originalism as an interpretive practice—perhaps the central battlefield in constitutional scholarship over the past few decades.[5]

One especially notable aspect of the Court's recent turn to history is that it appears to depart from—or at least extend beyond—standard public meaning originalism, which has become the dominant version of originalist

––––––––––––––––––––––––––

[1] *See, e.g.*, Aaron Tang, *After* Dobbs: *History, Tradition, and the Uncertain Future of a Nationwide Abortion Ban*, 75 STAN. L. REV. (forthcoming 2023) (manuscript at 30-52), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4205139 [https://perma.cc/783Z-9JX4]; Reva Siegel, *Memory Games:* Dobbs*'s Originalism as Anti-Democratic Living Constitutionalism—and Some Pathways for Resistance*, 101 TEX. L. REV. 1127, 1180-93 (2023); Albert W. Alschuler, Twilight-Zone Originalism: The Supreme Court's Peculiar Reasoning in *New York State Rifle & Pistol Association v. Bruen* 6-8 (Jan. 19, 2023) (unpublished manuscript) (on file with author), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4330457 [https://perma.cc/TFY5-NJUR]; Saul Cornell, *Cherry-Picked History and Ideology-Driven Outcomes:* Bruen*'s Originalist Distortions*, SCOTUSblog (Jun. 27, 2022), https://www.scotusblog.com/2022/06/cherry-picked-history-and-ideology-driven-outcomes-bruens-originalist-distortions [https://perma.cc/S2HD-K3JW].

[2] *See, e.g.*, David Cole, *Egregiously Wrong: The Supreme Court's Unprecedented Turn*, N.Y. REV. (Aug. 18, 2022) ("[W]hy should states in the twenty-first century be limited to what states did centuries earlier, particularly when conditions have radically changed?").

[3] Dobbs v. Jackson Women's Health Org., 142 S. Ct. 2228, 2324 (2022) (Breyer, Sotomayor, and Kagan, JJ., dissenting) ("[O]f course, 'people' did not ratify the Fourteenth Amendment. Men did. So it is perhaps not so surprising that the ratifiers were not perfectly attuned to the importance of reproductive rights for women's liberty, or for their capacity to participate as equal members of our Nation.").

[4] *See, e.g.*, *History, the Supreme Court, and* Dobbs v. Jackson*: Joint Statement from the American Historical Association and the Organization of American Historians*, AM. HIST. ASS'N (July 2022), https://www.historians.org/news-and-advocacy/aha-advocacy/history-the-supreme-court-and-dobbs-v-jackson-joint-statement-from-the-aha-and-the-oah-(july-2022) [https://perma.cc/RX2B-L5NH] [hereinafter *"Joint Statement from the American Historical Association"*] ("The opinion [in *Dobbs*] inadequately represents the history of the common law, the significance of quickening in state law and practice in the United States, and the 19th-century forces that turned early abortion into a crime.").

[5] We discuss leading approaches to originalism throughout the Article; for prominent critiques, see ERWIN CHEMERINSKY, WORSE THAN NOTHING: THE DANGEROUS FALLACY OF ORIGINALISM (2022); FRANK CROSS, THE FAILED PROMISE OF ORIGINALISM (2009); ERIC J. SEGALL, ORIGINALISM AS FAITH (2018); Mitchell N. Berman, *Originalism is Bunk*, 84 N.Y.U. L. REV. 1 (2009).

Electronic copy available at: https://ssrn.com/abstract=4408228

methodology.[6] Rather than identifying the original public meaning of constitutional text[7] (which might then be implemented through doctrinal tests[8]) judges applying this new method are supposed to analogize modern laws directly to historical sources, unmediated by a legal rule or standard like the tiers of scrutiny. Though some scholars in the originalist literature have noted the difficulties of analogizing across time,[9] the important differences between public-meaning originalism, traditionalism, and the historical-analogical approach—which we call originalism-by-analogy—have yet to be fully extrapolated or addressed.

An exchange between Justices Samuel Alito and Antonin Scalia in *Jones v. United States*[10] helps illuminate the distinctions between standard public meaning originalism (championed by Scalia) and the historical-analogical approach (critiqued by Alito). In response to Scalia's reliance on 18th-century legal tradition to assess whether using a GPS device to track a suspect's car comports with the Fourth Amendment, Alito wrote that "it is almost impossible to think of late-18th-century situations that are analogous to" the use of GPS devices.[11] Alito asked drily, "Is it possible to imagine a case in which a constable secreted himself somewhere in a coach and remained there for a period of time in order to monitor the movements of the coach's owner?"[12] He observed the absurdity

---

[6] *See* Richard H. Fallon, Jr., *The Chimerical Concept of Original Public Meaning*, 107 Va. L. Rev. 1421, 1424 (2021) ("The leading current version [of originalism] is public meaning originalism."); Lawrence B. Solum, *Originalism Versus Living Constitutionalism: The Conceptual Structure of the Great Debate*, 113 Nw. U. L. Rev. 1243, 1251 (2019) ("Most contemporary originalists aim to recover the public meaning of the constitutional text at the time each provision was framed and ratified; this has been the dominant form of originalism since the mid-1980s.").

[7] Randy E. Barnett, Restoring the Lost Constitution: The Presumption of Liberty 94-95 (2014) (describing "original meaning originalism" as seeking "the public or objective meaning that a reasonable listener would place on the words used in the constitutional provision at the time of its enactment"); Vasan Kesavan & Michael Stokes Paulsen, *The Interpretive Force of the Constitution's Secret Drafting History*, 91 Geo. L.J. 1113, 1132-33 (2003) (describing a theory of "original, objective-public-meaning textualism") (emphasis omitted).

[8] *See* Lawrence B. Solum, *The Interpretation-Construction Distinction*, 27 Const. Comment. 95, 100 (2010) ("In general, interpretation recognizes or discovers the linguistic meaning of an authoritative legal text."); *id.* at 103 ("Conceptually, construction gives legal effect to the semantic content of a legal text.").

[9] *See, e.g.*, Laura Kalman, *Border Patrol: Reflections on the Turn to History in Legal Scholarship*, 66 Fordham L. Rev. 87, 121 (1997) ("Like precedent and Founders' intent, historical analogies can be indeterminate."); Richard A. Posner, *Past-Dependency, Pragmatism, and Critique of History in Adjudication and Legal Scholarship*, 67 U. Chi. L. Rev. 573, 591 (2000) ("At best the historical analogy furnishes a lesson that may be applicable to a current problem."); Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 Wash. U.L. Rev. 1187, 1216 (2015) (pointing to examples that illustrate "the manifold problems with the use of historical analogy" in Second Amendment cases).

[10] 565 U.S. 400 (2012).

[11] *Id.* at 420 (Alito, J., concurring).

[12] *Id.*

Captured by Third Circuit Library on 6/07/2023

of that analogy: "This would have required either a gigantic coach, a very tiny constable, or both—not to mention a constable with incredible fortitude and patience."[13] Scalia gamely responded that such a situation "is not far afield—a constable's concealing himself in the target's coach in order to track its movements."[14] But perhaps recognizing the strained nature of the historical analogy, he ultimately disclaimed the need to rely on analogical reasoning at all: "In any case, it is quite irrelevant whether there was an 18th-century analog. Whatever new methods of investigation may be devised, our task, *at a minimum,* is to decide whether the action in question would have constituted a search within the original meaning of the Fourth Amendment."[15]

Justice Scalia's sidestep to public meaning originalism, however, seems unavailable under the new historical-analogical approach manifested most prominently in *New York State Rifle and Pistol Association v. Bruen.*[16] Rejecting the Second Amendment framework adopted throughout the federal courts of appeals—a test that relied on both history and scrutiny[17]—the Court held that contemporary gun laws must instead be evaluated solely by comparison to historical tradition.[18] The Court emphasized that application of this new test would require not only historical citations, but the kind of historical analogy akin to the sort critiqued by Alito and disclaimed by Scalia in *Jones.* In fact, the *Bruen* majority used versions of the word "analogy" nearly thirty times.

From tiny constables to GPS devices, or from muskets to AR-15s,[19] historical-analogical reasoning raises serious challenges, which are evident in lower courts' faltering efforts to apply *Bruen* to modern gun laws. Although the dust has yet to settle and there is still time for courts to develop workable

---

[13] *Id.* at 420 n.3.

[14] *Id.* at 406 n.3 (majority opinion).

[15] *Id.* Alito and Scalia had a similar exchange in a First Amendment challenge to restrictions on violent video games:

> JUSTICE ALITO: Well, I think what Justice Scalia wants to know is what James Madison thought about video games.
>
> (Laughter.)
>
> JUSTICE ALITO: Did he enjoy them?
>
> JUSTICE SCALIA: No, I want to know what James Madison thought about violence. Was there any indication that anybody thought, when the First Amendment was adopted, that there[] was an exception to it for[] speech regarding violence?

Transcript of Oral Argument at 17, Brown v. Ent. Merchs. Ass'n, 131 S. Ct. 2729 (2011) (No. 08-1448).

[16] 142 S. Ct. 2111 (2022).

[17] *See infra* notes 65-72 and accompanying text (discussing pre-*Bruen* methodology).

[18] *Bruen*, 142 S. Ct. at 2126; *infra* Section I.A (describing *Bruen*'s approach).

[19] Joseph Blocher & Darrell A.H. Miller, *A Supreme Court Head-Scratcher: Is a Colonial Musket 'Analogous' to an AR-15?*, N.Y. Times (July 1, 2022), https://www.nytimes.com/2022/07/01/opinion/guns-supreme-court.html [https://perma.cc/4WK2-2UFC].

Electronic copy available at: https://ssrn.com/abstract=4408228

standards (as they did after *Heller*[20]), post-*Bruen* cases reveal an erratic, unprincipled jurisprudence, with courts striking down gun laws on the basis of thin historical discussion and no meaningful explanation of historical analogy.[21] Some decisions upholding gun laws likewise seem adrift, with courts upholding the federal prohibition on gun possession by felons without addressing the well-recognized lack of early historical predecessors[22] or concluding that firearm manufacturing receives no Second Amendment protection at all because "making" is neither "keeping" nor "bearing."[23]

Whether one celebrates or condemns the outcomes in any given case, the new approach has been a methodological mess, generating wildly manipulable and unpredictable case outcomes.[24] In the ten months after *Bruen*, courts reached divergent results regarding the constitutionality of laws banning people under felony indictment from acquiring new guns;[25] prohibiting assault weapons,[26]

---

[20] *See generally* Eric Ruben & Joseph Blocher, *From Theory to Doctrine: An Empirical Analysis of the Right to Keep and Bear Arms After* Heller, 67 DUKE L.J. 1433, 1488 (2018) (describing and measuring the development of doctrine after *Heller*).

[21] *See* Jacob D. Charles, *The Dead Hand of a Silent Past:* Bruen*, Gun Rights, and the Shackles of History*, 73 DUKE L.J. (forthcoming 2023) (manuscript at 39-50), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4335545 [https://perma.cc/TT65-VZWD] (analyzing results from more than 100 lower federal court decisions in Second Amendment cases after *Bruen*).

[22] *See, e.g.,* United States v. King, __ F.Supp.3d __, 2022 WL 5240928, at *5 (S.D.N.Y. Oct. 6, 2022) (arguing that *Bruen* did not disturb the Supreme Court's earlier approval in *Heller* of laws disarming felons without discussing history).

[23] Def. Distributed v. Bonta, No. CV 22-6200-GW-AGRX, 2022 WL 15524977, at *4 (C.D. Cal. Oct. 21, 2022), adopted, No. CV 22-6200-GW-AGRX, 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022) (upholding a restriction on manufacturing "ghost guns" because it "has nothing to do with 'keep[ing]' or 'bear[ing]' arms").

[24] There also appear to be predictable ideological differences, at least in terms of the party of a judge's nominating president, with the vast majority of opinions finding gun laws constitutionally impermissible after *Bruen* drafted by Republican-nominated judges. That would be consistent with pre-*Bruen* trends showing a developing ideological split. *See* Adam M. Samaha & Roy Germano, *Judicial Ideology Emerges, at Last, in Second Amendment Cases*, 13 CHARLESTON L. REV. 315, 345 (2018) ("The most recent data indicate that, unlike the early years after *Heller*, judge ideology has become a significant predictor of judge votes in civil gun rights cases.").

[25] *Compare* United States v. Kelly, No. 22-CR-00037, 2022 WL 17336578 (M.D. Tenn. Nov. 16, 2022) (enforceable) *with* United States v. Quiroz, No. 22-CR-00104-DC, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022) (unenforceable).

[26] *Compare* Herrera v. Raoul, No. 23-CV-532, 2023 WL 3074799 (N.D. Ill. Apr. 25, 2023) (enforceable) *with* Barnett v. Raoul, No. 23-CV-209, 2023 WL 3160285 (S.D. Ill. Apr. 28, 2023) (unenforceable).

Electronic copy available at: https://ssrn.com/abstract=4408228

firearms with obliterated serial numbers,[27] and large-capacity magazines;[28] restricting self-manufactured "ghost guns;"[29] disarming unlawful users of controlled substances;[30] barring guns in "sensitive places" such as places of worship, summer camps, urban mass transit, and Times Square;[31] and prohibiting the purchase or carry of guns by eighteen- to twenty-year-olds.[32] Perhaps most prominently, in *United States v. Rahimi* the Fifth Circuit disagreed with other post-*Bruen* case law and struck down the federal law prohibiting those subject to a domestic violence restraining order from possessing a gun, declaring it an "outlier[] that our ancestors would never have accepted,"[33] though every court prior to *Bruen* had done exactly that.

The historical-analogical approach thus raises novel challenges for the relationship between law and history, and implicates two rich scholarly literatures that until now have had relatively little interaction. For generations, scholars—some drawing on psychology and cognitive science—have attempted to both describe and evaluate analogical reasoning in law.[34] But for whatever reason (perhaps simply because much of the foundational literature in this area predated the ascendance of originalism), scholarship on analogical reasoning has

---

[27] *Compare* United States v. Reyna, No. 21-CR-41, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022) (enforceable) *with* United States v. Price, No. 22-CR-00097, 2022 WL 6968457 (S.D. W. Va. Oct. 12, 2022) (unenforceable).

[28] *Compare* Oregon Firearms Fed'n v. Brown, No. 22-CV-01815, 2022 WL 17454829, at *9 (D. Or. Dec. 6, 2022) (enforceable) *with* Rocky Mountain Gun Owners v. Bd. of Cnty. Commissioners of Boulder Cnty., No. 122CV02113CNSMEH, 2022 WL 4098998 (D. Colo. Aug. 30, 2022) (unenforceable).

[29] *Compare* Def. Distributed v. Bonta, No. CV 22-6200-GW-AGRX, 2022 WL 15524977 (C.D. Cal. Oct. 21, 2022), *adopted*, No. CV 22-6200-GW-AGRX, 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022) (enforceable), *with* Rigby v. Jennings, ___F.Supp.3d___, 2022 WL 4448220 (D. Del. Sept. 23, 2022) (unenforceable).

[30] *Compare* United States v. Daniels, 610 F.Supp.3d 892, 897 (S.D. Miss. 2022) (enforceable) *with* United States v. Harrison, No. CR-22-00328, 2023 WL 1771138, at *24 (W.D. Okla. Feb. 2, 2023 (unenforceable).

[31] *See infra* notes 215-233 and accompanying text (discussing divergent outcomes within the *Antonyuk* line of opinions).

[32] *Compare* Nat'l Rifle Assoc. v. Bondi, 61 F. 4th 1317, 1320 (11th Cir. 2023) (enforceable in the context of purchasing) *with* Fraser v. Bureau of Alcohol, Tobacco, Firearms, and Explosives, No. 3:22-CV-410, 2023 WL 3355339 (E.D. Va. May 10, 2023) (unenforceable in the context of purchasing); Firearms Pol'y Coal., Inc. v. McCraw, No. 4:21-cv-1245, 2022 WL 3656996, at *11 (N.D. Tex. Aug. 25, 2022) (unenforceable in the context of carrying).

[33] United States v. Rahimi, 61 F.4th 443, 461 (5th Cir. 2023) (quoting *Bruen*, 142 S. Ct. at 2132) (striking down the federal law prohibiting gun possession by those subject to a domestic violence protective order). *But see* United States v. Kays, No. CR-22-40-D, 2022 WL 3718519, at *5 (W.D. Okla. Aug. 29, 2022) (finding the same law, 18 U.S.C. §922(g)(8), to be enforceable).

[34] *See infra* Section II.A.2 (discussing literature on analogical reasoning).

Captured from the UC Circuit Libraries on 06/07/2023

tended to focus on similarity as "seen *between cases*"[35] and not between laws and practices across time.[36] In his enormously influential work on analogical reasoning, Cass Sunstein makes this distinction explicit: "In the United States, most constitutional cases are decided *not* by reference to constitutional text or history, but through analogies and thus through casuistical reasoning."[37]

Meanwhile, the originalism literature has primarily focused on questions like why history should bind,[38] whether historical analysis is constraining,[39] whether judges are well-positioned to perform it,[40] and which historical materials matter.[41] Some of that debate is implicitly about analogical reasoning—to critique an originalist opinion as anachronistic is, in effect, to argue that there are insufficient principles of relevant similarity connecting historical sources to a contemporary legal challenge.[42] But originalist scholarship has not thoroughly engaged with the literature on analogical reasoning, nor vice versa. Given the

---

[35] EDWARD H. LEVI, AN INTRODUCTION TO LEGAL REASONING 2 (1949) (emphasis added); *see also* BENJAMIN N. CARDOZO, THE NATURE OF THE JUDICIAL PROCESS 31-34 (1921) (describing method through which "the professional experts who make up the lawyer class" could conclude when cases are "the same" or not).

[36] Of course, an element of comparison across time is present even when simply comparing precedent, but it is pronounced for originalism due to its commitment to the fixation thesis—the notion that the meaning of a constitutional provision is set at the time of ratification. Lawrence B. Solum, *The Fixation Thesis: The Role of Historical Fact in Original Meaning*, 91 NOTRE DAME L. REV. 1, 1 (2015).

[37] Cass R. Sunstein, *Analogical Reasoning* 2 (Harv. Pub. L. Public Working Paper, Paper No. 21-39, 2021), https://ssrn.com/abstract=3938546 [https://perma.cc/4XSF-ZQME] [hereinafter Sunstein, *Analogical Reasoning*]; *see also id.* at 32 ("Indeed, American constitutional law is often constructed from analogies—not from text or history, not from moral theory, and not from existing social consensus.").

[38] *See, e.g.*, John O. McGinnis & Michael B. Rappaport, *A Pragmatic Defense of Originalism*, 2007 NW. U. L. REV. COLLOQUY 1, 14 (contending that "originalism provides a theory of constitutional interpretation that has good consequences even though it does not force judges to assess consequences on a case-by-case basis.")

[39] *See, e.g.*, William Baude, *Originalism as a Constraint on Judges*, 84 U. CHI. L. REV. 2213, 2214-15 (2017) (considering ways that originalism does and does not constrain judges).

[40] *See, e.g.*, Jonathan Gienapp, *Knowing How vs. Knowing That: Navigating the Past*, PROCESS (Apr. 4, 2017), http://www.processhistory.org/gienapp-knowing-how [https://perma.cc/4MNZ-SEU9] ("Lawyers are trained to read the Constitution's words embedded in modern language games—which is also how virtually every contemporary American citizen reads them. This is a highly credible way to interpret the document . . . . But, for better or worse, what it cannot do is locate the text's original meaning.").

[41] *See, e.g.*, Randy E. Barnett, *The Original Meaning of the Commerce Clause*, 68 U. CHI. L. REV. 101, 107 (2001) ("With original meaning, then, more 'historical context' is not automatically preferred. To the contrary, originalism requires a limited focus on certain types of evidence of historical meaning: that evidence that most clearly indicates the public meaning of the text that is being interpreted at the time it was adopted.").

[42] *See supra* note 9 (collecting critiques).

Electronic copy available at: https://ssrn.com/abstract=4408228

Court's turn to originalism-by-analogy, such engagement has never been more essential.

In Part I, we explain *Bruen*'s method. The central doctrinal instruction is that courts must evaluate the constitutionality of modern laws by analogizing to historical predecessors. The majority opinion highlighted two non-exhaustive "metrics" to guide that comparison—"how" and "why" historical and modern laws burden armed self-defense—but also introduced a variety of additional and alternative principles.[43] Whether *Bruen*'s approach can be classified as originalist, traditionalist, or something else entirely depends on how one defines those interpretive methods—a deeply contested set of questions we do not purport to resolve. But whatever label one applies, originalism-by-analogy differs in important ways from standard approaches to historical reasoning, raising distinctive and unaddressed challenges.[44]

In Part II, we explore three of these challenges and offer some doctrinal solutions. First, as the *Bruen* majority recognized, "because '[e]verything is similar in infinite ways to everything else,' one needs 'some metric enabling the analogizer to assess which similarities are important and which are not.'"[45] Indeed, the very essence of analogical reasoning is comparing two or more things by reference to principles of relevant similarity.[46] While others have criticized *Bruen*'s impact on public safety[47] and its reading of the historical record,[48] our concern is that the opinion failed to provide, let alone apply, sufficient principles to guide the novel historical-comparative doctrine it created. It is thus unsurprising that many post-*Bruen* opinions look like conclusions accompanied by historical citations, with little connecting the two.[49] We turn to

---

[43] *See infra* Section I.A.

[44] *See infra* Section I.B.

[45] 142 S. Ct. 2111, 2132 (2022) (quoting Frederick Schauer & Barbara Spellman, *Analogy, Expertise, and Experience*, 84 U. Chi. L. Rev. 249, 254 (2017)) (internal citations omitted); *see also* Larry Alexander & Emily Sherwin, Demystifying Legal Reasoning 76-83 (2008) ("Similarities are infinite; therefore some rule or principle is necessary to identify important similarities.").

[46] *See infra* Section II.A.2 (discussing the emphasis on principles of relevant similarity in scholarship on analogical reasoning in law).

[47] *See, e.g.*, John J. Donohue, *The Supreme Court's Gun Decision Will Lead to More Violent Crime*, Wash.       Post       (July       8,       2022,       2:29       PM), https://www.washingtonpost.com/outlook/2022/07/08/guns-crime-bruen-supreme-court [https://perma.cc/J42E-8VRH].

[48] *See, e.g.*, Charles, *supra* note 21; Patrick J. Charles, *The Fugazi Second Amendment:* Bruen*'s Text, History, and Tradition Problem and How to Fix It*, 71 Cleveland St. L. Rev. (forthcoming 2023); Cornell, *supra* note 1.

[49] *See* Brannon P. Denning & Glenn Harlan Reynolds, *Retconning* Heller: *Five Takes on* New York Rifle & Pistol Association, Inc. v. Bruen, 65 Wm. & Mary L. Rev. (forthcoming 2023) (manuscript at 20), https://ssrn.com/abstract=4372216 ("Given the number of questions about

Electronic copy available at: https://ssrn.com/abstract=4408228

the literature on analogical reasoning to help explain this shortcoming and why courts need to derive principles to mediate the analogical process.[50]

Second, by requiring direct comparison between modern and historical practices the historical-analogical approach raises acute problems of anachronism.[51] It is one thing to ask whether a historically-derived right to armed self-defense can be legitimately burdened by a modern prohibition on gun possession in subways or airplanes; it is quite another to ask whether such prohibitions have analogues at a time before subways and airplanes existed. How can courts use historical comparators to evaluate the constitutionality of contemporary gun laws involving firearms or places that did not exist at the Founding, or which reflect recognition of problems (and for that matter people) the Framers failed to address? What historical analogues should guide evaluation of modern domestic violence restrictions that were adopted specifically to break from a legal tradition that undervalued women's lives?[52]

Originalism-by-analogy must be able to accommodate the immense differences between historical and modern weapons and violence—as the Court itself recognized in defining the class of "Arms" to include modern weapons.[53] Adjusting the level of generality at which the historical inquiry is conducted can help mitigate the risk of anachronism. For example, a court evaluating the modern domestic violence prohibitor might recognize a historical tradition of disarming dangerous persons generally,[54] rather than domestic abusers particularly. We argue that there are good reasons to operate at a high level of generality to mitigate the risk of anachronism. But whatever level of generality a court selects, it should be evenly applied—not, for example, describing the right at a broad level of generality and then narrowly defining the set of relevant historical regulations.[55]

---

the analogical process left open in *Bruen*, we think you might (if somewhat uncharitably) say that the three phases of Second Amendment analysis post-*Bruen* are: (1) Consult text, history, tradition; (2) ? ; (3) Decision.").

[50] *See infra* Sections II.A.2 & II.A.3.

[51] *See infra* Section II.B.

[52] Reva B. Siegel, *"The Rule of Love": Wife Beating as Prerogative and Privacy*, 105 YALE L.J. 2117, 2119 (1996) (describing process of "preservation through transformation"). *See also* Joseph Blocher & Reva B. Siegel, *Guided by History: Protecting the Public Sphere From Weapons Threats Under Bruen*, 98 NYU L. REV. (forthcoming 2023) (manuscript at 27-31), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4355024 (inter alia, critiquing *Rahimi* for misapplying *Bruen*'s method).

[53] *See infra* notes 319-320; 400-401 and accompanying text.

[54] *See* Joseph Blocher & Caitlan Carberry, *Historical Gun Laws Targeting "Dangerous" Groups and Outsiders, in* NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY (Joseph Blocher, Jacob D. Charles & Darrell A. H. Miller eds., Oxford Univ. Press forthcoming 2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3702696.

