# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

———————————

BRYAN DAVID RANGE,

Plaintiff-Appellant,

v.

ATTORNEY GENERAL OF THE UNITED STATES, et al.,

Defendants-Appellees.

———————————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

———————————

**SUPPLEMENTAL BRIEF OF APPELLEES
ADDRESSING *UNITED STATES V. RAHIMI***

———————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*

JACQUELINE C. ROMERO
  *United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT
KEVIN B. SOTER
  *Attorneys, Appellate Staff
  Civil Division, Room 7222
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 305-1754*

# TABLE OF CONTENTS

**Page**

ARGUMENT ............................................................................................... 1

THE COURT'S PRIOR ANALYSIS IN THIS CASE IS INCONSISTENT WITH THE
SUPREME COURT'S SUBSEQUENT DECISION IN *RAHIMI*. .......................... 1

A.   *Rahimi* corrects several misconceptions regarding the
analytical framework set forth in *Bruen*. ...................................... 1

B.   Under *Rahimi*, Range's constitutional challenge to Section
922(g)(1) fails. ............................................................................ 7

1.   History and tradition reflect that legislatures may
disarm persons who have committed serious crimes
and persons whose possession of firearms would
endanger themselves or others ............................................ 9

2.   *Rahimi* directs courts to identify a permissible category
of firearm regulation and decide whether the
challenged law fits that category ....................................... 23

3.   *Rahimi*'s methodology does not leave room for a
person to obtain an as-applied exemption from Section
922(g)(1) based on the nature of his crime or his
individual circumstances ................................................... 25

CONCLUSION .......................................................................................... 29

COMBINED CERTIFICATIONS

# TABLE OF AUTHORITIES

**Cases:**                                                                 **Page(s)**

*Adoptive Couple v. Baby Girl*,
  570 U.S. 637 (2013) .................................................................................. 15

*Austin v. United States*,
  509 U.S. 602 (1993) .................................................................................. 11

*Avery v. Everett*,
  18 N.E. 148 (N.Y. 1888) ........................................................................... 11

*Beauharnais v. Illinois*,
  343 U.S. 250 (1952) .................................................................................. 15

*Binderup v. Attorney Gen.*,
  836 F.3d 336 (3d Cir. 2016) ...................................................................... 22

*Bucklew v. Precythe*,
  587 U.S. 119 (2019) .................................................................................. 10

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
  596 U.S. 61 (2022) .................................................................................... 18

*Cruzan v. Director, Mo. Dep't of Health*,
  497 U.S. 261 (1990) .................................................................................. 15

*Dickerson v. New Banner Inst., Inc.*,
  460 U.S. 103 (1983) .................................................................................. 22

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ................................................ 7, 14-15, 15, 16, 23, 24

*Kanter v. Barr*,
  919 F.3d 437 (7th Cir. 2019) .................................................................... 24

*Lara v. Commissioner Penn. State Police*,
   91 F.4th 122 (3d Cir. 2024), *petition for cert. filed*,
   No. 24-93 (U.S. July 25, 2024)..............................................................18, 19

*Lewis v. United States*,
   445 U.S. 55 (1980)...................................................................................... 22

*Lewis v. United States*,
   518 U.S. 322 (1996).................................................................................... 27

*McIntyre v. Ohio Elections Comm'n*,
   514 U.S. 334 (1995)...................................................................................... 5

*New York State Rifle & Pistol Ass'n v. Bruen*,
   597 U.S. 1 (2022) ..................................................... 1, 2, 3, 5, 6, 9, 23, 24

*New York State Rifle & Pistol Ass'n v. City of New York*,
   590 U.S. 336 (2020)...................................................................................... 7

*Range v. Attorney Gen.*,
   69 F.4th 96 (3d Cir. 2023), *cert. granted, judgment vacated*, No. 23-374,
   2024 WL 3259661 (U.S. July 2, 2024)............... 8-9, 10, 12, 14, 22, 24, 25, 28

*Rehaif v. United States*,
   588 U.S. 225 (2019).................................................................................... 17

*State v. Hogan*,
   58 N.E. 572 (1900) ..................................................................................... 20

*State v. Shelby*,
   2 S.W. 468 (1886)....................................................................................... 20

*United States v. Barton*,
   633 F.3d 168 (3d Cir. 2011), *overruled in part by*
   *Binderup v. Attorney General*, 836 F.3d 336 (3d Cir. 2016)........................ 21-22

*United States v. Bullock*,
   679 F. Supp. 3d 501 (S.D. Miss. 2023), *appeal pending*,
   No. 23-60408 (5th Cir. filed July 28, 2023)................................................. 27

*United States v. Canada*,
103 F.4th 257 (4th Cir. 2024) ..................................................... 29

*United States v. Dorsey*,
105 F.4th 526 (3d Cir. 2024) ...................................................... 28

*United States v. Duarte*,
101 F.4th 657 (9th Cir.), *vacated upon grant of reh'g en banc*,
No. 22-50048, 2024 WL 3443151 (9th Cir. July 17, 2024) ........................ 27

*United States v. Dubois*,
94 F.4th 1284 (11th Cir. 2024) ................................................... 29

*United States v. Everist*,
368 F.3d 517 (5th Cir. 2004) ...................................................... 21

*United States v. Gay*,
98 F.4th 843 (7th Cir. 2024) .................................................. 8, 29

*United States v. Harper*,
689 F. Supp. 3d 16 (M.D. Pa.), *appeal pending*,
No. 23-2604 (3d Cir. filed Sept. 6, 2023) ...................................... 26

*United States v. Jackson*,
69 F.4th 495 (8th Cir. 2023), *cert. granted, judgment vacated and remanded*,
No. 23-6170, 2024 WL 3259675 (U.S. July 2, 2024) ....................... 8, 23, 29

*United States v. Jenkins*,
697 F. Supp. 3d 380 (E.D. Pa. 2023) .......................................... 28

*United States v. Newkirk*,
No. 2:20-cr-623, 2024 WL 3518109 (D.N.J. July 23, 2024) ...................... 26

*United States v. Perez-Garcia*,
96 F.4th 1166 (9th Cir. 2024) .................................................... 6

