No. 21-2835

In the
# United States Court of Appeals
for the Third Circuit

◆

**BRYAN DAVID RANGE,**

*Plaintiff-Appellant,*

v.

**ATTORNEY GENERAL OF THE UNITED STATES,** *et al.*,

*Defendants-Appellees,*

◆

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
Case No. 5:20-CV-03488-GEKP

◆

**SUPPLEMENTAL BRIEF OF PLAINTIFF-APPELLANT**

◆

| | |
|---|---|
| Michael P. Gottlieb | David H. Thompson |
| PA Bar No. 36678 | Peter A. Patterson |
| VANGROSSI & RECCHUITI | William V. Bergstrom |
| 319 Swede Street | COOPER & KIRK, PLLC |
| Norristown, PA 19401 | 1523 New Hampshire Ave., NW |
| Telephone: (610) 279-4200 | Washington, DC 20036 |
| mikem1a1@aol.com | Telephone: (202) 220-9600 |
| | dthompson@cooperkirk.com |

*Counsel for Plaintiff-Appellant*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION .....................................................................................................1

ARGUMENT .............................................................................................................3

    I.   *Rahimi*'s Narrow Holding That Section 922(g)(8) Is Facially Constitutional Does Not Bear Directly on the Constitutionality of Section 922(g)(1)............3

    II.  *Rahimi*'s Reasoning Confirms Range Cannot Be Disarmed For Life ............5

CONCLUSION ........................................................................................................14

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page**

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)..................................................................................3

*Folajtar v. United States*,
    980 F.3d 897 (3d Cir. 2020) ....................................................................12

*Garland v. Range*,
    No. 23-374, 2024 WL 3259661 (U.S. July 2, 2024) (Mem.)..........................2

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
    597 U.S. 1 (2022).............................................................................1, 3, 8, 9

*Range v. Att'y Gen.*,
    69 F.4th 96 (3d Cir. 2023) ..................... 5, 6, 7, 8, 9, 10, 11, 13, 14

*United States v. Rahimi*,
    144 S. Ct. 1889 (2024)........................ 1, 3, 4, 6, 7, 8, 9, 10, 12, 13

*Wellons v. Hall*,
    558 U.S. 220 (2010)..................................................................................2

**Other Authorities**

4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND (1769).......13

STEPHEN P. HALBROOK, FIREARMS LAW DESKBOOK (2023) ....................................9

Tr. of Oral Argument, *United States v. Rahimi*, No. 22-915 (Nov. 7, 2023) ..........11

## INTRODUCTION

In *United States v. Rahimi*, the Supreme Court "conclude[d] only this: An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." 144 S. Ct. 1889, 1903 (2024). On its face, *Rahimi*'s holding does not apply to Bryan Range. Indeed, Range's case is, in many ways, the opposite of *Rahimi*. *Rahimi* was a facial challenge to Section 922(g)(8); Range challenges Section 922(g)(1) only as applied to himself. *Rahimi* involved an extensive recent history of violent behavior that culminated in a court specifically finding that Rahimi posed a danger of physical violence to others; the Government has expressly "admit[ted]" that "Range has never engaged in violence, nor has he ever threatened anyone with violence," JA 171, and his only adverse legal finding was that, over thirty years ago, he made false statements about his income in an application for food stamps. *Rahimi* was temporarily disarmed for the duration of a restraining order; Range has been disarmed for over thirty years and, if Section 922(g)(1) is constitutional as applied to him, there is no end date for his disarmament.

*Rahimi* is not, therefore, directly relevant to this case. But in demonstrating an application of the framework laid out in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), it provides additional context to guide this Court in its historical analysis of the contours of the Second Amendment right.

1

On that front, it is entirely supportive of Range and reinforces the en banc majority's conclusion that Range cannot permanently be denied the right to possess firearms for lawful purposes, based merely on a 30-year-old non-violent conviction.

Given that *Rahimi* only bolsters the en banc majority's reasoning and calls none of this Court's previous conclusions into question, an appropriate response by this Court to the Supreme Court's order granting certiorari, vacating judgment, and remanding for further consideration, *see Garland v. Range*, No. 23-374, 2024 WL 3259661 (U.S. July 2, 2024) (Mem.), would be "summary reissuance of the same opinion," *Wellons v. Hall*, 558 U.S. 220, 228 (2010) (Scalia, J., dissenting). Indeed, to the extent *Rahimi* requires altering the previous en banc opinion in this case at all, the majority may simply insert additional reasons for rejecting the Government's arguments regarding Range at both the textual and historical level of the analysis, with cites to *Rahimi*, and the en banc dissenters should join the majority or at a minimum omit several of their arguments that are entirely out of bounds following that decision. But no other changes need to be made. This Court should therefore not delay in reaffirming its pre-*Rahimi* decision that Section 922(g)(1) is unconstitutional as applied to Range.

