No. 21-2835

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

BRYAN RANGE,

Plaintiff-Appellant

v.

ATTORNEY GENERAL OF THE UNITED STATES, et al.,

Defendants-Appellees

---

Appeal from an order entered in the United States District Court for
the Eastern District of Pennsylvania at No. 5:20-cv-3488

---

## BRIEF FOR *AMICI CURIAE* FEDERAL PUBLIC AND COMMUNITY DEFENDER OFFICES OF THE THIRD CIRCUIT IN SUPPORT OF APPELLANT BRYAN RANGE

ELENI KOUSOULIS,
Federal Public Defender
District of Delaware

LISA EVANS LEWIS,
Chief Federal Defender
Eastern District of Pennsylvania

LEO A. LATELLA,
Acting Federal Public Defender
Middle District of Pennsylvania

K. ANTHONY THOMAS
Federal Public Defender
District of New Jersey

MATTHEW CAMPBELL,
Federal Public Defender
District of the U.S. Virgin Islands

ELISA A. LONG,
Interim Federal Public Defender
Western District of Pennsylvania

RENEE PIETROPAOLO
TIMOTHY SHEPHERD
STACIE FAHSEL
EVAN AUSTIN
Assistant Federal Public Defenders

Federal Public Defender for the
Western District of Pennsylvania
1001 Liberty Avenue, Suite 1500
Pittsburgh, PA 15222
(412) 644-6565

# TABLE OF CONTENTS

Table of Authorities ....................................................................... ii

Identity and Interest of *Amici Curiae* ....................................... iv

Introduction ..................................................................................... 1

*Rahimi* confirmed *Bruen's* methodology and clarified that
courts must draw narrow principles from well-established historical
regulations ....................................................................................... 3

    A.    The *Rahimi* Court explained that *Bruen's* Second
    Amendment analysis requires the government to
    identify historical firearms regulations before drawing
    a principle that underpins them ............................................... 3

    B.    *Rahimi* illustrates that historical principles must be
    narrowly drawn from historical regulations ........................... 5

    C.    *Rahimi's* instruction to narrowly draw historical principles
    from regulations is consistent with other constitutional
    jurisprudence. ........................................................................ 10

    D.    The government's invitation to draw broad principles from
    the historical record is at odds with Supreme Court
    precedent, including *Rahimi*. ................................................ 15

    E.    Broad principles like the government's proposals will result
    in continued over-incarceration of marginalized
    communities. .......................................................................... 19

Conclusion ...................................................................................... 25

Certificate of Bar Membership

Certificate of Compliance

Certificate of Service

i

# TABLE OF AUTHORITIES

**Cases**

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of N.J.*,
910 F.3d 106 (3d Cir. 2018) .................................................. 20

*Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011) ............................. 14

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ..................................... 12

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .......................... 11, 18

*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) ........................................... 20

*Giles v. California*, 554 U.S. 353 (2008) .......................................... 12, 13

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) ........................... 13

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022) .................................................................... 1

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ...................................... 14

*Range v. Att'y Gen.*, 69 F.4th 96 (3d Cir. 2023), *cert.
granted, judgment vacated*, No. 23-374, 2024 WL 3259661
(U.S. July 2, 2024) ...................................................... 1, 3, 18

*United States v. Alvarez*, 567 U.S. 709 (2012) ........................................ 14

*United States v. Bullock*, 679 F. Supp. 3d 501 (S.D. Miss. 2023) ........... 22

*United States v. Duarte*, 101 F.4th 657 (9th Cir.), *vacated upon
grant of reh'g en banc*, No. 22-50048, 2024 WL 3443151
(9th Cir. July 17, 2024) ............................................................ 7

*United States v. Rahimi*, 144 S. Ct. 1889 (2024) ........................... *passim*

*United States v. Stevens*, 559 U.S. 460 (2010) ....................................... 14

**Statutes**

18 U.S.C. § 922(g)(1) ....................................... 1, 16, 19, 22, 23, 25

18 U.S.C. § 922(g)(3) ......................................................... 24

18 U.S.C. § 922(g)(4) ......................................................... 24

18 U.S.C. § 922(g)(5) ......................................................... 24

18 U.S.C. § 922(g)(8) ..................................................... 5, 6, 7

18 U.S.C. § 922(n) ............................................................ 24

**Constitutional Provisions**

U.S. Const. amend. I ...................................................... 13, 14

U.S. Const. amend. II ..................................................... *passim*

U.S. Const. amend. VI ......................................................... 12

**Other Authorities**

Carol Anderson, *The Second: Race and Guns in a Fatally Unequal America* (2021) ................................................................ 23