[55] *See infra* Section II.B.2.

Electronic copy available at: https://ssrn.com/abstract=4408228

Third, and finally, as with any doctrinal test, it is important that originalism-by-analogy be applied with attention to questions of institutional competence in at least two ways.[56] First, courts should be careful about basing broad decisions on a supposed lack of historical evidence, given that they simply do not have the time or ability to identify all the relevant historical comparators. Neither do professional historians, whose research programs do not conform to a court's briefing schedule.[57] A relative dearth of historical evidence might simply reflect institutional limitations, not constitutional analysis. Second, and to a degree that has been underappreciated by both those who criticize and those who celebrate it, the historical-analogical method actually *relies* on contemporary empirical evidence. This is because *Bruen* specifically requires that modern and historical laws be compared with regard to "why" and "how" they burden armed self-defense. It is impossible to conduct that comparison without evidence regarding the justification and operation of the modern laws—matters on which legislative deference may be appropriate.

In the wake of *Bruen*, courts face a Second Amendment "terra incognita" akin to that following *District of Columbia v. Heller*.[58] Addressing the challenges we identify is the first step toward articulating coherent and meaningful legal rules. And to the degree that *Bruen* and other cases from the 2021-22 Term are a harbinger of a broader change in the Supreme Court's approach to history and constitutional law,[59] grappling with originalism-by-analogy will be a central challenge for many years to come.

---

[56] *See infra* Section II.C.

[57] *See infra* notes 335-341, 407-413 and accompanying text (describing institutional limitations).

[58] United States v. Masciandaro, 638 F. 3d 458, 475 (4th Cir. 2011) (describing "the dilemma faced by lower courts in the post-*Heller* world" and that "[t]he whole matter strikes us as a vast *terra incognita* that courts should enter only upon necessity and only then by small degree").

[59] *See, e.g.*, Michael C. Dorf, *The Injustice, Insincerity, and Destabilizing Impact of the SCOTUS Turn to History*, Verdict (Oct. 26, 2022), https://verdict.justia.com/2022/10/26/the-injustice-insincerity-and-destabilizing-impact-of-the-scotus-turn-to-history [https://perma.cc/R2FG-KCCC]; Jimmy Hoover, *Supreme Court Embraces Originalism in 'Momentous' Term*, LAW360 (July 1, 2022, 9:58 PM), https://www.law360.com/insurance-authority/articles/1508127/supreme-court-embraces-originalism-in-momentous-term [https://perma.cc/43PZ-W39U]; Adam Liptak, *A Transformative Term at the Most Conservative Court in Nearly a Century*, N.Y. TIMES (July 1, 2022), https://www.nytimes.com/2022/07/01/us/supreme-court-term-roe-guns-epa-decisions.html [https://perma.cc/R5TU-RBFD] ("The term was a triumph for the theory of constitutional interpretation known as originalism, which seeks to identify the original meaning of constitutional provisions using the tools of historians."); Nicholas Tomaino, *The Conservative Supreme Court Has Arrived*, WALL St. J. (July 1, 2022, 4:28 PM) https://www.wsj.com/articles/the-conservative-court-has-arrived-paul-clement-dobbs-bruen-religion-administrative-state-justice-roberts-alito-thomas-11656692402 [https://perma.cc/YRA7-6TFC]; Randy E. Barnett & Lawrence B. Solum, *Originalism After Dobbs,* Bruen*, and Kennedy: The Role of History and Tradition*, Nw. U. L. REV. (forthcoming).

Electronic copy available at: https://ssrn.com/abstract=4408228

Captured by the Third Circuit Libraries on 06/07/2023

## I. *Bruen*'s Novel Approach to Historical Analogy

The Supreme Court's 2008 decision in *District of Columbia v. Heller* was both celebrated and criticized as a high water mark of originalism.[60] *New York State Rifle and Pistol Association v. Bruen* appears to have pushed that mark even higher, despite adopting a different approach to constitutional historicism—one that does not simply identify the original public meaning of constitutional text and then apply standard doctrinal rules (as *Heller*'s progeny did), but purports to reason directly and exclusively by analogy to the historical record.

In *Bruen*, the Court struck down a New York law requiring that an individual demonstrate a heightened risk of being attacked in order to obtain a permit to carry a concealed handgun for self-defense.[61] That outcome had an immediate and significant impact on the roughly 80 million people living in states with discretionary, "may-issue" licensing laws like New York's,[62] as it required those states to adopt more permissive "shall-issue" policies that can include objective criteria like minimal training but not an applicant's self-defense need.[63]

But the broader and more lasting impact of *Bruen* will be the novel approach the Court adopted for evaluating Second Amendment challenges.[64] Before

---

[60] *See, e.g.*, Randy Barnett, *News Flash: The Constitution Means What It Says*, Wall St. J. Via Cato Inst. (June 27, 2008), https://www.cato.org/publications/commentary/news-flash-constitution-means-what-it-says [https://perma.cc/4GKM-EUXV] (calling *Heller* "the finest example of what is now called 'original public meaning' jurisprudence ever adopted by the Supreme Court"); Jamal Greene, Heller *High Water? The Future of Originalism*, 3 Harv. L. & Pol'y Rev. 325, 326 (2009) ("[E]ven if *Heller* is a triumph for originalism, it might also be its high water mark.").

[61] *Bruen*, 142 S. Ct. at 2122.

[62] Adam Liptak, *Supreme Court Strikes Down New York Law Limiting Guns in Public*, N.Y. Times (June 23, 2022), https://www.nytimes.com/2022/06/23/us/supreme-court-ny-open-carry-gun-law.html [https://perma.cc/9NKZ-MG5N].

[63] *See Bruen*, 142 S. Ct. at 2138 n.9 (noting that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes"); *id.* at 2162 (Kavanaugh, J., concurring) (underscoring that "shall-issue licensing regimes are constitutionally permissible").

[64] Along with Darrell A.H. Miller of Duke Law School, we filed an amicus brief in support of neither side urging the Court to adopt the two-part framework embraced throughout the federal courts of appeal before *Bruen*. *See* Brief of Second Amendment Law Professors as Amici Curiae in Support of Neither Party, N.Y. State Rifle & Pistol Ass'n., Inc. v. Bruen, 597 U.S. __ (2022) (No. 20-843), 2022 WL 2251305. Both of us later separately testified before the Senate Judiciary Committee about *Bruen*'s analogical approach, and some of the exposition in this Article is reflected in that testimony. Written Testimony of Joseph Blocher, *Hearing Before the Senate Judiciary Committee, After the Highland Park Attack: Protecting Our Communities from Mass Shootings* (July 20, 2022), https://www.judiciary.senate.gov/imo/media/doc/Testimony%20-%20Blocher%20-%202022-07-20.pdf [https://perma.cc/5RUY-NBCA]; Written Testimony of Eric Ruben, *Hearing Before the Senate Judiciary Committee, Protecting Public Safety After* New York State Rifle & Pistol Association v. Bruen

Electronic copy available at: https://ssrn.com/abstract=4408228

*Bruen*, courts applied a conventional methodology that combined historical analysis with consideration of contemporary costs and benefits. As *Bruen* recognized: "[T]he Courts of Appeals [had] coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny."[65] In fact, that framework was adopted by every federal court of appeals to consider the question.[66] Under this consensus approach, courts would "ask if the restricted activity is protected by the Second Amendment in the first place; and then, if necessary, [they would] . . . apply the appropriate level of scrutiny."[67] The first part of this framework was a "threshold question [of] whether the regulated activity falls within the scope of the Second Amendment"[68] based on a "historical understanding of the scope of the . . . right."[69] "[I]f the historical evidence is inconclusive or suggests that the regulated activity is *not* categorically unprotected[,] then there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights."[70] At this latter step, courts would "evaluate the regulatory means the government has chosen and the public-benefits end it seeks to achieve."[71]

The pre-*Bruen* doctrine conformed the Second Amendment right to other constitutional tests; indeed, the methodology was expressly borrowed from First Amendment cases.[72] *Bruen* rejected that approach, instead holding that modern gun laws, including those addressing problems unknown to or unrecognized by the Founding generation, must be evaluated based on whether they are consistent with historical tradition.

Our concern here is not with *Bruen*'s reading of history, which others have criticized, but its *use* of that history—that is, the guidance it gives (and fails to give) about how to reason from historical sources. Our critique is therefore methodological rather than historical. *Bruen* mandates a historical-analogical approach to Second Amendment adjudication but does not articulate or apply a

---

(Mar. 15, 2023), https://www.judiciary.senate.gov/imo/media/doc/2023-03-14%20-%20Testimony%20-%20Ruben.pdf [https://perma.cc/VEJ2-7XHE].

[65] *Bruen*, 142 S. Ct. at 2125; *see also* Ruben & Blocher, *supra* note 20.

[66] *Bruen*, 142 S. Ct. at 2174 (Breyer, J., dissenting) ("[E]very Court of Appeals to have addressed the question has agreed on a two-step framework for evaluating whether a firearm regulation is consistent with the Second Amendment.").

[67] United States v. Focia, 869 F.3d 1269, 1285 (11th Cir. 2017), *cert. denied*, 139 S. Ct. 846 (2019) (quoting GeorgiaCarry.org, Inc. v. Georgia, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012)).

[68] Ezell v. City of Chicago, 846 F.3d 888, 892 (7th Cir. 2017).

[69] Jackson v. City and Cnty. of San Francisco, 746 F.3d 953, 960 (9th Cir. 2014) (quoting Dist. of Columbia v. Heller, 554 U.S. 570, 625 (2008)).

[70] Kanter v. Barr, 919 F.3d 437, 441 (7th Cir. 2019) (quoting Ezell v. City of Chicago, 651 F.3d 684, 703 (2011)).

[71] *Id.* (internal quotation marks omitted) (quoting *Ezell*, 651 F.3d at 703).

[72] *See, e.g.*, United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010) (looking to the First Amendment for guidance on deriving the pre-*Bruen* framework).

Electronic copy available at: https://ssrn.com/abstract=4408228

coherent approach to analogical reasoning. The majority opinion invokes a variety of alternative and sometimes-conflicting considerations, and its primary "metrics" of relevant similarity—"why" and "how" modern and historical gun laws burdened armed self-defense—are plainly incomplete.[73] Though these difficulties share some characteristics with common objections to originalism in general, they also mark a significant departure from standard approaches to originalism, like the search for original public meaning.[74] And that novelty in turn raises serious challenges for implementation, which we address in Part II.

### A.  Bruen*'s Novel Approach*

*Bruen* opened by holding on textualist and originalist grounds that the right to keep and bear arms extends outside the home, a proposition the parties did not contest.[75] That holding was not surprising methodologically, nor did it disrupt much existing doctrine, since lower courts had overwhelmingly held or assumed as much to be true.[76]

But in implementing its holding by setting rules to determine which gun laws are consistent with the right to bear arms, *Bruen* announced an entirely new framework:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."[77]

This new historical test represented a sea change in doctrine, calling into question more than a thousand post-*Heller* cases that had been decided on grounds that were not exclusively historical and analogical.[78] And because that

---

[73] *See infra* Section I.A.

[74] *See infra* Section I.B.

[75] *Bruen*, 142 S. Ct. at 2122.

[76] *See* Rogers v. Grewal, 140 S. Ct. 1865, 1868 (2020) (Thomas, J., dissenting from denial of certiorari) (observing how lower courts had either found or assumed that the Second Amendment extended outside the home).

[77] *Bruen*, 142 S. Ct. at 2126; *see also id.* at 2129-30 (reiterating this test nearly verbatim).

[78] One measure of this disruption was the fact that, within days of *Bruen*, nearly every Second Amendment case on Westlaw was apparently marked with a red flag. Unfortunately, Westlaw does not—or would not, in response to queries—account for how many red flags were added or why, so this is simply our own observation.

Electronic copy available at: https://ssrn.com/abstract=4408228

historical record is contested, unclear, and incomplete, it of course will not provide clear guidance in all cases.[79] To fill the gap, *Bruen* emphasized repeatedly that its methodology will require litigants and judges to make analogies to historical regulations.[80] Many have highlighted the difficulty of deriving workable rules from *Bruen*,[81] and we share the view that its guidance is insufficient at best. In the following sections, we identify the major elements of its framework before turning to some attendant complications in Part II.

1.  The "Plain Text" Threshold

   While *Bruen* dismissed the consensus two-part approach applied in the lower courts as having "one step too many,"[82] it introduced a two-part test of its own—one that appears to prescribe a historical-analogical inquiry only in a subset of Second Amendment disputes.[83] In particular, the majority said that "*when* the Second Amendment's plain text covers an individual's conduct . . . the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."[84] Since the word "when" seems to function as a conditional, the reach of *Bruen*'s historical-analogical test appears limited only to those cases already covered by the "plain text" of the Amendment.[85]

---

[79] *See, e.g.*, Kachalsky v. Cnty. of Westchester, 701 F.3d 81, 91 (2d Cir. 2012) ("History and tradition do not speak with one voice."); Heller v. D.C., 670 F.3d 1244, 1275 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("[W]hen legislatures seek to address new weapons that have not traditionally existed or to impose new gun regulations because of conditions that have not traditionally existed, there obviously will not be a history or tradition of banning such weapons or imposing such regulations. That does not mean the Second Amendment does not apply to those weapons or in those circumstances. Nor does it mean that the government is powerless to address those weapons or modern circumstances. Rather, in such cases, the proper interpretive approach is to reason by analogy from history and tradition.").

[80] As noted above, the opinion contained more than thirty references to versions of the word "analogy."

[81] *See* Alschuler, *supra* note 1; Randy E. Barnett & Nelson Lund, *Implementing* Bruen, L. & LIBERTY (Feb. 6, 2023), https://lawliberty.org/implementing-bruen [https://perma.cc/ZFE7-V3RQ]; Charles, *supra* note 21; Denning & Reynolds, *supra* note 49 (manuscript at 20).

[82] *Bruen*, 142 S. Ct. at 2117.

[83] United States v. Rahimi, 59 F. 4th 443, 453 (5th Cir. 2023) ("*Bruen* articulated two analytical steps"); Nat'l Rifle Ass'n v. Bondi, 61 F.4th 1317, 1329 (11th Cir. 2023) ("[W]e read *Bruen* as articulating two analytical steps.").

[84] *Bruen*, 142 S. Ct. at 2130 (emphasis added).

[85] To the extent the Court is drawing a clear distinction between textual and historical inquiries, that itself is a departure from conventional originalist approaches that consider contemporaneous history to determine original meaning. *See, e.g.*, Michael D. Ramsey, Missouri v. Holland *and Historical Textualism*, 73 MO. L. REV. 969 (2008) ("A text's historical meaning arises from the context in which it was written and from the common meaning of its words in the ordinary language of that particular time.").

Electronic copy available at: https://ssrn.com/abstract=4408228

Four features of *Bruen*'s initial textual inquiry are particularly notable. First, even a plain text inquiry will involve significant judicial discretion. In *Bruen* itself, the Court had no trouble concluding that the plain text of the Amendment covers "carrying handguns publicly for self-defense."[86] In keeping with some other courts, the majority found this result to be compelled by the plain text of the word "bear."[87] But, of course, reading self-defense into the phrase "bear arms" is itself a deeply contested historical claim[88] and hard to justify solely on the unadorned text, even if it might be supportable on historical or other grounds.

Second, these discretionary choices about plain text shape not only the scope of Second Amendment rights, but also the downstream application of the historical-analogical test described below, since the scope of the right impacts perceptions of how heavy the burden imposed actually is.[89] By framing the plain text as protecting a right to "carry[] handguns publicly for self-defense,"[90] the Court in *Bruen* accentuated the burdens imposed by New York's public carry law. Those burdens would have looked less significant if the Court had defined the relevant conduct as, for example, the ability to carry *weapons* for self-defense, let alone the right to keep and bear arms as a whole.[91] If a broader slice of the right to keep and bear arms were used as the denominator, the constitutional

---

[86] *Id.* at 2134.

[87] *Id.* at 2135 ("The Second Amendment's plain text thus presumptively guarantees petitioners Koch and Nash a right to 'bear' arms in public for self-defense."); Moore v. Madigan, 702 F.3d 933, 936 (7th Cir. 2012) ("The right to 'bear' as distinct from the right to "keep" arms is unlikely to refer to the home. To speak of 'bearing' arms within one's home would at all times have been an awkward usage. A right to bear arms thus implies a right to carry a loaded gun outside the home."); Young v. Hawaii, 992 F.3d 765, 831 (9th Cir. 2021) (O'Scannlain, J., dissenting) ("The evidence that the Second Amendment's Framers and ratifiers understood the right to bear arms to encompass public carry is not only lexical, but *logical*.").

[88] *See, e.g.*, Dennis Baron, *Corpus Evidence Illuminates the Meaning of Bear Arms*, 46 HASTINGS CONST. L.Q. 509 (2019); Neal Goldfarb, *Corpora and the Second Amendment*, LAWNLINGUISTICS, https://lawnlinguistics.com/corpora-and-the-second-amendment [https://perma.cc/Z6QQ-D3SU]; Alison L. LaCroix, *Historical Semantics and the Meaning of the Second Amendment*, PANORAMA (Aug. 3, 2018), https://thepanorama.shear.org/2018/08/03/historical-semantics-and-the-meaning-of-the-second-amendment [https://perma.cc/7SL4-R292].

[89] *See infra* Section I.A.3.

[90] *Bruen*, 142 S. Ct. at 2134.

[91] For another example of a court defining the textually protected right in a way that increases the government's burden to defend a regulation, see Boland v. Bonta, __ F. Supp. 3d__, 2023 WL 2588565, at *6 (C.D. Cal. Mar. 20, 2023) (concluding that the Second Amendment's plain text covers "purchasing state-of-the-art handguns on the primary market" and then striking down a law requiring certain safety features as impinging that protected conduct).

Electronic copy available at: https://ssrn.com/abstract=4408228

burden imposed by New York's handgun law would look comparatively smaller.[92]

Third, the plain text of the Second Amendment simply does not address many gun-rights claims. The plain text of the word "arms," for example, does not distinguish between handguns and the "dangerous and unusual weapons" that the Supreme Court said are not covered,[93] nor does it clearly indicate whether manufacturing untraceable "ghost guns" is covered.[94] That is not to say that such weapons necessarily fall outside the Amendment, only that the lines must be drawn based on considerations beyond the unadorned plain text. To the degree that the heavy historical burden that *Bruen* prescribes is triggered *only* by cases involving the "plain text" of the Second Amendment, its reach should be relatively circumscribed.

Fourth, it seems plausible that some courts will resolve cases at this plain text stage in order to avoid the difficulties of applying the subsequent historical-analogical analysis.[95] Consider the federal law prohibiting gun possession by domestic violence misdemeanants.[96] Prior to *Bruen*, that law was universally upheld against Second Amendment challenges.[97] Yet there were no historical

---

[92] *See generally* Joseph Blocher, *Bans*, 129 YALE L.J. 308 (2019) (discussing denominator problems in Second Amendment cases); Eric Ruben, *Law of the Gun: Unrepresentative Cases and Distorted Doctrine*, 107 IOWA L. REV. 173 (2021) (discussing gun-centricity in Second Amendment cases).

[93] *Heller*, 554 U.S. at 627; *cf.* Bryan Garner (@BryanAGarner), Twitter (May 25, 2022, 4:11 PM), https://twitter.com/BryanAGarner/status/1529555870031527939 [https://perma.cc/X49L-B2RB] ("If, alas, we can't repeal the Second Amendment, let's say its meaning extends only to technologies of the caliber (ahem) that existed when it took effect: muskets that required eight seconds to reload between shots. The Second Amendment has nothing to do with assault rifles."). Garner is editor-in-chief of Black's Law Dictionary, and co-authored two books with Justice Scalia: BRYAN A. GARNER & ANTONIN SCALIA, MAKING YOUR CASE: THE ART OF PERSUADING JUDGES (2008) and BRYAN A. GARNER & ANTONIN SCALIA, READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012).

[94] *Compare* Rigby v. Jennings, No. CV 21-1523, 2022 WL 4448220, at *7 (D. Del. Sept. 23, 2022) (concluding that the plain text of the Second Amendment covers unfinished lower receivers) *with* Def. Distributed v. Bonta, No. CV 22-6200-GW-AGRX, 2022 WL 15524977, at *4 (C.D. Cal. Oct. 21, 2022), adopted, No. CV 22-6200-GW-AGRX, 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022) (concluding that the plain text of the Second Amendment does not cover home manufacture of firearms).

[95] *See, e.g.*, Ocean State Tactical, LLC v. Rhode Island, No. 22-CV-246 JJM-PAS, 2022 WL 17721175 (D.R.I. Dec. 14, 2022); Oregon Firearms Fed'n, Inc. v. Brown, No. 2:22-CV-01815-IM, 2022 WL 17454829 (D. Or. Dec. 6, 2022); Def. Distributed v. Bonta, No. CV 22-6200-GW-AGRX, 2022 WL 15524977 (C.D. Cal. Oct. 21, 2022), adopted, No. CV 22-6200-GW-AGRX, 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022).

[96] *See* 18 U.S.C. § 922(g)(9).

[97] *But cf.* United States v. Perez-Gallan, No. 22-CR-00427, 2022 WL 16858516, at *12 (W.D. Tex. Nov. 10, 2022) (holding that because "the historical record does not contain evidence sufficient to support the federal government's disarmament of domestic abusers," it is unconstitutional to prohibit gun possession by those subject to domestic violence restraining orders).

Electronic copy available at: https://ssrn.com/abstract=4408228

laws specifically prohibiting gun possession by domestic violence offenders in 1791.[98] As we argue below,[99] searching for such a "historical *twin*" would be contrary to *Bruen*'s own plain text,[100] as well as to any feasible analogical approach. Instead, the question should be asked at a different level of generality—for example, by reference to the historical disarmament of "dangerous" people.[101] We would not be surprised, however, if some courts simply exclude domestic violence misdemeanants at *Bruen*'s step one, which some courts have already done for felons and unlawful immigrants—treating them as outside "the people" covered by the plain text.[102]

If that hydraulic plays out, the result will be a major shift in the style of Second Amendment holdings. Whereas after *Heller*, many courts assumed coverage at the first part of the two-part framework and then evaluated a challenged law by applying tiered scrutiny at step two,[103] courts after *Bruen* will have a parallel incentive to resolve cases at the threshold with a "plain text"

---

[98] Congress disqualified domestic violence misdemeanants from gun possession for the first time in 1996 after concluding that "[e]xisting felon-in-possession laws . . . were not keeping firearms out of the hands of domestic abusers, because 'many people who engage in serious spousal or child abuse ultimately are not charged with or convicted of felonies.'" United States v. Hayes, 555 U.S. 415, 426 (2009) (quoting 142 Cong. Rec. 22985 (1996) (statement of Sen. Frank R. Lautenberg)); *see also* Siegel, *supra* note 52, at 2121-29 (describing the evolution of legal attitudes regarding the "right of chastisement").

[99] *See infra* Section II.A.

[100] NY. State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111, 2133 (2022).

[101] *See infra* notes 281-286 and accompanying text (discussing dangerousness and other principles of relevant similarity than can be gleaned from historical gun restrictions).

[102] *See, e.g.*, United States v. Collette, No. 22-CR-00141, 2022 WL 4476790, at *6 (W.D. Tex. Sept. 25, 2022) ("So if the definition of 'the people' is consistent throughout the Constitution—and it has been historically constitutional to exclude those convicted of a crime from 'the people' under Section 2, Article I —it would also be constitutional then to exclude those groups from the Second Amendment's kindred 'political right.'"); United States v. Ingram, No. 18-557-MGL-3, 2022 WL 3691350, at *3 (D.S.C. Aug. 25, 2022) ("By distinguishing non-law-abiding citizens from law-abiding ones, the dicta in *Heller* and *McDonald* clarifies the bounds of the plain text of the Second Amendment. This, coupled with the majority's focus in *Bruen* on the Second Amendment rights of 'law-abiding citizens' throughout the opinion convinces this Court that the Supreme Court would conclude that [felon-in-possession and comparable statutes] fail to infringe on any Second Amendment rights."); United States v. Sitladeen, 64 F.4th 978, 987 (8th Cir. 2023) ("[U]nlawful aliens are not part of 'the people' to whom the protections of the Second Amendment extend."); *see also* Jacob D. Charles, *Defeasible Second Amendment Rights: Conceptualizing Gun Laws That Dispossess Prohibited Persons*, 83 Law & Contemp. Probs. 53 (2020) (summarizing debate about whether certain groups subject to disarmament fall outside the Second Amendment entirely or instead have defeasible gun rights).

[103] *See, e.g.*, Kanter v. Barr, 919 F.3d 437, 447 n.9 (7th Cir. 2019) (endorsing the "prudential approach" of "defer[ring] the threshold historical scope inquiry [at step one] and proceed[ing] directly to means-end scrutiny [at step two]").

Captured with permission of Libraries at 6/7/2023

holding in order to avoid the complications of the historical-analogical inquiry.[104] As the Eighth Circuit put it in a recent opinion upholding the federal ban on gun possession by unlawfully present immigrants, "whatever the answer to [the] difficult historical debate" regarding Founding-era analogues, the court "need not resolve it" because circuit precedent "already answers *Bruen*'s threshold textual inquiry in the negative."[105]

Cases involving prohibitions on assault weapons and high-capacity magazines will be interesting in this regard. Prior to *Bruen*, such prohibitions had been universally upheld in the federal courts of appeal. In all but one case, courts assumed coverage and applied scrutiny.[106] A central question going forward is whether courts will continue to assume coverage under a plain text threshold now that doing so invites a difficult historical analysis akin to what courts avoided before *Bruen*.