*United States v. Prince*,
700 F. Supp. 3d 663 (N.D. Ill. 2023) .......................................... 27

iv

*United States v. Quailes*,
 688 F. Supp. 3d 184 (M.D. Pa.), *appeal pending*,
 No. 23-2533 (3d Cir. filed Aug. 24, 2023)................................................. 26

*United States v. Rahimi*,
 144 S. Ct. 1889 (2024) ............................................... 1, 2, 3, 4, 5, 6, 7, 9, 11,
 12, 18, 19, 21, 23, 24, 25, 29

*United States v. Skoien*,
 614 F.3d 638 (7th Cir. 2010) .................................................................... 21

*Vincent v. Garland*,
 80 F.4th 1197 (10th Cir. 2023), *cert. granted, judgment vacated and remanded*,
 No. 23-683, 2024 WL 3259668 (U.S. July 2, 2024)............................... 8, 29

*Williams v. Garland*,
 No. 17-cv-2641, 2023 WL 7646490 (E.D. Pa. Nov. 14, 2023),
 *appeal pending*, No. 24-1091 (3d Cir. filed Jan. 12, 2024) ........................... 26

**Statutes:**

Act of Feb. 26, 1925, ch. 260, § 2, 1925 Or. Gen. Laws 468......................... 17

Act of Mar. 5, 1925, ch. 47, § 2, 1925 Nev. Laws 54.................................... 17

Act of Mar. 7, 1923, ch. 266, § 5, 1923 N.D. Laws 380 ............................... 17

Act of Mar. 12, 1925, ch. 207, § 4, 1925 Ind. Laws 495-96........................... 17

Act of Apr. 29, 1925, ch. 284, § 4, 1925 Mass. Acts 323 ............................. 17

Act of April 30, 1790, ch. 9, § 14, 1 Stat. 112, 115 ...................................... 10

Act of May 4, 1923, ch. 118, § 3, 1923 N.H. Laws 138 ................................ 17

Act of June 2, 1927, No. 373, § 2, 1927 Mich. Acts 887-88 ........................... 17

Act of June 13, 1923, ch. 339, § 2, 1923 Cal. Stat. 696.................................. 17

Act of June 19, 1931, ch. 1098, § 2, 1931 Cal. Stat. 2316 .............................. 17

Act of Oct. 3, 1961, Pub. L. No. 87-342, § 2, 75 Stat. 757 ............................. 17

Federal Firearms Act, ch. 850, § 2(d), 52 Stat. 1250, 1251 (1938).............16, 20

Firearms Owners' Protection Act,
    Pub. L. No. 99-308, § 102(5)(D), 100 Stat. 449, 452 (1986)........................ 20

Gun Control Act of 1968,
    Pub. L. No. 90-618, § 102, 82 Stat. 1213, 1220 .......................................... 20

Omnibus Consolidated Appropriations Act, 1997,
    Pub. L. No. 104-208, tit. VI, § 658(b)(2), 110 Stat. 3009, 3009-372............. 21

18 U.S.C. § 922(g)(1) ...................................................................................... 1

18 U.S.C. § 922(g)(8) ...................................................................................... 2

**Other Authorities:**

Act of Dec. 1775, *in* 15 *The Public Records of the Colony of Connecticut From May,
    1775 to June 1776, inclusive* 193 (Charles J. Hoadly ed., 1890)...................... 13

Stuart Banner, *The Death Penalty: An American History* (2002) ........................ 10

4 William Blackstone, *Commentaries on the Laws of England* (1769)............10, 11

Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the
    Right to Bear Arms* (2008)........................................................................... 13

Letter from George Washington to Governor Cooke (Jan. 6, 1776), *in*
    3 *The Writings of George Washington* 323
    (Worthington Chauncey Ford ed., 1889)............................................... 13-14

Letter from John Marshall to Edward Livingston (Oct. 24, 1825),
    https://perma.cc/7A6W-GXK5.............................................................. 16

Edward Livingston, *A System of Penal Law for the State of Louisiana* (1824) ...... 15

Edward Livingston, *A System of Penal Law for the United States* (1828)............. 16

Elon H. Moore, *The Livingston Code*, 19 J. Am. Inst. Crim. L. &
Criminology 344 (1928).............................................................................. 16

Resolution of July 25-26, 1776, *in* 1 *American Archives: Fifth Series* 588
(Peter Force ed., 1848) .............................................................................. 13

Resolution of Mar. 13, 1776, *in Journal of the Provincial Congress of South
Carolina, 1776* (1776)................................................................................ 13

Resolutions of Sept. 1, 1775, *in* 1 *Journals of the Provincial Congress,
Provincial Convention, Committee of Safety and Council of Safety of the
State of New-York* 132 (1842) .................................................................... 13

Richard E. Finneran & Steven K. Luther, *Criminal Forfeiture and the Sixth
Amendment: The Role of the Jury at Common Law*,
35 Cardozo L. Rev. 1 (2013)...................................................................... 11

2 *The Documentary History of the Ratification of the Constitution* 598
(Merrill Jensen ed., 1976) ......................................................................... 14

On remand from the Supreme Court, this Court has directed the parties to address the impact of *United States v. Rahimi*, 144 S. Ct. 1889, 1897 (2024). Although *Rahimi* concerned a different provision than the one at issue here, the methodology adopted and applied by the Supreme Court undermines the methodology previously applied by this Court in assessing the constitutionality of 18 U.S.C. § 922(g)(1). Under *Rahimi*'s methodology, plaintiff Bryan Range's constitutional challenge to the federal felon-dispossession statute fails.

## ARGUMENT

### THE COURT'S PRIOR ANALYSIS IN THIS CASE IS INCONSISTENT WITH THE SUPREME COURT'S SUBSEQUENT DECISION IN *RAHIMI*.

**A.**   ***Rahimi* corrects several misconceptions regarding the analytical framework set forth in *Bruen*.**

In *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 19 (2022), the Supreme Court held that when a firearm regulation is challenged under the Second Amendment, courts must rely on "the Second Amendment's text, as informed by history." If the "plain text" of the Amendment "covers an individual's conduct," the regulation must be "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17.