# ARGUMENT

**I.  *Rahimi*'s Narrow Holding That Section 922(g)(8) Is Facially Constitutional Does Not Bear Directly on the Constitutionality of Section 922(g)(1).**

In *Rahimi*, the Supreme Court held that 18 U.S.C. § 922(g)(8), which prohibits a person subject to a domestic violence restraining order from possessing a firearm for the duration of that restraining order, was not facially unconstitutional. Indeed, the Court said, it was constitutional as applied to Rahimi himself, because his restraining order "contain[ed] a finding that [he] pose[d] a credible threat to the physical safety of [his] intimate partner." *Rahimi*, 144 S Ct. at 1896.

In so holding, *Rahimi* implicitly found that the text of the Second Amendment (which extends, under *District of Columbia v. Heller*, to "all Americans," 554 U.S. 570, 581 (2008)), was implicated by Rahimi's challenge. The Court wasted no time discussing the text of the Second Amendment, but its brevity was itself noteworthy, for it demonstrated that the Second Amendment's presumptive protection of the rights of *all* "the people" is "unqualified." *Bruen*, 597 U.S. at 17.

Rather, the Court focused the entirety of its analysis on "considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. Examining the historical record, the Court noted that although going back to "the earliest days of the common law" there were examples of laws that permitted disarming certain groups (including

3

"political opponents [of the sovereign] and disfavored religious groups"), those laws were largely defunct by the Founding, with the exception of "regulations targeting individuals who physically threatened others." *Id.* at 1899. Those latter laws came in "two distinct legal regimes." *Id.* There were "surety laws" which "provided a mechanism for preventing violence before it occurred" by requiring an individual who was found to pose a risk of violence to post sureties which would be forfeit in case of criminal violence, *id.* at 1899–1900, and "going armed laws" which "provided a mechanism for punishing those who had menaced others with firearms" and punished "affray[ers]" with imprisonment and forfeiture of their arms, *id.* at 1900–01. Putting those two regulatory strands together, the Court found that history proved "what common sense suggests," namely that: "An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id.* at 1901, 1903.

That holding does not overlap with this case at all. Whereas Rahimi was temporarily disarmed after a court found he posed a threat of future violence, the Government would disarm Range for *life*, having admitted he's not a danger to anyone, JA 171, based only on a conviction for making false statements in an application for food stamp benefits. Therefore, just as before *Rahimi*, the burden remains on the Government to show that the Second Amendment's text, as informed

4

by history, supports permanent disarmament following a conviction wholly unrelated to violence or danger.

## II. *Rahimi*'s Reasoning Confirms Range Cannot Be Disarmed For Life.

At each point of its analysis, the en banc majority's opinion that Section 922(g)(1) is unconstitutional as applied to Range is bolstered, not undermined, by *Rahimi*. Beginning with the text of the Second Amendment, the majority held that Range was a member of "the people," despite the fact that he had been convicted of a crime. *Range v. Att'y Gen.*, 69 F.4th 96, 101 (3d Cir. 2023) (en banc). In so holding, the majority specifically rejected the Government's claim (also taken up by the dissenters) that when the Supreme Court had used the phrase "law-abiding, responsible citizens" to describe the plaintiffs in *Heller*, *McDonald*, and (several times) in *Bruen*, it had limited the textual scope of the Second Amendment to only individuals who were both "law-abiding" and "responsible." *Compare id.* at 101–03 (maj. op.), *with id.* at 114 (Schwartz, J., dissenting) *and id.* at 119 (Krause, J., dissenting). The majority noted that "the criminal histories of the plaintiffs in *Heller*, *McDonald*, and *Bruen* were not at issue in those cases" so the statements were dicta, not a definitive limitation on the textual scope of the right. *Id.* at 101. Furthermore, "the phrase 'law-abiding, responsible citizens' is as expansive as it is vague," and "the Government's claim that only 'law-abiding, responsible citizens' are protected by the Second Amendment devolves authority to legislators to decide whom to

5

exclude from 'the people,' " a proposition that is antithetical to the very nature of constitutional rights. *Id.* at 102.