Benjamin Levin, *Guns and Drugs*, 84 Fordham L. Rev. 2173 (2016) .... 22

David E. Patton, *Criminal Justice Reform and Guns: The Irresistible Movement Meets the Immovable Object*, 69 Emory L.J. 1011 (2020) ................................................. 22

U.S. Sentencing Comm'n, *Quick Facts: Felon in Possession of a Firearm* (2021) ................................................................ 22

U.S. Dep't of Health and Human Servs., Office of Minority Health, *Profile: Black/African Americans* ........................................ 22

Emma Luttreel Shreefter, *Federal Felon-in-Possession Gun Laws: Criminalizing a Status, Disparately Affecting Black Defendants, and continuing the Nation's Centuries-Old Methods to Disarm Black Communities*, 21 CUNY L. Rev. 143 (2018) ....................................... 23

## Identity and Interest of *Amici Curiae*

The Federal Public and Community Defender Offices for the judicial districts in the Third Circuit represent indigent defendants in federal court in each office's respective district and in the United States Court of Appeals for the Third Circuit pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A. As institutional defenders, these offices have a unique interest and expertise in all areas of federal criminal law. These organizations also defend the majority of indigent defendants charged under 18 U.S.C. § 922(g)(1), which prohibits any person convicted of a crime punishable by imprisonment for a term exceeding one year, from possessing, shipping, transporting, or receiving a firearm or ammunition. More broadly, *Amici* represent individuals charged with firearms-related offenses on a daily basis and in these cases they often litigate Second Amendment issues. Accordingly, *Amici* have a strong interest in the methodology this Court applies to resolving Second Amendment challenges in the wake of *New York State Rifle & Pistol, Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) and *United States v. Rahimi*, 144 S. Ct. 1889 (2024), which lies at the heart of Mr. Range's challenge.

Counsel for the plaintiff have consented to the filing of this brief; counsel for defendants represent that they do not understand the Court's supplemental briefing order to contemplate amicus briefs. No party's counsel authored this brief in whole or in part, nor did any person or entity, other than *Amici* or its counsel, make a monetary contribution to the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(2), (a)(4)(E).

## INTRODUCTION

Before *Bruen*, lower courts assessed Second Amendment challenges through a deferential form of mean-ends balancing, which involved weighing the government's interest in firearm regulation against a challenger's interest in keeping and bearing arms and resulted in few meaningful constraints on governmental power. *See New York State Rifle & Pistol, Ass'n, Inc. v. Bruen*, 597 U.S. 1, 25 (2022). *Bruen* rejected this judicial deference to legislative interest-balancing and confirmed that a firearms regulation passes muster only if it conforms to the Second Amendment's text and this nation's historical tradition. *Id*. at 19, 22-24. That is because the Second Amendment "is the very *product* of an interest balancing by the people," and it is that "balance—struck by the traditions of the American people—that demands our unqualified deference." *Id*. at 26.

The *Range* majority faithfully applied *Bruen's* text-and-history methodology to find § 922(g)(1)'s lifetime prohibition on firearm possession unconstitutional as applied to a person with a false statements conviction. *Range v. Att'y Gen*., 69 F.4th 96 (3d Cir. 2023), *cert. granted, judgment vacated*, No. 23-374, 2024 WL 3259661 (U.S. July

2, 2024). Nothing about the Supreme Court's decision in *United States v. Rahimi*, 144 S. Ct. 1889 (2024), undermines the majority's holding.

Nevertheless, the government urges that *Rahimi* requires this Court to revise its prior decision, based on a purported historical tradition of disarming (for life) (1) "persons who have been convicted of [undefined] serious crimes" and (2) "categories of persons thought to present a special danger of misuse." *See* Gov't Supp. Br. 23-24. *Rahimi* illustrates that the government's principles are too broadly drawn. *Amici* write to emphasize *Rahimi's* guidance for deriving principles from historical firearms regulations, to illustrate how the government's analysis conflicts with *Rahimi's* guidance and long-standing Supreme Court precedent, and to highlight some troubling consequences of the government's overreading of *Rahimi*.[1]

---

[1] Mr. Range explains in his supplemental briefing that *Rahimi* effectively validates the majority's holding that Range is among "the people" whose conduct is protected by the Second Amendment and its careful rejection of the government's theory that Congress may disarm those who are not "law-abiding, responsible citizens" as overly broad and vague. *See generally* Range Supp. Br. *Amici* endorse but do not repeat those arguments. *Amici* also do not address the government's historical arguments regarding capital punishment and other felony punishment laws. This Court's reasoning for rejecting those arguments remains undisturbed by *Rahimi*.