If lower courts end up relying on strained readings of the plain text to resolve such cases at the level of coverage, rather than proceeding to the historical-analogical analysis of protection, it could be a strong signal that judges themselves think *Bruen*'s test is unworkable.[107] And to the degree that these cases come to different conclusions about the plain text, it will raise further questions about just how plain the text really is.

One possibility is that textual and historical arguments will become intertwined along a sliding scale: The stronger the textual argument in favor of the right (as, in the Court's view, was true in *Bruen* and *Heller*), the higher the

---

[104] *See, e.g.*, Oregon Firearms Fed'n, Inc. v. Brown, No. 22-CV-01815-IM, 2022 WL 17454829, at *10 (D. Or. Dec. 6, 2022) (concluding that plaintiffs had "not shown that magazines capable of accepting more than ten rounds of ammunition are firearms 'in common use today for self-defense' and thereby covered by the plain text of the Second Amendment" (quoting *Bruen*, 142 S. Ct. at 2134)); United States v. Sanchez, No. W-21-CR-00213, 2022 WL 17815116, at *2 (W.D. Tex. Dec. 19, 2022) (concluding with minimal analysis that "the language of Section 922(g)(3) [banning firearm possession by those who unlawfully use or are addicted to a controlled substance] is not covered by the plain text of the Second Amendment"); Def. Distributed v. Bonta, No. CV 22-6200-GW-AGRx, 2022 WL 15524977, at *4 (C.D. Cal. (Oct. 21, 2022) (upholding a restriction on manufacturing "ghost guns" because the plain text of Second Amendment "plainly does not" cover the statute at issue); *see also* Denning & Reynolds, *supra* note 49 (manuscript at 24-27) (discussing the potential for "desultory or bad faith application of *Bruen*").

[105] United States v. Sitladeen, 64 F.4th 978, 986 n.3 (8th Cir. 2023); *see also* Pratheepan Gulasekaram, *The Second Amendment's "People" Problem*, 76 VAND. L. REV (forthcoming 2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4366188.

[106] *See, e.g.*, Worman v. Healey, 922 F.3d 26 (1st Cir. 2019); N. Y. State Rifle & Pistol Ass'n v. Cuomo, 804 F.3d 242 (2d Cir. 2015); Friedman v. City of Highland Park, 784 F.3d 406 (7th Cir. 2015); Heller v. District of Columbia, 670 F.3d 1244 (D.C. Cir. 2011). The one exception in the federal appellate courts, which found such weapons to be "dangerous and unusual" and thus outside the scope of the Second Amendment entirely, was *Kolbe v. Hogan*, 849 F.3d 114, 137, 142 (4th Cir. 2017).

[107] *See infra* Section II.C (discussing questions of institutional competence).

Electronic copy available at: https://ssrn.com/abstract=4408228

historical burden on the government to justify the regulation. The more tenuous the textual argument, the lower the historical burden. Yet the Supreme Court did not flesh out such an approach in *Bruen*, and the resulting indeterminacy opens the door to judicial obfuscation.

2.    A Stringent Test for Historically Persistent "General Societal Problems"

If the plain text threshold is met, *Bruen* prescribes that modern laws be evaluated based on whether they are consistent with historical predecessors. But the stringency of that analogical test itself depends on whether the problem that the law addresses is one that was known to earlier generations.[108] If the societal problem *has* persisted historically: (1) "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment,"[109] (2) "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional,"[110] and (3) "if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality."[111] These considerations drop away in the context of "unprecedented societal concerns or dramatic technological changes," in which case the "more nuanced approach" described in the following subsection applies.[112]

A few features of the stringent test for "general societal problems" are worth emphasizing. First, it runs headlong into problems we describe in greater depth in Part II. In particular, it places a great deal of weight on historical silence ("the lack of a distinctly similar historical regulation"), effectively treating it as evidence for expansive gun rights.[113] Failure to regulate—or, more accurately, absence of evidence of regulation—might have had nothing to do with a belief that doing so would have been unconstitutional.[114] Maybe the Founding

---

[108] *Bruen* does not clearly settle the issue of which historical era provides the relevant comparators. 142 S. Ct. at 2162-63 (Barrett, J., concurring) (noting that the majority opinion does not resolve whether history after the framing era, including during Reconstruction, is relevant to the historical-analogical test the majority endorses).

[109] *Id.* at 2131 (majority opinion).

[110] *Id.*

[111] *Id. But see infra* note 352 and accompanying text (observing how states have different constitutional gun rights traditions).

[112] *Bruen*, 142 S. Ct. at 2132; *infra* Section I.A.3.

[113] *See supra* Charles, *supra* note 21.

[114] *Cf. Dobbs*, 142 S. Ct. at 2250 ("Although a pre-quickening abortion was not itself considered homicide, it does not follow that abortion was *permissible* at common law—much less that abortion was a legal *right*.").

Captured by the Third Circuit Library on 06/07/2023

generation did not think of a particular solution. Maybe the regulatory means did not exist.[115] Maybe policymakers prioritized other pressing issues like setting up a new government and addressing external and internal threats to its existence.[116]

Second, which lens—modern or historical—should be used to determine if a phenomenon even *was* a "societal problem"? The Framers did not seem to regard armed domestic violence as a problem worthy of significant legal intervention[117]—a fact judges have cited in the course of striking down modern laws prohibiting gun possession by those subject to a domestic-violence-related restraining order.[118] But surely the Framers' relative silence on this problem reflects a blinkered moral sensibility with regard to domestic violence, not a

---

[115] For example, as of this writing, the township of Howell, Michigan is defending the constitutionality of a local zoning ordinance restricting the location of shooting ranges. Oakland Tactical Supply, LLC v. Howell Twp., Michigan, No. 21-1244, 2022 WL 3137711, at *2 (6th Cir. Aug. 5, 2022). A district court rejected the challenge on the grounds that the plaintiffs' "proposed course of conduct, construction and use of an outdoor, open-air 1,000-yard shooting range, is not covered by the plain text of the Second Amendment." Oakland Tactical Supply, LLC v. Howell Twp., 2023 WL 2074298, *4 (E.D. Mich. Feb. 17, 2023). If that rationale is not endorsed in the pending appeal, the court would be faced with the conundrum that zoning itself is effectively an invention of the early twentieth century. Amanda Erickson, *The Birth of Zoning Codes, a History*, Bloomberg; CityLab (June 19, 2012), https://www.bloomberg.com/news/articles/2012-06-19/the-birth-of-zoning-codes-a-history [https://perma.cc/PZD3-AWPJ]. Under *Bruen*'s slicing of the history, this makes it too late to be probative. *Bruen*, 142 S. Ct. at 2154 ("As we suggested in *Heller*, however, late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence.").

[116] As Andrew Koppelman colorfully puts it:

At any given time, an infinite number of laws are not enacted. The question of why they are not enacted is an incoherent question. Just as the number of nonenacted laws is infinite, so is the number of reasons why the legislature decides not to enact them, starting with the obvious possibility that no one thought of it. Congress has never required that the Capitol building be painted with big red polka dots. This is not evidence that it thought such a decorative choice would be unconstitutional.

Andrew Koppelman, *The Use and Abuse of Tradition: A Comment on DeGirolami's Traditionalism Rising*, J. Contemp. Leg. Iss. (forthcoming 2023) (manuscript at 6), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4383680; *see also* Sherif Girgis, *Living Traditionalism* 98 N.Y.U. L. Rev. at *30 (forthcoming 2023), available at https://ssrn.com/abstract=4366019Girgis, ("[W]hile states have never banned ice cream, that doesn't make ice cream consumption a constitutional right.").

[117] *See* Siegel, *supra* note 52. To be sure, there was *some* protection for abused women, even if it was woefully inadequate. *See* Elizabeth Pleck, Domestic Tyranny: The Making of American Social Policy Against Family Violence from Colonial Times to the Present (1987); Carolyn B. Ramsey, *Firearms in the Family*, 78 Ohio St. L.J. 1257, 1301 (2017); Carolyn B. Ramsey, *Domestic Violence and State Intervention in the American West and Australia, 1860-1930*, 86 Ind. L.J. 185, 207 (2011).

[118] *See, e.g.*, United States v. Rahimi, 61 F.4th 443 (5th Cir. 2023); United States v. Perez-Gallan, __ F.Supp.3d __, 2022 WL 16858516 (W.D. Tex. Nov. 10, 2022)).

Electronic copy available at: https://ssrn.com/abstract=4408228

determination about the scope of the right to keep and bear arms.[119] To regard it as a binding Second Amendment tradition is to make a contemporary normative determination about which historical practices are worthy of constitutional respect and which are not.[120]

Third, and perhaps most consequentially, this part of *Bruen*'s framework invites broad judicial discretion in deciding whether a historical problem has persisted and characterizing the means adopted for addressing it. In other words, what *is* a "general societal problem"?[121] What does it mean for a historical regulation to be "distinctly similar"?[122] What are "materially different means"?[123] If one defines the "general societal problem" as "gun violence"—a broad level of generality—then it will be harder to justify modern regulations that are not "distinctly similar" to predecessors. But one might also define the modern "general societal problem" at a lower level of generality—for example, as "mass shootings" or "school shootings"——and thereby avoid the need for a "distinctly similar" historical forebear to prove constitutionality.[124]

*Bruen* demonstrates how slippery and manipulable the persistent-societal-problem principle can be, as well as how little meaningful guidance it provides to lower courts. Without citing any historical sources, the majority seems to equate the modern "societal concern" of handgun violence with that of the Founding era. Addressing how this principle played out in *Heller*, the *Bruen* Court wrote:

> One of the District's regulations challenged in *Heller* 'totally ban[ned] handgun possession in the home.' The District in *Heller* addressed a perceived societal problem—firearm violence in densely populated communities—and it employed a regulation—a flat ban on the possession of handguns in the home—that the Founders themselves could have adopted to confront that problem.[125]

---

[119] Moreover, even if the Founding generation had appreciated the problem of domestic violence, there still might not have been a need to regulate guns in the domestic violence context because research suggests that they were rarely used for domestic violence—probably a reflection of the state of firearm technology at the time. *See infra* note 316 and accompanying text (discussing domestic violence at the Founding).

[120] On this process of constitutional memory-making, see Jack M. Balkin, *Constitutional Memories*, 31 Wm. & Mary Bill Rts. J. 307 (2022); Reva B. Siegel, *The Politics of Constitutional Memory*, 20 Geo. J. L. & Pub. Pol'y 19 (2022).

[121] *Bruen*, 142 S. Ct. at 2131.

[122] *Id.*

[123] *Id.*

[124] *See infra* notes 325-327 and accompanying text (discussing the recentness of mass shootings and school shootings).

[125] *Bruen*, 142 S. Ct. at 2131.

Electronic copy available at: https://ssrn.com/abstract=4408228

The implication under the persistent-societal-problem principle would be that the historical omission was strong evidence of the modern law's unconstitutionality. The Court characterized *Bruen* similarly: "New York's proper-cause requirement concerns the same alleged societal problem addressed in *Heller*: 'handgun violence,' primarily in 'urban area[s].'"[126] Both cases, according to the majority, called for "straightforward historical inquiry."[127]

But the Court's apparent conclusion that historical and modern urban handgun violence are "the same alleged societal problem"[128] is anything but straightforward. Certainly, gun violence existed in the Founding era. But why would "the Founders themselves" have adopted "a flat ban on the possession of handguns" when less than ten percent of the firearm stock consisted of handguns, and without evidence of widespread handgun use in crime?[129] There were, in some sense, urban areas and densely populated communities, but nothing even remotely comparable to today. New York City alone now contains more than twice the entire country's 1790 population.[130]

The persistent-societal-problem principle has yet to meaningfully influence Second Amendment jurisprudence, which likely is due to the challenge of defining what counts as such problems and the corresponding challenge of determining how to calibrate the historical-analogical inquiry for regulations addressing them. Rather, courts have focused most of their attention on two nonexhaustive metrics *Bruen* offered for comparing past and present laws, to which we now turn.

3.  *Bruen*'s Primary Historical-Analogical "Metrics": "Why" and "How"

The plain text threshold and persistent-societal-problem principle purportedly dictate the applicability and stringency of the historical-analogical test at the center of *Bruen*. But what form does that historical-analogical analysis take?

The *Bruen* majority recognized that "because '[e]verything is similar in infinite ways to everything else,' one needs 'some metric enabling the analogizer to assess which similarities are important and which are not.'"[131] The majority pointed to "at least two" such metrics:

---

[126] *Id.*

[127] *Id.*

[128] *Id.*

[129] *See* Ruben, *supra* note 92, at 204-207 (discussing firearms, crime, and self-defense at the founding).

[130] *See infra* notes 307-311 and accompanying text (discussing lack of urbanization at the founding).

[131] *Bruen*, 142 S. Ct. at 2132 (quoting Cass Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 774 (1993); and Schauer & Spellman, *supra* note 45, at 254); *see also* Alexander &

Captured by the Third Circuit Libraries on 6/06/2023

> While we do not now provide an exhaustive survey of the
> features that render regulations relevantly similar under the
> Second Amendment, we do think that *Heller* and *McDonald* point
> toward at least two metrics: *how* and *why* the regulations burden
> a law-abiding citizen's right to armed self-defense.[132]

Citing *Heller* and *McDonald v. City of Chicago* for the proposition that individual
self-defense is the central component of the right to keep and bear arms, the
Court further elaborated that "whether modern and historical regulations
impose a comparable burden on the right of armed self-defense and whether
that burden is comparably justified are central considerations when engaging in
an analogical inquiry."[133]

Restated, this test appears to require that two categories of things—"modern
and historical regulations"—be compared across two metrics: the burdens they
impose on "armed self-defense" and their justifications. Just *how* "comparable"
the modern and historical gun laws must be remains unclear, except that
"analogical reasoning requires only that the government identify a well-
established and representative historical *analogue*, not a historical *twin*." [134]

As Justice Breyer's dissent pointed out, "how" and "why" are effectively
synonyms for "means" and "end,"[135] which might be evaluated more
straightforwardly under a tiers-of-scrutiny-type analysis. And yet the majority
maintained that there is a difference between its analogical method and means-
end scrutiny:

> This does not mean that courts may engage in independent
> means-end scrutiny under the guise of an analogical inquiry.
> Again, the Second Amendment is the "product of an interest
> balancing *by the people*," not the evolving product of federal
> judges. Analogical reasoning requires judges to apply faithfully
> the balance struck by the founding generation to modern
> circumstances, and contrary to the dissent's assertion, there is
> nothing "[i]roni[c]" about that undertaking. It is not an invitation
> to revise that balance through means-end scrutiny.[136]

Of course, as we address in more detail below, to say that the Second
Amendment was the "product of an interest balancing by the people," as *Heller*

---

Sherwin, *supra* note 45, at 76-83 ("Similarities are infinite; therefore some rule or principle is
necessary to identify important similarities.").
[132] *Bruen*, 142 S. Ct. at 2132-33 (emphasis added).
[133] *Id.* (citing McDonald v. City of Chicago, 561 U.S. 742, 767 (2010) (quoting District of
Columbia v. Heller, 554 U.S. 570, 599 (2008))) (quotation marks and emphasis omitted).
[134] *Id.* at 2133; *see also id.* ("So even if a modern-day regulation is not a dead ringer for historical
precursors, it still may be analogous enough to pass constitutional muster.").
[135] *Id.* at 2179 (Breyer, J., dissenting).
[136] *Id.* at 2133 n.7 (internal citations omitted).

Captured by the Third Circuit Libraries on 06/07/2023

did,[137] is a relatively empty concept when it comes to resolving the concrete constitutional conflicts that "the people" did not consider in 1791.[138]

Courts have generally treated the "how" and "why" metrics as *Bruen*'s central methodological holding.[139] Broadly speaking, they are the closest the Court comes to giving concrete guidance about how to apply its historical-analogical test, and they will probably continue to be the central factors in cases that get past the "plain text" threshold.

Even so, *Bruen* signaled that courts can consider other factors beyond "how" and "why," observing that it did not purport to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment."[140] In Part II, we show that courts *must* consider other factors for the doctrine to be coherent.

### 4. The Continuing Relevance of *Heller*'s "Presumptively Lawful" Regulations

Just as it had done in *Heller*, the Court in *Bruen* repeatedly emphasized that its holding was consistent with various forms of gun regulation. *Heller* grounded this principle in history:

> [T]he majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.[141]

---

[137] *Heller*, 554 U.S. at 635 (emphasis omitted).

[138] *See infra* Section II.B (discussing differences between historical and modern weapons and violence).

[139] *See, e.g.*, United States v. Rahimi, 61 F.4th 443, 454 (5th Cir. 2023); United States v. Perez-Garcia, No. 3:22-CR-01581-GPC, 2022 WL 4351967, at *3 (S.D. Cal. Sept. 18, 2022), *review denied*, No. 22-CR-1581-GPC, 2022 WL 17477918 (S.D. Cal. Dec. 6, 2022); United States v. Martin, No. 2:21-CR-00068, 2023 WL 1767161, at *2 (D. Vt. Feb. 3, 2023).

[140] *Bruen*, 142 S. Ct. at 2132. The Court also said that *Heller* and *McDonald* point to "*at least* two metrics"—those being the "how" and "why"—suggesting that other metrics are permitted. *Id.* at 2133 (emphasis added).

[141] *Heller*, 554 U.S. at 626-27 (internal citations omitted). In a footnote, *Heller* referred to these as "examples" of "presumptively lawful regulatory measures," further noting that the "list does not purport to be exhaustive." *Id.* at 627 n.26. The opinion then also blessed restrictions on "dangerous and unusual weapons" such as "M-16 rifles and the like." *Id.* at 627.

Electronic copy available at: https://ssrn.com/abstract=4408228

Captured by the Third Circuit Libraries on 06/07/2023

The Court reproduced this passage in *McDonald v. City of Chicago*,[142] and it was central to post-*Heller* Second Amendment litigation throughout the lower courts.[143]

The *Bruen* majority—while purporting to apply *Heller*—notably did not fully reproduce this passage, but it did discuss with approval some of the restrictions that *Heller* had blessed.[144] Moreover, concurring opinions signed by three of the Justices who also joined the six-Justice majority emphasized that *Heller*'s endorsement of various forms of regulation remains good law. Justice Alito wrote, "Nor have we disturbed anything that we said in *Heller* or *McDonald v. Chicago* about restrictions that may be imposed on the possession or carrying of guns."[145] Justice Kavanaugh, in a concurring opinion joined by Chief Justice Roberts, underscored that "as *Heller* and *McDonald* established and the Court today again explains, the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. Properly interpreted, the Second Amendment allows a 'variety' of gun regulations."[146] Kavanaugh then went on to reproduce the "presumptively lawful" paragraphs from *Heller* and *McDonald*.[147] Kavanaugh also highlighted, as the majority opinion had, that the

---

[142] *See* McDonald v. City of Chicago, 561 U.S. 742, 786 (2010).

[143] *See* Ruben & Blocher, *supra* note 20, at 1488 (noting, based on review of more than 1,000 Second Amendment challenges between 2008 and 2016, that "a majority of the challenges in our study (60 percent) explicitly cited those paragraphs, though the ratio trended downward over time, perhaps reflecting the fact that *Heller* itself has now been baked into circuit precedent").

[144] *Bruen*, 142 S. Ct. at 2133-34 (discussing "sensitive places" restrictions).

[145] *Id.* at 2157 (Alito, J., concurring) (internal citations omitted).

[146] *Id.* at 2162 (Kavanaugh, J., concurring) (internal citations and quotation marks omitted).

[147] *Id.* (quoting District of Columbia v. Heller, 554 U.S. 570, 626-27 & 627 n.26 (2008); and *McDonald*, 561 U.S. at 786). To be precise, Kavanaugh's concurrence quoted *nearly* all of those paragraphs—omitting the part about the presumptive constitutionality of "prohibitions on carrying concealed weapons." *Heller*, 554 U.S. at 626. That language had been relied on by federal courts of appeal after *Heller*. *See, e.g.*, Peruta v. Cnty. of San Diego, 824 F.3d 919, 928 (9th Cir. 2016) ("Of particular interest here, [*Heller*] noted that the Second Amendment has not been generally understood to protect the right to carry concealed firearms."); Peterson v. Martinez, 707 F.3d 1197, 1201 (10th Cir. 2013) (quoting *Heller*'s language about concealed carry restrictions and concluding "that the carrying of concealed firearms is not protected by the Second Amendment").

    Perhaps the concurring Justices decided that it would be too confusing and complicated—in a case involving an asserted right to carry concealed handguns in public—to cite language saying that concealed carry can be outright prohibited. To acknowledge as much would not necessarily have been to decide the case in New York's favor, since the state *also* prohibits open carry of handguns, but the interplay between those two forms of public carry has been a complicating factor in many licensing cases. *See Peruta*, 824 F.3d at 941-42 (summarizing the debate between the majority and dissenting judges regarding the relevance of open carry restrictions when deciding on the constitutionality of concealed carry restrictions); Transcript of Oral Argument, at 42, *Bruen*, 142 S.Ct. 2111 (Kagan, J.) ("If we tried to copy history, we would

Electronic copy available at: https://ssrn.com/abstract=4408228

decision does not call into question "shall-issue" permitting, without acknowledging the lack of any obvious Founding-era analogue for such policies.[148]

These reassurances signal that the Supreme Court may be willing to uphold gun regulations outside the strict parameters of the Court's historical-analogical test—including those recognized as "presumptively lawful" in *Heller*. What this means for the viability of pre-Bruen cases that relied on this passage in Heller remains somewhat unclear. We expect (and have already seen evidence[149]) that courts will continue to invoke *Heller*'s exceptions as carve-outs from Second Amendment coverage, suggesting that some continuity will be maintained between pre- and post-*Bruen* case outcomes, despite the opinion's radical reframing of Second Amendment methodology.

For present purposes, the more relevant point is that some of *Heller*'s exceptions are not particularly easy to square with *Bruen*'s historical-analogical approach. For example, "[a]lthough the Supreme Court [in *Heller*] observed that bans on gun possession by the mentally ill are 'longstanding,' legal limits on the possession of firearms by the mentally ill . . . are of 20th Century vintage."[150] Similarly, "[t]he Founding generation had no laws . . . denying the right to people convicted of crimes,"[151] nor did they generally treat domestic violence as a crime,[152] although today either of those can be a basis for prohibiting gun possession.[153]

Our goal thus far has been to give as clear a statement as possible of *Bruen*'s methodological holding. That articulation is necessarily tentative because the opinion itself contains much ambiguity and the majority neither states nor

---

find ourselves in a world in which the only thing that a state could do is tell people, you know, you can't carry it concealed, you have to carry it open."). Whether to frame the debate around public carry generally or concealed carry specifically demonstrates a way in which the level of generality can be outcome determinative under *Bruen*'s historical test, a point we discuss in greater detail below. *See infra* Section II.B.

[148] *Id.* at 2162 (stating that "shall-issue licensing regimes are constitutionally permissible"); *id.* at 2138 (majority opinion); *see also* Adam M. Samaha, *Is* Bruen *Constitutional? On the Methodology that Saved Most Gun Licensing*, 98 N.Y.U. L. REV. (forthcoming 2023) (analyzing inconsistencies between *Bruen*'s stated methodology and the preservation of shall-issue licensing regimes).

[149] *See, e.g.*, United States v. Hoover, No. 3:21-cr-22(S3)-MMH-MCR, 2022 WL 10524008, at *13 (M.D. Fla. Oct. 18, 2022) ("[T]he Supreme Court's holding in *Bruen* did not overturn *D.C. v. Heller*, in which the Court recognized the importance of 'the historical tradition of prohibiting the carrying of "dangerous and unusual weapons."'" (quoting *Heller*, 554 U.S. at 627)); United States v. Daniels, No. 1:03-cr-00083-MR, 2022 WL 5027574, at *4 (W.D.N.C. Oct. 4, 2022) ("Nothing in the *Bruen* decision . . . casts doubt on 'the longstanding prohibitions on the possession of firearms by felons.'" (citing *Heller*, 554 U.S. at 626-27)).

[150] Tyler v. Hillsdale Cnty. Sheriff's Dep't, 837 F.3d 678, 687 (6th Cir. 2016) (quotation marks and citations omitted).

[151] Adam Winkler, Heller*'s Catch-22*, 56 UCLA L. REV. 1551, 1563 (2009).

[152] *Supra* note 52 and sources cited therein.

[153] *See, e.g.*, 18 U.S.C. § 922(g)(9).

Captured by Third Circuit Library on 05/07/2023

applies a consistent test. But one point is relatively clear: Even as it points to the past, *Bruen* represents something new—not just for the Second Amendment, as we have shown above, but also for historical approaches to constitutional law more broadly.