In *United States v. Rahimi*, 144 S. Ct. 1889 (2024), the Supreme Court applied this historical-tradition test for the first time since *Bruen*. *Rahimi* did not delimit "'the full scope of the Second Amendment,'" and the Court's core

holding concerned "only" the specific statute at issue there. *Id.* at 1903 (quoting *Bruen*, 597 U.S. at 31). But it arises in the context of a broader set of recurring methodological questions regarding the Second Amendment in the wake of *Bruen*. And *Rahimi* made clear that, since *Bruen*, "some courts have misunderstood the methodology of [the Supreme Court's] recent Second Amendment cases." *Id.* at 1897. Those cases "were not meant to suggest a law trapped in amber." *Id.*

In *Rahimi*, the Court rejected a Second Amendment challenge to 18 U.S.C. § 922(g)(8), which prohibits the possession of firearms by individuals subject to certain domestic violence restraining orders. The Court emphasized that "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition," 144 S. Ct. at 1898, and that those principles "permit[] more than just regulations identical to ones that could be found in 1791," *id.* at 1897-98. Section 922(g)(8), the Court held, is consistent with the following historical principle: "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 1901.

As evidence of that historical principle, the Court relied upon "two distinct legal regimes," "[t]aken together": surety laws, which authorized magistrates to "require individuals suspected of future misbehavior to post a

bond," and "going armed" laws, which "provided a mechanism for punishing those who had menaced others with firearms." *Rahimi*, 144 S. Ct. at 1899-1901. There are a number of differences between these historical laws and Section 922(g)(8). For example, "[a]fter providing sureties, a person kept possession of all his firearms," and "[e]ven if he breached the peace," the penalty "was that he and his sureties had to pay a sum of money," rather than forfeit weapons or face imprisonment. *Id.* at 1939 (Thomas, J., dissenting). Likewise, "going armed" laws imposed a different burden than Section 922(g)(8) on arms-bearing because they "prohibited only carrying certain weapons . . . in a particular manner . . . and in particular places," and their justification was generally linked to "public" misconduct, not to the "conduct [the modern prohibition] seeks to prevent—interpersonal violence in the home." *Id.* at 1942-43.

The Court recognized that the challenged prohibition "is by no means identical to these founding era regimes" but held that "it does not need to be." *Rahimi*, 144 S. Ct. at 1901. Instead, it was sufficient that the prohibition "is 'relevantly similar'" to historical laws "in both why and how it burdens the Second Amendment right." *Id.* (quoting *Bruen*, 597 U.S. at 29). As to why, both the modern law and its historical antecedents regulate "individuals found to threaten the physical safety of another." *Id.* As to how, surety and going

armed laws, like Section 922(g)(8), "involved judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon." *Id.* at 1902. The Court further emphasized that "the penalty" for violating historical "going armed laws" included "imprisonment." *Id.* The Court reasoned that "if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible." *Id.*

The Supreme Court's analysis corrects several methodological misconceptions that are relevant in evaluating Range's challenge to Section 922(g)(1). *First*, *Rahimi* cautions against placing undue weight on the absence of historical firearms regulations on a particular topic. The Second Amendment "permits more than just those regulations identical to ones that could be found in 1791." *Rahimi*, 144 S. Ct. at 1897-98. As Justice Barrett emphasized in concurrence, "a test that demands overly specific analogues" would result in a "'law trapped in amber'" by "forc[ing] 21st-century regulations to follow late-18th-century policy choices." *Id.* at 1925 (Barrett, J., concurring). Such a test would also wrongly "assume[] that Founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority." *Id.* (Barrett, J., concurring).

4

Rejecting that incorrect view of legislative authority, the Court held that "the appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Id.* at 1898 (majority opinion) (emphasis added).

Accordingly, the Court was unpersuaded by the dissent's assertion that the statute at issue in *Rahimi*, which prohibits firearm possession by individuals subject to certain domestic violence restraining orders, violates the Second Amendment because "interpersonal violence" has existed since the Founding but the Founders addressed the problem "'through [the] materially different means' of surety laws." *Id.* at 1933 (Thomas, J., dissenting) (alteration in original) (quoting *Bruen*, 597 U.S. at 26). Under the dissent's approach, "the legislatures of today would be limited not by a distant generation's determination" that a law like Section 922(g)(8) "was unconstitutional, but by a distant generation's failure to consider that such a law might be necessary." *Id.* at 1905 (Sotomayor, J., concurring). The majority's principles-focused approach instructs courts not to mistakenly equate historical inaction with unconstitutionality. *Cf. McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 373 (1995) (Scalia, J., dissenting) ("Quite obviously, not every restriction upon expression that did not exist in 1791 or in 1868 is *ipso facto* unconstitutional. . . .").

*Second*, *Rahimi* indicates that in consulting historical regulations to discern why and how they burdened the right to bear arms, a court's role is not to nitpick, isolating each historical precursor and asking if it differs from the challenged regulation in some way. Such a "divide-and-conquer approach to the historical evidence," *United States v. Perez-Garcia*, 96 F.4th 1166, 1191 (9th Cir. 2024), would be inconsistent with the Court's assurances that "a 'historical *twin*' is not required," *Rahimi*, 144 S. Ct. at 1903 (quoting *Bruen*, 597 U.S. at 30). In *Rahimi* itself, the Court derived the relevant principle from "two distinct legal regimes" (surety laws and going armed laws), "[t]aken together." *Id.* at 1899-1901. The dissent criticized the Court for "cobbl[ing] together" multiple historical laws to discern a general principle rather than demanding a closer match to the why and how of "a single historical law," *id.* at 1944 (Thomas, J., dissenting), but the majority's principles-focused approach is not so onerous.

*Third*, *Rahimi* indicates that post-ratification history can be relevant to the historical inquiry if Founding-era history is ambiguous. Justice Kavanaugh explained that "[p]ost-ratification interpretations and applications by government actors—at least when reasonably consistent and longstanding— can be probative of the meaning of vague constitutional text." *Rahimi*, 144 S. Ct. at 1916 (Kavanaugh, J., concurring). Justice Barrett also recognized that

6

post-ratification history can be "an important tool." *Id.* at 1924 (Barrett, J., concurring).