This tracks *Rahimi* perfectly. Although *Rahimi* did not spend any time specifically discussing the text of the Second Amendment, it did go out of its way to "reject the Government's contention that Rahimi may be disarmed simply because he is not 'responsible.' " *Rahimi*, 144 S. Ct. at 1903 (citation omitted). Just like the en banc majority, *Rahimi* criticized the Government's proffered rule as "vague," noting it was "unclear what such a rule would entail." *Id.* It rejected the suggestion that any such rule could be derived from its Second Amendment precedents, explaining that while, in the past, it had "used the term 'responsible' to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right[,] . . . those decisions did not define the term and said nothing about the status of citizens who were not 'responsible.' The question was simply not presented." *Id.* And though *Rahimi* discussed specifically the "responsible" adjective, its criticisms of the Government's position extend with equal force to the references to "law-abiding" citizens in those same cases. The Supreme Court used the terms in the same way (often together) in *Bruen* and *Heller*, neither of which confronted the question of the status of *non*-law abiding people vis-à-vis the Second Amendment, and "law abiding" and "responsible" are equally indefinite terms subject to the same sort of legislative manipulation. *See Range*, 69 F.4th at 102 ("Who are 'law-abiding'

6

citizens in this context? Does it exclude those who have committed summary offenses or petty misdemeanors, which typically result in a ticket and a small fine? No."). Justice Thomas, in dissent, equated the two phrases, explaining that "the 'law-abiding, dangerous citizen' test is the Government's own creation, designed to justify every one of its existing regulations. It has no doctrinal or constitutional mooring," and "[n]ot a single member of the Court adopts the Government's theory." *Rahimi*, 144 S. Ct. at 1944–45 (Thomas, J., dissenting).

*Rahimi* aligns with the majority's historical analysis as well. At the outset, the en banc majority explained that in asking whether Range could be disarmed " 'consistent with the Nation's historical tradition of firearm regulation,' " the Government need only " 'identify a well-established and representative historical *analogue*, not a historical twin.' " *Range*, 69 F.4th at 103 (quoting *Bruen*, 597 U.S. at 24, 30). In doing so, the Court must assess whether "historical and modern firearms regulations [are] similar enough" by asking "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* (quoting *Bruen*, 597 U.S. at 30). *Rahimi* agrees. It reiterated that "[w]hy and how the regulation burdens the right [to keep and bear arms] are central to [the analogical] inquiry," and cautioned that while a "law must comport with the principles underlying the Second Amendment, … it need not be a 'dead ringer' or 'historical twin.' " *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 30). Although *Rahimi* emphasized that the

7

Second Amendment does not demand "a law trapped in amber," and "permits more than just those regulations identical to ones that could be found in 1791," 144 S. Ct. at 1897–98, it also left in place the Court's warning, in *Bruen*, that it would be equally wrong to "uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." 597 U.S. at 30 (cleaned up). And though the Government's aim must be to elucidate a historical "principle" that is revelatory about the scope of the Second Amendment, "a court must be careful not to read a principle at such a high a level of generality that it waters down the right," *Rahimi*, 144 S. Ct. at 1926 (Barrett, J., concurring), and it is not at liberty to seek new principles, not found in history, to curb the scope of the Second Amendment *id.* at 1912 (Kavanaugh, J., concurring) ("History, not policy, is the proper guide.").

Following these guidelines, the en banc majority began its discussion of history by rejecting the Government's attempt to avoid scrutiny altogether on the grounds that the statement in *Heller* that prohibitions on "felons" were "presumptively lawful" was enough to resolve this case. The Court explained that, even assuming that statement could be conclusive in some cases, it is not here, because under the most "longstanding" version of the felon-in-possession ban (dating to 1938), Range would not have been a prohibited person. *See Range*, 69 F.4th at 103–04. Indeed, it was only in 1961, 170 years after the ratification of the

8

Second Amendment, that Congress enacted a law that would reach individuals with criminal histories like Range. *Id.* at 104. Given that *Bruen* ignored all history from after the turn of the twentieth century as too late in time to be worth mentioning, *see* 597 U.S. at 66 n.28, and ultimately held unconstitutional a law that dated to the "early 1900s," *id.* at 11, it would have been incongruous, to say the least, to accept the Government's claim that the modern Section 922(g)(1) supplied historical proof of its own constitutionality.