2

Although *Rahimi* clarified that the appropriate analysis involves discerning "the principles that underpin our regulatory tradition," 144 S. Ct. at 1898, the Court's holding and reasoning make clear that any such principles must be narrowly drawn. Drawing "principles" at too a high a level of generality would devolve into the now repudiated "judge-empowering interest-balancing inquiry," *see Bruen*, 142 S. Ct. at 2129, that led to near universal acceptance of legislative policy judgments. *See Rahimi*, 144 S. Ct. at 1909 (Gorsuch, J., concurring). Drawing "principles" at the high level of generality advocated by the government also will result in the continued over-incarceration of marginalized communities, a concern *Amici* are uniquely positioned to highlight.

*Range*, like *Rahimi*, was "a narrow" decision, *Range*, 69 F.4th at 106, and this Court should adhere to its prior ruling.

**Rahimi confirmed Bruen's methodology and clarified that courts must draw narrow principles from well-established historical regulations.**

**A.    The *Rahimi* Court explained that *Bruen*'s Second Amendment analysis requires the government to identify historical firearms regulations before drawing a principle that underpins them.**

*Rahimi* confirms *Bruen*'s "historical tradition" test: "[W]hen a firearm regulation is challenged under the Second Amendment, the

Government must show that the restriction 'is consistent with the Nation's historical tradition of firearm regulation.'" 144 S. Ct. at 1896 (quoting *Bruen*, 597 U.S. at 24). The *Rahimi* Court clarified that the modern law must be "consistent with the principles that underpin our regulatory tradition." *Id.* at 1898. Applying that methodology, courts must ascertain whether the challenged law is "relevantly similar" to historical laws, "applying faithfully the balance struck by the founding generation to modern circumstances." *Id.* (quoting *Bruen*, 597 U.S. at 29).

The Court reaffirmed that the "central considerations" in the "relevantly similar" inquiry are "[w]hy and how the regulation burdens the [Second Amendment] right"—*i.e.*, "whether modern and historical regulations impose a *comparable burden* on the right of armed self-defense and whether that burden is *comparably justified." Id.*; *Bruen*, 597 U.S. at 29 (emphasis added). "Even when a law regulates arms-bearing for a permissible reason," the Court cautioned, it violates the Second Amendment "if it does so to an extent beyond what was done at the founding." *Rahimi*, 144 S. Ct. at 1898.

**B.   *Rahimi* illustrates that historical principles must be narrowly drawn from historical regulations.**

After *Bruen*, some courts struggled with the appropriate level of generality at which to draw historical principles in Second Amendment challenges. *Rahimi* demonstrates how to do so. The Court clarified that drawing historical "principles" from the regulatory tradition is much like drawing principles from case law. *Rahimi*, 144 S. Ct. at 1989; *see id.* at 1926 (Barrett, J., concurring) ("Pulling principle from precedent, whether case law or history, is a standard feature of legal reasoning."). But its analysis makes clear that there must be a close fit between the identified well-established historical regulations and the principle those regulations established.

At issue in *Rahimi* was 18 U.S.C. § 922(g)(8), which criminalizes possession of a firearm by a person subject to a domestic violence restraining order if (1) that order was issued after notice and an opportunity to participate in a hearing, § 922(g)(8)(A), and (2) the order contains a finding that the defendant "represents a credible threat to the physical safety" of a protected person, § 922(g)(8)(C)(i). The Court focused solely on subsection § 922(g)(8)(C)(i) and upheld that subsection as consistent with a historical tradition of temporarily disarming those

found by a court to pose a credible threat to the physical safety of another. *Rahimi*, 144 S. Ct. at 1903.

While the government proffered numerous purported "analogues" for § 922(g)(8), the *Rahimi* Court grounded its narrow holding on "two distinct legal regimes" that "specifically addressed firearms violence." *Id.* at 1899. Namely, only founding-era surety and going-armed laws were "relevantly similar" to § 922(g)(8) "in both why and how [they] burden the Second Amendment right." *Id.* at 1899-1901; *see id.* at 1907 (Gorsuch, concurring) (reiterating the important methodological point that the government must show both a "comparable justification" and a "comparable burden"). Laws barring people from misusing weapons to harm or menace others were "[w]ell entrenched in the common law" and persisted to the founding in the form of surety laws and going armed (or "affray") laws. *Id.*, 1899-1900.