### B.  A Pivot in Constitutional Historicism

*Bruen* was decided at the end of a Term in which the Court's conservative supermajority leaned heavily on historical—often originalist—methods.[154] As the previous Section showed, *Bruen* itself is an extraordinarily historicist opinion. But what *kind* of historical approach it represents is a harder question.[155] Some scholars have called it "originalistic,"[156] "purportedly originalist,"[157] or "originalish."[158]

On the one hand, the opinion pursues many standard originalist inquiries. For example, it refers to the "public understanding" of the Second Amendment at the time of its adoption[159] and says that its meaning is "fixed" by "the understandings of those who ratified it,"[160] which is consistent with the "fixation thesis" popular among modern originalists.[161] Justice Barrett's concurrence also treats the majority opinion as originalist by noting that it does not resolve the question of whether 1791 or 1868 is the relevant date for historical analysis[162]—

---

[154] *See* David Cole, *The Supreme Court Embraces Originalism—and All Its Flaws*, WASH. POST (June 30, 2022), https://www.washingtonpost.com/opinions/2022/06/30/supreme-court-originalism-constitution [https://perma.cc/5HW7-DTYX].

[155] Chad Flanders, *Flag Bruen-ing: Texas v. Johnson in Light of The Supreme Court's 2021-22 Term*, 2022 U. ILL. L. REV. ONLINE 94, 95 ("Call it originalism, or call it the text and history method; the way forward now, it seemed, would be not to rely on traditional doctrinal categories or on *stare decisis*.").

[156] Clay Calvert & Mary Rose Papandrea, *The End of Balancing? Text, History & Tradition in First Amendment Speech Cases after* Bruen, 18 DUKE J. CONST. L. & PUB. POL'Y (forthcoming 2023) (manuscript at 2).

[157] Randy Barnett, *A Minor Impact on Gun Laws But a Potentially Momentous Shift in Constitutional Method*, SCOTUSBLOG (June 27, 2022) www.scotusblog.com/2022/06/a-minor-impact-on-gun-laws-but-a-potentially-momentous-shift-in-constitutional-method [https://perma.cc/S2PD-HSV8].

[158] A.W. Geisel, Bruen *Is Originalish* (Jan. 23, 2023), https://ssrn.com/abstract=4335950 [https://perma.cc/SFV8-2WJ3].

[159] N.Y. State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111, 2136, 2137, 2138 (2022).

[160] *Id.* at 2132.

[161] *See supra* note 36.

[162] *Id.*  at 2163 (Barrett, J., concurring).

Electronic copy available at: https://ssrn.com/abstract=4408228

an important issue for originalists.[163] Understandably, then, both supporters[164] and critics[165] of *Bruen*'s methodology have treated the opinion as originalist.

On the other hand, when it came to evaluating the constitutionality of modern gun laws like New York's, the Court seemed to take a different approach—one focused on "historical tradition" rather than the fixation of meaning at the moment of ratification.[166] In this respect, the Court adopted the test of "text, history, and tradition" championed by then-Judge Kavanaugh as an alternative to the prevailing two-part framework.[167] Scholars have explored

---

[163] *See* Akhil Reed Amar, Heller, HLR*, and Holistic Legal Reasoning*, 122 HARV. L. REV. 145, 173–74 (2008) (criticizing *Heller* for using mid-nineteenth sources to show the meaning of the Second Amendment in 1791).

[164] John O. McGinnis, Bruen's *Originalism*, LAW & LIBERTY (July 21, 2022), https://lawliberty.org/bruens-originalism [https://perma.cc/9A92-MYXB] (arguing that in *Bruen* "originalism was very much on the surface, not only governing the Second Amendment, but perhaps changing the approach to the adjudication of constitutional rights more generally"); Lawrence B. Solum & Randy E. Barnett, *Originalism after* Dobbs, Bruen*, and Kennedy: The Role of History and Tradition* (manuscript at 31), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4338811 (arguing that that history and tradition is "business as usual" for the Supreme Court, and that cases like *Bruen* and *Dobbs* "contain scant evidence of the emergence of a new approach to constitutional interpretation that would supplant either Public Meaning Originalism or Constitutional Pluralism . . . .").

[165] *See, e.g.*, Saul Cornell, *Originalism's Historical Problems: The Supreme Court's Embrace of a Controversial Theory*, ORIGINS (Nov. 2022) https://origins.osu.edu/read/originalisms-historical-problems-supreme-courts-embrace-controversial-theory [https://perma.cc/NL7A-LUNA]; Ruth Marcus, *Ye Olde Supreme Court: Your Originalism is Making America Unsafe.*, WASH. POST (Feb. 4, 2023, 9:33 AM EST), https://www.washingtonpost.com/opinions/2023/02/05/guns-bruen-supreme-court-second-amendment [https://perma.cc/B8ZX-9Q6W]; Press Release, Am. Const. Soc'y, ACS Statement in Response to Supreme Court Decision in New York State Rifle & Pistol Association v. Bruen (June 23, 2022), https://www.acslaw.org/press_release/acs-statement-in-response-to-supreme-court-decision-in-new-york-state-rifle-pistol-association-v-bruen [https://perma.cc/HE46-WUF6].

[166] Michael L. Smith, *Abandoning Original Meaning*, 86 ALBANY L. REV. 43, 76 (2023) ("While the Court paid lip service to the Constitution's meaning, its opinions focused far more on historic practices and traditions without drawing an explicit link between such history and textual meaning."); Noah Feldman, *Supreme Court 'Originalists' Are Flying a False Flag*, WASH. POST (July 17, 2022), https://www.washingtonpost.com/business/supreme-court-originalists-are-flying-a-false-flag/2022/07/17/2e02fdcc-05d1-11ed-80b6-43f2bfcc6662_story.html [https://perma.cc/C75N-VZEX] (concluding that *Bruen* "is the most originalist decision of the recent major cases," but that it ultimately "was an exercise in historicist analogy, not genuine originalism").

[167] Heller v. Dist. of Columbia, 670 F.3d 1244, 1271 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("In my view, *Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny."); *Bruen*, 142 S. Ct. 2111, 2161 (Kavanaugh, J., concurring) ("The Court employs and elaborates on the text, history, and tradition test that *Heller* and *McDonald* require for evaluating whether a government regulation infringes on the Second Amendment right to possess and carry guns for self-defense.").

Electronic copy available at: https://ssrn.com/abstract=4408228

whether and how that test mapped onto existing doctrinal approaches in other areas of constitutional law, noting the ways in which it differed from standard forms of originalism.[168] Those same questions now apply to *Bruen* and raise questions about whether the Justices will further blur the lines between traditionalism and originalism.[169]

Ultimately, the question of whether *Bruen* was or was not originalist depends on one's view of two deeply contested issues: what *Bruen*'s methodology actually is, and what counts as originalism.[170] As shown above,[170] the first issue is incredibly complicated. The second is, too. Originalism is not monolithic, but is rather a family of theories and practices united by a focus on interpreting the Constitution by reference to the past.[171] Thus, the fact that *Bruen* might not conform to the dominant scholarly description of original public meaning originalism does not mean it is not originalist from other perspectives, including those that see originalism simply as a way to restrain judges by tying them to historical sources or view it as a completely political project to block liberal policies in the courts.[172]

The aspects of "originalism-by-analogy" that we explore here apply equally whether one considers the opinion originalist, traditionalist, or something else entirely. For our purposes, what is most striking about *Bruen* is its heavy reliance on historical analysis not simply to establish the original meaning and thus scope of a constitutional right (the central focus of original public meaning originalism), but to evaluate the constitutionality of restrictions on that right. The two do not necessarily go hand in hand. One might, for example, employ public meaning originalism to determine that the Second Amendment protects

---

[168] *See, e.g.*, Darrell A.H. Miller, *Text, History, and Tradition: What the Seventh Amendment Can Teach Us About the Second*, 122 YALE L.J. 852 (2013).

[169] Girgis, *supra* note 116, at *17; Jack Balkin, *More on Text, History, and Tradition – Discussion Questions for* Dobbs*, Part One*, BALKINIZATION, https://balkin.blogspot.com/2022/07/more-on-text-history-and-tradition.html [https://perma.cc/XK8E-SF7P] ("*Dobbs*, like *Bruen*, suggests that the Court's self-described originalist judges are not strongly distinguishing originalism from traditionalism.").

[170] *See supra* Section I.A.

[171] *Cf.* Thomas B. Colby & Peter J. Smith, *Living Originalism*, 59 DUKE L.J. 239, 244 (2009) ("A review of originalists' work reveals originalism to be not a single, coherent, unified theory of constitutional interpretation, but rather a smorgasbord of distinct constitutional theories that share little in common except a misleading reliance on a single label.").

[172] *See* J. HARVIE WILKINSON III, COSMIC CONSTITUTIONAL THEORY 40 (2012) ("This constraining focus of originalism is the basis of its appeal, accounting for 'the prominence it has achieved in the last few decades as both a justification for and an objective constraining on the power of judicial review.'" (quoting Michael W. McConnell, *Active Liberty: A Progressive Alternative to Textualism and Originalism?*, 119 HARV. L. REV. 2387, 2414 (2006)); CHEMERINSKY, *supra* note 5, at 165 ("The remarkable willingness of originalists to abandon originalism when it fails to produce conservative results shows that the theory was never the constraint on the judiciary that its boosters promised. It is simply convenient rhetoric, used by conservatives to make it seem that their decisions are a product of something other than their political views.").

Electronic copy available at: https://ssrn.com/abstract=4408228

a right to have a handgun in the home for self-defense, and then evaluate any restrictions on that right—say, a safe storage law—using heightened scrutiny or some other doctrinal test. Much constitutional law works this way. *Bruen*, however, uses historical analysis not simply to interpret the Second Amendment's meaning and thus the scope of its coverage, but also to directly evaluate the constitutionality of particular laws.[173]

This reliance on history at the second step of the analysis is what separates *Bruen* from the two-part framework that it rejected[174] and from how other constitutional rights questions are answered beyond the Second Amendment.[175] The two steps of the pre-*Bruen* framework map onto the commonly invoked difference between *interpretation* and *construction* within originalist theory. Interpretation is "the process (or activity) that recognizes or discovers the linguistic meaning or semantic content of the legal text," while construction is "the process that gives a text legal effect (either . . . translating the linguistic meaning into legal doctrine or by applying or implementing the text)."[176] One way to understand the two-part framework is as adopting—or at least accepting—history as a matter of interpretation, but using scrutiny tests in the "construction zone."[177] The methodological question before the Court in *Bruen* thus was *not* whether history matters in Second Amendment adjudication.

---

[173] Of course, as we have emphasized, *Bruen* itself was unclear about its historical-analogical test, which has led to uncertainty among commentators (including leading originalist scholars) regarding how to understand the opinion. In their essay, Randy E. Barnett and Lawrence B. Solum read *Bruen* as most plausibly using analogies to the historical tradition of firearms regulation as a means of interpretation "to identify the exact contours of the pre-existing legal right to keep and bear arms in either 1791 or 1868." Barnett & Solum, *supra* note 164, at 56 (April 23, 2023 draft). In that reading, "*Bruen* is a thoroughly originalist opinion." *Id.* at 36. In an earlier draft, Barnett and Solum read *Bruen*'s test differently, as "an implementing doctrine that is not justified by originalist reasoning." Randy E. Barnett and Lawrence B. Solum, *Originalism After* Dobbs, Bruen, *and* Kennedy*: The Role of History and Tradition* (manuscript at 23) (Jan. 26, 2023). They explained that Justice Thomas or others "might well view this rule of construction as constituting the original meaning of the text itself." *Id.* But in their view at the time, "[e]valuating the constitutionality of firearms regulations by comparing them to regulations that have been traditionally accepted from the founding until today is not a method for identifying the original meaning of the text." *Id.* at 22.

We are more persuaded by Barnett's and Solum's earlier reading of the historical-analogical test as a means of implementing the Second Amendment within the construction zone. For reasons they raised, *id.*, and we elaborate in this Article, considering only a subset of historical regulations passed by unrepresentative policymaking bodies and ignoring all other historical evidence strikes us as a plainly deficient approach to original public meaning.

[174] *See supra* notes 65-72 and accompanying text (discussing pre-*Bruen* framework).

[175] *See infra* notes 188-194 and accompanying text.

[176] Solum, *supra* note 8, at 96.

[177] Randy E. Barnett & Evan Bernick, *The Letter and the Spirit: A Unified Theory of Originalism*, 107 GEO. L.J. 1, 34, 38-41 (2018) (identifying use of two-part framework in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), as "good-faith construction").

Electronic copy available at: https://ssrn.com/abstract=4408228

Second Amendment doctrine already employed originalism and traditionalism before *Bruen*.[178] Indeed, soon after *Heller* and for more than a decade, courts had acknowledged that "historical meaning enjoys a privileged interpretive role in the Second Amendment context."[179] Instead, *Bruen* eliminated the role of standard doctrinal tests that conventionally complement and even implement historical analysis, requiring instead direct comparison between challenged laws and historical ones.

Our point here is to emphasize that *Bruen* does not somehow sidestep the crucial role of the rules that *implement* the meaning of a constitutional provision in concrete cases. As noted above, many originalists refer to this as a process of "construction," though for our purposes the label is less important than the fact that these rules—and not just the semantic content of the Constitution—are what courts use to decide actual cases.[180] Originalists take different approaches to the status and content of these rules.[181] Jack Balkin, for example, argues that "a thin theory with a broad zone for construction is better able to avoid anachronism; thick theories of original meaning tend to encourage anachronism."[182] Others, in contrast, contend that the construction zone should be narrow.[183] All agree that it exists. What *Bruen* did was replace one rule of construction with another.

---

[178] *See, e.g.*, Mark Anthony Frassetto, *Judging History: How Judicial Discretion in Applying Originalist Methodology Affects the Outcome of Post-Heller Second Amendment Cases*, 29 WM. & MARY BILL RTS. J. 413 (2020) (emphasizing the relevance of historical analysis and analogy pre-*Bruen*).

[179] United States v. Masciandaro, 638 F.3d 458, 470 (4th Cir. 2011).

[180] Lawrence Lessig calls this a process of "translation." LAWRENCE LESSIG, FIDELITY AND CONSTRAINT: HOW THE SUPREME COURT HAS READ THE AMERICAN CONSTITUTION (2019). *See also See* Jack M. Balkin, *Translating the Constitution*, 118 MICH. L. REV. 977 (2020) (arguing that Lessig's theory is best understood as an approach to constitutional construction).

[181] Some originalists have proposed ways to fill the construction zone with reasoning that aligns with original public meaning. *See, e.g.*, Barnett & Bernick, *supra* note 177, at 3 ("[O]riginalism must be committed to the Constitution's original spirit as well—the functions, purposes, goals, or aims implicit in its individual clauses and structural design. We term this spirit-centered implementation 'good-faith constitutional construction.'"). Others have sought to minimize the role for construction. *See, e.g.*, John O. McGinnis & Michael B. Rappaport, *The Power of Interpretation: Minimizing the Construction Zone*, 96 NOTRE DAME L. REV. 919, 921 (2021) ("In this Article, we offer the first sustained argument that the construction zone is a small one."). Whether the application of the pre-*Bruen* doctrinal rules provided sufficient judicial constraint is of course a separate question, and many critics of the two-part framework alleged that it was applied too flexibly. But even if that were true, the solution need not be history-all-the-way-down, especially in light of the tradition of applying a non-historical-analogical approach to gun rights questions. *See infra* note 187 and accompanying text (noting the tradition of permitting gun regulation in the interests of public welfare).

[182] JACK M. BALKIN, MEMORY AND AUTHORITY: THE USES OF HISTORY IN CONSTITUTIONAL INTERPRETATION 110 (forthcoming 2024).

[183] *See* McGinnis & Rappaport, *supra* note 181, at 921.

Electronic copy available at: https://ssrn.com/abstract=4408228

This is not to say that *Bruen* was clear about the nature and application of its new rule of construction, which predictably has created challenges for the lower courts.[184] *Bruen*'s failure to give coherent guidance regarding how to implement its holding connects to the level-of-generality problem we discuss in Section II.B: some courts have defined the scope of Second Amendment rights at a high level of generality (for example, a right to carry firearms in public) but the regulatory tradition at a low level of generality (for example, as bans on carrying guns only at the precise places restricted in the 1700s and 1800s), essentially converting Second Amendment cases into questions of interpretation with minimal work for construction. But that asymmetrical approach to history is a consequence of judicial choice, not anything in the Second Amendment's text, *Bruen*, or the original understanding of the right to keep and bear arms (let alone of judicial review).[185]

No matter how it is framed, *Bruen* departs dramatically from traditional forms of implementing doctrine. It does not use historical analysis to select a nonhistorical doctrinal test, as *Dobbs* effectively did in saying that rational-basis review applies to abortion restrictions because the right to abortion is not historically rooted.[186] Nor does it adopt a doctrinal test *from* history, for example by borrowing from the Founders' narrow conception of judicial review and their corresponding understanding that guns could be regulated in the interests of public welfare.[187] Instead, *Bruen* says that a novel historical analysis *is* the doctrinal test. Specifically, it says—as detailed above in Section I.A—that modern gun laws must be evaluated by analogy to historical forebears, unmediated by a recognizable doctrinal test. It places front-and-center a test calling not for determining original meaning as such, but for comparisons between modern and historical laws in light of their purposes and on-the-ground operation.

In this way, *Bruen* breaks not only from standard forms of originalism but from other areas of constitutional rights adjudication—none of which employ historical-analogical inquiry as the sole means of determining constitutionality.[188]

---

[184] *See infra* Section III.A (suggesting ways to identify principles of relevant similarity that *Bruen* itself fails to specify sufficiently).

[185] That is why we prefer Barnett and Solum's initial reading of *Bruen*, which recognized the role of construction. *See supra* note 173.

[186] Dobbs v. Jackson Women's Health Organization, 142 S. Ct. 2228, 2266 & 2284 (2022).

[187] *See* Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 L. & CONTEMP. PROBS. 31 (2020); *see also infra* notes 425-433 and accompanying text (discussing the scope of historical police power and judicial review).

[188] The closest doctrinal comparator may be the approach taken for Seventh Amendment cases. *See* Miller, *supra* note 168 (discussing Seventh Amendment doctrine in the context of the turn to historicism in Second Amendment case law). However, Seventh Amendment doctrine is distinct from *Bruen*'s approach in various ways, including that the "reliance on analogical reasoning from

Electronic copy available at: https://ssrn.com/abstract=4408228

The majority attempted to link the historical-analogical approach to other areas of constitutional law,[189] but as others—including those who support *Bruen*'s result—have noted, this attempt to claim doctrinal consistency is "extremely tendentious."[190] For example, the majority claimed that its approach comports with free speech doctrine,[191] since "the government must generally point to *historical* evidence about the reach of the First Amendment's protections."[192] But of course the Supreme Court's freedom-of-speech doctrine has long deployed means-end scrutiny after determining the scope of First Amendment coverage.[193] Indeed, the First Amendment precedent cited by the majority itself in *Bruen* makes clear this aspect of freedom-of-speech doctrine.[194]

We call *Bruen*'s novel approach "originalism-by-analogy" to differentiate it from existing categories like public meaning originalism, which focuses on finding the historical semantic meaning of constitutional text,[195] which might then be implemented through doctrines like heightened scrutiny.[196] Within the terminology of originalism, *Bruen* comes closer to expected applications

---

[text, common law history, or tradition" is "not exclusive." *Id.* at 856. Rather, Seventh Amendment doctrine applies a historical-analogical inquiry flexibly, and "[w]here history is not dispositive or an analogy not apparent," *id.* at 886, expands the inquiry, including to policy or "functional" considerations, *id.* at 886, 891, 891 n.237 (quoting City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 718 (1999)).

[189] New York State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111, 2130 (2022) ("This Second Amendment standard accords with how we protect other constitutional rights.").

[190] *See, e.g.*, Denning & Reynolds, *supra* note 49, at 15-16 ("Justice Thomas's claim that text-history-tradition is the predominant or primary means of protecting constitutional rights is extremely tendentious.").

[191] *Bruen*, 142 S.Ct. at 2130.

[192] *Id.* (emphasis in original).

[193] *See, e.g.*, Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 194, 198 (5th Cir. 2012) ("First Amendment doctrine demonstrates that, even with respect to a fundamental constitutional right, we can and should adjust the level of scrutiny according to the severity of the challenged regulation."); Clay Calvert & Mary-Rose Papandrea, *The End of Balancing? Text, History & Tradition in First Amendment Speech Cases After* Bruen, 18 DUKE J. OF CONST. L. & PUB. POL'Y (forthcoming 2023) (describing *Bruen*'s account of First Amendment doctrine as "largely inaccurate"); Genevieve Lakier, *The Invention of Low-Value Speech*, 128 HARV. L. REV. 1 (2015).

[194] *See, e.g.*, United States v. Playboy Ent. Grp., Inc., 529 U.S. 803, 813 (2000) ("Since § 505 is a content-based speech restriction, it can stand only if it satisfies strict scrutiny."); *Bruen*, 142 S.Ct. at 2130 (citing to *Playboy Ent. Grp., Inc.* when discussing First Amendment support for rejecting means-end scrutiny).

[195] Of course, the two approaches are not incompatible: As we have noted, *Bruen* does both. The point is that public meaning originalism does not necessarily entail originalism-by-analogy—the pre-*Bruen* framework involved the former but not the latter.

[196] Barnett & Lund, *supra* note 81 (advocating such a test instead of one grounded solely in historical analogy).

Captured from the Digital Libraries on 06/07/2023

originalism.[197] As Jack Balkin explains, such an approach "asks how people living at the time the text was adopted would have expected it would be applied using language in its ordinary sense."[198] Because it pitches questions narrowly and specifically, expected applications originalism shares features with originalism-by-analogy, and might rely on some of the same forms of evidence. In evaluating a modern safe-storage law, for example, an expected applications originalist might ask whether such a restriction would have been thought constitutional in 1791. The existence or lack thereof of similar restrictions at that time would certainly be relevant to that question. For *Bruen*'s originalism-by-analogy, the central question is not a historical counterfactual, but a historical *comparison*: not whether a modern law *would have been thought* constitutional, but whether its justification ("why") and stringency ("how") are sufficiently similar to the laws actually on the books in the Founding era. Simply put, under *Bruen*, the question is not what the historical meaning of a right is. As Justice Thomas himself has acknowledged in the context of defamation "law did not remain static after the founding" which "reflected changing policy judgments, not a sense that existing law violated the original meaning" of the Constitution.[199] The same, of course, is true of Founding-era gun law.

That does not mean, however, that *Bruen*'s originalism-by-analogy is necessarily more rigid than original expected applications or other forms of originalism with regard to the evidence it considers or the regulations it permits. *Bruen*'s analogical approach in fact represents a *departure* from strict historical reasoning, because it requires a comparison of modern and historical laws based on "why" and "how" they operated. This inevitably requires consideration of contemporary costs, benefits, and legislative deference, as we explain in more detail below,[200] because it is impossible to compare things like justifications for a law or the burdens it imposes on armed self-defense without evidence.

Although *Bruen* might represent a revolution in Second Amendment law and potentially in originalism more broadly, the lay of the land is nonetheless familiar. After all, *Heller* did not explicitly adopt any recognizable doctrinal test when it struck down D.C.'s handgun prohibition, but the limited doctrinal guidance that it did provide indicated the importance of "longstanding" regulations.[201] It was left to lower courts to flesh out the doctrine, which they

---

[197] Lawrence B. Solum, *Triangulating Public Meaning: Corpus Linguistics, Immersion, and the Constitutional Record*, 2017 B.Y.U. L. REV. 1621, 1637 ("Original public meaning should be distinguished from what have been called 'original expected application[s].'").

[198] Jack M. Balkin, *Abortion and Original Meaning*, 24 CONST. COMM. 291, 296 (2007); *id.* at 295-97 ("[C]onstitutional interpretation is not limited to those applications specifically intended or expected by the framers and adopters of the constitutional text.").

[199] McKee v. Cosby, 139 S. Ct. 675, 682 (2019) (Thomas, J., concurring in the denial of certiorari).

[200] *See infra* Section II.C.2.

[201] District of Columbia v. Heller, 554 U.S. 570, 626-27 (2008).

Electronic copy available at: https://ssrn.com/abstract=4408228

did with the two-part framework that predominated before *Bruen*. And as one would expect, concrete questions—like whether people convicted of felonies can be disarmed—became governed by circuit precedent, without a need for renewed historical inquiry in each case.[202]

It seems likely that a similar dynamic will play out after *Bruen*. Investigating the historical record and finding relevant similarities among historical laws will generate precedent to govern new cases. Later courts cannot *both* respect such precedent *and* conduct historical-analogical reasoning de novo in every case.[203] As courts apply originalism-by-analogy, they will generate binding precedent both at a narrow level (e.g., that the felony prohibitor is constitutional) and at a broader level (e.g., that "founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety").[204] The latter is a generalizable principle derived from *Bruen*'s analogical mandate. The principle of relevant similarity—dangerousness—becomes a legal rule, and the question in any given Second Amendment challenge to a group prohibitor is then whether the group is dangerous. In this way, the historical-analogical approach—like more standard forms of originalism—eventually creates applicable doctrinal rules and precedent, crowding out the need for direct historical analysis in future cases.[205] *Bruen*'s method thus might ultimately be a waystation to other, nonanalogical doctrinal rules. That makes it all the more important that the initial decisions—those that directly apply the historical-analogical method—are well-grounded, because they will shape the future of the doctrine in the same way as the early two-part framework cases did after *Heller*.