**B.    Under *Rahimi*, Range's constitutional challenge to Section 922(g)(1) fails.**

As an initial matter, in addition to the general historical-tradition test addressed in *Rahimi*, the Supreme Court has repeatedly provided specific assurances that its precedents do not "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," which the Court has described as "presumptively lawful." *District of Columbia v. Heller*, 554 U.S. 570, 626-27, 627 n.26 (2008).  In *Rahimi*, the Court gave effect to these reassurances in rejecting the respondent's argument that Congress cannot bar firearm possession in the home and in emphasizing that nothing in the Court's historical analysis is intended to "suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse."  144 S. Ct. at 1901-02.  Justices have joined the Court's opinions in various cases, including *Rahimi*, on the understanding that these assurances from *Heller* reflect "traditional exceptions to the right" to bear arms that have already been "recognized."  *Id.* at 1923 (Kavanaugh, J., concurring); *see also, e.g.*, *New York State Rifle & Pistol Ass'n v. City of New York*, 590 U.S. 336, 364 (2020) (Alito, J.,

dissenting) (stating that the Court has "recognized that history supported the constitutionality" of laws "prohibiting possession by felons").

Two courts of appeals to consider the issue after *Bruen* have recognized that *Heller*'s assurances regarding felon-dispossession statutes foreclose individualized as-applied challenges to Section 922(g)(1), and a third has relied on these assurances while also independently concluding that the historical record forecloses such challenges. *See Vincent v. Garland*, 80 F.4th 1197, 1202 (10th Cir. 2023) (reaffirming circuit precedent foreclosing as-applied challenges based on *Heller*'s assurances), *cert. granted, judgment vacated and remanded*, No. 23-683, 2024 WL 3259668 (U.S. July 2, 2024); *United States v. Dubois*, 94 F.4th 1284, 1293 (11th Cir. 2024) (same); *United States v. Jackson*, 69 F.4th 495, 501-02 (8th Cir. 2023) (relying on "these assurances by the Supreme Court, and the history that supports them"), *cert. granted, judgment vacated and remanded*, No. 23-6170, 2024 WL 3259675 (U.S. July 2, 2024). *Rahimi* provides further support for the conclusions reached by the Eighth, Tenth, and Eleventh Circuits.

We respectfully urge that this Court should revisit its conclusion that application of the felon-dispossession statute to plaintiff Bryan Range is not "'consistent with the Nation's historical tradition of firearm regulation.'" *Range v. Attorney General*, 69 F.4th 96, 101-06 (3d Cir. 2023) (en banc) (quoting

*Bruen*, 597 U.S. at 24), *cert. granted, judgment vacated*, No. 23-374, 2024 WL

3259661 (U.S. July 2, 2024).  The Court's prior analysis is inconsistent not

only with the Supreme Court's reassurances regarding the constitutionality of

felon-dispossession statutes but also with *Rahimi*'s articulation and application

of the historical-tradition test.[1]

### 1. History and tradition reflect that legislatures may disarm persons who have committed serious crimes and persons whose possession of firearms would endanger themselves or others.

Historical tradition establishes at least two principles that support felon

disarmament: (1) legislatures may disarm persons who have been convicted of

serious crimes; and (2) legislatures may disarm "categories of persons thought

by a legislature to present a special danger of misuse," *Rahimi*, 144 S. Ct. at

1901 (reserving this issue).  Each principle provides an independent ground for

disarming persons subject to Section 922(g)(1)'s disqualification, including

Range.

---

[1] As detailed in the petition for a writ of certiorari in this case, the government maintains that felons are not among "the people" protected by the Second Amendment.  Petition for a Writ of Certiorari at 8-13, *Garland v. Range*, No. 23-374 (U.S. Oct. 5, 2023), 2023 WL 6623648 (*Range* Pet.).  This supplemental brief focuses on the government's additional arguments that Section 922(g)(1)'s application to Range is consistent with Supreme Court precedent and historical tradition, *see id.* at 8-10, 13-22, because these are the issues most directly affected by *Rahimi*.

### a.　Disarmament due to serious criminal convictions.

The principle that legislatures may disarm persons who have been convicted of serious crimes follows naturally from three types of historical evidence: Founding-era felony punishment laws, Founding-era disarmament laws, and post-ratification felon-disarmament laws.

*Founding-era felony punishment laws.*　As this Court recognized in its prior opinion, the Founding generation determined that many criminal offenses were of such "gravity" that they should "expose offenders to the harshest of punishments," including death. *Range*, 69 F.4th at 105. Indeed, "death was 'the standard penalty for all serious crimes' at the time of the founding." *Bucklew v. Precythe*, 587 U.S. 119, 129 (2019) (quoting Stuart Banner, *The Death Penalty: An American History* 23 (2002)). That penalty extended even to non-violent crimes, such as forgery, horse theft, and many others. *See Range*, 69 F.4th at 105; *see also* Act of April 30, 1790, ch. 9, § 14, 1 Stat. 112, 115 (law passed by First Congress making forgery a capital offense); Banner, *supra*, at 7-8 (discussing capital punishment for a variety of non-violent offenses).

At common law, felons generally also forfeited their lands, goods, and chattels. *See* 4 William Blackstone, *Commentaries on the Laws of England* 380-389 (1769); *see also Range*, 69 F.4th at 102, 105 (recognizing that felonies at

common law were "punishable by estate forfeiture and even death"). That rule—which reflected the belief that "property was a right derived from society which one lost by violating society's laws," *Austin v. United States*, 509 U.S. 602, 612 (1993)—took hold in the colonies. *See* Richard E. Finneran & Steven K. Luther, *Criminal Forfeiture and the Sixth Amendment: The Role of the Jury at Common Law*, 35 Cardozo L. Rev. 1, 35-41 (2013).

Moreover, a felon who was sentenced to death was deemed "already dead in law" even before his execution. 4 Blackstone, *supra*, at 374. That status, known as civil death, involved "an extinction of civil rights, more or less complete." *Avery v. Everett*, 18 N.E. 148, 150 (N.Y. 1888). A convicted felon thus had no "right to vote, to sit as a juror, *to bear arms*, to marry, and [to] hold office." *Id.* at 156 (Earl, J., dissenting) (emphasis added).

Section 922(g)(1) is "relevantly similar" to those Founding-era laws "in both why and how it burdens the Second Amendment right." *Rahimi*, 144 S. Ct. at 1901. As for why: Section 922(g)(1) likewise applies because an individual has been convicted of a felony. As for how: The burden imposed by Section 922(g)(1) is far more modest than those imposed by Founding-era criminal laws. If legislatures at the Founding could deprive convicted felons of the right to life, the right to own property, and all other civil and political

rights, then legislatures today certainly may deprive them of the right to possess firearms.