*Rahimi* fully supports this conclusion. Justice Thomas, in dissent, clarified that the "passing reference" in *Heller* to felon bans was "dicta" and that reliance on it is comparable to the "responsible" citizens argument that the majority rejected: neither could appropriately take the place of the actual historical inquiry that is the centerpiece of the Second Amendment analysis under *Bruen*. 144 S. Ct. at 1944 n.7 (Thomas, J., dissenting). And while the *Rahimi* majority referenced the "presumptively lawful" language to refute Rahimi's broad argument that *Heller* "established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home," it reiterated that the prohibition is only "presumptively lawful." 144 S. Ct. at 1902 (cleaned up). Furthermore, Section 922(g)(8), which was at issue in *Rahimi*, was scarcely less "longstanding" than the modern Section 922(g)(1), having been enacted just 33 years later. *See* STEPHEN P. HALBROOK, FIREARMS LAW DESKBOOK § 5:2 n.16 (2023). *Rahimi*'s own historical

9

work, which was predicated on a principle derived from surety laws and "going armed" prohibitions, emphasized that both regulatory traditions had roots that traced back at least to the Founding, *see* 144 S. Ct. at 1900–01, and, with the exception of one citation to a case from 2010 "recognizing that common-law prohibition on fighting in public remains even now chargeable in Maryland," which it used to confirm its conclusion that the "going armed" laws remained part of America's common law tradition with a connection to a much earlier period, *id.* at 1901, the Court did not consider *any* evidence of a relevant regulatory tradition from after the beginning of the twentieth century. The en banc majority was, therefore, right to dismiss twentieth century legislation as irrelevant to the scope of the Second Amendment. *Range*, 69 F.4th at 103.

The en banc majority next rejected the Government's attempt to analogize to historical laws demonstrating that " 'legislatures traditionally used status-based restrictions' to disarm certain groups of people," *Id.* at 104, laws that one of the dissents claimed were motivated by the view that the groups in question were "disloyal to the sovereign," *id.* at 115 (Schwartz, J., dissenting). Noting that many such restrictions, which were frequently targeted at groups defined by race or religion, "now would be unconstitutional under the First and Fourteenth Amendments," the majority concluded they could not justify disarming Range because the Government had failed to show, even assuming the laws were part of a

10

valid tradition of historical regulation, that Range was part of any similar group today. *Id.* at 104 (maj. op.). Indeed, accepting for the sake of argument that the dissent was correct regarding the motivation for those laws, nothing in this case suggests Range is "disloyal to the sovereign." Because the principle underlying the historical regulation would not encompass Range, it is not an appropriate analogue under *Rahimi*, even on the dissent's own terms.

Moreover, following *Rahimi*, the dissent's conception of these laws can be rejected out of hand. In *Rahimi*, the Government expressly declined to rely on any historical laws that restricted firearm rights based on race and took the position that those laws were not an expression of the principle that the government could disarm certain groups suspected of disloyalty, but rather they "were [an] application[] of a separate principle under the Second Amendment, which is that those who are not considered among the people can be disarmed." Tr. of Oral Argument at 53:16-19, *United States v. Rahimi*, No. 22-915 (Nov. 7, 2023). That statement, which adopts the position for which Range has advocated in this case, *see* Pet. for Reh'g En Banc, Doc. 68 at 13 (Jan. 3, 2023) ("Those laws were targeted at individuals who were not, at the time, considered to be part of 'the people' and were routinely denied other rights, so they cannot say anything about the colonial era views on the scope of the right."), adds an additional reason the majority was correct to disregard those laws, and refutes the dissent's alternative view.

*Rahimi* also adds new reasons to reject laws disarming people based on their religious beliefs as analogues in *any* Second Amendment case, noting that the English practice of disarming "political opponents and disfavored religious groups" had been "largely eliminated . . . on this side of the Atlantic," by the time of the Founding. *Rahimi*, 144 S. Ct. at 1899; *but see* 69 F.4th at 120–24 (Krause, J., dissenting). Indeed, the only subset of these "group" laws that *Rahimi* does not specifically undermine are those targeting people who refused to take loyalty oaths during the Revolutionary War. But there was ample reason to reject reliance on those laws before *Rahimi*, and *Rahimi* did not change that. *See, e.g.*, *Folajtar v. United States*, 980 F.3d 897, 914–15 (3d Cir. 2020) (Bibas, J., dissenting) ("To ensure peace and safety, the colonies had to disarm [loyalists].").