By contrast, the Court rejected the much broader historical principle proposed by the government, that it could disarm people deemed "not responsible." *Id.* at 1903. As a threshold matter, the government's sources did not establish a historical tradition of disarming those "not responsible." The government identified, in part, historical

laws that disarmed disfavored religious and political groups before the founding. But the Second Amendment and state constitutions largely eliminated governmental authority to disarm those types of groups. *Rahimi,* 144 S. Ct. at 1899, 1901. So the government's reliance on this "tradition" was misplaced. Instead of roughly assembling a smattering of disparate founding-era laws to identify a regulatory tradition, *Rahimi* relied on two types of widespread firearms regulations—surety and affray laws—entrenched in the common law that persisted at the founding.[2]

---

[2] The government places inordinate weight on founding-era punishment laws purportedly penalizing "felons" with death and total estate forfeiture, laws that were not in any sense *firearm* regulations. Gov't Supp. Br. at 10-16. In looking to surety laws as an analogue for § 922(g)(8), *Rahimi* emphasized, "[i]mportantly for this case, the surety laws also targeted the misuse of firearms." *Rahimi,* 144 S. Ct. at 1900. So laws that did not target the misuse of firearms are not proper analogues. The government's broad punishment provisions, to the extent they are accurately summarized, plainly are not relevantly similar in how and why they burden the right to bear arms. *See generally United States v. Duarte*, 101 F.4th 657 (9th Cir.), *vacated upon grant of reh'g en banc*, No. 22-50048, 2024 WL 3443151 (9th Cir. July 17, 2024) (concluding that the historical evidence showed penalties of death and total estate forfeiture were far less prevalent for founding-era felons than the government's argument pre-supposed and that the term "felony" today is a much broader category than it was at the founding).

The Court also rejected the government's ahistorical responsible citizen argument on *methodological* grounds. *Rahimi* makes clear that the principle derived from the regulatory tradition must be narrowly drawn, or "else [courts] risk gaming away" the Second Amendment right. *See Rahimi,* 144 S. Ct. at 1908 (Gorsuch, concurring). The Court considered how the identified, well-established surety and affray laws operated (the "how") and their purpose (the "why") to carefully discern an underlying tradition of temporarily disarming those found by a court to present "a clear threat of physical violence to another." *Id*. at 1901-02. The "individualized surety regime," allowed justices of the peace to "arrest all who go armed offensively [and] require[d]" them to post bond for keeping the peace. *Id*. at 1899-1901 (internal quotation marks omitted). Surety laws offered significant procedural protections before burdening conduct: A person "'having reasonable cause to fear' that the accused would do him harm or breach the peace" had to make a complaint to the judicial authority, who would take evidence and allow the accused an opportunity to respond. *Id*. at 1900. Further, bonds were of limited duration and exceptions existed including for self-defense. *Id*. "Going armed" or "affray" laws similarly prohibited "'riding or going armed, with

dangerous or unusual weapons, [to] terrify[]'" and were punishable by "forfeiture of the arms … and imprisonment." *Id*. "Taken together, the surety and going armed laws confirm [that] [w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id*. at 1901.

In a concurring opinion, Justice Barrett explained that the majority had settled on "just the right level of generality," cautioning, "a court must be careful not to read a principle at such a high level of generality that it waters down the right." *Rahimi*, 144 S. Ct. at 1926 (Barrett, J., concurring). Justice Gorsuch likewise warned courts should not "try[] to glean from historic exceptions overarching 'policies,' 'purposes,' or 'values' to guide them in future cases." *Id*. at 1908 (Gorsuch, J., concurring). Nor should courts "extrapolate their own broad new principles from [historical] sources." *Id*. at 1909.

In sum, the *Rahimi* Court rejected efforts by both parties to read the *Bruen* standard either too narrowly or broadly. It reiterated that the government need not identify a "historical twin" or "dead ringer" for the challenged law. *Id*. at 1898. But it also rejected the government's historically unsupported effort to establish a broad tradition of disarming

9

those deemed not "responsible," explaining that the government's rule is "vague," and it was "unclear what such a rule would entail." *Id*. at 1903. Indeed, "[n]ot a single Member of the Court adopt[ed] the Government's theory" "that the Second Amendment allows Congress to disarm anyone who is not 'responsible' and 'law-abiding.'" *Id*. at 1944 (Thomas, J., dissenting).

### C. *Rahimi's* instruction to narrowly draw historical principles from regulations is consistent with other constitutional jurisprudence.

*Rahimi's* analysis accords with how the Supreme Court has drawn historical principles in Second Amendment and other constitutional cases. As illustrated, the Court in *Rahimi* required a close fit between the identified well-established historical regulations and the principle those regulations established. The government's identified historical regulations permitted temporary firearms restrictions only after firearms misuse, or upon an individualized finding of a real threat of violence with a firearm. The principle derived from that regulatory tradition was closely drawn: an individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed. *Rahimi*, 144 S. Ct. 1903. The *Rahimi* majority summarily and

unanimously rejected the government's efforts to extract any broader historical principle. *See* 144 S. Ct. at 1903.