After *Bruen*, lower courts must not only establish the original meaning of constitutional text and the historical facts probative of it, but also draw connections between a subset of historical facts and modern laws to determine the validity of the latter. This approach raises fundamental questions about legal reasoning that have been overlooked amidst the focus on what historical gun regulation looked like. No one seriously disputes that many of today's realities would be unimaginable to the Founding generation. But that central fact complicates decisionmaking rooted in historical-analogy, providing a set of challenges we address in the following Part.

---

[202] *See* Ruben & Blocher, *supra* note 20, at 1493-94 (finding that, in the eight years after *Heller*, at least 21 percent of cases were decided on the basis of controlling precedent).

[203] *See* Frederick Schauer, *Why Precedent in Law (and Elsewhere) is Not Totally (or Even Substantially) About Analogy*, 3 PERSPECTIVES PSYCH. SCI. 454, 454 (2008) (noting that precedent imposes a constraint—following a relevantly similar decision despite disagreement—that is not present for many other forms of analogical reasoning which are directed more to making the "best" decision).

[204] Kanter v. Barr, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting).

[205] *Cf.* Amy Coney Barrett & John Copeland Nagle, *Congressional Originalism*, 19 U. PA. J. CONST. L. 1, 1 (2016) ("Precedent poses a notoriously difficult problem for originalists.").

Captured by the Third Circuit Libraries on 6/6/7/2023

Electronic copy available at: https://ssrn.com/abstract=4408228

## II. IMPLEMENTING ORIGINALISM-BY-ANALOGY

In the wake of *Bruen*, courts are faced not only with the concrete difficulty of resolving Second Amendment cases, but more broadly making sense of a novel constitutional methodology that—as described in Part I—builds on but departs from standard approaches to history-based constitutional decisionmaking. As in the years after *Heller*, lower courts will be the primary authors of doctrine to implement *Bruen*'s directives.[206] How they do so is especially important if the approach spreads to other areas of constitutional law, which seems likely given the current majority's apparent commitment to historicism and dissatisfaction with conventional tests like the tiers of scrutiny.[207]

In this Part, we identify several challenges—and some solutions—to implementing originalism-by-analogy coherently. First and most fundamentally, the central task after *Bruen* is not simply finding historical sources, but also drawing meaningful connections between them and present controversies.[208] To do so sensibly, courts need to identify and articulate principles of relevant similarity—as *Bruen* itself suggests.[209] Second, the Second Amendment right at issue, regulatory tradition, and principles of relevant similarity have to be cast at a level of generality that limits anachronism and permits meaningful comparison. Third, courts must recognize their institutional limitations with regard to historical fact-finding, as well as a continued role for modern empirics and legislative deference.

We offer this combination of critique and solution neither to praise originalism-by-analogy nor to bury it. In a *Bruen* amicus brief filed in support of neither party, we argued against the adoption of the text, history, and tradition

---

[206] *See* Ruben & Blocher, *supra* note 20, at 1439. 1455 (noting that after *Heller*, the Supreme Court "[left] doctrinal development primarily to the lower courts," which crafted rules and standards in more than 1,000 challenges); *see also* Denning & Reynolds, *supra* note 49, at 35 ("[T]he lower court response may be as important as the Supreme Court action itself, yet likely to receive much less attention.").

[207] *See, e.g.*, New York State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111, 2129 & n.5 (2022) (emphasizing the Court's "rejection of means-end scrutiny" and characterizing a statement in *Heller* about "the standards of scrutiny that we have applied to enumerated constitutional rights" as a "gilding-the-lily observation") (citations omitted).

[208] To be clear, the former is a substantial difficulty as well, given the expertise, time, and resources needed to research historical gun regulation. *See* Shawn Hubler, *In the Gun Law Fights of 2023, a Need for Experts on the Weapons of 1791*, N.Y. TIMES (March 16, 2023), https://www.nytimes.com/2023/03/14/us/gun-law-1791-supreme-court.html [https://perma.cc/XFP7-S2Z3]; *infra* notes 335-341; 407-413 and accompanying text; *see also* Joseph Blocher & Brandon L. Garrett, *Originalism and Historical Fact-Finding*, 111 GEO. L.J. (forthcoming 2023).

[209] 142 S.Ct. at 2132.

Electronic copy available at: https://ssrn.com/abstract=4408228

approach.[210] The early returns from post-*Bruen* cases confirm many of our fears that such an approach fails to give meaningful guidance in contemporary Second Amendment jurisprudence. As should be clear by now, we—like some who celebrate the outcome—think the opinion's methodology is problematic.[211]

But for present purposes we write from the internal perspective, attempting to make the most of what the Court has given us. That task is important and urgent as legislatures attempt to address the astonishing recent rise in gun deaths and courts are faced with a rising tide of Second Amendment cases whose resolution will shape the balance of gun rights and regulation for many years to come. Judges, litigators, and scholars must all be able to make arguments within *Bruen*'s framework, even if they believe it to be fundamentally flawed. This Part therefore combines critique and a positive vision for coherent implementation.

### A.  *Principles of Relevant Similarity*

The essence of analogical reasoning is comparing things by reference to some principle of relevant similarity. *Bruen* recognized as much in saying that "because '[e]verything is similar in infinite ways to everything else,' one needs 'some metric enabling the analogizer to assess which similarities are important and which are not.'"[212] This is not a matter of adding up characteristics or employing unexamined intuitions, but of making choices about what matters.[213] In Part I we described *Bruen*'s halting efforts to do so. Here, we show how *Bruen*'s failures have generated unprincipled decisionmaking in the lower courts.

---

[210] *See* Brief of Second Amendment Law Professors as Amici Curiae in Support of Neither Party, *supra* note 64.

[211] Denning & Reynolds, *supra* note 49, at 19-20; Barnett & Lund, *supra* note 81 ("Rather than relying on specious historical traditions, courts could evaluate gun laws against the purpose of protecting the right to keep and bear arms: facilitating the exercise of the fundamental right of personal and collective self-defense.").

[212] *Bruen*, 142 S. Ct. at 2132 (quoting Schauer & Spellman, *supra* note 45, at 254 (internal citations omitted)); *see also* ALEXANDER & SHERWIN, *supra* note 45, at 76-83 ("Similarities are infinite; therefore some rule or principle is necessary to identify important similarities."); Cass R. Sunstein, *On Analogical Reasoning*, 106 HARV. L. REV. 741, 745 (1993) [hereinafter Sunstein, *On Analogical Reasoning*] ("The major challenge facing analogical reasoners is to decide when differences are relevant.").

[213] BALKIN, *supra* note 182, at 140 ("One must draw analogies and make extrapolations to apply them to today's problems in today's world. There is nothing wrong with creative extension, if we recognize it for what it is. It is part of the lawyer's trade. The task of thick versions of originalism, however, is to disguise this creativity and analogical extension so that it appears that if we want to be faithful to the law—as opposed to being lawless—we really have no choice but to follow the past's commands.") (internal citation omitted); Frederick Schauer, *Analogy in the Supreme Court:* Lozman v. City of Riviera Beach, Florida, 2013 SUP. CT. REV. 405, 416-17 (2013) ("Identifying analogies or disanalogies between or among multi-attribute items is not just a matter of counting attributes when none of the attributes is strictly necessary. Some . . . attributes are simply more important than others.").

Electronic copy available at: https://ssrn.com/abstract=4408228

We then attempt to distill lessons from the literature on analogical reasoning—a literature that has not yet been fully operationalized in discussions of originalism and other historical approaches to constitutional law.

1.  Historical Citations Without Reasoning

Under *Bruen*, courts must at a minimum understand and articulate workable principles of relevant similarity. In the kind of historical-analogical test that *Bruen* has created, such principles form the basis for judicial decision, so to say that courts must articulate them is simply to say that they must give reasons for their decisions. And yet many post-*Bruen* cases have failed this basic requirement.

The first prominent post-*Bruen* case was *Antonyuk v. Nigrelli*, a challenge to a New York regulation barring guns from various places including behavioral health centers, playgrounds, nursery schools, and homeless shelters.[214] In the span of ten weeks, the case resulted in a trilogy of opinions attempting originalism-by-analogy.[215] In the first, the court opined that all of New York's sensitive-place restrictions were unconstitutional because "the Supreme Court in *NYSRPA* effectively barred the expansion of sensitive locations beyond schools, government buildings, legislative assemblies, polling places and courthouses," and the court could not find "historical analogs for restricting firearms at *all* of the" locations enumerated in the New York law.[216] Five weeks later, in a second opinion, the court walked back both of these methodological interpretations of *Bruen*.[217] As for what counts as a sufficient analogue, however,

---

[214] *See* 2022 N.Y. Sess. Laws ch. 371, § 4 (McKinney) (codified at N.Y. PENAL LAW § 265.01-e) (enacting the Concealed Carry Improvement Act); Antonyuk v. Hochul, No. cv-0986, 2022 WL 16744700, at *2-3 (N.D.N.Y. Nov. 7, 2022) [hereinafter *Antonyuk III*] (describing complaints).

[215] *See* Antonyuk v. Bruen, No. cv-0734, 2022 WL 3999791 (N.D.N.Y. Aug. 31, 2022) [hereinafter *Antonyuk I*]; Antonyuk v. Hochul, No. cv-0986, 2022 WL 5239895 (N.D.N.Y. Oct. 6, 2022) [hereinafter *Antonyuk II*]; *Antonyuk III*, 2022 WL 16744700. *Antonyuk I* and *II* addressed whether to impose a temporary restraining order, and *Antonyuk III* addressed whether to impose a preliminary injunction. Despite the differing procedural postures, the court found that the same standard applies to each. *Antonyuk II*, 2022 WL 5239895, at *3 ("In the Second Circuit, the standard for issuance of a temporary restraining order is the same as the standard for a preliminary injunction.") (citing Fairfield Cnty. Med. Ass'n v. United Healthcare of New England, 985 F. Supp. 2d 262, 270 (D. Conn. 2013), *aff'd as modified sub nom.* Fairfield Cnty. Med. Ass'n v. United Healthcare of New England, Inc., 557 F. App'x 53 (2d Cir. 2014)). Our focus here is on the Second Amendment methodology that also should not vary as between a ruling on a temporary restraining order and preliminary injunction.

[216] *Antonyuk I*, 2022 WL 3999791, at *34.

[217] *Antonyuk II*, 2022 WL 5239895, at *14 ("[A]lthough the Supreme Court has not altogether barred the expansion of sensitive locations beyond schools, government buildings, legislative assemblies, polling places and courthouses, it has indicated a skepticism of such an expansion based on the historical record."); *id.* ("[A]lthough this Court has found that most of the CCIA's list of 'sensitive locations' violate the Constitution, the Court does so not because the list (or a portion of the list) must rise or fall in its entirety . . . .").

Electronic copy available at: https://ssrn.com/abstract=4408228

the court stated simply that "generally, a historical statute cannot earn the title 'analogue' if it is clearly more distinguishable than it is similar to the thing to which it is compared."[218] Instead of explaining what *makes* a law "distinguishable," the court resorted to a counting exercise, concluding that at least three historical laws are needed to comprise an analogous "tradition."[219] A month later, in its third opinion, the court acknowledged that sometimes it must "broaden its conception of what constitutes an 'analogue' and focus its attention on the justification for, and burden imposed by, it."[220] But the court did not explain how to "broaden" its conception of what constitutes an "analogue."[221] Rather, it added another layer atop the quantity of laws necessary for an analogous "tradition": the laws must govern more than fifteen percent of the population.[222] In none of the opinions did the court articulate clear principles of relevant similarity.

Predictably, the shifting methodologies and failure to identify principles of similarity created confusion. Bans on guns in places of worship were unconstitutional in *Antonyuk I*,[223] constitutional in *Antonyuk II*,[224] and unconstitutional again in *Antonyuk III*.[225] Bans on guns in children's summer camps were unconstitutional in *Antonyuk I and II*,[226] but constitutional in *Antonyuk III*.[227] The same went for guns in Times Square—unconstitutional in the first two opinions,[228] and constitutional in the third.[229] In *Antonyuk I and II*, the court found the prohibition on guns in mass transit unconstitutional for lack of historical analogues.[230] In *Antonyuk III*, the court opined that a ban on guns on NYC buses would be constitutional "during the period before school."[231]

---

218 *Id.* at *8.

219 *Id.* at *9. As the opinion put it, "two such historical analogues . . . can . . . appear as a mere trend," not a "tradition," and *Bruen* requires "traditions," not "trends." *Id.*

220 *Antonyuk III*, at *41.

221 *Id.* at *67.

222 *Id.* ("The Court need not go back and recalculate the numbers so that they both come from the same census: it is confident that, under reasoning . . . in *NYSRPA*, the resulting percentage of less than 15 would not suffice to be representative of the Nation.").

223 *Antonyuk I*, at *34. In each *Antonyuk* opinion the court considered the "likelihood of success on the merits," an element for both temporary restraining orders and preliminary injunctions. *See Antonyuk II*, at *3. The constitutional rulings referenced in this discussion should be qualified accordingly.

224 *Antonyuk II*, at *16. The court required New York to make "an exception for those persons who have been tasked with the duty to keep the peace at the place of worship or religious observation." *Id.*

225 *Antonyuk III*, at *60-63.

226 *Antonyuk I*, at *34; *Antonyuk II*, at *17.

227 *Antonyuk III*, at *22 n.35.

228 *Antonyuk I*, at *34; *Antonyuk II*, at *20.

229 *Antonyuk III*, at *37 & n.66.

230 *Antonyuk I*, at *34; *Antonyuk II*, at *17.

231 *Antonyuk III*, at *70 n.114.

Captured by the Third Circuit Libraries on 6/6/2023

Electronic copy available at: https://ssrn.com/abstract=4408228

Within the opinions, a litigant could only speculate about why some place-based restrictions were constitutional and others were not. In *Antonyuk III*, for example, the court found it constitutional to restrict guns at playgrounds because of the presence of children, but unconstitutional to restrict them at zoos because although children might be present, some adults are unaccompanied by them.[232] The court explained the discrepancies between opinions as a result of "better briefing by the State Defendants and its further consideration of the historical laws obtained in light of the standard set forth in *NYSRPA*."[233] But the meandering methodologies and correspondingly divergent constitutional outcomes are more clearly an indication of *Bruen*'s failure to set forth a clear standard and the *Antonyuk* court's failure to identify sensible, workable principles of relevant similarity.

The *Antonyuk* opinions are not isolated examples. In *United States v. Perez-Gallan*,[234] a federal judge declared unconstitutional the federal law prohibiting gun possession by people subject to a domestic violence restraining order.[235] That law was passed in 1994 to address the relationship—well-documented now, but apparently unappreciated at the Founding—between guns and domestic violence.[236] The court concluded that, after *Bruen*, "[n]o longer can lower courts account for public policy interests, historical analysis being the only tool."[237] And it found that "straightforward historical analysis . . . reveals a historical tradition likely unthinkable today" because "until the mid-1970s, government intervention—much less removing an individual's firearms— because of domestic violence practically did not exist."[238] The court agreed with then-judge Barrett's observation that "[F]ounding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety."[239] But

---

[232] *Id.* at *67.

[233] *Id.* at *41.

[234] United States v. Perez-Gallan, No. 22-CR-00427-DC, 2022 WL 16858516 (W.D. Tex. Nov. 10, 2022).

[235] *Id.* at *15 (ruling unconstitutional 18 U.S.C. § 922(g)(8)).

[236] Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 §110401(c) (codified at 18 U.S.C. § 922(g)). *See* Safe Homes for Women Act, H.R. 4092, 103d Cong. § 1624 (1994) (finding that "domestic violence is the leading cause of injury to women in the United States between the ages of 15 and 44" and "firearms are used by the abuser in 7 percent of domestic violence incidents"); *see also* Emiko Petrosky, Janet M. Blair, Carter J. Betz, Katherine A. Fowler, Shane P.D. Jack & Bridget H. Lyons, *Racial and Ethnic Differences in Homicides of Adult Women and the Role of Intimate Partner Violence—United States, 2003-2014*, 66 MORBIDITY & MORTALITY WKLY. REP. 741, 741-42 (2017) (observing that nearly half of women who are murdered in the United States are killed by an intimate partner and more than half of those murders involve a firearm); Elizabeth Richardson Vigdor & James A. Mercy, *Do Laws Restricting Access to Firearms by Domestic Violence Offenders Prevent Intimate Partner Homicide?*, 30 EVALUATION REV. 313, 313 (2006) (concluding that roughly 60 percent of intimate-partner homicides are committed with a firearm).

[237] *Perez-Gallan*, at *1.

[238] *Id.* at *5.

[239] *Id.* at *11 (quoting Kanter v. Barr, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting)).

Electronic copy available at: https://ssrn.com/abstract=4408228

the court refused to see that legal tradition as analogous to modern restrictions on domestic abusers, declining to take what it called a "leap of faith" in concluding that the "colonies considered domestic abusers a 'threat to public safety.'"[240] Thus, the historical failure to treat domestic violence *specifically* as a threat to public safety in the late 1700s made it unconstitutional *today* to disarm people whom a judge has determined present a threat of domestic violence.[241]

Other opinions have similarly limited the analogical inquiry to dead ringers. For example, in *Firearms Policy Coalition v. McCraw*, a district judge struck down a Texas law prohibiting eighteen- to twenty-year-olds from carrying a handgun in public.[242] The court emphasized that the earliest age restriction identified by the government dated to 1856—too late in the court's view.[243] Nowhere did the court consider whether *other* historical restrictions on categories of people could be relevantly similar to those based on age,[244] nor did it consider whether gun violence among youth was a historical problem that warranted a historical solution.

Similarly, in *Koons v. Reynolds*, a challenge to New Jersey's post-*Bruen* law regulating public carry, a district judge issued a temporary restraining order pending further litigation about a ban on gun possession in bars, emphasizing the government's failure to present exact historical replicas of the modern law.[245] The government pointed to historical prohibitions on possessing guns while intoxicated,[246] but the judge dismissed that precedent as having "no relevance here as the restriction at issue clearly does not address possession of firearms by intoxicated persons."[247] The court relegated the question of *why* the historical intoxication laws were passed to a footnote—"presumably because guns and alcohol do not mix"—stating without elaboration that it is "unlikely" any such rationale would adequately support the regulation.[248]

---

[240] *Id.* at *11 (emphasis omitted).

[241] *Id. Cf.* United States v. Quiroz, No. 22-CR-00104-DC, 2022 WL 4342482, at *10 (W.D. Tex. Sept. 19, 2022) (refusing to extend the "historical tradition of excluding specific groups from the rights and powers reserved to 'the people'" to those under felony indictment, observing that "little evidence" from the late 1700s "supports excluding those under indictment in any context").

[242] Firearms Pol'y Coal., Inc. v. McCraw, No. 4:21-cv-1245-P, 2022 WL 3656996, at *1 (N.D. Tex. Aug. 25, 2022).

[243] *Id.* at *11 ("The earliest law cited is from 1856.").

[244] *See infra* notes 281-286 and accompanying text (discussing possible principles of relevant similarity based on Founding-era restrictions on categories of people).

[245] No. 22-7464, 2023 WL 128882, at *13-14 (D.N.J. Jan. 9, 2023) (reviewing 2022 N.J. LAWS 131 § 7(a)).

[246] *Id.* at *14 (citing 1867 KAN. SESS. LAWS 25 and Mo. Rev. Stat. § 1274 (1879)).

[247] *Id.* at *14.

[248] *Id.* at *14 n.15. In its subsequent opinion granting a preliminary injunction against this provision, the court provided even less analysis, referring back to its decision at the temporary

Electronic copy available at: https://ssrn.com/abstract=4408228

Looking only for exact matches in the historical record, as some post-*Bruen* cases have, fails to comply with *Bruen*'s admonition that analogical reasoning does not require finding a "historical *twin*."[249] In effect, it is the equivalent of ducking analogical reasoning entirely and looking for discrete historical facts rather than principles of relevant similarity. The historical record is not going to resolve the methodological problem; guidance is more likely to be found in the literature on analogical reasoning, to which we now turn.

2.  The Centrality of Relevant Similarity in Analogical Reasoning

Analogy is a common form of reasoning, so much so that its mechanism often passes unnoticed. Every day, in innumerable ways, we make analogies: whether grouping blue shirts in the closet with other shirts rather than in a desk drawer with blue pens, or in organizing books by subject or author instead of by publisher. Such decisions depend on principles, usually unarticulated, of relevant similarity, which is precisely why it can be jarring or even funny to see another person organize their closets or books according to different principles (by date of acquisition, say, or by size).

It should come as no surprise, then, that analogy is at the heart of legal reasoning. Cass Sunstein opens his influential "On Analogical Reasoning" with the observation: "Reasoning by analogy is the most familiar form of legal reasoning."[250] Fred Schauer similarly notes, "It has long been argued that reasoning by analogy—which is often claimed to be central to human thought generally—is at the core of legal reasoning, legal interpretation, and legal decision making."[251] Yet the fact that analogical reasoning is commonplace in law does not mean that it is easily or straightforwardly applied—any more so

---

restraining order stage and reducing "the dangers of mixing firearms with alcohol" to "policy arguments" that "this Court cannot consider." Koons v. Platkin, No. 22-7464, 2023 WL 3478604, at *86 (D.N.J. May 16, 2023).

[249] New York State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111, 2133.

[250] Sunstein, *On Analogical Reasoning*, *supra* note 212, at 741. A revised version of the article recently posted to SSRN begins slightly differently: "Much of legal reasoning is analogical . . . ." Sunstein, *Analogical Reasoning*, *supra* note 37, at 1.

[251] Schauer, *supra* note 213, at 407; *see also* Kent Greenawalt, Statutory and Common Law Interpretation 188 (2013) (noting that analogical argument is "thought by some to be the most distinctive aspect of legal reasoning").

Captured by the Third Circuit Library on 06/07/2023

than concepts like "precedent"[252] or even "law,"[253] notwithstanding their centrality to our legal culture. For one thing, as with many deep-set legal practices, legal analogical reasoning is not always explicitly identified as such.[254] And even when it is identified, the key factor in any analogical process—the principle that mediates between comparators, making them relevantly similar or not—can operate sub silentio.

Schauer points to the Supreme Court's 2013 decision in *Lozman v. City of Riviera Beach, Florida* as an example of analogical reasoning in law.[255] There, a 7-2 majority decided that the petitioner's houseboat was not a "vessel" and thus not subject to admiralty jurisdiction.[256] In concluding that the houseboat was, in effect, more house than boat, the majority reasoned: "[I]n our view a structure does not fall within the scope of this statutory phrase unless a reasonable observer, looking to the home's physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water."[257] Dissenting, Justice Sotomayor criticized the test as malleable; an "I know it when I see it" approach that would "import[]" other seemingly irrelevant criteria.[258] As Schauer notes, "it remains difficult to escape the conclusion . . . that the Court's result is actually driven by an analogical process," and that "[i]n the final analysis, Lozman's residence simply looked more to the Court like a house than a boat."[259]

Identifying principles of relevant similarity is more important in a system of social decisionmaking like law. If actors in a social system analogize using idiosyncratic, unidentified principles, it will be impossible to coordinate, debate, or guide others. We might choose to group books on our personal bookshelves according to how much we like them or when we bought them. But those principles will be unintelligible to others; they could not be used to organize a library's public holdings. The organizing principle must itself be sensible and intelligible, especially in the case of law, given the significant stakes involved. If

---

[252] *See, e.g.*, RANDY J. KOZEL, SETTLED VERSUS RIGHT: A THEORY OF PRECEDENT (2017) (exploring how individual views on the correctness of decisions undermine the durability of precedent); Stefanie A. Lindquist & Frank B. Cross, *Empirically Testing Dworkin's Chain Novel Theory: Studying the Path of Precedent*, 80 N.Y.U. L. REV. 1156, 1158-77 (2005) (describing a complex patchwork of explanations and theories that might explain the seemingly "commonplace notion of deciding according to precedent").

[253] Any citation here would be woefully inadequate, as the nature of law is a—if not the—central question for all of jurisprudence.

[254] *See, e.g.*, Eric Ruben & Joseph Blocher, *"Second-Class" Rhetoric, Ideology, and Doctrinal Change*, 110 GEO. L.J. 613, 624-26 (2022) (discussing how various forms of rhetoric guide legal argumentation, sometimes without attribution).

[255] *See* Schauer, *supra* note 213, at 405.

[256] *See* Lozman v. City of Riviera Beach, 568 U.S. 115 (2013).

[257] *Id.* at 121.

[258] *Id.* at 139 (Sotomayor, J., dissenting).

[259] Schauer, *supra* note 213, at 415.

Electronic copy available at: https://ssrn.com/abstract=4408228

the principle of relevant similarity in *Lozman*—that is, the characteristic that unites "vessels"—had been "things that float" not "things designed to a practical degree for carrying people or things over water,"[260] Lozman *would* have been subject to admiralty jurisdiction and the imposition of a maritime lien against him would have been proper.[261]

What is needed, then, are principles of relevant similarity tied in an articulable way to the shared goals and functioning of law. To put the point in the form of a syllogism: If analogical reasoning is deployed as legal reasoning, and legal reasoning should be generalizable, coherent, and clear,[262] then such analogical reasoning should be as well. That does not mean that the principles of relevant similarity—any more than other legal principles—will be capable of *precise* articulation, nor that everyone will always agree about what they are.[263] But that is no reason to accept the kinds of occluded and unprincipled reasoning on display in the post-*Bruen* cases we describe here.