This Court's prior opinion stated that "[t]he greater" authority to execute felons (and subject them to civil death) "does not necessarily include the lesser" authority to disarm them. *Range*, 69 F.4th at 105. But in *Rahimi*, the Supreme Court relied on a similar logic as part of its principles-focused approach to analogical reasoning. The Court noted that historical "going armed laws provided for imprisonment." *Rahimi*, 144 S. Ct. at 1902. The Court then explained that, "if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible." *Id.* Applying *Rahimi*'s principles-focused approach here, the Court should recognize that because capital punishment and the denial of all civil and political rights were permissible to respond to the commission of a felony at the Founding, the lesser restriction of disarmament is also permissible.

***Founding-era disarmament laws.*** Because death was the standard penalty for all serious crimes at the Founding, early legislatures had little occasion to consider whether to disarm convicted criminals who were not executed. Even so, the available historical evidence shows that the "exclusion of criminals from the individual right to keep and bear arms . . . was understood" legislative

power.  *See* Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008).

For example, several colonies enacted such disarmament laws during the Revolution.  A New York law provided that a person would "be disarmed" upon conviction for furnishing provisions to the British army or for opposing the authority of the Continental Congress.  Resolutions of Sept. 1, 1775, *in* 1 *Journals of the Provincial Congress, Provincial Convention, Committee of Safety and Council of Safety of the State of New-York* 132 (1842).  A South Carolina law provided that a person would "be disarmed" upon "due conviction" for bearing arms against, or opposing the measures of, the Continental Congress.  Resolution of Mar. 13, 1776, *in Journal of the Provincial Congress of South Carolina, 1776*, at 77 (1776).  Hampshire County, Massachusetts, ordered that "all persons that shall be convicted of being notoriously inimical to the cause of American Liberty, be disarmed."  Resolution of July 25-26, 1776, *in* 1 *American Archives: Fifth Series* 588 (Peter Force ed., 1848) (emphasis omitted).  And a Connecticut law provided that anyone "duly convicted" of seditious libel "shall be disarmed and not allowed to have or keep any arms."  Act of Dec. 1775, *in* 15 *The Public Records of the Colony of Connecticut From May, 1775 to June 1776, inclusive* 193 (Charles J. Hoadly ed., 1890); *see also* Letter from George Washington to Governor Cooke (Jan. 6, 1776), *in* 3 *The Writings of*

*George Washington* 323 (Worthington Chauncey Ford ed., 1889) (stating that
"the other colonies ought to adopt similar" measures).

The Court's prior opinion in this case distinguished Founding-era laws
that "disarmed groups . . . like Loyalists" based on its view that Range is not
"part of a similar group today." *Range*, 69 F.4th at 105. But under *Rahimi*'s
principles-based approach, the laws disarming loyalists at least support the
principle—evident from other laws as well—that those who commit serious
crimes may be disarmed. The relevant issue is not whether Range is similar to
a Founding-era loyalist in all respects, but rather whether Congress's
determination to disarm felons is consistent with the enduring principles that
follow from the historical evidence as a whole.

Moreover, the principle that legislatures could properly disarm convicted
criminals persisted after the Revolution. At Pennsylvania's ratifying
convention, Anti-Federalists proposed a bill of rights that, among other things,
would have prohibited "disarming the people or any of them, *unless for crimes
committed*, or real danger of public injury from individuals." 2 *The Documentary
History of the Ratification of the Constitution* 598 (Merrill Jensen ed., 1976)
(emphasis added). The Federalists, who considered a bill of rights
unnecessary, defeated the proposal, but the Anti-Federalists published it in the
"highly influential" Dissent of the Minority of the Convention. *Heller*, 554

U.S. at 604; *see id.* at 624.  "Given the Anti-Federalists' vehement opposition"

to federal power, *Adoptive Couple v. Baby Girl*, 570 U.S. 637, 664 (2013)

(Thomas, J., concurring), it is telling that even they accepted the disarmament

of convicted criminals.

Evidence from the early 19th century confirms that the Second

Amendment was understood to permit the disarmament of convicted

criminals.  Edward Livingston, one of the Nation's early leading lawyers,

proposed model legal codes for Louisiana and then for the United States that

have been cited by the Supreme Court as evidence of the types of laws that

would have been considered permissible at the Founding.  *See Beauharnais v.

Illinois*, 343 U.S. 250, 255 n.4 (1952); *see also Cruzan v. Director, Mo. Dep't of

Health*, 497 U.S. 261, 294 (1990) (Scalia, J., concurring).  Livingston's

proposed codes, which did not provide for capital punishment, listed the

"suspension" and permanent "forfeiture" of "political or civil rights"—

including the "right of bearing arms in defence of the country"—as among the

punishments courts could impose.  *See* Edward Livingston, *A System of Penal

Law for the State of Louisiana* 26-27, 29 (1824); *id.* at 49 (seven years of

imprisonment and permanent disarmament for perjury); *id.* at 73 (fifteen years

of imprisonment and permanent disarmament for forgery); *id.* at 138 (one year

of imprisonment and five years of disarmament for fraudulent interference

with an inheritance); Edward Livingston, *A System of Penal Law for the United States* 19-20, 40, 79, 126 (1828) (similar provisions in model penal code for the United States).

Although Livingston's codes were not ultimately adopted, his proposals won wide acclaim from Founders including Jefferson, Madison, and Story. *See* Elon H. Moore, *The Livingston Code*, 19 J. Am. Inst. Crim. L. & Criminology 344, 345, 354 (1928). Chief Justice Marshall, who read one of these codes "with attention and interest," wrote to Livingston: "Among your penalties a deprivation of civil and political rights is frequently introduced. I believe no former legislator has relied sufficiently on this provision; and I have strong hopes for its efficacy." Letter from John Marshall to Edward Livingston (Oct. 24, 1825), https://perma.cc/7A6W-GXK5. Chief Justice Marshall evidently did not believe that those deprivations raised any constitutional concerns.