Next, the majority rejected the Government's argument that, because "founding-era practice was to punish some felony offenses with death," it must therefore be appropriate to disarm modern felons, who are not put to death, for the rest of their life. 69 F.4th at 105 (cleaned up). As the majority explained: "The greater does not necessarily include the lesser: founding-era governments' execution of some individuals convicted of certain offenses does not mean that the State, then or now, could constitutionally strip a felon of his right to possess arms if he was not executed." *Id.* Of course, Range's offense was a misdemeanor, so this argument does not apply to him.

In any event, *Rahimi* does not undermine this Court's reasoning. To be sure, *Rahimi* did engage in a form of greater-includes-the-lesser reasoning, stating that "if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible." 144 S. Ct. at 1902. But that analysis is distinct from the Government's argument here. While in *Rahimi*, the "how" of the historical and modern laws' responses to "the use of guns to threaten the physical safety of others" were different in degree, they were motivated by precisely the same concern with the unlawful use of firearms. *Id.* In contrast, here, the reason for historically punishing felonies with death—retributive justice for crimes judged to be sufficiently serious, *see* 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 54 (1769)—is dissimilar to the dissent's own formulation of the felon possession ban as an expression of "legislatures' longstanding authority to disarm groups who pose a threat to the rule of law." *Range*, 69 F.4th at 128 (Krause, J., dissenting). Despite a superficial similarity, the "greater includes the lesser" argument engaged in by the dissent is entirely unmoored from the guideposts of the comparison between "how" and "why" historical and modern statutes restrict the right that were critical to *Rahimi*'s reasoning. It is, instead, predicated on the idea—entirely foreign to *any* historical restriction on the right to keep and bear arms cited by the Government or the dissents in this case—that lifetime deprivation of Range's

13

constitutional right to own firearms is a justifiable *punitive* measure, excused by the State's forbearance in not simply executing him for the failure to properly report lawn mowing income when applying for benefits. *See id.* at 126–27 (Krause, J., dissenting) ("Those who committed grave felonies—both violent and non-violent—were executed. *A fortiori*, the ubiquity of the death penalty suggests that the Founding generation would have had no objection to imposing on felons the comparatively lenient penalty of disarmament."). There is no reason why, if such logic is accepted, Congress could not tomorrow pass a law depriving anyone convicted of a felony of their Fourth Amendment rights for as long as they live—and doing so would undoubtedly make a lot of police work much easier. But such logic should not be accepted because there is not one shred of historical evidence that would support such a stunning principle. After all, as both the en banc majority and Judge Krause in dissent pointed out, if a person were *not* executed for committing a felony (as they frequently were not), they retained their Second Amendment rights for the rest of their lives. *Id.* at 105 (maj. op.); *id.* at 127–28 (Krause, J., dissenting).

## CONCLUSION

The Court should forthwith re-enter its judgment holding Section 922(g)(1) unconstitutional as applied to Range.

Dated: August 2, 2024

Michael P. Gottlieb
PA Bar No. 36678
VANGROSSI & RECCHUITI
319 Swede Street
Norristown, PA 19401
Telephone: (610) 279-4200
mikem1a1@aol.com

Respectfully submitted,

/s/David H. Thompson
David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, DC 20036
Telephone: (202) 220-9600
dthompson@cooperkirk.com

# CERTIFICATE OF COMPLIANCE

In accordance with the Federal Rules of Appellate Procedure and this Court's Rules, I certify the following:

1. This brief complies with the Court's July 12 order because it contains 3,450 words, excluding the parts of the brief exempted under Federal Rule of Appellate Procedure 32(f), and has been filed within 21 days from the date of the order.

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

3. This brief complies with Local Rule 31.1(c). The text of the electronic brief is identical to the text in the paper copies supplied to the Court. Pursuant to the July 12 order, 16 paper copies of the brief have been mailed to the court. Further, VirusTotal was run on the electronic brief and no viruses were detected.

4. David H. Thompson, Peter A. Patterson, William V. Bergstrom, and Michael P. Gottlieb are all admitted to practice in the Third Circuit Court of Appeals and are members in good standing.

                                                      /s/ David H. Thompson
                                                      David H. Thompson
                                                      *Counsel for Plaintiff-Appellant*

**CERTIFICATE OF SERVICE**

Pursuant to Federal Rule of Appellate Procedure 25(d) and Local Rule 25.1(b), I hereby certify that on August 2, 2024, I electronically filed the foregoing document with the Clerk of the Court by using the appellate CM/ECF system. Service on all counsel for all parties has been accomplished via ECF.

s/ David H. Thompson
David H. Thompson

*Counsel for Plaintiff-Appellant*