Other limitations on the Second Amendment have been similarly narrowly drawn. For example, *Heller* acknowledged in dicta one such potential historical limitation for firearms in "sensitive places[.]" *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). *Bruen* looked to the historical record and determined that the "sensitive places" category where firearms may be restricted was fairly narrow: "[T]he historical record yields relatively few 18th- and 19th- century 'sensitive places' where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses." *Bruen,* 597 U.S. at 30 (citing *Heller*, 554 U.S. at 626). While not defining "sensitive places," the Court rejected New York's argument to expand that principle to "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." 597 U.S. 30-31. *Bruen* thus demonstrates that principles must be narrowly drawn by reference to historical firearms regulations.

Likewise, the Second Amendment historically permits bans on "dangerous and unusual weapons." *Heller*, 554 U.S. at 627. But that

principle too has been narrowly drawn, and the Court has rejected efforts to broaden the exception to any weapon that could cause death or bodily harm. *See Caetano v. Massachusetts*, 577 U.S. 411, 417-18 (2016) (Alito, J., concurring). Rather, the principle turns on the narrower question of whether the challenged firearm is commonly possessed for lawful purposes today. *Id.* at 420 (Alito, J., concurring).

Drawing these types of narrow principles from historical evidence is not unique to Second Amendment law. The Supreme Court has looked to text and history to define the scope of other constitutional rights. And it has consistently refused to extrapolate from text and history the policies behind the right and then to assess whether a modern regulation is consistent with those policies. *See, e.g., Giles v. California*, 554 U.S. 353, 375-76 (2008) ("It is not the role of courts to extrapolate from the words of the Sixth Amendment to the values behind it, and then to enforce its guarantees only to the extent they serve (in the courts' views) those underlying values.").

For example, the right of confrontation has historically been subject to exceptions for declarations made by speakers who were aware they were on "the brink of death" or witnesses who were intentionally "kept

away" by "means or procurement" of the defendant. *See Giles*, 554 U.S. at 358-59. The principle drawn from the historical laws is narrow: out-of-court statements are permitted if the defendant engaged in wrongful conduct specifically *designed* to prevent a witness's testimony. *Id*. at 366-67. The Court in *Giles* refused to "glean from [those] historic exceptions" an "overarching 'polic[y]'" that would read an exception into the right of confrontation for out-of-court statements by any witness if the "defendant committed a wrongful act that rendered the witness unavailable to testify at trial." *Rahimi*, 144 S. Ct. at 1908 (Gorsuch, J., concurring) (citing *Giles*, 554 U.S. 358, 358-61). Instead, to justify a modern exception to the constitutional right, the government must "point to a close historic analogue." *Rahimi*, 144 S. Ct. at 1908 (Gorsuch, J., concurring); *see also Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 322-23 (2009) (declining to expand the narrow historical confrontation exception for a clerk's certificate authenticating an official record).

First Amendment jurisprudence, likewise, provides helpful examples of historical exceptions drawn at the appropriate level of generality. When a law restricts First Amendment conduct, "the Government [as in the Second Amendment context] bears the burden" of

identifying "historical evidence" that shows a particular "type of speech belongs to a 'historic and traditional category' of constitutionally unprotected speech." *Bruen* 597 U.S. at 24-25 (quoting *United States v. Stevens*, 559 U.S. 460, 468-71 (2010)). And those categories of unprotected speech must be "well-defined and narrowly limited," rather than "highly manipulable." *Stevens*, 559 U.S. at 468-69, 472. Those "well-defined and narrowly limited classes of speech" include obscenity, defamation, fraud, incitement, and speech integral to criminal conduct. *Id.* at 468-69.

The Court has carefully policed the boundaries of those categories. *See, e.g.*, *United States v. Alvarez*, 567 U.S. 709, 719-23 (2012) (rejecting effort to extrapolate defamation and fraud exceptions to include all false statements); *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 792 (2011) (noting past rejection of state "attempt to shoehorn speech about violence into obscenity"). In fact, since the 1960s, the Court has "narrowed the scope of the traditional categorical exceptions for defamation … and for obscenity[.]" *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383 (1992). The Court has never recognized First Amendment exceptions at the level of

generality proposed by the government here—*i.e.,* speech by any people deemed by the legislature to pose a special danger.