Of course, as with any other approach to legal reasoning, matters are more complex than a single thumbnail sketch can capture.[264] Some argue that judges are, in effect, just announcing rules when they purportedly engage in analogical reasoning; that policy choices reflecting normative commitments are doing most if not all of the work.[265] Ronald Dworkin put it bluntly: "An analogy is a way of stating a conclusion, not a way of reaching one, and theory must do the real work."[266] Richard Posner came to a similar conclusion: "One can call this reasoning by analogy if one likes but what is really involved is querying (or

---

[260] *See supra* notes 256-258 and accompanying text (discussing *Lozman*).

[261] *Lozman*, 568 U.S. at 118-19 (describing the question of whether a maritime lien could be brought against Lozman).

[262] It is far beyond our scope here to engage thoroughly with the jurisprudential debates, but we suspect that nearly any theory of the rule of law will prioritize these values. *See, e.g.*, LON L. FULLER, THE MORALITY OF LAW (1964) (identifying values that constitute "the inner morality of law"—namely, that laws be general, public, prospective, coherent, clear, stable, and practicable).

[263] On some accounts, analogical reasoning in law is valuable in part because it permits a kind of incomplete agreement. Sunstein, *Analogical Reasoning, supra* note 37, at 1 ("[C]ourts are drawn to analogical reasoning in large part because analogies allow people to reach incompletely theorized agreements. To say that one case is like another, we need a reason or a principle, but we can often offer a reason or a principle that operates at a low level of ambition.").

[264] The preceding has been what Schauer calls a "traditionalist[]" account. Schauer, *supra* note 213, at 420-21; *see also* LLOYD L. WEINREB, LEGAL REASON: THE USE OF ANALOGY IN LEGAL ARGUMENT (2005) (probing the complexities of reasoning by analogy). For a somewhat different approach describing analogical reasoning as a form of abductive reasoning, see Scott Brewer, *Exemplary Reasoning: Semantics, Pragmatics, and the Rational Force of Legal Argument by Analogy*, 109 HARV. L. REV. 923 (1996).

[265] *See, e.g.*, Larry Alexander, *Bad Beginnings*, 145 U. PENN. L. REV. 57 (1996); Richard A. Posner, *Reasoning by Analogy*, 91 CORNELL L. REV. 761 (2006) (book review); Peter Westen, *On "Confusing Ideas": Reply*, 91 YALE L.J. 1153 (1982).

[266] Ronald Dworkin, *In Praise of Theory*, 29 ARIZ. ST. L.J. 353, 371 (1997).

Electronic copy available at: https://ssrn.com/abstract=4408228

quarrying) the earlier case for policies that may be applicable to the later one and then deciding the later one by reference to those policies."[267]

We do not doubt that analogical reasoning—including historical-analogical reasoning—is deeply intertwined with considerations of theory and policy. Indeed, one of our goals here is to make those considerations more visible, and to show that despite its posturing as neutral and objective, *Bruen*'s analogical method inevitably involves a significant degree of normative decisionmaking. When judges identify a principle of relevant similarity from a prior case ("querying (quarrying)" in Posner's terms),[268] they will typically do so by focusing on its reasoning, which will generally involve theory, policy, or other normative considerations. In *Bruen*, the Court did this by emphasizing the centrality of self-defense in its own prior decisions.[269] And, returning to Posner's framework, when judges compare a later case to an earlier one by reference to that principle ("then deciding the later one"),[270] they will inevitably have to ask whether the two cases are sufficiently similar, such that the identified principle (self-defense, for example) compels the same result. In *Bruen*, the Court concluded that it did, and thus that the right to keep and bear arms must extend outside the home.[271]

In short, analogical reasoning requires judges to engage with normative questions of theory and policy. Indeed, this can be one of its strengths. But the identification and articulation of those principles of relevant similarity should, like any form of legal reasoning, be as coherent and transparent as possible.

3.   Toward Workable Principles of Relevant Similarity After *Bruen*

Analysis of *Bruen*'s injunction that modern gun laws must be "consistent with this Nation's historical tradition"[272] has generally focused on identifying the relevant "historical tradition." But as a matter of law development, it is even more important that courts elaborate what it means to be "consistent" with that tradition. Put differently, courts must identify principles of relevant similarity in a historical-analogical mode, beyond simply identifying a set of historical comparators. How might this look?

---

[267] RICHARD A. POSNER, OVERCOMING LAW 518 (1995).

[268] *Id.*

[269] New York State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111, at 2133("As we stated in *Heller* and repeated in *McDonald*, 'individual self-defense is "the central component" of the Second Amendment right.'").

[270] POSNER, *supra* note 267, at 518.

[271] *Bruen*, 142 S. Ct. at 2135 ("Although we remarked in *Heller* that the need for armed self-defense is perhaps 'most acute' in the home, we did not suggest that the need was insignificant elsewhere. Many Americans hazard greater danger outside the home than in it.") (citations omitted).

[272] *Id.* at 2126; *see also id.* at 2129-30 (reiterating this test nearly verbatim).

Electronic copy available at: https://ssrn.com/abstract=4408228

The regulation of sensitive places provides a useful illustration. After identifying several historical place-based restrictions, the majority in *Bruen* emphasized that "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible."[273] Doing so means understanding *how* such rules "burden a law-abiding citizen's right to armed self-defense"[274]—which is to say, completely, at least with a firearm when one is within a prohibited place. And it also means focusing on *why* such prohibitions are "justif[ied]"—perhaps because the location is central to certain governmental or constitutionally protected activities,[275] is subject to the government's power as a proprietor,[276] is central to participating in a democratic community,[277] or is a site of overcrowding in close quarters.[278] In other words, courts should not conclude, as *Antonyuk I* did, that the precise places identified by *Bruen* are the *only* ones at which guns can be banned.[279] Nor should they list historical laws and then simply declare a modern law disanalogous without reasoned analysis, as *Koons* did.[280] The judicial task is finding what principles are reflected by the historical restrictions.

The sensitive-places example reflects that the historical-analogical mode might not reduce to a *single* principle of relevant similarity. This point bears emphasizing, since some opinions that have implied the need for principles of relevant similarity when engaging in analogical reasoning nonetheless have assumed that there could be only *one* such principle.

The variance in identifying principles is exemplified by laws prohibiting gun possession by people with past convictions.[281] Ample scholarship has questioned "the extent to which felons . . . were considered excluded from the right to bear arms during the Founding era."[282] Some historical-analogical opinions have correctly looked for principles that explain *other* restrictions that

---

[273] *Bruen*, 142 S. Ct. at 2133.

[274] *Id.* at 2132-33.

[275] Darrell A. H. Miller, *Constitutional Conflict and Sensitive Places*, 28 WM. & MARY BILL RTS. J. 459, 466 (2019).

[276] *See, e.g.*, Bonidy v. U.S. Postal Service, 790 F.3d 1121, 1126 (10th Cir. 2015); United States v. Class, 930 F.3d 460, 465 (D.C. Cir. 2019).

[277] Blocher & Siegel, *supra* note 52.

[278] *See, e.g.*, State Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction, Antonyuk v. Hochul, 22-cv-0986, at 3-4 (N.D.N.Y Oct. 13, 2022) ("History shows several broad categories of locations in which states prohibited deadly weapons to protect the people, including . . . places including fairs, ballrooms, parties, and public exhibitions where large numbers of people would gather in a confined space.").

[279] *See supra* note 216 (discussing *Antonyuk I*).

[280] *See supra* notes 245–248 and accompanying text (discussing *Koons v. Reynolds*).

[281] *See, e.g.*, 18 U.S.C. § 922(g)(1) (2018).

[282] United States v. Skoien, 614 F.3d 638, 650 (7th Cir. 2010) (Sykes, J., dissenting) (collecting scholarship).

Electronic copy available at: https://ssrn.com/abstract=4408228

existed during the Founding era, but then sought to identify a unitary principle to explain them all. For example, then-Judge Amy Coney Barrett, in an opinion addressing the constitutionality of disqualifying a nonviolent felon from firearm possession, confidently asserted that "legislatures disqualified categories of people from the right to bear arms *only* when they judged that doing so was necessary to protect the public safety."[283] But dangerousness is not the *only* reason—the only "why" in *Bruen*'s framework—that legislatures historically disarmed certain groups, as various courts and commentators have observed. For example, a Third Circuit panel, in the first published post-*Bruen* federal appellate opinion, considered a challenge to the federal law prohibiting gun possession by convicted felons.[284] And based on its review of the historical record, the court rejected the challenge on the basis that "[t]hose whose criminal records evince disrespect for the law are outside the community of law-abiding citizens entitled to keep and bear arms."[285] Still other courts have justified similar prohibitions based on historical laws denying guns to those who lack "virtue."[286]

This example reflects the fact that it is impossible to speak of history, and especially legislative history, as if it were a discrete, uniform thing. Legislators of the past, like those today, pursued different agendas that sometimes converged and other times did not. Partly as a result, it will often be impossible to identify a narrow and precise principle of similarity by which to compare modern and historical gun laws. There may even be good reasons to define such principles at a high level of abstraction, as in the examples above: dangerousness, virtue, and so on. Indeed, the next Section addresses in more detail the value of such approaches. Our point here is simply that such principles can still be articulable and transparent.

---

[283] Kanter v. Barr, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated by Bruen*, 142 S. Ct. 2111; Blocher & Carberry, *supra* note 54 (observing then-Judge Barrett's view that "dangerousness is the Second Amendment's *exclusive* limiting principle") (emphasis added).

[284] *See* Range v. Att'y Gen., 53 F.4th 262 , 266 (3d Cir. 2022).

[285] *Id.* at 273; *see also* United States v. Bena, 664 F.3d 1180, 1183 (8th Cir. 2011) (noting historical regulation of citizens who are not "responsible"). *Range* was subsequently vacated after the Third Circuit granted a motion for rehearing en banc. Range v. Att'y Gen., No. 21-2835, 2023 WL 118469, at *1 (3d Cir. Jan. 6, 2023).

[286] Binderup v. Att'y Gen., 836 F.3d 336, 348 (3d Cir. 2016); United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012) ("[F]elons 'were excluded from the right to arms' because they were deemed unvirtuous."); United States v. Yancey, 621 F.3d 681, 684-85 (7th Cir. 2010) ("[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'"); United States v. Vongxay, 594 F.3d 1111, 1118 (9th Cir. 2010) (observing scholarly consensus "that the right to bear arms was 'inextricably . . . tied to' the concept of a 'virtuous citizen[ry]'"); United States v. Rene E., 583 F.3d 8, 15 (1st Cir. 2009) ("In the parlance of the republican politics of the time, these limitations were sometimes expressed as efforts to disarm the 'unvirtuous.'").

Electronic copy available at: https://ssrn.com/abstract=4408228

### B.  Anachronism and Levels of Generality

As historian Bernard Bailyn put it, "the past is a different world."[287] That raises difficulties for the project of using historical understandings to establish contemporary constitutional meaning precisely because contemporary readers—especially non-historians—will inevitably struggle to understand this "different world." But it is an especially serious problem for originalism-by-analogy, which demands not only understanding the past but the further step of rendering it relevantly similar to the present.

A standard solution to problems of anachronism is to alter the level of generality, typically by pitching a question at a broader level. So, for example, rather than asking whether the Founding generation specifically disarmed domestic abusers or prohibited rocket launchers, one might ask instead whether they disarmed people they judged to be "dangerous"[288] or prohibited weapons they thought were "dangerous and unusual."[289] The striking difference between these inquiries, both of them rooted in historical analogy, demonstrates how "[m]ovements in the level of constitutional generality may be used to justify almost any outcome."[290] That makes it all the more crucial that levels of generality be selected and applied with care. Here, we elaborate the threat of anachronistic analogy and the promise—and perils—of levels of generality as a solution.

#### 1.  Anachronism After *Bruen*

Perhaps the most concrete and jarring complication of *Bruen*'s historical-analogical approach is the degree to which it requires judges to compare modern and historical gun laws, given the extraordinary technological and social changes since the Founding. What meaningful historical comparator could there be for the modern prohibition on guns in airplane cabins[291] or restrictions on automatic weapons?[292] Perhaps more fundamentally, what about modern laws that reflect

---

[287] Bernard Bailyn, Sometimes an Art: Nine Essays on History 22 (2015). Or, as L.P. Hartly put it in the first line of *The Go-Between*, "The past is a foreign country: they do things differently there." L.P. Hartley, The Go-Between, at xvi (1953).

[288] *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting).

[289] *Heller*, 554 U.S. at 627.

[290] Frank H. Easterbrook, *Abstraction and Authority*, 59 U. Chi. L. Rev. 349, 358 (1992).

[291] *See, e.g.*, 14 C.F.R. § 135.119 (2022) ("No person may, while on board an aircraft being operated by a certificate holder, carry on or about that person a deadly or dangerous weapon, either concealed or unconcealed.").

[292] *See, e.g.*, 18 U.S.C. § 922(o) (2018) (banning the possession or transfer of machineguns not possessed before May 19, 1986).

Electronic copy available at: https://ssrn.com/abstract=4408228

broader social change, like the prohibition on gun possession by those who have committed crimes of domestic violence?[293]

Many post-*Bruen* cases fall prey to anachronism. In *Antonyuk II*, for example, the court halted enforcement of New York's requirement that concealed-carry permit applicants provide a list of social media accounts for the past three years, noting that New York failed to provide historical analogues from the Framing era "requiring persons to disclose the pseudonyms they have used while publishing political pamphlets or newspaper articles."[294] In *United States v. Price*, a court declared unconstitutional the federal ban possessing or receiving "any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered."[295] The court explained that "[a] firearm without a serial number in 1791 was certainly not considered dangerous or unusual compared to other firearms because serial numbers were not required or even commonly used at that time."[296]

The most prominent post-*Bruen* appellate decision thus far is *United States v. Rahimi*, in which the Fifth Circuit struck down a law prohibiting gun possession by people subject to a domestic violence restraining order.[297] The court concluded that the ban on possession of firearms by people whom a judge has found to present a risk of domestic violence is "an 'outlier[] that our ancestors would never have accepted.'"[298] To cast the inquiry as *Rahimi* did is to invite a combination of social and technological anachronism. It is true that the Founding generation under-protected women from domestic violence. But that was a function of their own moral sensibility with regard to domestic violence, and likely also the fact that colonial-era muskets were simply not used as commonly in domestic violence incidents as handguns are today.[299]

One can imagine a similar risk with respect to suicide prevention laws, like those requiring guns to be safely stored or providing for extreme risk protection orders.[300] Modern research has increased our understanding of mental health

---

[293] *See, e.g.*, 18 U.S.C. § 922(g)(9) (2018) (banning possession by anyone "who has been convicted in any court of a misdemeanor crime of domestic violence").

[294] *Antonyuk II*, at *12.

[295] 2022 WL 6968457 (S.D.W. Va Oct. 12, 2022) (ruling on the constitutionality of a conviction under 18 U.S.C. § 922(k)).

[296] *Id.* at *6.

[297] United States v. Rahimi, 61 F.4th 443 (5th Cir. 2023); *see also* United States v. Perez-Gallan,__ F.Supp.3d __, 2022 WL 16858516 (W.D. Tex. Nov. 10, 2022) (same); 18 U.S.C. § 922(g)(8) (2018).

[298] *Rahimi*, 61 F.4th at 461.

[299] *Infra* notes 311-317 and accompanying text.

[300] *See* Giffords Law Center, *Child Access Prevention & Safe Storage*, https://giffords.org/lawcenter/gun-laws/policy-areas/child-consumer-safety/child-access-prevention-and-safe-storage [https://perma.cc/36DW-6C92] (surveying safe storage laws); Jeffrey W. Swanson et al., *Implementation and Effectiveness of Connecticut's Risk-Based Gun Removal Law: Does it Prevent Suicides?*, 80 LAW AND CONTEMP. PROBS 179 (2017).

Electronic copy available at: https://ssrn.com/abstract=4408228

and revealed a strong connection between means restriction and suicide prevention not appreciated in the 1700s,[301] when for obvious technological reasons a firearm would have been a less-preferred instrument. Meanwhile, in *Firearms Policy Coalition v. McCraw*, the court searched exclusively for historical age restrictions when considering a modern age restriction, but nowhere considered whether historical gun violence among youths was even a problem in need of a solution.[302]

Judges applying originalism-by-analogy must be attuned to the ways guns and gun violence have evolved since the Founding, the corresponding shape of historical weapons regulations, and how selection of a level of generality will guide the historical-analogical exercise. We address each in turn.

a. Guns and Gun Violence Then and Now

As a general matter, private firearm violence today exceeds, by an order of magnitude, private firearm violence in 1791, which presents an overarching challenge for basing the constitutionality of modern gun laws on the evidence (or lack thereof) of historical gun laws. As Judge Richard Posner put it after *Heller*, the subject of gun violence "has been transformed" since the Founding: "The Framers of the Bill of Rights could not have been thinking of the crime problem in the large crime-ridden metropolises of twenty-first-century America."[303] In fact, scholars have shown that "during the colonial period, the urban areas were relatively free of the consistent use of firearms."[304] According to historian Randolph Roth, spikes in homicides occurred in various *non*-urban places, such as "in the Georgia-South Carolina backcountry, where the Revolutionary War was a civil war."[305] Into the 1800s, homicide rates in the comparatively rural South far outpaced those in urban areas.[306]

---

[301] *See, e.g.*, Deborah Azrael & Matthew J. Miller, *Reducing Suicide Without Affecting Underlying Mental Health: Theoretical Underpinnings and a Review of the Evidence Base Linking the Availability of Lethal Means and Suicide*, *in* THE INTERNATIONAL HANDBOOK OF SUICIDE PREVENTION 642 (Rory C. O'Connor & Jane Pirkis, eds., 2016); Michael C. Monuteaux, Deborah Azrael, & Matthew Miller, *Association of Increased Safe Household Firearm Storage with Firearm Suicide and Unintentional Death Among U.S. Youths*, JAMA PEDIATRICS (2019).

[302] *See supra* notes 242-243 and accompanying text (discussing *Firearms Policy Coalition v. McCraw*).

[303] Richard A. Posner, *In Defense of Looseness: The Supreme Court and Gun Control*, NEW REPUBLIC (Aug. 27, 2008).

[304] LEE KENNETT & JAMES LAVERNE ANDERSON, THE GUN IN AMERICA: THE ORIGINS OF A NATIONAL DILEMMA 48 (1975).

[305] Randolph Roth, *Guns, Gun Culture, and Homicide: The Relationship between Firearms, the Uses of Firearms, and Interpersonal Violence*, 59 WM. & MARY Q. 223, 236 (2002).

[306] Southern homicide rates were double those of the two "most homicidal" Northern cities— New York and Philadelphia—by the 1820s. RANDOLPH ROTH, AMERICAN HOMICIDE 200 (2009); *see also* Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern*

Captured by the Third Circuit Libraries on 06/07/2023

Why was gun violence *not* an urban problem at the Founding? One part of the explanation is that urban areas simply did not exist in 1791 as we understand them today. In 1790, just before the Second Amendment was ratified, 33,000 people lived in New York City, the country's largest city and home of the First Congress.[307] The population of the *entire country* was under four million.[308] Today, more than twice that many people live in New York City alone.[309] The densification of American cities during the late 1800s is well documented,[310] as is the relationship between urbanization and crime.[311]

Likewise, firearm technology has transformed. Americans in 1791 generally owned muzzle-loading flintlocks, "liable to misfire" and incapable of firing multiple shots.[312] Guns thus generally were not kept or carried loaded in 1791, which in turn is reflected in the kinds of laws on the books. Unintentional shootings by children handling unlocked, loaded guns is a tragic problem today,[313] but would have been less likely at a time when guns were not stored loaded. Conversely, communities in the late 1700s *were* concerned with the risk of fire from improperly stored black powder,[314] which is not a significant problem today. Moreover, fewer than ten percent of firearms were handguns, currently

---

*Antebellum Case Law in Context*, 125 YALE L.J. F. 121 (2015) (discussing differing regional firearm traditions).

[307] *Pop Culture: 1790*, U.S. CENSUS BUREAU, https://www.census.gov/history/www/through_the_decades/fast_facts/1790_fast_facts.html [https://perma.cc/D3QB-7B2H] (noting a 1790 population of 33,131 in New York City).

[308] *See* U.S. BUREAU OF THE CENSUS, A CENTURY OF POPULATION GROWTH: FROM THE FIRST CENSUS OF THE UNITED STATES TO THE TWELFTH, 1790-1900, at 80 (1969).

[309] *Id.* (noting a 1790 resident population of 3,929,214 people in the United States); *QuickFacts New York City, New York*, U.S. CENSUS BUREAU, https://www.census.gov/quickfacts/newyorkcitynewyork [https://perma.cc/R8X8-RW7Q] (noting a July 2021 population of 8,467,513 in New York City).

[310] *See, e.g.*, Eric Jaffe, *Watch 210 Years of Manhattan Densification in 2 Minutes*, BLOOMBERG (June 3, 2015), https://www.bloomberg.com/news/articles/2015-06-03/this-2-minute-animation-captures-210-years-of-manhattan-density-history [https://perma.cc/8KV7-8WZE].

[311] *See generally* LOUISE I. SHELLEY, CRIME AND MODERNIZATION: THE IMPACT OF INDUSTRIALIZATION AND URBANIZATION ON CRIME (1981) (reviewing literature and data regarding crime patterns).

[312] Randolph Roth, *Why Guns Are and Are Not the Problem: The Relationship Between Guns and Homicide in American History*, *in* A RIGHT TO BEAR ARMS? THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT 275 (Jennifer Tucker, Barton C. Hacker & Margaret Vining eds., 2019).

[313] *See, e.g.*, Jaclyn Diaz, *High Gun Sales and More Time at Home Have Led to More Accidental Shootings by Kids*, NPR (Aug. 31, 2021, 8:15 AM ET), https://www.npr.org/2021/08/31/1032725392/guns-death-children [https://perma.cc/M2LX-2WJ8] (citing data showing 128 deaths from March through December 2020 due to unintentional discharges by children).

[314] *See* Joseph Blocher, *Firearm Localism*, 123 YALE L.J. 82, 114-16 (2013) (describing colonial gun powder laws).

Electronic copy available at: https://ssrn.com/abstract=4408228

the most common type of gun used to commit crimes.[315] Crimes at the Founding were committed using weapons far less lethal than modern firearms, or even with no firearms at all in the context of domestic violence: "Family and household homicides—most of which were caused by abuse or simple assaults that got out of control—were committed almost exclusively with weapons that were close at hand," which were not loaded guns but rather "whips, sticks, hoes, shovels, axes, knives, feet, or fists."[316] Well into the 1800s, even after pistols became more common, some commentators still considered knives to be more dangerous.[317]

Modern supporters of gun regulation have sometimes deployed arguments from anachronism, for example, suggesting that *only* colonial-era weapons should be covered by the Second Amendment.[318] The standard gun rights response has been dismissive, as Justice Scalia put it in *Heller*: "Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment."[319] Instead, he argued, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."[320] *Bruen* effectively takes the same tack, adopting a definition of "arms" that accommodates change.[321] This approach, if it is principled, and not just an argument in favor of expanding the category of protected "arms," must be understood more broadly as an argument against anachronism. And that means it must account for other forms of change, including those regarding regulation.

Today, in contrast to the Founding era, criminal gun violence is largely an urban problem and is perpetuated with handguns that are far more lethal than a colonial-era musket.[322] According to one analysis, "[h]alf of America's gun

---

[315] Kevin M. Sweeney & Saul Cornell, *All Guns Are Not Created Equal*, Chron. of Higher Educ. (Jan. 28, 2013), https://www.chronicle.com/article/all-guns-are-not-created-equal/?bc_nonce=yl4ezgqxk1fr1nyysqdip&cid=reg_wall_signup [https://perma.cc/9P9B-XRH6] (observing that only "[a] distinct minority of colonists" owned pistols in the late eighteenth century).

[316] Roth, *supra* note 312, at 117 (describing the pattern of "gun use in homicides in colonial and revolutionary America").

[317] Cockrum v. State, 24 Tex. 394, 402 (1859) ("The gun or pistol may miss its aim, and when discharged, its dangerous character is lost, or diminished at least. . . . The bowie-knife differs from these in its device and design; it is the instrument of almost certain death.").

[318] *See* supra note 93.

[319] District of Columbia v. Heller, 554 U.S. 570, 582 (2008).

[320] *Id.*

[321] *Bruen*, 142 S. Ct. at 2132 ("[E]ven though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense.").

[322] Military historian Trevor N. Dupuy developed the Theoretical Lethality Index ("TLI") "to measure how many people a particular weapon could kill in one hour." Darrell A. H. Miller & Jennifer Tucker, *Common Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495, 2497 (2022).

Electronic copy available at: https://ssrn.com/abstract=4408228

homicides in 2015 were clustered in just 127 cities and towns . . . even though they contain less than a quarter of the nation's population."[323] Another analysis found that "in Maryland from 2016-2020, someone living in Baltimore City was 30 times more likely to die by firearm than someone living 40 miles away in Montgomery County."[324]

Other gun violence problems, like mass shootings and school shootings, are also of recent vintage. In one recent case, a court relied on "evidence that there is no known occurrence of a mass shooting resulting in double-digit fatalities from the nation's Founding in 1776 until 1948, with the first known mass shooting resulting in ten or more deaths occurring in 1949."[325] At the Founding, nothing similar occurred nor *could have* occurred; policymakers then unsurprisingly had no reason to pass public-safety measures to address acts of random mass violence. Similarly, researchers have tracked a significant increase in school shootings in recent years,[326] from eleven shootings a decade ago to ninety-three shootings during 2020-2021 school year.[327] At the Founding, there was no comparable problem of gun violence at schools.