***Felon-disarmament laws.*** Laws prohibiting convicted criminals from possessing firearms are themselves sufficiently "longstanding" to form part of the Nation's tradition of firearm regulation. *Heller*, 554 U.S. at 626. The United States has a century-old tradition of disarming *violent* criminals (regardless of whether their crimes constitute felonies). *See, e.g.*, Federal Firearms Act, ch. 850, § 2(d), 52 Stat. 1250, 1251 (1938). And the United

States also has a century-old tradition of disarming convicted *felons* (regardless of whether their crimes are violent):  In the 1920s and 1930s, legislatures began to prohibit the possession of handguns by those who had been convicted of felonies against person or property (a category that included nonviolent property crimes such as theft).[2]  At around the same time, other legislatures began to prohibit the possession or purchase of handguns by felons in general.[3]  Congress followed the latter model in 1961, when it forbade the receipt of a firearm by anyone convicted of a crime punishable by more than a year of imprisonment.  *See* Act of Oct. 3, 1961, Pub. L. No. 87-342, § 2, 75 Stat. 757.  Today, at the federal level, Section 922(g)(1) is by far the most commonly applied firearm disqualification in Section 922(g), a statute that "probably does more to combat gun violence than any other federal law."  *Rehaif v. United States*, 588 U.S. 225, 239 (2019) (Alito, J., dissenting).  And every single State and territory has enacted some form of felon-disarmament law.  *See* Defendants' Motion to Dismiss Amended Complaint at 20 nn.9-10, *Atkinson v.*

---

[2] *See* Act of Mar. 7, 1923, ch. 266, § 5, 1923 N.D. Laws 380; Act of May 4, 1923, ch. 118, § 3, 1923 N.H. Laws 138; Act of June 13, 1923, ch. 339, § 2, 1923 Cal. Stat. 696; Act of Feb. 26, 1925, ch. 260, § 2, 1925 Or. Gen. Laws 468; Act of Mar. 12, 1925, ch. 207, § 4, 1925 Ind. Laws 495-96.

[3] *See* Act of Mar. 5, 1925, ch. 47, § 2, 1925 Nev. Laws 54; Act of Apr. 29, 1925, ch. 284, § 4, 1925 Mass. Acts 323; Act of June 2, 1927, No. 373, § 2, 1927 Mich. Acts 887-88; Act of June 19, 1931, ch. 1098, § 2, 1931 Cal. Stat. 2316.

*Garland*, No. 1:21-cv-291 (N.D. Ill. July 15, 2024), Dkt. No. 40-1 (collecting sources).

The century-old, nationwide tradition of disarming convicted felons (including non-violent felons) confirms the correct result in this case. Although post-ratification evidence cannot overcome clear constitutional text, "the Framers themselves intended that post-ratification history would shed light on the meaning of vague constitutional text." *Rahimi*, 144 S. Ct. at 1917 (Kavanaugh, J., concurring); *see also id.* at 1924 (Barrett, J., concurring) (recognizing that post-ratification history can be "an important tool"). And the Supreme Court has often relied on post-ratification history, including history from long after the Founding, in resolving constitutional ambiguities. *See, e.g.*, *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 75 (2022) ("[F]or the last 50-plus years, federal, state, and local jurisdictions have repeatedly relied upon on-/off-premises distinctions. . . ."); *see also Rahimi*, 144 S. Ct. at 1918-19 (Kavanaugh, J., concurring) (collecting numerous additional examples).[4]

---

[4] In *Lara v. Commissioner Pennsylvania State Police*, 91 F.4th 122 (3d Cir. 2024), *petition for cert. filed*, No. 24-93 (U.S. July 25, 2024), this Court held that "the Second Amendment should be understood according to its public meaning in 1791," and then "set aside" a "catalogue of statutes from the mid-to-late nineteenth century." The subsequent decision in *Rahimi* supports our reliance on the post-Founding history discussed above. In any event, the result

*Continued on next page.*

### b. Disarmament of groups deemed dangerous by a legislature

In addition, the United States has a longstanding tradition of disarming persons whose possession of firearms poses a danger to themselves or others. *Rahimi* involved one aspect of that tradition: disarmament based on a court's finding that a particular individual poses such a danger. *See Rahimi*, 144 S. Ct. at 1896. This case involves another aspect of that tradition, which *Rahimi* did not pass upon: disarmament of "categories of persons thought by a legislature to present a special danger of misuse." *Id.* at 1901.

Beyond the Founding-era disarmament laws discussed above that categorically disarmed groups such as loyalists, throughout the 19th century, American legislatures disarmed classes of individuals who posed a danger of misusing firearms. At least 29 jurisdictions banned or restricted the sale of firearms to, or the possession of firearms by, individuals below specified ages. *See* Brief for the United States at 24 n.16, *Rahimi*, 144 S. Ct. 1889 (No. 22-915), 2023 WL 5322645 (collecting citations). Several States banned the sale of firearms to persons of unsound mind. *Id.* at 25 n.17. At least a dozen States

---

in this case is not affected by *Lara*'s "timeframe question," *id.* at 133, because as discussed, in 1791 the public understood that persons convicted of serious crimes could be disarmed.

disarmed "tramps"—that is, vagrants.  *Id.* at 25 n.18.  And some States forbade intoxicated persons from buying or carrying firearms.  *Id.* at 26 n.19.

State courts upheld those laws, even though the laws did not require an individualized assessment of danger.  The Missouri Supreme Court, for example, upheld a ban on carrying arms while intoxicated as a "reasonable regulation" that prevented the "mischief to be apprehended from an intoxicated person going abroad with fire-arms."  *State v. Shelby*, 2 S.W. 468, 469 (1886).  And the Ohio Supreme Court explained that a law disarming "tramps" was consistent with the right to bear arms because that right "was never intended as a warrant for vicious persons to carry weapons with which to terrorize others."  *State v. Hogan*, 58 N.E. 572, 575 (1900).

The tradition of making such categorical judgments continued into the 20th century.  In the 1930s, Congress disqualified fugitives and persons under felony indictment.  *See* Federal Firearms Act, 52 Stat. at 1251.  In the 1960s, Congress disqualified drug users, drug addicts, and persons with mental illnesses.  *See* Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1213, 1220.  In the 1980s, Congress disqualified noncitizens who are unlawfully present in the United States and persons who have been dishonorably discharged from the Armed Forces.  *See* Firearms Owners' Protection Act, Pub. L. No. 99-308, § 102(5)(D), 100 Stat. 449, 452 (1986).