### D. The government's invitation to draw broad principles from the historical record is at odds with Supreme Court precedent, including *Rahimi.*

The government argues that historical regulations establish two principles: that Congress may disarm (1) "persons who have been convicted of serious crimes" and (2) "categories of persons thought to present a special danger of misuse." Gov't Supp. Br. at 9-21. The government's attempt to pull overly broad principles from its proposed regulations cannot be squared with Supreme Court precedent.[3] Indeed, *Rahimi's* analysis reflects its rejection of the government's reliance on overly broad, vague categories.

The government's first principle—disarming those convicted of serious crimes—is purportedly based on the historical use of capital punishment or forfeiture for certain felonies, and unrelated examples of

---

[3] Beyond drawing these "principles" at too high a level of generality, the government misstates or overstates historical practices, and improperly relies on laws having nothing to do with regulating firearms and laws far removed from the founding-era. Thus, even if the government's broad tests were coherent and administrable, the government's sources do not establish a historical tradition of disarming persons convicted of "serious" crimes and those "thought to represent a special danger of misuse."

disarming discrete groups of disloyal persons. Gov't Supp. Br. 10-16. The government's principle is entirely unmoored from this historical evidence.[4] The government's overly broad reading of capital punishment would permit not only disarmament, but *any* constitutional deprivation following a felony conviction. This is not the type of narrow principle evidenced in *Rahimi* or the other constitutional examples discussed above. Rather, the government seeks to "glean from historic exceptions overarching policies" that would justify countless categorical restrictions. *See Rahimi*, 144 S. Ct. at 1908 (Gorsuch, J., concurring).

*Rahimi* similarly forecloses the government's second principle— that it can disarm those deemed dangerous by a legislature. *See* Gov't Supp. Br. 19-23. The government recasts dicta from *Rahimi*—that the Court was not suggesting the government could not disarm "categories of persons thought by a legislature to present a special danger of misuse," 144 S. Ct. at 1901—as a historical principle, and then broadens it beyond

---

[4] The government points only to § 922(g)(1) itself and its predecessor from the 1930s as historical evidence of felon disarmament laws that support the constitutionality of § 922(g)(1). Gov't Supp. Br. 16-18. Of course, the challenged law cannot itself establish the historical tradition supporting it. And the *Bruen* Court already rejected this type of argument in striking down an even more "longstanding" law.

recognition. The government collects laws (largely from the 19th century and later) that disarmed loyalists, juveniles, vagrants, those of "unsound mind," the intoxicated, and others. And, from that, the government identifies a historical principle that legislatures have the "power to make categorical judgments about dangerousness," and then disarm those categories. Gov't Supp. Br. 21. Again, unlike the narrowly drawn principle in *Rahimi*, this principle is disconnected from the actual historical evidence, and operates "at such a high level of generality that it waters down the right." *See Rahimi*, 144 S. Ct. at 1926 (Barrett, J., concurring).

Both principles also repeat the precise error the government committed in *Rahimi* in advancing its "responsible" theory. As noted, *Rahimi* easily rejected the government's primary argument that the Second Amendment allows Congress to disarm anyone who is not "responsible." *Rahimi*, 144 S. Ct. at 1903; *see id.* 1944 (Thomas, dissenting) ("Not a single Member of the Court adopts the Government's theory" "that the Second Amendment allows Congress to disarm anyone who is not 'responsible' and 'law-abiding.'").

What is true of "responsible" is equally true of the government's proposed tests. The government in *Rahimi* treated the term "not responsible" as synonymous with "dangerous." *Rahimi*, 144 S. Ct. at 1945 (citing Tr. of Oral Arg. at 10-11 (government confirming it uses the terms "not responsible" and "dangerous" interchangeably)) (Thomas, J., dissenting); *see also* Tr. of Oral Arg. at 11 (positing there was "no daylight at all … between not responsible and dangerous"). "[D]angerous" is just as "vague" as "responsible," *see Rahimi*, 144 S. Ct. at 1903. Moreover, the government's "serious" crime test appears to be analogous to a "law-abiding" test, and "responsible" and "law-abiding" derive from the same source: *Heller*'s and *Bruen*'s use of those words to describe the challengers in those cases. *See Rahimi*, 144 S. Ct. at 1903. As the *Range* majority rightly found and the Supreme Court affirmed in *Rahimi*, those references were dicta because *Heller* and *Bruen* "said nothing about the status of citizens who were not 'responsible'" or "law-abiding"—the questions were "simply not presented." *Rahimi*, 144 S. Ct. at 1903; *Range*, 69 F.4th at 101. Likewise, the term "serious" is just as "vague" as the term "responsible." *Rahimi*, 144 S. Ct. at 1903.