So, too, has law enforcement changed. In his concurring opinion in *Bruen*, Justice Alito noted that "[i]n 1791, when the Second Amendment was adopted, there were no police departments, and many families lived alone on isolated farms or on the frontiers. If these people were attacked, they were on their

---

The TLI for an eighteenth century flintlock is 43. *Id.* at 2508. The TLI calculated for certain World War Two-era handguns ranges from 228 to 297. Christopher A. Lawrence, *TLIs and Gun Control*, Mystics & Statistics (Nov. 15, 2022), http://www.dupuyinstitute.org/blog/2022/11/15/tlis-and-gun-control/ (blog hosted by The Dupuy Institute). In the civilian context, various factors not considered by the TLI, like concealability, also influence the modern handgun's lethality.

[323] Aliza Aufrichtig, Lois Beckett, Jan Diehm & Jamiles Lartey, *Want to Fix Gun Violence in America? Go Local*, Guardian (2017), https://www.theguardian.com/us-news/ng-interactive/2017/jan/09/special-report-fixing-gun-violence-in-america [https://perma.cc/5SGW-DMW6].

[324] John Hopkins Center for Gun Violence Solutions, A Year in Review: 2020 Gun Deaths in the U.S. 27 (Apr. 28, 2022), https://publichealth.jhu.edu/sites/default/files/2022-05/2020-gun-deaths-in-the-us-4-28-2022-b.pdf [https://perma.cc/VY8K-3SGY] (citing county-level data from the U.S. Centers for Disease Control and Prevention).

[325] Or. Firearms Fed'n, Inc. v. Brown, No. 2:22-CV-01815-IM, 2022 WL 17454829, at *13 (D. Or. Dec. 6, 2022).

[326] *See generally* K-12 School Shooting Database, https://k12ssdb.org [https://perma.cc/T99H-BKLK] (last checked Oct. 5, 2022) (collecting data for shootings at U.S. schools).

[327] *See* Chantal Da Silva, *School Shootings Rose to Highest Number in 2 Decades, Federal Report Shows*, NBC News (June 28, 2022, 7:40 AM EDT), https://www.nbcnews.com/news/us-news/school-shootings-rose-highest-number-2-decades-federal-report-shows-rcna35638 [https://perma.cc/4K2T-FBFW].

Electronic copy available at: https://ssrn.com/abstract=4408228

own."[328] Today, of course, police departments do exist and are tasked with providing public safety.[329] In effect, then, Justice Alito's point—like his invocation of the "tiny constable" in *Jones*[330]—further highlights the danger of building constitutional doctrine on anachronism. Judges looking to historical regulations for present-day guidance must appreciate how the starkly different context in the late 1700s influenced the shape of regulations.

b.  Historical Regulatory Silences, Violations, and Variations

The historical record underlying the historical-analogical method is not an easily discovered, homogenous set of facts that can simply be compiled or averaged. It is replete with silences (no historical evidence one way or the other), violations (historical laws that would be unconstitutional by modern lights), and variations (different approaches taken in different places). We consider each in turn.

First, historical regulatory practice will obviously not always speak directly to a contemporary problem. As Justice Alito alluded to in *Jones*, there was no Founding-era law with regard to GPS devices because the technology did not exist.[331] The same is true for innumerable constitutional law questions, especially those involving technological and social change. No amount of painstaking archival work will turn up historical predecessors except at a higher level of generality, as we discuss below. The narrowness of the analogical approach debated in *Jones* (the search for a "tiny constable"), as well as in many post-*Bruen* cases discussed above,[332] suggests that the historical-analogical method is especially prone to over-reading historical silences.

The risk here is, in effect, falling victim to the "law of the churn"—a failure to properly connect particulars and principles. As Justice Holmes memorably related in *The Path of the Law*:

> There is a story of a Vermont justice of the peace before whom a suit was brought by one farmer against another for breaking a churn. The justice took time to consider, and then said that he had looked through the statutes and could find nothing about churns, and gave judgment for the defendant.[333]

---

[328] New York State Rifle and Pistol Association v. Bruen, 142 S. Ct. 2111, 2161 (2022) (Alito, J., concurring).

[329] *See* District of Columbia v. Heller, 554 U.S. 570, 636 (2008) (observing that, unlike at the founding, today "well-trained police forces provide personal security").

[330] *See supra* notes 10-15 (discussing *Jones*).

[331] United States v. Jones, 565 U.S. 400, 420 (2012) (Alito, J., concurring).

[332] *See supra* Section II.A.1.

[333] Oliver Wendell Holmes, Jr, *The Path of the Law*, 10 HARV. L. REV. 457, 474-75 (1897).

Electronic copy available at: https://ssrn.com/abstract=4408228

Ignoring the legal principles underlying, say, historical gun bans in ballrooms, markets, or schools when evaluating modern gun bans in subways, summer camps, or day care centers is the law of the churn at work in *Bruen*'s frame.[334]

In other cases, historical silence might reflect not an absence of law and practice, but the simple fact that historians have yet to uncover it, let alone on a briefing schedule. As one court recently noted in the context of a Second Amendment challenge to California's restrictions on homemade guns:

> In order to even be able to assess whether or not [plaintiff] could demonstrate a "likelihood" of prevailing on the merits . . . there is no possibility this Court would expect Defendants to be able to present the type of historical analysis conducted in *Bruen* on 31 days' notice (or even 54 days' notice).[335]

Had the court required such an analysis and treated it as final, the result almost certainly would have been to build constitutional law on a fundamentally incomplete foundation. Indeed, historians have emphasized the tension between litigation and their professional norms. Historian Zachary M. Schrag, an expert both on methods of historical research[336] and on mass transit in particular,[337] was retained by the District of Columbia to defend the constitutionality of its rule against firearms on mass transit like the D.C. Metro.[338] Even with that professional expertise—indeed, because of it—Schrag entered an expert declaration effectively declining the job: "The District has asked whether I or a team of historians could adequately research the 'Nation's historical tradition' of firearm regulation on mass transit within 60 days. The answer is 'no[]' . . . ."[339]

The challenge of discovering historical weapons regulations is especially acute given that most regulation and enforcement was local, and therefore less likely to be preserved digitally today. Modern compilations of historical laws are highly incomplete for this reason alone.[340]

---

[334] *See* Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller, "*A Map Is Not the Territory*": *The Theory and Future of Sensitive Places Doctrine*, 98 N.Y.U. L. REV. ONLINE 13-14 (forthcoming 2023), https://ssrn.com/abstract=4325454.

[335] Def. Distributed v. Bonta, No. CV 22-6200-GW-AGRx, 2022 WL 15524977, at *5 n.9 (C.D. Cal. Oct. 21, 2022), *adopted*, No. CV 22-6200-GW-AGRx, 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022).

[336] *See* ZACHARY M. SCHRAG, THE PRINCETON GUIDE TO HISTORICAL RESEARCH (2021).

[337] *See* ZACHARY M. SCHRAG, THE GREAT SOCIETY SUBWAY: A HISTORY OF THE WASHINGTON METRO (2006).

[338] *See* Declaration of Zachary Schrag, Angelo v. District of Columbia, No. 22-cv-1878 (D.D.C. Sept. 16, 2022).

[339] *Id.* ¶ 6.

[340] *See, e.g.*, David B. Kopel & Joseph G.S. Greenlee, The History of Bans on Types of Arms Before 1900, at 6 (Mar. 2023) (unpublished manuscript), https://davekopel.org/2A/LawRev/The%20History%20of%20Bans%20on%20Types%20of%20Arms%20Before%201900.pdf [https://perma.cc/XPY6-4R5Y] (chronicling historical

Electronic copy available at: https://ssrn.com/abstract=4408228

*Bruen* attempts to minimize this problem by invoking the rule of party presentation and saying that "[c]ourts are thus entitled to decide a case based on the historical record compiled by the parties."[341] But that simply compounds the problem when the doctrinal test directs courts to a historical record that could not possibly be complete. The issue is not a failure of the parties, but of a test that purports to respect history without accounting for the realities of historical research.

A second problem in addition to regulatory silences is that the known historical record from which lawyers and judges must analogize is full of practices and laws that would be impermissible today, as well as *failures* to regulate that we would not accept today. The Alien and Sedition Acts, to take one obvious example, were passed within a decade of the First Amendment's ratification, but originalists dismiss them as a guide for understanding the meaning of the freedom of speech.[342] Similarly, it would be impossible to even begin to canvas the ways in which law marginalized and oppressed the majority of people living in the United States, and by doing so limited the voices of those who might have shaped it. As Justice Jennifer Brunner of the Ohio Supreme Court recently noted in a post-*Bruen* gun case:

> [T]he glaring flaw in *any* analysis of the United States' historical tradition of firearm regulation in relation to Ohio's gun laws is that no such analysis could account for what the United States' historical tradition of firearm regulation *would have been* if women and nonwhite people had been able to vote for the representatives who determined these regulations.[343]

Black American men did not gain a constitutional right to vote until 1870.[344] Women did not gain the franchise until 1920,[345] *after* the implementation of the law struck down in *Bruen*, which the majority deemed too modern to reflect an

---

prohibitions on types of weapons including "some local restrictions," but acknowledging that the authors "have not attempted a comprehensive survey of the thousands of local governments").

[341] *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2130 n.6 (2022). This is itself a bit ironic, given that *Bruen* was decided on the pleadings and therefore did not have the benefit of the development of historical facts at trial notwithstanding disagreements and uncertainty regarding the historical record.

[342] *See, e.g.*, Amy Coney Barrett, *Originalism and Stare Decisis*, 92 NOTRE DAME L. REV. 1921, 1931 (2017) ("It is of no more consequence at this point whether the Alien and Sedition Acts of 1798 were in accord with the original understanding of the First Amendment than it is whether *Marbury v. Madison* was decided correctly." (quoting ANTONIN SCALIA, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 138-39 (Amy Gutmann ed., 1997))).

[343] State v. Philpotts, 194 N.E.3d 371, 373 (unpublished table decision) (Ohio 2022) (Brunner, J., dissenting) (emphasis added).

[344] *See* U.S. CONST. amend. XV.

[345] *See* U.S. CONST. amend. XIX.

Electronic copy available at: https://ssrn.com/abstract=4408228

American regulatory tradition.[346] If, historically, women and Black Americans favored stricter firearm policies than white men—consistent with today's overall demographic preferences[347]—then the failure to include their views when doing the *Bruen* test skews our history in a highly problematic, unrepresentative way to broaden gun rights, divorced from the original public understanding of the American people (that is, unless one is willing to argue that the views of women and Black Americans should not be included in *Bruen*'s historical-analogical method). And yet there is no obvious way to correct the omission of over half the voices in the country, as Justice Brunner observed: "[E]ven if a court tries to take the views of women and nonwhite people into account, are there sufficient materials on their views available to enable reliable conclusions to be made?"[348]

The third problem is that of variation. As Akhil Amar has noted, "our common Constitution looks slightly different from state to state and across the various regions of this great land."[349] The same, of course, was true historically, especially with regard to gun regulations, which varied significantly both regionally[350] and locally[351] because of differing needs and values. What result if eight original states did not pass a given law, but five did? What if the count is nine and four? What if some of those states changed positions on the issue in the nineteenth century? What if some of those states changed again after the Civil War? What if some state courts upheld the restriction but others struck it down? What if variations existed within a state? And what if state weapon traditions were shaped by divergent state constitutional protection for the right to keep and bear arms?[352] A narrow focus might lead to doctrine being

---

[346] *Bruen*, 142 S. Ct. at 2122 (observing that the New York licensing scheme struck down "largely tracks that of the early 1900s").

[347] *See, e.g.*, Megan Brenan, *Stark Gender Gap in Gun Ownership, Views of Gun Laws in U.S.*, GALLUP (Dec. 2, 2022), https://news.gallup.com/poll/406238/stark-gender-gap-gun-ownership-views-gun-laws.aspx [https://perma.cc/CA4V-WHTR]; Katherine Schaeffer, *Key Facts About Americans and Guns*, PEW RSCH. CTR. (Sept. 13, 2021), https://www.pewresearch.org/fact-tank/2021/09/13/key-facts-about-americans-and-guns [https://perma.cc/MB9Q-3VVP].

[348] *Philpotts*, 194 N.E.3d at 373 (Brunner, J., dissenting).

[349] AKHIL REED AMAR, THE LAW OF THE LAND: A GRAND TOUR OF OUR CONSTITUTIONAL REPUBLIC, at xii (2015); *see also* Joseph Blocher, *Disuniformity of Federal Constitutional Rights*, 2020 U. ILL. L. REV. 1479, 1485-91 (describing ways that federal constitutional law is not uniform from place to place).

[350] *See, e.g.*, Ruben & Cornell, *supra* note 306, at 123-24 (arguing that gun regulations from the antebellum South grew out of a "distinctive culture of slavery and honor" and did not reflect a "national understanding of the Second Amendment's scope").

[351] *See, e.g.*, Blocher, *supra* note 314, at 85 (explaining that cities have historically regulated guns more strictly than rural areas).

[352] *See* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 TEX. REV. L. & POL. 191, 193-204 (2006) (listing state constitutional rights to keep and bear arms by state and year).

Captured: Third Circuit Library on 06/06/2023

constructed on the basis of unrepresentative traditions—using only antebellum cases from Southern states as comparators, for example.[353]

The complications of historical silences, violations, and variations invite a fundamental question for judges implementing originalism-by-analogy: What should courts do about the acute risk of anachronism? After all, as *Bruen* recognized, "the Founders created a Constitution—and a Second Amendment—'intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs.'"[354] The most obvious doctrinal solution is to adjust the level of generality at which a court conducts the inquiry. And that, in turn, raises new methodological challenges.

2.   Selecting a Level of Generality

How broadly or narrowly a judge defines or applies a principle of relevant similarity can increase or decrease the risk of anachronism, but at the same time can be outcome-determinative, meaning that it is not the historical record that will determine the result but the level of generality at which the judge decides to approach it.[355] Although it is impossible to articulate a single, overarching rule principle governing levels of generality in legal reasoning,[356] understanding this dynamic will be crucial for principled application of originalism-by-analogy. Our goal here, then, is not to provide a test, but to illustrate the stakes, identify some common problems, and suggest some guiding principles.

Dueling originalist accounts of *Loving v. Virginia*[357] provide an example of the relationship between level of generality and case outcomes in an originalist frame. As Peter Smith has shown, the dominant narrative of the opinion until relatively recently was that *Loving* is not consistent with the original understanding of the Fourteenth Amendment because, at the time it was enacted, there was a legislative tradition banning interracial marriages.[358] If the principle of relevant similarity gleaned from historical laws is cast narrowly as

---

[353] *See* Ruben & Cornell, *supra* note 306, at 123-24.

[354] *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2132 (2022) (quoting McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 415 (1819)).

[355] *See generally* Peter J. Smith, *Originalism and Level of Generality*, 51 Ga. L. Rev. 485 (2017) (providing examples of originalist attempts at constitutional interpretation and demonstrating how selecting a level of generality plays a pervasive, undertheorized role); Easterbrook, *supra* note 290, at 358 ("Movements in the level of constitutional generality may be used to justify almost any outcome.").

[356] Scholars have investigated the issue of levels of generality for decades. *See, e.g.*, Michael C. Dorf & Laurence H. Tribe, *Levels of Generality in the Definition of Rights*, 57 U. Chi. L. Rev. 1057 (1990).

[357] 388 U.S. 1 (1967).

[358] Smith, *supra* note 355, at 508-10 (describing "early accounts of *Loving* [that] concluded that it was indefensible on originalist grounds").

Electronic copy available at: https://ssrn.com/abstract=4408228

Captured by the Public.Resource.Org Library on 06/07/2023

whether there was protection for interracial marriage, then the critique is hard to avoid. In contrast, recent originalist accounts have focused on a higher-level legislative tradition: that governing contract rights, with marriage being one type of contract.[359] If the principle of relevant similarity gleaned from historical laws is focused on protection of contract rights generally, not marriage contracts in particular, it is easier to explain *Loving* on originalist grounds. After all, laws such as the Civil Rights Act of 1866 protected a right "to make and enforce contracts."[360]

Unarticulated decisions about the appropriate level of generality reflect the risk that originalism-by-analogy will not be transparent. As Sunstein notes in his generally laudatory account of analogical reasoning, "[i]f done poorly, analogical thinking can deflect the eye from the specific problem and thus induce a kind of blindness to what is really at stake."[361] Chief Justice Roberts similarly noted in a Fourth Amendment case that an "analogue test" can "launch courts on a difficult line-drawing expedition" to answer questions such as: "Is an e-mail equivalent to a letter? Is a voicemail equivalent to a phone message slip?"[362] Such a test, he added, would keep "judges guessing for years to come."[363]

*Bruen*'s approach to historical analogy raises the importance of operating at a high level of generality. If questions are pitched too narrowly, courts will run directly into the problems of anachronism discussed above,[364] like searching for historical regulations of guns in subways. So, too, will they fail to account for historical silences, variations, and violations, potentially building federal constitutional doctrine on a set of unrepresentative or even reprehensible traditions. Operating at a higher level of generality—looking for broad principles of similarity, rather than near-identical historical models—is no panacea,[365] but can help minimize these problems. Meanwhile, the level of generality should be applied symmetrically when characterizing rights and regulatory authority—it would be unprincipled to describe the right in broad terms, and thus susceptible to support from many historical sources, and then

---

[359] *See, e.g.,* Steven G. Calabresi & Andrea Matthews, *Originalism and* Loving v. Virginia, 2012 BYU L. REV. 1393, 1398.

[360] *Id.* at 1413-20.

[361] Sunstein, *Analogical Reasoning, supra* note 37, at 23.

[362] Riley v. California, 573 U.S. 373, 401 (2014).

[363] *Id.* (quoting Sykes v. United States, 564 U.S. 1, 34 (2011) (Scalia, J., dissenting)); *see also* Ross v. Bernhard, 396 U.S. 531, 538 n.10 (1970) (analogizing modern causes of action to those that existed at common law in applying the Seventh Amendment "requir[es] extensive and possibly abstruse historical inquiry" that is "difficult to apply").

[364] *See infra* Section II.B.1.

[365] BALKIN, *supra* note 182, at 214-15 ("What distinguishes good from bad uses of history … is not the level of abstraction. It is whether we acknowledge or disguise our modality of argument. Bad uses of history mislead their audiences about the kinds of justification they actually employ.").

Electronic copy available at: https://ssrn.com/abstract=4408228

demand that historical regulations be more specific. We address both points in turn.

a.   High Levels of Generality

Deciding on an appropriate level of generality is a classic issue for tradition-based approaches to constitutional reasoning.[366] Some, including Justice Scalia, have argued for defining historical rights and regulations narrowly. *Bruen* did not articulate any level-of-generality theory, but seemed to take this narrowing approach when framing the relevant regulatory tradition, even as it defined the right at a high level of abstraction.[367] The following subsection addresses the problematic nature of this mismatch; here, we focus on the potential virtues of a (symmetric) high level of abstraction.

The debate over levels of generality in assessing constitutional history is often associated with *Michael H. v. Gerald D*, which considered whether a natural father has a constitutionally protected interest in his relationship with a child.[368] In his plurality opinion, Justice Scalia looked to history for whether such an interest existed and, in doing so, argued for a low level of generality (i.e., a narrow inquiry), writing that "[w]e refer to the most specific level at which a relevant tradition protecting, or denying protection to, the asserted right can be identified," and emphasizing the "value of consulting the most specific tradition available."[369] Under that lens, Scalia cast the asserted interest as "the [parental] rights of an adulterous natural father," which he concluded were not sufficiently grounded in American tradition to warrant constitutional protection. Justice Brennan contested Scalia's "exclusively historical analysis,"[370] and also argued

---

[366] *See, e.g.*, David A. Strauss, *Can Originalism Be Saved?*, 92 B.U. L. REV. 1161, 1163 (2012) ("If we are allowed to change the level of generality at which we characterize the original understandings, then originalism can justify anything.")

[367] *See infra* notes 400-401 and accompanying text.

[368] 491 U.S. 110 (1989). There are of course innumerable illustrations. *Compare* Bowers v. Hardwick, 478 U.S. 186, 190 (1986) ("The issue presented is whether the Federal Constitution confers a fundamental right upon homosexuals to engage in sodomy ….") *with* Lawrence v. Texas, 539 U.S. 558, 567 (2003) ("To say that the issue in Bowers was simply the right to engage in certain sexual conduct demeans the claim the individual put forward, just as it would demean a married couple were it to be said marriage is simply about the right to have sexual intercourse.").

[369] *Id.* at 127 n.6 (plurality opinion). By pointing to "the most specific level at which a relevant tradition protecting, *or denying protection*" could be identified, *id.* (emphasis added), Scalia also tacitly acknowledged the need for symmetry in analyzing both the asserted right and asserted regulatory tradition. We discuss the importance of such symmetry in more detail below. *See infra* Section II.B.2.b.

[370] *Id.* at 137 (Brennan, J., dissenting) ("[T]he plurality opinion's exclusively historical analysis portends a significant and unfortunate departure from our prior cases and from sound

Electronic copy available at: https://ssrn.com/abstract=4408228

that the relevant interest should have been framed more broadly as "that of a parent and child in their relationship with each other."[371] Brennan argued that a broader frame would be more consistent with the Court's precedent[372] and would also lead to the opposite conclusion: that, indeed, a natural father has a constitutionally-protected interest in his relationship with a child.

*Bruen*'s framing comports more with Brennan's than Scalia's. Had the *Bruen* majority cast the Second Amendment issue at "the most specific tradition available,"[373] the case might plausibly have come out the other way. After all, the petitioners were challenging a restriction on their ability to carry a concealed handgun in public,[374] and "the most specific tradition available"[375] to evaluate that claim would be the historical prohibition of concealed carry of handguns in public, which Justice Scalia's own opinion in *Heller* noted was constitutional.[376] The petitioners, in other words, would have lost. *Bruen* instead adopted a higher level of generality, treating the case as about "the constitutional right to carry handguns publicly for self-defense,"[377] or even the right to "armed self-defense."[378]

Though of course there is much to criticize in *Bruen*'s approach—including that it appears internally inconsistent and unprincipled—there are in fact good reasons to operate at a high level of generality when evaluating traditions of rights and regulations. Otherwise, originalism-by-analogy can fall prey to anachronism in either direction: Rejecting a gun rights claim because there was no right to carry a semiautomatic handgun in 1791, or upholding the claim because in 1791 there was no law specifically forbidding it. The danger, as Cass

---

constitutional decisionmaking"); *id.* at 142 ("On the facts before us, therefore, the question is not what 'level of generality' should be used to describe the relationship between Michael and Victoria, but whether the relationship under consideration is sufficiently substantial to qualify as a liberty interest under our prior cases." (internal citations omitted)).

[371] *Id.* at 141-42.

[372] *Id.* at 139-140; *see also id.* at 132 (O'Connor, J., concurring in part) (contending that Scalia's level-of-generality analysis is a "mode of historical analysis . . . that may be somewhat inconsistent with our past decisions").

[373] *Id.* at 127 n.6 (plurality opinion).

[374] The Supreme Court granted certiorari "limited to the following question: 'Whether the state's denial of petitioners' applications for concealed-carry licenses for self-defense violated the Second Amendment.'" Docket, New York State Rifle & Pistol Ass'n v. Bruen, No. 20-843 (Apr. 26, 2021).

[375] *Michael H.*, 491 U.S. at 127 n.6.

[376] *Heller*, 554 U.S. at 626 ("Like most rights, the right secured by the Second Amendment is not unlimited . . . . For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues.").

[377] *Bruen*, 142 S. Ct. at 2122.

[378] *See, e.g., id.* at 2118, 2128, 2132, 2133, and 2135. One might argue that *Bruen* involved a textually specified right while *Michael H.* did not, but of course these formulations are nowhere specified in the *text* of the Second Amendment, which says nothing at all about self-defense.

Electronic copy available at: https://ssrn.com/abstract=4408228

Sunstein has noted, is failing adequately to connect a broad historical frame to a concrete legal conclusion: "[I]t is familiar to find a constitutional lawyer reading history at a very high level of abstraction ('the Framers were committed to freedom of speech') and concluding that some concrete outcome follows for us ('laws regulating obscenity are unconstitutional'). This use of history is not honorable."[379]

A high level of generality is not a substitute for transparent reasoning, which is why we have emphasized above the importance of articulating principles of relevant similarity.[380] But a *narrow* level of generality can exacerbate problems, making it impossible to draw useful analogies to historical sources. The Founding generation thought it constitutional to deny firearms to Native Americans, Black Americans, and those refusing to take loyalty oaths.[381] At a low level of generality, then, there is a far stronger historical record supporting those restrictions than, say, a rule disarming domestic abusers.[382] And yet it would be absurd to conclude that *today* the Second Amendment permits the government to disarm Black Americans and Native Americans but not domestic abusers. Some opinions have responded by leveling down, discounting the historical laws because they would be unconstitutional today.[383] But that in effect becomes a one-way ratchet in favor of gun rights unless it is paired with a recognition that—as discussed above—certain *failures* to regulate must be inverted because of racial and gender discrimination in the makeup of policymaking bodies.[384] If we can rightly disregard gun bans reflective of the Founding era's racism, why must we accept the Founding era's moral blindness with regard to weapons and domestic violence?[385]

These problems can be mitigated by asking *why* earlier generations disarmed certain groups of people, rather than asking only *whom* they disarmed. For example, scholarship and case law have examined whether and to what degree the Founding generation disarmed people that they thought were dangerous,[386]

---

[379] Cass R. Sunstein, *The Idea of a Useable Past*, 95 COLUM. L. REV. 601, 603 (1995).