And in the 1990s, it disarmed domestic-violence misdemeanants. *See* Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, tit. VI, § 658(b)(2), 110 Stat. 3009, 3009-372.

In short, legislatures' power to make categorical judgments about dangerousness is one of "the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. As the Seventh Circuit put it, "[t]hat *some* categorical limits are proper is part of the original meaning" of the Second Amendment. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc). When 18th- and 19th-century legislatures enacted laws categorically disarming loyalists, minors, and vagrants, they did not require case-by-case findings of dangerousness. Nor have legislatures required such findings when enacting legislation disarming the categories of persons deemed to pose a special danger with firearms today, including persons who are mentally ill, drug users, and others in addition to felons.

Section 922(g)(1) is consistent with that tradition of imposing categorical limits on the right to keep and bear arms. Someone who commits a felony offense "has shown manifest disregard for the rights of others." *United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004). It is therefore unsurprising that "felons are more likely to commit violent crimes" than are law-abiding individuals. *United States v. Barton*, 633 F.3d 168, 175 (3d Cir. 2011), *overruled*

*in part by Binderup v. Attorney General*, 836 F.3d 336, 349-50 (3d Cir. 2016) (en banc). The Supreme Court has repeatedly recognized that persons who have been "convicted of serious crimes," as a class, can "be expected to misuse" firearms. *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 119 (1983); *see, e.g.*, *Lewis v. United States*, 445 U.S. 55, 67 (1980) ("The federal gun laws . . . [focus on the] fact of conviction . . . in order to keep firearms away from potentially dangerous persons."). And "numerous studies" show a "link between past criminal conduct and future crime, including gun violence." *Binderup*, 836 F.3d at 400 (Fuentes, J., concurring in part, dissenting in part, and dissenting from the judgments); *see id.* at 400 n.160 (collecting studies).

Range has argued that dangerousness is the *only* principle that could support felon disarmament and that he cannot be disarmed based on Congress's categorical dangerousness assessment. *See, e.g.*, *Range*, 69 F.4th at 104 n.9. That assertion was rejected by a majority of this Court in *Binderup* and again in subsequent cases, *see id.*, and is at odds with the historical evidence detailed above. In any event, Range has failed to offer the Court a historically principled or judicially administrable basis for assessing particular felons' dangerousness. On the contrary, even "if dangerousness is considered the traditional *sine qua non* for dispossession," then "the prohibition on

22

possession by convicted felons still passes muster under historical analysis."

*Jackson*, 69 F.4th at 504.

**2.** **Rahimi directs courts to identify a permissible category of firearm regulation and decide whether the challenged law fits that category.**

The approach this Court adopted in its prior opinion is inconsistent with *Rahimi*'s overall methodology for deriving and applying "the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. In determining whether Section 922(g)(1)'s application to Range is consistent with historical tradition, it is appropriate to follow the steps that were set forth in *Rahimi* itself.

The Court should first examine the historical evidence as a whole to determine whether it establishes a category of permissible regulation. The Supreme Court has already identified several such categories, such as laws concerning "dangerous and unusual weapons," *Bruen*, 597 U.S. at 21, 47 (quoting *Heller*, 554 U.S. at 627), laws prohibiting the carry of firearms in "sensitive places," *id.* at 30, and laws that "disarm individuals who present a credible threat to the physical safety of others," *Rahimi*, 144 S. Ct. at 1902.

The two principles discussed above provide additional guidance: (1) legislatures may disarm persons who have been convicted of serious crimes; and (2) legislatures may disarm categories of persons thought by a legislature

23

to present a special danger of misuse. These principles are supported by history, are framed at the "right level of generality," *Rahimi*, 144 S. Ct. at 1926 (Barrett, J., concurring), and apply to "Range's situation," *Range*, 69 F.4th at 105. *Rahimi* directs courts to identify principles; "[p]eople like Range," *id.* at 106, is not a historically grounded principle.

After establishing the relevant category (or categories) of permissible regulation, the Court must then determine whether the challenged law fits within that category (or categories). In doing so, what matters is whether application of Section 922(g)(1) today comports with relevant historical principles, regardless of whether criminal offenses similar to Range's were specifically associated with disarmament in the Founding era. *Cf. Bruen*, 597 U.S. at 47 (making clear that in applying the principle that legislatures may prohibit "'dangerous and unusual weapons,'" the governing test looks to the use of the weapons "today" (quoting *Heller*, 554 U.S. at 627)); *Kanter v. Barr*, 919 F.3d 437, 464 (7th Cir. 2019) (Barrett, J., dissenting) (reasoning that a legislature may disarm a category of persons "based on present-day judgments" about the appropriate scope of that category).

This approach does not afford legislatures more "deference" than the Second Amendment permits. *Range*, 69 F.4th at 103. Congress's authority to disarm persons convicted of serious crimes and categories of persons who

present a special danger of firearms misuse is subject to meaningful, judicially enforceable limits. Our argument here is not that Range may be disarmed solely on the basis that "he is not 'responsible,'" *Rahimi*, 144 S. Ct. at 1903, nor are we contending that Range's welfare fraud conviction would allow Congress to disarm him as a non-"law-abiding citizen" if the conviction had been for a "summary offense[]" or a "petty misdemeanor[]," *Range*, 69 F.4th at 102. Courts may properly review a disqualification's breadth, as well as a legislature's judgment that a category of persons committed offenses that are serious or that indicate they would pose a danger if armed. Courts may ask, for example, whether these judgments are supported by evidence, common sense, or the judgments of other American legislatures today or over time. What courts may not do is place undue weight on past generations' failure to regulate identical conduct. *See Rahimi*, 144 S. Ct. at 1906 (Barrett, J., concurring) (describing a "'use it or lose it' view of legislative authority" as a "flawed" assumption that is not what originalism calls for).

**3.** *Rahimi*'s **methodology does not leave room for a person to obtain an as-applied exemption from Section 922(g)(1) based on the nature of his crime or his individual circumstances.**

As the government detailed in its petition for a writ of certiorari in this case, courts should interpret the Second Amendment in line with other constitutional provisions, which generally distinguish among types of crimes

based on the maximum authorized penalty. A regime of individualized as-applied challenges is unsound in principle and unworkable in practice. *Range* Pet. 19-22, 2023 WL 6623648.