Thus, the "dangerousness" and "serious crimes" arguments just repackage the government's "responsible" citizen theory. It was *this* argument—*i.e.*, irresponsibility justifies disarmament—that the Supreme Court rejected in *Rahimi*. 144 S. Ct. at 1903. It necessarily follows that the government here cannot defend § 922(g)(1) by invoking a purported tradition of disarming those who pose a "danger" or are otherwise not "law-abiding."

### E.    Broad principles like the government's proposals will result in continued over-incarceration of marginalized communities.

Resort to vague and overly broad principles like "danger" to define the categories of people excluded from the Second Amendment's protections is nothing more than interest-balancing under the guise of historical comparison. The government essentially admits as much, explicitly repackaging its demand for deference to legislative judgment as a historical tradition. *See* Gov't Supp. Br. 21 ("legislatures' power to make categorical judgments about dangerousness is one of 'the principles that underpin our regulatory tradition'"). Indeed, the government's post-*Bruen* briefing around the country evidences the limitless scope of its proposed historical principles. Since *Bruen*, the government has relied on

the same historical evidence and broad principle—whether "dangerous," "unvirtuous," or "irresponsible"—to defend the constitutionality of disparate statutes disarming felons, indictees, undocumented persons, those with mental health issues, and drug users and addicts. Sadly, the costs of this maximalist approach are already evident in the criminal justice system. The brunt of such a broad test will continue to be disproportionately borne by marginalized communities.

The government's approach would permit it to disarm any class of disfavored person in the interest of public safety. Indeed, it turns *Bruen* and *Rahimi* on their head by claiming a historical principle of deference to legislatures to disarm those it deems dangerous. *See* Gov't Supp. Br. 19-23. This is exactly the sort of "judicial deference to legislative interest balancing" expressly rejected in *Bruen. See* 597 U.S. at 26. By "deferring absolutely" to legislatures' "predictive judgments," courts effectively "insulated" firearms regulations "from meaningful judicial review." *Drake v. Filko*, 724 F.3d 426, 456-57 (3d Cir. 2013) (Hardiman, J., dissenting); *see also Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of N.J.*, 910 F.3d 106, 131 (3d Cir. 2018) (Bibas, J., dissenting) (criticizing

majority for "reflexively defer[ring]" to government's "predictive judgments").

Justice Thomas—who authored *Bruen* and was not disputed by the *Rahimi* majority on this point—outlined how the "Government's own evidence exemplifies the dangers of approaches based on generalized principles." *Rahimi*, 144 S. Ct. at 1946 (Thomas, J., dissenting). He explained that laws disarming slaves and native Americans are "cautionary tales," not "exemplars of Congress's authority[.]" *Id.* "They warn that when majoritarian interests alone dictate who is 'dangerous,' and thus can be disarmed, disfavored groups become easy prey." *Id.* And the government's reliance on earlier laws disarming political dissidents fares no better. "The Second Amendment stems from English resistance *against* 'dangerous' person laws … It would be passing strange to permit the Government to resurrect those selfsame 'dangerous' person laws to chip away at the Amendment's guarantee." *Id.* at 1934 (Thomas, J., dissenting). Other justices similarly cautioned against drawing historical principles this broadly, *see id.* at 1926 (Barrett, J., concurring), 1909 (Gorsuch, J., concurring), and "not a single Member of the Court adopt[ed] the Government's theory," *id.* at 1944 (Thomas, J., dissenting).

These risks are all too familiar to public defenders. Many "consider § 922(g)(1) and its state analogues to be canaries in the coal mine of our criminal justice system, disenfranchising minorities and exacerbating mass incarceration." *United States v. Bullock*, 679 F. Supp. 3d 501, 525 n.22 (S.D. Miss. 2023) (Reeves, J.). While advocacy in recent years has focused on racial justice and the war on drugs, people often ignore "enthusiasm for federal gun regulation as a significant contributor to black incarceration."[5] In 2021, 56.2% of those convicted under § 922(g)(1) were black, despite their making up only 12.1% of the population.[6] In many districts, the percentage exceeds 80 or 90%.[7] This is driven both by black overrepresentation in the felon population and by disparate

---

[5] David E. Patton, *Criminal Justice Reform and Guns: The Irresistible Movement Meets the Immovable Object*, 69 Emory L.J. 1011, 1025 (2020) ["Patton"] (cleaned up); *see also* Benjamin Levin, *Guns and Drugs*, 84 Fordham L. Rev. 2173 (2016).