[380] *See infra* Section II.A.

[381] *See* Blocher & Carberry, *supra* note 54.

[382] *See supra* notes 234-241 and accompanying text (discussing United States v. Perez-Gallan, __ F.Supp.3d __, 2022 WL 16858516 (W.D. Tex. Nov. 10, 2022)).

[383] *See, e.g.*, United States v. Hicks, __ F.Supp.3d. __, 2023 WL 164170, at *7 ("This Court is [] skeptical of using historical laws that removed someone's Second Amendment rights based on race, class, and religion to support doing the same today. Indeed, the Court believes that 'rejecting' the discriminatory application of those unconstitutional laws historically—while still arguing those laws should be a basis for the Court's decision—walks too fine a line.").

[384] *See supra* notes 343-348 and accompanying text (discussing how the law marginalized and oppressed the majority of people living in the United States).

[385] Siegel, *supra* note 52, at 2121-29 (describing the existence of a husband's "right of chastisement" into the nineteenth century).

[386] *See, e.g.*, Kanter v. Barr, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting).

Electronic copy available at: https://ssrn.com/abstract=4408228

or lacked virtue,[387] or were not law-abiding members of the political community.[388] The question for modern controversies then becomes whether prohibited groups like felons have that characteristic. That is not the same as pointing directly to the particular groups of disarmed people—such as Black Americans, Native Americans, and those refusing to take loyalty oaths—or, for that matter, those who the Founders *failed* to disarm, such as perpetrators of domestic violence.

A broad level of generality can also help accommodate the diversity of historical—and modern—approaches to gun regulation discussed above. *Bruen* relied heavily on the concept of "outliers," but without much transparency or rigor.[389] The Court cast New York's "may issue" law as an outlier of modern regulation—obscuring the fact that similar laws governed a quarter of the U.S. population, and that as recently as the 1980s *most* states had such laws.[390] It went on to dismiss as outliers a wide range of historical gun laws that, even by the Court's own estimation, supported New York's.[391] Such slicing and dicing totalizes a record that is marked by variation, and then treats the resulting, unitary "tradition" as if it were found rather than made. And that problem becomes worse the more narrowly the inquiry is pitched. If *Bruen* were to parse permit requirements more finely, it might have separated them based on training requirements, fee amounts, character requirements and the like, until *all* of them looked like "outliers" and no regulatory tradition at all remained.

This risk is especially heightened by an approach like *Bruen's* that requires identification of a "historical tradition" and treats the lack of evidence regarding such a tradition as evidence that analogous laws are unconstitutional today.[392] The historical record is full of examples of laws that some, but not other, jurisdictions passed. Indeed, one characteristic of the American tradition of weapons regulation is local and regional variation.[393] Tradition of variation comports with the Supreme Court's acknowledgment, in *McDonald v. City of Chicago*, "that conditions and problems differ from locality to locality and that

---

[387] *See, e.g.,* United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

[388] *See, e.g.,* Range v. Att'y Gen. United States, 53 F.4th 262, 273 (3d Cir. 2022).

[389] *See* Darrell A.H. Miller & Joseph Blocher, *Manufacturing Outliers,* 2023 SUP. CT. REV. (forthcoming 2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4389695 [https://perma.cc/L95B-84KE].

[390] Jacob D. Charles, *Securing Gun Rights by Statute: The Right to Keep and Bear Arms Outside the Constitution,* 120 MICH. L. REV. 581, 596 (2022) (noting that as recently as 1980 fully one-quarter of states outlawed concealed carry altogether, with most of the other states operating a "proper cause" or a similar "may issue" licensing regime).

[391] *See, e.g.,* New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2153 (2022) (dismissing Texas law's relevance while acknowledging "that the Texas cases support New York's proper-cause requirement").

[392] *See supra* Section II.B. 1.b (discussing historical silences and variation).

[393] *See* Blocher, *supra* note 314; Ruben & Cornell, *supra* note 306.

Electronic copy available at: https://ssrn.com/abstract=4408228

citizens in different jurisdictions have divergent views on the issue of gun control."[394] *McDonald* went on to explain that the Second Amendment "*limits* (but by no means eliminates) [states'] ability to devise solutions to social problems that suit local needs and values."[395] "[S]tate and local experimentation with reasonable firearms regulations," the Court continued, "will continue under the Second Amendment."[396] Indeed, at oral argument in *Bruen* Justice Thomas seemed to acknowledge such local-level tailoring: "It's one thing to talk about Manhattan or NYU's campus. It's another to talk about rural upstate New York."[397] A high level of abstraction can help *Bruen*'s historical-analogical test preserve that kind of sensible variation.

b.   Symmetric Levels of Generality

Whatever principles a court selects, the level of generality selected for historical analogy should be applied symmetrically to the right and regulation sides of the equation.[398] In other words, courts should not apply a broad and forgiving principle to characterize a regulatory tradition while applying a narrow and rigid characterization of a gun rights claim, nor vice versa. Anything else distorts the holistic historical record and risks confirmation bias, "twist[ing] evidence to fit [one's] preferred narrative," which historical methods—and originalism itself—are designed to avoid.[399] At minimum, courts should not apply a different historical frame for rights and regulations absent clear guidance that such a counterintuitive way to read history is required by the Second Amendment.

*Bruen* itself demonstrates the shortcomings of such asymmetrical historical analysis. The majority is quick to conclude that the Second Amendment extends to modern weapons that were unknown to the Framers: "We have already recognized in *Heller* at least one way in which the Second Amendment's historically fixed meaning applies to new circumstances: Its reference to 'arms'

---

[394] 561 U.S. 742, 783 (2010); *see also* Joseph Blocher, *Cities, Preemption, and the Statutory Second Amendment*, 89 U. Chi. L. Rev. 557, 574 (2022) (discussing benefits of local regulation of firearms); Richard Briffault, *Home Rule and Local Political Innovation*, 22 J.L. & Pol. 1, 31 (2006) (observing that if "the fifty states are laboratories for public policy formation, then surely the 3,000 counties and 15,000 municipalities provide logarithmically more opportunities for innovation, experimentation and reform").

[395] *McDonald*, 561 U.S. at 785.

[396] *Id.* (citation and quotation marks omitted).

[397] Transcript of Oral Argument at 60, *Bruen*, 142 S. Ct. 2111 (No. 20-843).

[398] For an explanation of the initial balance of rights and regulations and a theory for how they should evolve, see Darrell A.H. Miller, *Second Amendment Equilibria*, 116 Nw. U. L. Rev. 239, 259-63 (2021).

[399] Schrag, *supra* note 336, at 25 (discussing historians' ethics).

Electronic copy available at: https://ssrn.com/abstract=4408228

does not apply 'only [to] those arms in existence in the 18th century.'"[400] This is because "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense."[401]

When it comes to categories of arms covered by the Second Amendment, then, it appears that the principle of relevant similarity is whether the instrument "facilitate[s] armed self-defense."[402] The Court expressly used its interpretation of "arms" at a high level of generality as an example of how to construe historical statutes for the purpose of historical-analogical reasoning.[403] But the majority then applied a far less generous principle to evaluate modern gun laws in comparison to their historical counterparts. The symmetric principle of similarity, one would think, should be that the Second Amendment allows modern gun laws that facilitate public safety.[404] And that metric would lead to a very different analysis than the stringent historical one that the Court ended up applying.

Of course, while applying a symmetric level of generality on both sides of the analysis is a bare minimum of principled, historically-based decisionmaking, it does not answer the underlying question of whether the level should be broad or narrow. As we note above, society has experienced profound changes with respect to weapons.[405] It would be nonsensical to ask in a Second Amendment challenge to a restriction on a specific, modern gun model whether there is historical protection for that precise model. There are thus good reasons to analogize at a higher level of abstraction. But that breadth must be symmetric— the regulatory side of the analysis should be subject to the same level of generality.

### C.  Institutional Limitations

The final challenge to originalism-by-analogy that we address is staying within the judiciary's institutional competence. Constitutional doctrine should

---

[400] New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2132 (2022) (internal citations omitted).

[401] *Id.*

[402] *Id.*

[403] *Id.* ("Much like we use history to determine which modern 'arms' are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding.").

[404] *See, e.g.,* Nat'l Rifle Assoc. v. Bondi, 61 F. 4th 1317, 1326 (11th Cir. 2023) ("As for the 'why' of those historical regulations, it is also 'relevantly similar' to the 'why' of the Marjory Stoneman Douglas High School Public Safety Act. Both 'regulations burden a law-abiding citizen's right to armed self-defense' for the same reason: enhancing public safety." (quoting *Bruen*, 142 S. Ct. at 2132-33)).

[405] *See supra* Part II.B.1.

Electronic copy available at: https://ssrn.com/abstract=4408228

not direct judges down paths that render decisionmaking inscrutable, invite raw discretion, or require tasks that the judiciary is institutionally ill-suited to perform.[406] Analogical reasoning is, as noted above, bread and butter for jurists. But *Bruen*'s approach to historical-analogical reasoning, if misapplied, can lead judges to draw unsupported inferences—mistaking lack of historical evidence for evidence of lacking history—and also discounting the need for *contemporary* empirical evidence and legislative deference in order to conduct the kind of comparisons *Bruen* mandates.

1.  Judicial Resources

An approach focused exclusively on historical analogy transforms the way litigation operates, stretching resources more than conventional constitutional argumentation.[407] Judges have acknowledged that "[w]e will inevitably miss some" historical precedents because "[t]he briefs filed [are] able to address only so many before running up against word limits."[408] If historical analogy is the sole determinant of constitutionality, running out of space to document historical precedents can be the difference between winning or losing a case. This is especially true when courts rely on party presentation of historical analogues[409] and consider the *quantity* of analogues to be probative.[410] In *Antonyuk*, New York requested an additional seventy pages to respond to a motion for a preliminary injunction.[411] Even still, the court endeavored to find

---

[406] *Cf.* Michael W. McConnell, *Institutions and Interpretation: A Critique of* City of Boerne v. Flores, 111 HARV. L. REV. 153, 155 (1997) ("When translating constitutional text into judicially enforceable doctrine, a responsible court necessarily takes into consideration not only the meaning of the constitutional provision at issue, but also the institutional implications of the doctrine for the allocation of power between the courts and the representative branches.").

[407] For an analysis of how originalism and the usual rules of fact-finding intersect, see Blocher & Garrett, *supra* note 208208.

[408] Peruta v. Cnty. of San Diego, 742 F.3d 1144, 1155 n.6 (9th Cir. 2014), *rev'd on reh'g en banc*, 824 F.3d 919 (9th Cir. 2016).

[409] *See, e.g.*, *Bruen*, 142 S. Ct. at 2130 n.6 ("Courts are thus entitled to decide a case based on the historical record compiled by the parties.").

[410] *See, e.g.*, Firearms Policy Coalition v. McCraw, No. 4:21-cv-1245, 2022 WL 3656996, at *11 (N.D. Tex. Aug. 25, 2022) ("[T]he historical record before the Court establishes (at most) that between 1856 and 1892, approximately twenty jurisdictions (of the then 45 states) enacted laws that restricted the ability of those under 21 to 'purchase or use firearms.'"); Antonyuk v. Hochul, No. 1:22-CV-0986, 2022 WL 5239895, at *9 ("[T]he Court generally has looked to instances where there have been three or more such historical analogues . . . .").

[411] *See* Consent Letter Motion, Antonyuk v. Hochul, No. 1:22-CV-0986 (N.D.N.Y. Oct. 12, 2022) (requesting leave to file excess pages); Text Order, Antonyuk v. Hochul, No. 1:22-CV-0986 (N.D.N.Y. Oct. 12, 2022) (granting motion for additional pages). In *Miller v. Bonta*, a case concerning California's ban on assault weapons, the district judge asked the parties to compile a spreadsheet of relevant weapons policies from the time of the Second Amendment's

historical laws not included in the briefing.[412] New York State might have the resources to conduct such extensive—but still incomplete—motion practice; most municipalities defending local gun laws will not. At the same time, the burden on judges tasked with parsing a voluminous historical record and rendering it relatable to modern times will be significant and difficult—judges have even considered hiring historians to assist in the exercise.[413]

A similar institutional challenge has been discussed in the long-running interpretive debates over originalism, but it is especially accentuated with a historical-analogical test that requires not only identification of past practices and meanings, but also the further step of drawing relevant similarities from those historical sources to modern ones. Courts faced with tasks they are ill-suited to do often consider whether it is appropriate to defer to co-equal branches of government. Yet *Bruen* critiqued lower court caselaw as being too deferential to legislatures and too responsive to modern-day realities.[414] As a result, some courts have read *Bruen* as prohibiting consideration of empirics or deference to the legislature. But both empirics and deference remain relevant after *Bruen*, and they could mitigate the institutional challenges presented by the historical-analogical approach.

2.    Empirics and Deference

Despite *Bruen*'s suggestion that its approach is purely historical, the plain text of its test requires contemporary evidence to play a key role. Quite simply, there is no way to compare the "why" and "how" of modern and historical gun laws without evidence. History alone cannot show the "burden" that modern gun laws place on "armed self-defense," nor why such laws are "justified."[415] Doing so requires modern empirics to demonstrate, for example, how often particular weapons are used for self-defense or in crimes, or what harms a particular law prevents.[416]

---

enactment until twenty years after the Fourteenth Amendment's enactment. California's list was fifty-six pages long and contained 191 laws, statutes, or regulations. *See* Defendants' Survey of Relevant Statutes (Pre-Founding – 1888), Miller v. Bonta, No. 3:19-cv-01537 (Jan. 11, 2023).

[412] *See* Antonyuk v. Hochul, No. 1:22-CV-0986, 2022 WL 16744700, at *41 & n.72 (describing the court's research process).

[413] *See, e.g.*, Baird v. Bonta, No. 2:19-CV-00617, 2022 WL 17542432, at *9 (E.D. Cal. Dec. 8, 2022); United States v. Bullock, No. 3:18-CR-165, 2022 WL 16649175, at *1, *3 (S.D. Miss. Oct. 27, 2022).

[414] *Bruen,* 142 S. Ct. at 2131.

[415] *See supra* Section I.A (discussing *Bruen*'s primary metrics of "how" and "why" gun regulations limit armed self-defense).

[416] *See, e.g.*, Campiti v. Garland, 2023 WL 143173, at *3 (D. Conn. Jan. 10, 2023) (observing the historical tradition of "prohibit[ing] dangerous people from possessing guns" (quoting *Kanter,*

Electronic copy available at: https://ssrn.com/abstract=4408228

Indeed, although it is somewhat opaque on this point, the Court actually seemed to be taking this presentist approach when it emphasized what it considered to be the stringency of New York's law and the supposed commonality of armed self-defense. The majority highlighted the relative strictness of proper cause requirements, concluding that requiring a "special need" to carry a handgun is a "demanding" standard.[417] Justice Alito blended present and future in writing, "*Today*, unfortunately, many Americans have good reason to fear that they *will be* victimized if they are unable to protect themselves."[418] In these ways, at least—all of which worked in favor of broadening gun rights—the Justices were willing and able to consider contemporary evidence and even predictions about the future.

As the dissent pointed out, there was actually no record evidence regarding the operation of New York's statute—what percentage of permit applications were rejected, for example—which makes it hard to evaluate the statute's contemporary burdens on armed self-defense.[419] In future cases that do include a record, those defending gun laws will presumably want to include evidence showing that challenged laws still allow armed self-defense. If, for example, a prohibition on one particular class of weapons leaves open a range of adequate

---

919 F.3d at 451 (Barrett, J., dissenting)); *id.* at *4 (concluding that "the available data reflects that 'someone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use'" and thus the federal felon-in-possession law is consistent with historical tradition (citation omitted)); United States v. Goins, 2022 WL 17836677, at *12 (E.D. Ky. Dec. 21, 2022) ("There is little reason to doubt that Congress could have deemed Mr. Goins to represent a threat to public safety, consistent with the Second Amendment's history and tradition."); *id.* at *13 (discussing the empirical connection between DUI convictions drug possession and public safety).

[417] *Bruen*, 142 S. Ct. at 2123.

[418] *Id.* at 2161 (Alito, J., concurring) (emphasis added). Specifically, Justice Alito cites a brief to the effect that "[a]ccording to survey data, defensive firearm use occurs up to 2.5 million times per year." *Id.* at 2159. It is worth noting that empiricists studying more recent data have concluded that the 2.5 million estimate, which is derived from Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. Crim. L. & Criminology 150, 184 tbl.2 (1995), "should be viewed with considerable skepticism." Philip J. Cook, *The Great American Gun War: Notes from Four Decades in the Trenches*, 42 Crime & Just. 19, 37, 43-44 (2013). Empirical efforts to identify the prevalence of defensive gun uses vary by orders of magnitude. *See, e.g.*, Bureau of Just. Stat, U.S. Dep't of Justice, NCJ-147004, Guns and Crime: Handgun Victimization, Firearm Self-Defense, and Firearm Theft 1-2 (1994) (estimating approximately 80,000 defensive uses based on the National Crime Victimization Survey).

[419] *Bruen*, 142 S. Ct. at 2164 (Breyer, J., dissenting) ("[T]he Court decides this case on the basis of the pleadings, without the benefit of discovery or an evidentiary record. As a result, it may well rest its decision on a mistaken understanding of how New York's law operates in practice.").

Electronic copy available at: https://ssrn.com/abstract=4408228

alternatives, then the burden on armed self-defense is lessened and perhaps negligible.[420]

The majority's flexibility in accepting arguments about the high burden of the modern regulation, however, was in stark contrast to its willingness to minimize the burdens imposed by historical regulations. For example, the Court discounted the evidentiary value of an early Massachusetts law copied by states across the country that regulated the public carriage of arms by providing that anyone who carried publicly without "reasonable cause" could be required to post a surety under specified circumstances.[421] The majority held that the law—despite serving as an explicit example of states limiting public carry to those with cause—was not relevant in evaluating the constitutionality of New York's public carry law because the burden of a surety requirement was supposedly dissimilar to that imposed by New York's permit requirement.[422] In the same vein, the Court declined to give weight to historical laws that it concluded were underenforced[423] or only prohibited the use of arms to "terrorize" others.[424]

The continuing relevance of empirics invites a question about how much deference judges should give to legislative determinations. Though the *Bruen* majority critiqued legislative deference within the tiered-scrutiny framework,[425] deference should not be off the table after *Bruen* if it is part of the historical tradition of weapons rights and regulation.[426] Here, too, a principle of symmetry should apply—this time, between the deference courts give to historical and modern legislative determinations.

In this regard, the longstanding debate regarding the scope of police power and judicial power at the Founding is relevant. In his review of opinions

---

[420] *See* Friedman v. City of Highland Park, 784 F.3d 406, 411 (7th Cir. 2015) (pointing out that if Highland Park's ordinance banning assault rifles left viable legal alternatives open to criminals, then it similarly left viable legal alternatives open to those seeking to carry in self-defense); Ruben, *supra* note 92, at 208 ("In a gun-centric world in which the only 'arm' is a firearm, firearms restrictions intuitively cut deeper into the right to keep and bear arms than in a world where there are myriad alternatives."). *See generally* Joseph Blocher & Darrel A.H. Miller, *Lethality, Public Carry, and Adequate Alternatives*, 53 HARV. J. ON LEGIS. 279 (2016) (considering the potential Second Amendment significance of advancing non-lethal weapons technology).

[421] *Bruen*, 142 S. Ct. at 2148-49; *see* 1836 Mass. Acts 750 ("If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace . . . .")

[422] *Bruen*, 142 S. Ct. at 2148-49.

[423] *Id.* at 2149.

[424] *Id.* at 2150.

[425] *Id.* at 2131 (critiquing how courts defer to legislative determinations when faced with difficult empirical decisions under intermediate scrutiny).

[426] *Id.* (stating the need to adhere to the "balance . . . struck by the traditions of the American people" when implementing the Second Amendment).

Electronic copy available at: https://ssrn.com/abstract=4408228

exercising judicial review between the Founding and *Marbury v. Madison*, for example, William Treanor found that courts deferred outside limited circumstances in which legislators "overstepp[ed] their bounds with respect to the power of other governmental entities."[427] Treanor concluded that "[j]udicial review thus was not about protecting individual rights" at the time.[428] Others have similarly highlighted the broad scope of police powers in early American history[429] or the limited role of judicial review.[430]

Our goal here is not to provide a broad account of the historical relationship between police power and judicial review[431] but to make a more modest point: *Bruen* instructed courts to heed historical regulatory tradition in Second Amendment cases, and legislative deference may very well be an important part of that tradition. In her dissenting opinion in *Kanter v. Barr*, for example, then-Judge Barrett concluded that "[i]n 1791—and for well more than a century afterward—legislatures disqualified categories of people from the right to bear arms only when *they judged* that doing so was necessary to protect the public safety."[432] In this telling, it was the legislature that was "judg[ing]" the threat to public safety presented by a category of people. If the principle of relevant similarity at issue in categorical prohibition cases is that the legislature can bar those "they judge[]" to be dangerous from gun possession,[433] and their historical determinations were overinclusive and would have received deference from the judiciary, modern-day legislatures arguably should be granted similar leeway, subject, of course, to other constitutional limitations.

---

[427] William Michael Treanor, *Judicial Review Before* Marbury, 58 STAN. L. REV. 455, 557 (2005).
[428] *Id.*
[429] *See, e.g.*, Saul A. Cornell, *The Police Power and the Authority to Regulate Firearms in Early America*, BRENNAN CTR. FOR JUST. (June 29, 2021), https://www.brennancenter.org/our-work/research-reports/police-power-and-authority-regulate-firearms-early-america [https://perma.cc/45NL-ZKPB].
[430] *See, e.g.*, Larry D. Kramer, *Judicial Supremacy and the End of Judicial Restraint*, 100 CAL. L. REV. 621, (2012); *Campbell*, *supra* note 187, at 34; William Baude, *Of Course the Supreme Court Needs to Use History. The Question is How.*, WASH. POST (Aug. 8, 2022, 9:27 AM EDT), https://www.washingtonpost.com/opinions/2022/08/08/supreme-court-use-history-dobbs-bruen [https://perma.cc/752Y-RJFR] ("[I]n *Bruen*, the court refused to allow any kind of 'interest balancing' of gun rights against public safety. But deeper historical research might support such balancing after all. At the Founding and during Reconstruction, many constitutional rights were subject to regulation in the name of the public good. Such arguments could support more regulation of Second Amendment rights than the court suggests.").
[431] *See, e.g.*, Steven G. Calabresi, *Originalism and James Bradley Thayer*, 113 NW. U. L. REV. 1419 (2019) (disputing James Bradley Thayer's influential 1893 account of Supreme Court judicial review and Thayer's related argument for a rule of clear mistake in separation-of-powers cases).
[432] Kanter v. Barr, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting) (emphasis added); *see also id.* at 458 ("In sum, founding-era legislatures categorically disarmed groups whom *they judged* to be a threat to the public safety." (emphasis added)).
[433] *Id.* at 458.

Electronic copy available at: https://ssrn.com/abstract=4408228

## Conclusion

Will originalism-by-analogy succeed or fail at providing a stable, coherent, and predictable jurisprudence? Initial efforts to apply *Bruen* give reason for doubt. Originalism-by-analogy has opened the door to tremendous challenges, reflected in divergent methodologies and outcomes. Bringing discipline to the increasingly erratic and unprincipled body of law that is emerging after *Bruen* should be a primary goal of appellate courts.

This Article proposes initial steps toward developing sound doctrine consistent with *Bruen*. At minimum, courts must articulate principles of relevant similarity to compare historical and modern laws. Because immense differences between past and present complicate that task, such principles ought to be cast at a high level of generality in order to avoid anachronism. At the same time, and contrary to common assumptions about post-*Bruen* law, courts will not be able to avoid questions about modern empirics and legislative deference.

Of course, redressing the doctrinal problems discussed in this Article will require more than identifying principles of relevant similarity, avoiding anachronism, and addressing institutional limitations. Given the upheaval spawned by *Bruen*, courts and scholars will likely be busy for years to come before the consequences of the Court's novel doctrinal approach to the Second Amendment cases comes into focus.

Electronic copy available at: https://ssrn.com/abstract=4408228

**Internet Sources Cited in Opinions**

In order to preserve information for research purposes, websites cited in precedential and nonprecedential opinions for the United States Court of Appeals for the Third Circuit are captured when possible. Because some URLs cited in opinions may change over time or disappear altogether, an attempt is made to capture, as closely as possible, the material cited in an opinion at the time of its release. However, capture dates may not match the "as visited" date contained in an opinion's citation to that material. **Any use of captured website information is the sole responsibility of the user.**  All captured information is provided in good faith for research purposes. The Third Circuit Court of Appeals and its employees shall have no responsibility for the accuracy, content, completeness, legality, or reliability of captured information and cannot be held liable for any loss, damage, or expense which arises as a result of use. The content of a capture may be protected by copyright and/or related rights. Use of captured information may require permission from the rights holder(s).