Experience in this Circuit since issuance of the prior decision illustrates some of the problems involved in establishing a judicial regime of individualized challenges to Section 922(g)(1). While many challenges to Section 922(g)(1) have correctly been rejected, *see, e.g.*, *United States v. Newkirk*, No. 2:20-cr-623, 2024 WL 3518109 (D.N.J. July 23, 2024), some district courts in this Circuit have relied on the Court's prior opinion to hold Section 922(g)(1) unconstitutional as applied to persons convicted of felony drug trafficking, robbery, and other offenses that bear little resemblance to Range's, including in the following cases:

- *United States v. Quailes*, 688 F. Supp. 3d 184, 187-88 (M.D. Pa.), *appeal pending*, No. 23-2533 (3d Cir. filed Aug. 24, 2023): six felony convictions, four of which were for drug trafficking.

- *United States v. Harper*, 689 F. Supp. 3d 16, 19-20 (M.D. Pa.), *appeal pending*, No. 23-2604 (3d Cir. filed Sept. 6, 2023): 13 felony convictions, including five for robbery and four for drug trafficking.

- *Williams v. Garland*, No. 17-cv-2641, 2023 WL 7646490, at *1 (E.D. Pa. Nov. 14, 2023), *appeal pending*, No. 24-1091 (3d Cir. filed Jan. 12, 2024): recidivist drunk-driving offense punishable by five years' imprisonment.

Many courts outside this Circuit have likewise relied on this Court's reasoning to hold Section 922(g)(1) unconstitutional in a variety of contexts, including:

- *United States v. Duarte*, 101 F.4th 657, 661-63 (9th Cir.), *vacated upon grant of reh'g en banc*, No. 22-50048, 2024 WL 3443151 (9th Cir. July 17, 2024): five felony convictions, including possession of a firearm by a felon and possession of a controlled substance for sale.

- *United States v. Bullock*, 679 F. Supp. 3d 501, 505-06, 506 n.2 (S.D. Miss. 2023), *appeal pending*, No. 23-60408 (5th Cir. filed July 28, 2023): felony convictions for manslaughter, aggravated assault, fleeing law enforcement, and attempted aggravated assault of a law-enforcement officer.

- *United States v. Prince*, 700 F. Supp. 3d 663, 675-76 (N.D. Ill. 2023), *appeal pending*, No. 23-3155 (7th Cir. filed Nov. 8, 2023): held that Section 922(g)(1) is facially unconstitutional.

To the extent the Court's prior opinion placed dispositive weight on the nature of Range's disqualifying offense, it did not explain what features of that offense distinguish it from other crimes meeting the common definition of felony. And the historical record, when viewed through *Rahimi*'s principles-based approach, provides no sound basis for drawing such distinctions among felonies. As in other contexts, courts can and should rely on the maximum penalty authorized by the legislature, which provides an "objective indication[] of the seriousness with which society regards the offense." *Lewis v. United States*, 518 U.S. 322, 328 (1996) (quotation marks omitted).

If, by contrast, the Court treated as constitutionally significant factors *other* than the nature of Range's disqualifying offense, such as the age of his disqualifying conviction, his "limited" criminal history after that conviction, or his choice to comply with Section 922(g)(1) while challenging it through this declaratory-judgment action, *see Range*, 69 F.4th at 98-99, the opinion does not explain how those factors are relevant to the constitutional question or what weight they should carry. There may be numerous respects in which a given felon is not "like Range," 69 F.4th at 106, *see, e.g.*, *United States v. Moore*, No. 23-1843 (3d Cir. Aug. 2, 2024) (rejecting challenge to Section 922(g)(1)); *United States v. Dorsey*, 105 F.4th 526, 530 (3d Cir. 2024) (rejecting challenge to Section 922(g)(1) on plain-error review), but that is not an administrable or historically supported legal standard. As one district court observed, this Court's prior opinion does not provide "district courts meaningful criteria to evaluate why any dissimilarity" between Section 922(g)(1) and historical firearms regulations "is relevant (or not relevant) and which level of generality is to be employed in coming to a decision." *United States v. Jenkins*, 697 F. Supp. 3d 380, 392 (E.D. Pa. 2023).

Congress made a clear, administrable, and historically supported categorical judgment tying disarmament to a disqualifying crime's maximum punishment, and this Court's prior decision in this case departed from the

judicial consensus that Section 922(g)(1) comports with the Second Amendment.  That consensus has grown since the prior decision issued.  Since *Bruen*, three courts of appeals have concluded that there is no room for "felony-by-felony litigation regarding the constitutionality of § 922(g)(1)." *Jackson*, 69 F.4th at 502; *see also Vincent*, 80 F.4th at 1202; *Dubois*, 94 F.4th at 1293.  And two other circuits have imposed limits on such felony-by-felony litigation by holding that, even "assum[ing] for the sake of argument that there is *some* room for as-applied challenges" to Section 922(g)(1), the statute plainly has a variety of constitutional applications. *United States v. Gay*, 98 F.4th 843, 846 (7th Cir. 2024); *see also United States v. Canada*, 103 F.4th 257, 258 (4th Cir. 2024).

Because Section 922(g)(1) is "consistent with the principles that underpin our regulatory tradition," *Rahimi*, 144 S. Ct. 1898, this Court should reject Range's challenge to its constitutionality.

## CONCLUSION

For the foregoing reasons, the district court's August 31, 2021, judgment should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*

JACQUELINE C. ROMERO
  *United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT

  */s/ Kevin B. Soter*

KEVIN B. SOTER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7222*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *California Bar No. 324524*
  *(202) 305-1754*
  *kevin.b.soter@usdoj.gov*

August 2024

## COMBINED CERTIFICATIONS

1.      Government counsel are not required to be members of the bar of this Court.

2.      This brief complies with the Court's July 12 order because it contains 6,492 words, excluding the parts of the brief exempted under Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Calisto MT 14-point font, a proportionally spaced typeface.

3.      The text of the electronic version of this document is identical to the text of the hard copies that will be provided.

4.      This document was scanned for viruses using CrowdStrike Falcon Sensor version 7.15-18513.0, and no virus was detected.

*/s/ Kevin B. Soter*
Kevin B. Soter