[6] *See* U.S. Sentencing Comm'n, *Quick Facts: Felon in Possession of a Firearm* at 1, available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Felon_In_Possession_FY21.pdf; U.S. Dep't of Health and Human Servs., Office of Minority Health, *Profile: Black/African Americans*, available at: https://minorityhealth.hhs.gov/blackafrican-american-health.

[7] Patton at 1022.

enforcement practices.[8] Indeed, the practice fits squarely within an odious historical tradition that has sought to disarm black Americans since slavery, through emancipation, and into the Civil Rights movement.[9]

As institutional defenders, *Amici* can identify scores of minority clients charged with § 922 offenses, often following similar troubling fact patterns. People of color are disproportionately subjected to pretextual traffic stops and may be found to be in possession of a firearm though not committing any independent offense. If they have a prior felony conviction, they are subject to ten- and fifteen- year maximum sentences under § 922(g)(1). But law enforcement may seek firearm charges even for non-felons. If a person lacks a criminal record, the government can pursue those same statutory penalties if, during the course of the police interaction, the person admits to being under indictment, being undocumented, suffering from mental health issues, using marijuana or

---

[8] *See* Emma Luttreel Shreefter, *Federal Felon-in-Possession Gun Laws: Criminalizing a Status, Disparately Affecting Black Defendants, and continuing the Nation's Centuries-Old Methods to Disarm Black Communities*, 21 CUNY L. Rev. 143, 157-64 (2018).

[9] *Id.* at 165-74; *see also generally* Carol Anderson, *The Second: Race and Guns in a Fatally Unequal America* (2021).

other drugs recreationally, or even if the officers simply smell marijuana. *See* 18 U.S.C. §§ 922(g)(3), (g)(4), (g)(5), (n).

For these people, Justice Thomas's warning about the "dangers of … generalized principles" is not hypothetical; it is a reality. The broad scope of these laws has already seen "disfavored" populations targeted and incarcerated, often senselessly. Many, disproportionately black Americans face lengthy criminal sentences simply for possessing a firearm. All of these laws and applications are purportedly justified by the similarly broad historical principles advanced now by the government. *Rahimi* makes clear that that is impermissible.

## CONCLUSION

For the reasons set forth above, in addition to those Mr. Range has identified, this Court should reenter its judgment holding § 922(g)(1) unconstitutional as applied to Mr. Range.

Respectfully submitted,

ELENI KOUSOULIS,
Federal Public Defender
District of Delaware

LISA EVANS LEWIS,
Chief Federal Defender
Eastern District of Pennsylvania

LEO A. LATELLA,
Acting Federal Public Defender
Middle District of Pennsylvania

K. ANTHONY THOMAS
Federal Public Defender
District of New Jersey

MATTHEW CAMPBELL,
Federal Public Defender
District of the U.S. Virgin Islands

ELISA A. LONG,
Interim Federal Public Defender
Western District of Pennsylvania

*/s/ Renee Pietropaolo*
RENEE PIETROPAOLO
TIMOTHY SHEPHERD
STACIE FAHSEL
EVAN AUSTIN
Assistant Federal Public Defenders

Federal Public Defender for the
Western District of Pennsylvania
1001 Liberty Avenue, Suite 1500
Pittsburgh, PA 15222
(412) 644-6565
renee_pietropaolo@fd.org

August 9, 2024

## CERTIFICATE OF BAR MEMBERSHIP

It is hereby certified that Renee Pietropaolo is a member of the bar of the Court of Appeals for the Third Circuit.

*/s/ Renee Pietropaolo*
RENEE PIETROPAOLO

DATED: August 9, 2024

## CERTIFICATE OF COMPLIANCE

I, Renee Pietropaolo, Assistant Federal Defender, hereby certify the following:

This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Word 365 in font size 14, type style Century Schoolbook.

This brief complies with 3d Circuit L.A.R. 31.1 (2011) because the text of the electronic brief is identical to the text in the paper copies. Further, the electronic version of the attached brief was automatically scanned by Trend Micro anti-virus software version 14.0 and found to contain no known viruses.

/s/ Renee Pietropaolo
Renee Pietropaolo
Assistant Federal Public Defender

# CERTIFICATE OF SERVICE

I, Renee Pietropaolo, Assistant Federal Defender, hereby certify that I have electronically filed the proposed Brief for *Amici Curiae* Federal Public and Community Defender Offices of the Third Circuit in Support of Appellant Bryan Range and that a copy has been served upon counsel of record, through the Third Circuit Court of Appeals' Electronic Case Filing (CM/ECF) system.

*/s/ Renee Pietropaolo*
RENEE PIETROPAOLO

DATED: August 9, 2024